No. 16-4159

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

**WEYERHAEUSER COMPANY**

**Plaintiff-Appellant,**

**vs.**

**DOMTAR CORP. and DOMTAR PAPER COMPANY, LLC,**

**Defendants-Appellees.**

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF DELAWARE

District Court Case No. 1:14-cv-00024-SLR

The Honorable Sue L. Robinson, District Judge

## APPENDIX VOLUME III
### (Pages 314-491)

BAYARD, P.A.
Stephen B. Brauerman
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899
(302) 655-5000

HILLIS CLARK MARTIN &
PETERSON P.S.
Laurie Lootens Chyz
Jake Ewart
999 Third Avenue, Suite 4600
Seattle, Washington 98104
(206) 623-1745

Counsel for Plaintiff-Appellant

# WEYERHAEUSER V. DOMTAR

## Appendix Table of Contents

| Document | Docket no. | App. page no. |
|---|---|---|
| **Appendix Volume I (pp. 1-43)** | | |
| 1. Notice of Appeal | 91 | 1 |
| 2. Judgment in a Civil Case (entered October 20, 2016) | 90 | 2 |
| 3. Order (entered August 31, 2016) | 89 | 3 |
| 4. Order (entered July 30, 2014) | 19 | 4 |
| 5. Memorandum Opinion (entered August 31, 2016) | 88 | 5-29 |
| 6. Memorandum Opinion (entered July 30, 2014) | 18 | 30-43 |
| **Appendix Volume 2 (SEALED) (pp. 44-313)** | | |
| 7. Declaration of Laurie Lootens Chyz in Support of Plaintiff Weyerhaeuser Company's Motion for Summary Judgment (SEALED) | 53 | 44-310 |
| 8. Declaration of Susan LaPrairie in Support of Plaintiff Weyerhaeuser Company's Motion for Summary Judgment (SEALED) | 54 | 311-313 |
| **Appendix Volume 3 (pp. 314-491)** | | |
| 9. Declaration of Courtney Dankworth in Support of Domtar's Motion to Dismiss for Failure to State a Claim | 14 | 314-486 |
| 10. Declaration of Anne Giardini in Support of Plaintiff Weyerhaeuser Company's Motion for Summary Judgment | 52 | 487-491 |

**Appendix Volume 4 (SEALED) (pp. 492-980)**

11. Declaration of Alex Ginsberg in Support of Defendants Domtar Corporation and Domtar Paper Company, LLC's Motion for Summary Judgment (SEALED) — 57 — 492-917

12. Declaration of Gary W. Kubek in Support of Defendants Domtar Corporation and Domtar Paper Company, LLC's Answering Brief in Opposition to Weyerhaeuser Company's Motion for Summary Judgment (SEALED) — 65 — 918-943

13. Declaration of Zygmunt Jablonski in Opposition to Weyerhaeuser Company's Motion for Summary Judgment (SEALED) — 66 — 944-946

14. Declaration of Alex Ginsberg in Support of Defendants Domtar Corporation and Domtar Paper Company, LLC's Reply Brief in Support of Their Motion for Summary Judgment (SEALED) — 76 — 947-980

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------- x
                                                        :
WEYERHAEUSER COMPANY, a Washington                      :
corporation,                                            :
                                                        :
                            Plaintiff,                  :   C.A. No. 14-00024-SLR
                                                        :
            v.                                          :
                                                        :
DOMTAR CORPORATION, a Delaware corporation,             :
and DOMTAR PAPER COMPANY, LLC, a Delaware               :
limited liability company,                              :
                                                        :
                            Defendants.                 :
                                                        :
------------------------------------------------------- x
```

I, Courtney M. Dankworth, hereby declare as follows:

1.      I am an attorney admitted to practice in New York.  I am admitted *pro hac vice* in this Court and am associated with Debevoise & Plimpton LLP, attorneys for defendants Domtar Corporation and Domtar Paper Company, LLC (together, "Domtar") in this action.

2.      I submit this declaration to place before the Court certain documents relied on, but not attached to, the Complaint and relevant to Domtar's motion to dismiss the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

3.      Attached as Exhibit A is a true and correct copy of the Amended and Restated Contribution and Distribution Agreement among Weyerhaeuser Company, Domtar Paper Company, LLC, and Domtar Corporation, dated as of January 25, 2007.

4.      Attached as Exhibit B is a true and correct copy of the Amended and Restated Transaction Agreement among Weyerhaeuser Company, Domtar Corporation, Domtar Paper

Company, LLC, Domtar Delaware Holdings Inc., Domtar Pacific Papers Inc., Domtar Pacific Papers ULC, Domtar (Canada) Paper Inc., and Domtar Inc., dated as of January 25, 2007.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on February 21, 2014.

_____
Courtney M. Dankworth

**Exhibit A**

AMENDED AND RESTATED

CONTRIBUTION AND DISTRIBUTION AGREEMENT

AMONG

WEYERHAEUSER COMPANY

AND

DOMTAR PAPER COMPANY, LLC

AND

DOMTAR CORPORATION

DATED AS OF JANUARY 25, 2007

[[2672857]]

# TABLE OF CONTENTS

Page

ARTICLE I

Definitions

ARTICLE II

The Contribution

SECTION 2.01.  Transfer of Assets and Assumption of Liabilities between
Weyerhaeuser and Newco................................................14
SECTION 2.02.  Newco Assets........................................................15
SECTION 2.03.  Newco Liabilities...................................................20
SECTION 2.04.  Post-Closing Working Capital Adjustment......................22
SECTION 2.05.  Documents Relating to Transfers of Newco Assets and
Assumption of Newco Liabilities ....................................25
SECTION 2.06.  Other Ancillary Agreements .....................................26
SECTION 2.07.  The Canadian Asset Sale..........................................26
SECTION 2.08.  Disclaimer of Representations and Warranties.................27
SECTION 2.09.  Governmental Approvals and Consents........................28
SECTION 2.10.  Separation of Contractual Arrangements.......................29
SECTION 2.11.  Employee Matters .................................................30
SECTION 2.12.  Transfer of Newco Equity Interests and Issuance of Spinco
Common Stock.........................................................31

ARTICLE III

The Distribution

SECTION 3.01.  Form of Distribution ..............................................33
SECTION 3.02.  The Distribution....................................................33
SECTION 3.03.  Delivery of Shares of Spinco Common Stock .................34
SECTION 3.04.  Timing of the Distribution .......................................34

ARTICLE IV

Mutual Releases; Indemnification

SECTION 4.01.  Release of Pre-Distribution Claims.............................35
SECTION 4.02.  Indemnification by Weyerhaeuser ..............................36
SECTION 4.03.  Indemnification by Spinco ......................................37
SECTION 4.04.  Indemnification by Weyerhaeuser Canada and Weyerhaeuser
Saskatchewan...........................................................37
SECTION 4.05.  Indemnification by Newco Canada Exchangeco .............38

i

SECTION 4.06. Indemnification Procedures ...................................................39
SECTION 4.07. Indemnification as Sole and Exclusive Remedy.....................40
SECTION 4.08. Calculation of Indemnity Payments ......................................41
SECTION 4.09. Additional Matters ................................................................41

## ARTICLE V

### Conditions to the Contribution and Distribution

SECTION 5.01. Transaction Agreement .........................................................41
SECTION 5.02. Spinco Financing...................................................................41

## ARTICLE VI

### Certain Other Matters

SECTION 6.01. Rights Under Weyerhaeuser Insurance Policies .....................42
SECTION 6.02. Registration Prior to the Distribution Date ...........................43
SECTION 6.03. Financing Arrangements........................................................43
SECTION 6.04. Enforcement of Confidentiality Agreements .........................43
SECTION 6.05. Site Separation Requirements ...............................................44

## ARTICLE VII

### Additional Covenants

SECTION 7.01. Agreement for Exchange of Information; Archives ................44
SECTION 7.02. Further Assurances................................................................45
SECTION 7.03. No Use of Certain Retained Names ......................................45
SECTION 7.04. Permits .................................................................................46
SECTION 7.05. Removal of Certain Property ................................................46
SECTION 7.06. Covenant Not to Compete.....................................................46
SECTION 7.07. Cooperation with respect to Quarterly Reports.....................47
SECTION 7.08. Canadian Asset Sale Structure .............................................48

## ARTICLE VIII

### Termination

SECTION 8.01. Termination by Mutual Consent ...........................................48
SECTION 8.02. Other Termination.................................................................48
SECTION 8.03. Effect of Termination............................................................48

## ARTICLE IX

### Miscellaneous

SECTION 9.01. Notices .................................................................................48

ii

SECTION 9.02. Interpretation ..................................................................................50
SECTION 9.03. Severability ......................................................................................50
SECTION 9.04. Counterparts .....................................................................................51
SECTION 9.05. Entire Agreement .............................................................................51
SECTION 9.06. Third Party Beneficiaries .................................................................51
SECTION 9.07. Governing Law .................................................................................51
SECTION 9.08. Assignment .......................................................................................51
SECTION 9.09. Enforcement ......................................................................................51
SECTION 9.10. Amendments .....................................................................................52
SECTION 9.11. Expenses ............................................................................................52

## EXHIBITS

Description of Newco Canada Exchangeco Assets and Newco Canada Exchangeco
   Liabilities ............................................................................................................ A
Form of Intellectual Property License Agreement ........................................................ B

[[2672857]]

iii

AMENDED AND RESTATED CONTRIBUTION
AND DISTRIBUTION AGREEMENT

THIS AMENDED AND RESTATED
CONTRIBUTION AND DISTRIBUTION AGREEMENT, dated
as of January 25, 2007 (this "Agreement"), among Weyerhaeuser
Company, a Washington corporation ("Weyerhaeuser"), Domtar
Paper Company, LLC (formerly known as Weyerhaeuser ELI,
LLC), a Delaware limited liability company and a wholly-owned
subsidiary of Weyerhaeuser ("Newco"), and Domtar Corporation
(formerly known as Weyerhaeuser TIA, Inc.), a Delaware
corporation and a wholly-owned subsidiary of Weyerhaeuser
("Spinco").

RECITALS

WHEREAS Weyerhaeuser, Newco and Spinco entered into a Contribution
and Distribution Agreement dated as of August 22, 2006, and Weyerhaeuser, Newco and
Spinco now desire to amend and restate such agreement;

WHEREAS Weyerhaeuser directly and indirectly through its subsidiaries
is engaged in the Newco Business (as defined in Article I);

WHEREAS the Board of Directors of Weyerhaeuser has determined that it
would be in the best interests of Weyerhaeuser and its shareholders to (i) transfer the
Newco Business to Newco, (ii) transfer the limited liability company interests of Newco
to Spinco, (iii) distribute the stock of Spinco to the shareholders of Weyerhaeuser, and
(iv) combine Domtar Inc., a Canadian corporation ("Domtar"), with Spinco by means of
a plan of arrangement pursuant to an amended and restated transaction agreement, dated
as of the date hereof (the "Transaction Agreement"), among Weyerhaeuser, Spinco,
Domtar, Newco, Domtar Delaware Holdings Inc. (formerly known as Weyerhaeuser ELI
Inc.), a Delaware corporation and wholly-owned subsidiary of Newco ("Newco
Holding"), Domtar Pacific Papers Inc., a British Columbia corporation and a wholly-
owned subsidiary of Newco Holding ("Old Newco Canada"), Domtar Pacific Papers
ULC, a Nova Scotia unlimited liability company and a wholly-owned subsidiary of
Newco Holding ("Newco Canada"), and Domtar (Canada) Paper Inc., a British Columbia
corporation and a wholly-owned subsidiary of Newco Canada ("Newco Canada
Exchangeco");

WHEREAS an executed commitment letter and related term sheet
pursuant to which the financial institutions named therein have agreed to provide debt
financing to Spinco in the amount and on the terms and conditions set forth therein (the
"New Debt Commitment Letter") has been delivered to the parties;

WHEREAS on the Contribution Date (as defined in Section 2.01(a)),
Weyerhaeuser shall transfer or cause to be transferred (A) the Newco Assets (as defined

1

in Section 2.02(a)) and the Newco Liabilities (as defined in Section 2.03) to Newco in exchange for limited liability company interests of Newco ("Newco Equity Interests"), and the assumption of the Newco Liabilities (the "Newco Contribution"), and (B) all the issued and outstanding Newco Equity Interests to Spinco in exchange for (x) that number of issued and outstanding shares of Spinco, par value $0.01 per share (the "Spinco Common Stock"), determined in accordance with Section 2.12, and (y) cash in an amount equal to the New Debt Amount (as defined in Article I) (the "Spinco Contribution" and, together with the Newco Contribution, the "Contribution");

WHEREAS on or prior to the Contribution Date, Newco shall cause Exchangeco Subsidiary to purchase the Newco Canada Exchangeco Assets (as defined in Article I) and assume the Newco Canada Exchangeco Liabilities (as defined in Article I) from Weyerhaeuser Canada and Weyerhaeuser Saskatchewan (each as defined in Article I) as provided in this Agreement;

WHEREAS following the Canadian Asset Sale (as defined in Section 2.07) and the Contribution and prior to the Effective Time (as defined in Article I), Weyerhaeuser shall distribute all of the issued and outstanding shares of Spinco Common Stock, on a pro rata basis or, at Weyerhaeuser's election, in an exchange offer or a combination thereof to Eligible Holders (as defined in Article I), in each case as provided in this Agreement (the "Distribution");

WHEREAS the parties intend that the Contribution and the Distribution shall qualify under Sections 355 and 368 of the Code (as defined in Article I); and

WHEREAS it is appropriate and desirable to set forth the principal corporate transactions required to effect the Contribution and the Distribution and certain other agreements that will govern certain matters relating to the Contribution and the Distribution and the relationship of Weyerhaeuser, Spinco and Newco following the Distribution;

NOW, THEREFORE, in consideration of the mutual agreements, provisions and covenants contained in this Agreement, the parties, intending to be legally bound, hereby agree as follows:

ARTICLE I

Definitions

For the purpose of this Agreement the following terms shall have the following meanings:

"Accounting Firm" has the meaning set forth in Section 2.04(b).

"Action" means any demand, action, suit, countersuit, arbitration, inquiry, proceeding or investigation by or before any federal, state, local, foreign or international Governmental Entity or any arbitration or mediation tribunal.

"affiliate" of any Person means another Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person. As used herein, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity, whether through ownership of voting securities or other interests, by contract or otherwise.

"Agreement" has the meaning set forth in the heading of this Agreement.

"Ancillary Agreements" means the Asset Conveyance Documents, the Liabilities Assumption Documents, the Canadian Purchase Agreement, the Tax Sharing Agreement, the Transition Services Agreement, the Site Services Agreements, the Fiber Supply Agreements and the Intellectual Property License Agreement.

"Arrangement" has the meaning set forth in the Transaction Agreement.

"Asset Conveyance Documents" has the meaning set forth in Section 2.05.

"Assumed Canadian Plans" has the meaning set forth in the Transaction Agreement.

"Benefit Plan Assets" has the meaning set forth in Section 2.02(a)(xvi).

"Benefit Plan Liabilities" has the meaning set forth in Section 2.03(a)(vii).

"Bowater Agreement" means the Asset Purchase Agreement, dated August 4, 1998, among Bowater Pulp and Paper Canada Inc., Bowater Incorporated, Weyerhaeuser Canada and Weyerhaeuser.

"Bowater Claim" means the claim of Weyerhaeuser and/or Weyerhaeuser Canada against Bowater Canadian Forest Products Inc. and Bowater Incorporated under the Bowater Agreement for the liabilities and obligations described in the notice to arbitrate dated March 17, 2006, as amended through the date hereof, delivered by Weyerhaeuser and Weyerhaeuser Canada to Bowater Canadian Forest Products Inc. and Bowater Incorporated, regardless of whether such claim is settled by arbitration or otherwise.

"Business Day" has the meaning set forth in the Transaction Agreement.

"Canadian Asset Sale" has the meaning set forth in Section 2.07(a).

"Canadian dollars" or "CDN$" means the lawful money of Canada.

"Canadian Excluded Assets" means the business, properties, assets, goodwill and rights of Weyerhaeuser Canada and Weyerhaeuser Saskatchewan listed under such heading in Exhibit A.

"Canadian Purchase Agreement" has the meaning set forth in Section 2.07(b).

"Canadian Retained Liabilities" means the obligations, liabilities and commitments of Weyerhaeuser Canada and Weyerhaeuser Saskatchewan listed under such heading in Exhibit A.

"CBA" has the meaning set forth in the Transaction Agreement.

"Closing Date" has the meaning set forth in the Transaction Agreement.

"Closing Working Capital" has the meaning set forth in Section 2.04(a).

"Code" means the U.S. Internal Revenue Code of 1986, as amended, and the Treasury regulations promulgated thereunder.

"Commission" means the Securities and Exchange Commission.

"Competitive Activities" has the meaning set forth in Section 7.06(a).

"Consents" means any consents, waivers or approvals from, or notification requirements to, any third parties.

"Contracts" has the meaning set forth in Section 2.02(a)(viii).

"Contribution" has the meaning set forth in the recitals.

"Contribution Date" has the meaning set forth in Section 2.01(a).

"Current Assets" has the meaning set forth in Section 2.04(d).

"Current Liabilities" has the meaning set forth in Section 2.04(d).

"DDII" has the meaning set forth in the Transaction Agreement.

"Delayed Transfer Assets" means any Newco Assets that this Agreement or any other Transaction Document provides or contemplates are to be transferred to Newco and that require the removal of a Legal Impediment or the receipt of a Consent or Governmental Approval to transfer, which Legal Impediment is not removed or Consent or Governmental Approval is not obtained on or prior to the Contribution Date.

"Delayed Transfer Liabilities" means any Newco Liabilities that this Agreement or any other Transaction Document provides or contemplates are to be assumed by Newco and that require the removal of a Legal Impediment or the receipt of a Consent or Governmental Approval for the transfer and assumption of such Newco Liabilities, which Legal Impediment is not removed or Consent or Governmental Approval is not obtained on or prior to the Contribution Date.

"Disabled Newco Employees" has the meaning set forth in the Transaction Agreement.

"Distribution" has the meaning set forth in the recitals.

"Distribution Date" means (i) if the Distribution is effected in whole as a pro rata dividend, the date on which the issued and outstanding shares of Spinco Common Stock are distributed to the Eligible Holders pursuant to a pro rata dividend, and (ii) if the Distribution is effected in whole or in part as an exchange offer as provided in Section 3.01(c), the date on which the validly tendered Eligible Shares are accepted for payment.

"Dollars" or "$" means the lawful money of the United States of America.

"Domtar" has the meaning set forth in the recitals.

"Domtar Common Shares" has the meaning set forth in the Transaction Agreement.

"Effective Time" has the meaning set forth in the Transaction Agreement.

"Eligible Holders" means (i) to the extent that the Distribution is effected as a pro rata dividend, (A) the holders of record of shares of Weyerhaeuser Common Stock on the Record Date, (B) the holders of record of any Weyerhaeuser Canada Exchangeable Shares on the Record Date (other than Weyerhaeuser), and (C) if and to the extent determined by Weyerhaeuser, the holders of record on the Distribution Date of any Weyerhaeuser Benefit Plan Shares issued by Weyerhaeuser after the Record Date and prior to the Distribution Date, or (ii) to the extent that the Distribution is effected pursuant to an exchange offer, the holders of Eligible Shares validly tendered and not withdrawn pursuant to an exchange offer as provided in Section 3.01(c).

"Eligible Shares" means (i) to the extent that the Distribution is effected as a pro rata dividend, (A) the shares of Weyerhaeuser Common Stock outstanding on the Record Date, (B) the Weyerhaeuser Canada Exchangeable Shares outstanding on the Record Date (other than any Weyerhaeuser Canada Exchangeable Shares held by Weyerhaeuser), and (C) if and to the extent determined by Weyerhaeuser, the Weyerhaeuser Benefit Plan Shares issued by Weyerhaeuser after the Record Date and prior to the Distribution Date, or (ii) to the extent that the Distribution is effected pursuant to an exchange offer, the shares of Weyerhaeuser Common Stock and the Weyerhaeuser Canada Exchangeable Shares outstanding and eligible to accept the exchange offer.

"Environmental Laws" means all applicable federal, state, provincial, local and foreign Laws, Judgments, legally binding agreements and Environmental Permits issued, promulgated or entered into by or with any Governmental Entity, relating to pollution, natural resources, protection or restoration of the environment (including ambient air, surface water, groundwater, land surface or subsurface strata), endangered or threatened species or human health.

5

[[2672857]]

"Environmental Liabilities" means all obligations, liabilities, costs or commitments relating to or in respect of environmental, health or safety matters, including (i) the compliance or noncompliance with Environmental Laws, (ii) the alleged or actual presence or Release of, or exposure to, Hazardous Materials, (iii) the offsite transportation, storage, disposal or arrangement for disposal of Hazardous Materials, and (iv) any other obligations, liabilities, costs or commitments relating to Environmental Laws, including, in each case, all investigatory, cleanup and other remediation costs, administrative oversight costs, natural resources damages, property damages, personal injury damages, indemnity, contribution and similar obligations and all costs and expenses, interest, fines, penalties and other monetary sanctions in connection with the foregoing.

"Exchange Act" has the meaning set forth in the Transaction Agreement.

"Exchange Agent" has the meaning set forth in Section 3.03(b).

"Exchangeco Subsidiary" has the meaning set forth in the Transaction Agreement.

"Excluded Assets" has the meaning set forth in Section 2.02(b).

"Excluded Benefit Plans" has the meaning set forth in Section 2.03(b)(iii).

"Excluded IRB Indebtedness" means all indebtedness evidenced by industrial revenue bonds issued by any Governmental Entity relating to the Newco Business (including any evidences of such indebtedness) and all Liabilities of Weyerhaeuser or any other member of the Weyerhaeuser Group under Contracts entered into by Weyerhaeuser or such member of the Weyerhaeuser Group in connection therewith, except for the Hawesville IRB Indebtedness and the Marlboro IRB Indebtedness.

"Excluded IRB Rights" means all rights, claims, causes of action and credits of Weyerhaeuser or any other member of the Weyerhaeuser Group in connection with the Excluded IRB Indebtedness, except for the Hawesville IRB Rights and the Marlboro IRB Rights.

"Fiber Supply Agreements" has the meaning set forth in the Transaction Agreement.

"Forest Licenses" means (i) the Amended Sustainable Forest License No. 542461 for the Trout Lake Forest issued by the Ministry of Natural Resources of the Province of Ontario on May 5, 2006, (ii) the Amended Sustainable Forest License No. 541593 for the Wabigoon Forest issued by the Ministry of Natural Resources of the Province of Ontario on May 5, 2006, and (iii) the Prince Albert Forest Management Agreement dated April 1, 2000 between Weyerhaeuser Saskatchewan, Ltd. and Her Majesty the Queen in the Right of the Ministry of Natural Resources.

6

"Forest Management Employees" has the meaning set forth in Section 2.11(a).

"GAAP" has the meaning set forth in the Transaction Agreement.

"Governmental Approvals" has the meaning set forth in the Transaction Agreement.

"Governmental Entity" has the meaning set forth in the Transaction Agreement.

"Group" means either the Spinco Group or the Weyerhaeuser Group, as the context requires.

"Hawesville IRB Indebtedness" means all indebtedness evidenced by the $600 million Hancock County, Kentucky Industrial Revenue Bonds, Series 1996 (Hawesville) issued pursuant to the Trust Indenture dated December 1, 1996, between Hancock County, Kentucky and the Bank of New York (including any evidences of such indebtedness), as amended by the Agreement of Amendment of Lease Agreement, Trust Indenture and Contract of Purchase dated November 30, 1999 among the County of Hancock, Kentucky, Willamette Industries, Inc., The Bank of New York and Investment Company of Oregon, and all Liabilities of Weyerhaeuser or any member of the Weyerhaeuser Group under Contracts entered into by Weyerhaeuser or such member of the Weyerhaeuser Group in connection therewith.

"Hawesville IRB Rights" means all rights, claims, causes of action and credits of Weyerhaeuser or any other member of the Weyerhaeuser Group in connection with the Hawesville IRB Indebtedness.

"Hazardous Materials" means (i) any petroleum or petroleum products, radioactive materials or wastes, asbestos in any form, urea formaldehyde foam insulation and polychlorinated biphenyls; and (ii) any other chemical, material, substance or waste that in relevant form or concentration is prohibited, limited or regulated under any Environmental Law.

"Indemnified Party" has the meaning set forth in Section 4.06(a).

"Indemnifying Party" has the meaning set forth in Section 4.06(a).

"Indemnitees" means the Spinco Indemnitees and the Weyerhaeuser Indemnitees.

"Intellectual Property" has the meaning set forth in Section 2.02(a)(v).

"Intellectual Property License Agreement" means the license of Intellectual Property by and between Weyerhaeuser and Newco substantially in the form attached as Exhibit B.

7

"Interim Newco Balance Sheet" has the meaning set forth in the Transaction Agreement.

"Inventory" has the meaning set forth in Section 2.02(a)(ii).

"ITA" has the meaning set forth in the Transaction Agreement.

"Judgment" has the meaning set forth in the Transaction Agreement.

"Laws" has the meaning set forth in the Transaction Agreement.

"Legal Impediment" means a legal impediment preventing or restricting the transfer of a Newco Asset or the assumption of a Newco Liability, as the case may be, in the Contribution as of the Contribution Date.

"Liabilities" has the meaning set forth in Section 2.03(a).

"Liabilities Assumption Documents" has the meaning set forth in Section 2.05.

"LIFO Reserve Amount" has the meaning set forth in Section 2.04(f).

"Losses" has the meaning set forth in Section 4.02.

"Marlboro IRB Indebtedness" means all indebtedness evidenced by the $450,000,000 State of Carolina Marlboro County Fee-In-Lieu-Of-Taxes Industrial Revenue Bond (Willamette Industries, Inc. Project) Series 1991 issued pursuant to an Ordinance of Marlboro County passed on August 8, 1991 and a Bond Purchase Agreement between Marlboro County and Willamette Industries, Inc. dated as of August 1, 1991 (including any evidences of such indebtedness), and all Liabilities of Weyerhaeuser or any member of the Weyerhaeuser Group under Contracts entered into by Weyerhaeuser or any member of the Weyerhaeuser Group in connection therewith.

"Marlboro IRB Rights" means all rights, claims, causes of action and credits of Weyerhaeuser or any other member of the Weyerhaeuser Group in connection with the Marlboro IRB Indebtedness.

"Measurement Date" has the meaning set forth in Section 2.12(b)(3).

"Mill Employee" has the meaning set forth in Section 2.11(a).

"New Benefit Plan" has the meaning set forth in the Transaction Agreement.

"Newco" has the meaning set forth in the heading of this Agreement.

"Newco Assets" has the meaning set forth in Section 2.02(a).

[[2672857]]

"Newco Benefit Agreement" has the meaning set forth in the Transaction Agreement.

"Newco Benefit Plan" has the meaning set forth in the Transaction Agreement.

"Newco Business" means (i) the uncoated free sheet and paper grade pulp operations as conducted at Weyerhaeuser's, Weyerhaeuser Saskatchewan's and Weyerhaeuser Canada's facilities in Hawesville, Kentucky; Marlboro, South Carolina; Kingsport, Tennessee; Johnsonburg, Pennsylvania; Rothschild, Wisconsin; Dryden, Ontario (Canada); and Prince Albert, Saskatchewan (Canada), (ii) the chip mill, uncoated free sheet, paper grade pulp and fluff pulp operations as conducted at Weyerhaeuser's facility in Plymouth, North Carolina, (iii) the paper grade pulp operations as conducted at Weyerhaeuser Canada's facilities in Kamloops, British Columbia (Canada), (iv) the uncoated free sheet converting operations as conducted at Weyerhaeuser's, Weyerhaeuser Saskatchewan's and Weyerhaeuser Canada's facilities listed under the heading 'Converting' on Schedule 2.02(a)(i), (v) the forms operations as conducted at Weyerhaeuser's facilities in Dallas, Texas; Indianapolis, Indiana; Langhorne, Pennsylvania; Rock Hill, South Carolina; and Cerritos, California, (vi) the coated groundwood and TMP operations as conducted at Weyerhaeuser's facility in Columbus, Mississippi, (vii) the chip mill operations as conducted at Weyerhaeuser's facilities listed under the heading 'Chip Mills' on Schedule 2.02(a)(i), (viii) the operations as conducted at Weyerhaeuser's facilities in Fort Mill, South Carolina, specifically excluding the medium density fiber board and particle board operations conducted at Fort Mill, South Carolina, (ix) the logging and forest management operations as conducted pursuant to the Forest Licenses, (x) the saw mill operations as conducted at Weyerhaeuser Canada's facilities in Ear Falls, Ontario and at Weyerhaeuser Saskatchewan's facilities in Big River, Saskatchewan, and (xi) the operations as conducted at Weyerhaeuser's regional replenishment centers, warehouses and sales offices used in connection with any of the other operations referred to above in this definition; provided, however, that the Newco Business shall in no event include any specialty pulp operations and any operations conducted with the Excluded Assets.

"Newco Canada" has the meaning set forth in the recitals.

"Newco Canada Exchangeco" has the meaning set forth in the recitals.

"Newco Canada Exchangeco Assets" means the business, properties, assets, goodwill and rights of Weyerhaeuser Canada and Weyerhaeuser Saskatchewan listed under such heading in Exhibit A.

"Newco Canada Exchangeco Indemnitees" has the meaning set forth in Section 4.04.

"Newco Canada Exchangeco Liabilities" means the obligations, liabilities and commitments of Weyerhaeuser Canada and Weyerhaeuser Saskatchewan listed under such heading in Exhibit A.

9

[[2672857]]

"Newco Canadian Pension Plans" has the meaning set forth in the Transaction Agreement.

"Newco Contribution" has the meaning set forth in the recitals.

"Newco Employees" has the meaning set forth in the Transaction Agreement.

"Newco Equity Interests" has the meaning set forth in the recitals.

"Newco Holding" has the meaning set forth in the recitals.

"Newco Liabilities" has the meaning set forth in Section 2.03(a).

"Newco Subsidiaries" has the meaning set forth in the Transaction Agreement.

"Newco U.S. Pension Plans" has the meaning set forth in the Transaction Agreement.

"New Debt Amount" means $1,350,000,000.

"New Debt Commitment Letter" has the meaning set forth in the recitals.

"Notice of Disagreement" has the meaning set forth in Section 2.04(b).

"NYSE" means the New York Stock Exchange, Inc.

"Old Newco Canada" has the meaning set forth in the recitals.

"Permits" has the meaning set forth in Section 2.02(a)(vii).

"Person" means an individual, a general or limited partnership, a corporation, a trust, a joint venture, an unincorporated organization, a limited liability entity, any other entity and any Governmental Entity.

"Proceeding" has the meaning set forth in Section 2.03(a)(vi).

"Pulp Inventory Adjustment Amount" has the meaning set forth in Section 2.04(f).

"Record Date" means the close of business on a date to be determined by the Weyerhaeuser Board of Directors as the record date for determining the shareholders of Weyerhaeuser and, if applicable, the holders of Weyerhaeuser Canada Exchangeable Shares, in each case entitled to receive shares of Spinco Common Stock in the Distribution if the Distribution is effected, in whole or in part, as a pro rata dividend.

"Records" has the meaning set forth in Section 2.02(a)(xii).

[[2672857]]

"Release" means any actual or threatened release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment (including ambient air, surface water, groundwater, land surface or subsurface strata) or within any building, structure, facility or fixture.

"Retained Benefit Liabilities" has the meaning set forth in Section 2.03(b)(iii).

"Retained Liabilities" has the meaning set forth in Section 2.03(b).

"Retained Names" means the names and marks set forth on Schedule 1.01 and any name or mark derived from, similar to or including any of the foregoing (in each case, in any style or design).

"SEC" has the meaning set forth in the Transaction Agreement.

"Securities Act" means the Securities Act of 1933, as amended, together with the rules and regulations promulgated thereunder.

"Shared Accounts Payable" has the meaning set forth in Section 2.03(a)(xi).

"Shared Accounts Receivable" has the meaning set forth in Section 2.02(a)(xx).

"Shared Inventory" has the meaning set forth in Section 2.02(a)(xix).

"Shared Payment Amount" has the meaning set forth in Section 2.04(f).

"Site Services Agreements" has the meaning set forth in the Transaction Agreement.

"Spinco" has the meaning set forth in the heading of this Agreement.

"Spinco Common Stock" has the meaning set forth in the recitals.

"Spinco Contribution" has the meaning set forth in the recitals.

"Spinco Group" means Spinco, Newco, each subsidiary of Newco and each other Person that is controlled directly or indirectly by Spinco.

"Spinco Indemnitees" has the meaning set forth in Section 4.02.

"Statement" has the meaning set forth in Section 2.04(a).

"subsidiary" of any Person means any corporation or other organization whether incorporated or unincorporated of which at least a majority of the securities or interests having by the terms thereof ordinary voting power to elect at least a majority of the board of directors or others performing similar functions with respect to such

11

[[2672857]]

corporation or other organization is directly or indirectly owned or controlled (i) by such Person, (ii) by any one or more of such Person's subsidiaries, or (iii) by such Person and one or more of its subsidiaries; provided, however, that no Person that is not directly or indirectly wholly-owned by any other Person shall be a subsidiary of such other Person unless such other Person controls, or has the right, power or ability to control, that Person.

"Taxes" has the meaning set forth in the Tax Sharing Agreement.

"Tax Sharing Agreement" has the meaning set forth in the Transaction Agreement.

"Technology" has the meaning set forth in Section 2.02(a)(vi).

"Third Party Claim" has the meaning set forth in Section 4.06(a).

"Transaction Agreement" has the meaning set forth in the recitals.

"Transaction Debt" has the meaning set forth in the Transaction Agreement.

"Transaction Documents" has the meaning set forth in the Transaction Agreement.

"Transferred Contracts" has the meaning set forth in Section 2.02(a)(viii).

"Transferred Employee" has the meaning set forth in the Transaction Agreement.

"Transferred Equipment" has the meaning set forth in Section 2.02(a)(iii).

"Transferred Intellectual Property" has the meaning set forth in Section 2.02(a)(v).

"Transferred Inventory" has the meaning set forth in Section 2.02(a)(ii).

"Transferred Permits" has the meaning set forth in Section 2.02(a)(vii).

"Transferred Real Property" has the meaning set forth in Section 2.02(a)(i).

"Transferred Records" has the meaning set forth in Section 2.02(a)(xii).

"Transferred Technology" has the meaning set forth in Section 2.02(a)(vi).

"Transition Services Agreement" has the meaning set forth in the Transaction Agreement.

12

"U.S. WC Newco Employees" has the meaning set forth in the Transaction Agreement.

"Wapawekka Lumber" means Wapawekka Lumber Ltd., a corporation incorporated under the laws of Saskatchewan, in which Weyerhaeuser Canada is a shareholder.

"Wapawekka Lumber Partnership" means Wapawekka Lumber Limited Partnership, a partnership formed under the laws of Saskatchewan, in which Weyerhaeuser Saskatchewan and Wapawekka Lumber are partners.

"Weyerhaeuser" has the meaning set forth in the heading of this Agreement.

"Weyerhaeuser Benefit Plan Shares" means, to the extent the Distribution is effected in the form of a pro rata dividend, the shares of Weyerhaeuser Common Stock issued by Weyerhaeuser after the Record Date and prior to the Distribution Date pursuant to any benefit plan (including any stock option plan, SAR arrangement or restricted stock arrangement) maintained by Weyerhaeuser to any director, officer or employee of Weyerhaeuser or its subsidiaries.

"Weyerhaeuser Business" means: (i) the business and operations of the Weyerhaeuser Group other than the Newco Business, (ii) all other businesses and operations acquired or commenced by any member of the Weyerhaeuser Group at any time after the Contribution Date, and (iii) any terminated, divested or discontinued businesses or operations that at the time of termination, divestiture or discontinuation did not primarily relate to the Newco Business as then conducted.

"Weyerhaeuser Canada" means Weyerhaeuser Company Limited, a corporation incorporated under the laws of Canada and an indirect subsidiary of Weyerhaeuser.

"Weyerhaeuser Canada Exchangeable Shares" means the shares of Weyerhaeuser Canada issued in connection with the acquisition by Weyerhaeuser of MacMillan Bloedel Limited, which are exchangeable from time to time for shares of Weyerhaeuser Common Stock in accordance with the terms and conditions as set forth in Appendix 1 to the Plan of Arrangement attached as Schedule D to the Transaction Agreement dated June 20, 1999 among Weyerhaeuser, 586476 B.C. Ltd. and MacMillan Bloedel Limited, as such terms and conditions may be amended prior to the Effective Time.

"Weyerhaeuser Canada Indemnitees" has the meaning set forth in Section 4.05(a).

"Weyerhaeuser Common Stock" means outstanding shares of common stock of Weyerhaeuser, par value $1.25 per share.

13

"Weyerhaeuser Group" means Weyerhaeuser, each subsidiary of Weyerhaeuser and any other Person that is controlled directly or indirectly by Weyerhaeuser (other than any member of the Spinco Group).

"Weyerhaeuser Indemnitees" has the meaning set forth in Section 4.03.

"Weyerhaeuser Insurance Policies" has the meaning set forth in Section 6.01(a).

"Weyerhaeuser Saskatchewan" means Weyerhaeuser Saskatchewan Ltd., a corporation incorporated under the laws of Saskatchewan and a wholly-owned subsidiary of Weyerhaeuser Canada.

"Weyerhaeuser Stock Plans" has the meaning set forth in the Transaction Agreement.

"Working Capital" has the meaning set forth in Section 2.04(d).

"Working Capital Principles" has the meaning set forth in Section 2.04(d).

## ARTICLE II

### The Contribution

SECTION 2.01. _Transfer of Assets and Assumption of Liabilities between Weyerhaeuser and Newco._ (a) At a time on or prior to the Distribution Date (the "Contribution Date"), Weyerhaeuser shall, and shall cause any other applicable members of the Weyerhaeuser Group to, sell, assign, transfer, convey and deliver to Newco, and Newco shall accept from Weyerhaeuser and any such members of the Weyerhaeuser Group, all of Weyerhaeuser's and such members' right, title and interest in, to and under all the Newco Assets other than the Delayed Transfer Assets in exchange for (i) the Newco Equity Interests issued pursuant to Section 2.01(e), and (ii) the assumption and agreement by Newco to pay, perform and discharge all the Newco Liabilities other than the Delayed Transfer Liabilities as provided in Section 2.01(b).

(b) On the Contribution Date, Newco shall irrevocably assume and agree to faithfully pay, perform and discharge when due all the Newco Liabilities other than the Delayed Transfer Liabilities in exchange for the sale, assignment, transfer, conveyance or delivery by Weyerhaeuser or any other member of the Weyerhaeuser Group of all the Newco Assets other than the Delayed Transfer Assets as provided in Section 2.01(a).

(c) Anything in this Agreement to the contrary notwithstanding, Weyerhaeuser shall not be obligated to assign, transfer, convey or deliver to Newco and Newco shall not be obligated to assume any of the rights and obligations under any Delayed Transfer Asset or Delayed Transfer Liability until such time as all Legal Impediments are removed and/or all Consents and/or Governmental Approvals necessary for the legal transfer and/or assumption thereof are obtained. Each of the parties hereto agrees that the Delayed Transfer Assets shall be assigned, transferred, conveyed and

14

delivered, and any Delayed Transfer Liabilities shall be assumed, in accordance with the provisions of Section 2.09. On the Contribution Date, Weyerhaeuser shall deliver to Newco a schedule setting forth all material Delayed Transfer Assets and Delayed Transfer Liabilities existing as of the Contribution Date.

(d) In the event that at any time or from time to time (whether prior to or after the Distribution Date), any party hereto (or any member of such party's respective Group), shall receive or otherwise possess any asset that is allocated to any other Person pursuant to this Agreement or any other Transaction Document, such party shall promptly transfer, or cause to be transferred, such asset to the Person so entitled thereto. Prior to any such transfer, the Person receiving or possessing such asset shall hold such asset in trust for any such other Person.

(e) Simultaneously with the Newco Contribution, Newco shall issue additional units of Newco Equity Interests to Weyerhaeuser, as its sole member, in consideration for the transfer of the Newco Assets and assumption of the Newco Liabilities in accordance with this Section 2.01.

SECTION 2.02. Newco Assets. (a) For purposes of this Agreement, "Newco Assets" means all the business, properties, assets, goodwill and rights (including lease, license and other contractual rights) of whatever kind and nature, real or personal, tangible or intangible, that are owned by Weyerhaeuser or any other member of the Weyerhaeuser Group immediately prior to the Contribution and used or held for use primarily in the operation or conduct of the Newco Business, other than (A) the Excluded Assets and (B) as otherwise provided for in this Section 2.02(a), which Newco Assets shall include (in each case, other than the Excluded Assets):

(i) all owned real property, leaseholds and other interests in real property of Weyerhaeuser or any other member of the Weyerhaeuser Group used or held for use primarily in the operation or conduct of the Newco Business, including the owned real property, leaseholds and other interests in real property set forth on Schedule 2.02(a)(i), in each case together with Weyerhaeuser's and any other member of the Weyerhaeuser Group's right, title and interest in, to and under all plants, facilities, buildings, structures, improvements and fixtures thereon and all easements and rights of way pertaining thereto or accruing to the benefit thereof and all other appurtenances and real property rights pertaining thereto (the "Transferred Real Property");

(ii) all raw materials, work-in-process, finished goods and products, supplies, parts and other inventories owned by Weyerhaeuser or any other member of the Weyerhaeuser Group ("Inventory") that as of the close of business on the Contribution Date are located on the Transferred Real Property and all other Inventory as of the close of business on the Contribution Date, in each case that are used or held for use primarily in the operation or conduct of the Newco Business or produced by the Newco Business for use in or sale by the Newco Business (the "Transferred Inventory");

15

[[2672857]]

(iii) (A) all other tangible personal property and interests therein owned by Weyerhaeuser or any other member of the Weyerhaeuser Group (including all machinery, equipment, furniture, furnishings, tools and vehicles owned by Weyerhaeuser or any other member of the Weyerhaeuser Group) that are used or held for use primarily in the operation or conduct of the Newco Business, and (B) the machinery and equipment set forth on Schedule 2.02(a)(iii) (collectively, the "Transferred Equipment");

(iv) all accounts receivable solely arising out of the operation or conduct of the Newco Business;

(v) (A) all patents (including all reissues, divisions, continuations and extensions thereof), patent applications, patent rights, trademarks, trademark registrations, trademark applications, servicemarks, trade names, business names, brand names, copyrights, copyright registrations, designs, design registrations, and all rights to any of the foregoing (collectively, the "Intellectual Property"), in each case that are owned by Weyerhaeuser or any other member of the Weyerhaeuser Group and used or held for use primarily in the operation or conduct of the Newco Business, including the Intellectual Property set forth on Schedule 2.02(a)(v) (the "Transferred Intellectual Property"), and (B) all rights, if any, owned by Weyerhaeuser or any other member of the Weyerhaeuser Group in the name and mark "Willamette";

(vi) all trade secrets, inventions, know-how, formulae, processes, procedures, research records, records of inventions, test information, market surveys, business potential analysis, strategic plans, consultants reports, technical reports and marketing know-how ("Technology"), in each case that are owned by Weyerhaeuser or any other member of the Weyerhaeuser Group and used or held for use solely in the operation or conduct of the Newco Business (the "Transferred Technology");

(vii) all permits, licenses, franchises, approvals or authorizations from any Governmental Entity ("Permits") set forth on Schedule 2.02(a)(vii), and all other Permits that are held by Weyerhaeuser or any other member of the Weyerhaeuser Group and used or held for use primarily in the operation or conduct of the Newco Business, in each case to the extent such Permits are transferable (the "Transferred Permits");

(viii) all written contracts, leases, subleases, licenses, notes, bonds, debentures, indentures, guarantees, agreements, commitments and all other legally binding instruments, arrangements and understandings ("Contracts") to which Weyerhaeuser or any other member of the Weyerhaeuser Group is a party or by which Weyerhaeuser or any other member of the Weyerhaeuser Group is bound that are set forth on Schedule 2.02(a)(viii), and all other Contracts to which Weyerhaeuser or any other member of the Weyerhaeuser Group is a party or by which Weyerhaeuser or any other member of the Weyerhaeuser Group is bound

16

that are used or held for use primarily in, or that arise primarily out of, the operation or conduct of the Newco Business (the "Transferred Contracts");

(ix) all rights of Weyerhaeuser or any other member of the Weyerhaeuser Group in and to products sold or leased (including products returned after the Contribution Date and rights of Weyerhaeuser or any other member of the Weyerhaeuser Group of rescission, replevin and reclamation) primarily in the operation or conduct of the Newco Business;

(x) all credits, prepaid expenses, deferred charges, advance payments, security deposits and prepaid items that are used or held for use primarily in, or that arise primarily out of, the operation or conduct of the Newco Business;

(xi) all rights, claims, causes of action and credits owned by Weyerhaeuser or any other member of the Weyerhaeuser Group to the extent relating to any Newco Asset or any Newco Liability, including any such items arising under any guarantees, warranties, indemnities, rights of recovery, rights of set-off and similar rights in favor of Weyerhaeuser or any other member of the Weyerhaeuser Group in respect of any Newco Asset or any Newco Liability;

(xii) subject to Section 7.01, all books, records and other documents (including all books of account, ledgers, general, financial, accounting and personnel records, files, invoices, customers' and suppliers' lists, other distribution lists, operating, production and other manuals, manufacturing and quality control records and procedures, billing records, sales and promotional literature) (in all cases, in any form or medium) owned by Weyerhaeuser or any other member of the Weyerhaeuser Group ("Records") (A) that as of the close of business on the Contribution Date are located at the Transferred Real Property and that are used or held for use primarily in, or that arise primarily out of, the conduct or operation of the Newco Business, or (B) that as of the close of business on the Contribution Date are not located at the Transferred Real Property and that are solely used or held for use in the conduct or operation of the Newco Business (collectively, the "Transferred Records");

(xiii) all goodwill owned by Weyerhaeuser or any other member of the Weyerhaeuser Group generated by or associated with the Newco Business or the Newco Assets;

(xiv) all assets owned by Weyerhaeuser or any other member of the Weyerhaeuser Group that are expressly contemplated by the Tax Sharing Agreement as assets to be transferred to Newco or any other member of the Spinco Group;

(xv) all rights of Newco or any other member of the Spinco Group under this Agreement or any other Transaction Document;

(xvi) all assets to be transferred to Newco or any member of the Spinco Group set forth on Schedule 2.02(a)(xvi) (the "Benefit Plan Assets");

17

(xvii) all Hawesville IRB Rights and Marlboro IRB Rights;

(xviii) all other assets, properties, goodwill and rights of Weyerhaeuser or any other member of the Weyerhaeuser Group reflected in the Interim Newco Balance Sheet other than assets, properties, goodwill and rights that are (A) sold, disposed or otherwise transferred after the date of such balance sheet, or (B) set forth on Schedule 2.02(a)(xviii);

(xix) all finished pulp manufactured at the Transferred Real Property owned by Weyerhaeuser or any other member of the Weyerhaeuser Group and that, as of the close of business on the Contribution Date, is located at Weyerhaeuser's facilities other than the Transferred Real Property to the extent allocated to Newco in accordance with Schedule 2.04(d) (the "Shared Inventory"); and

(xx) all accounts receivable with respect to pulp sales pursuant to which a payment is owed by a third party to the Newco Business and the Weyerhaeuser Business to the extent allocated to Newco in accordance with Schedule 2.04(d) (the "Shared Accounts Receivable").

(b) For the purposes of this Agreement, "Excluded Assets" shall mean the following assets owned by Weyerhaeuser or any other member of the Weyerhaeuser Group:

(i) all assets set forth on Schedule 2.02(b)(i) or 2.02(a)(xviii);

(ii) all cash and cash equivalents;

(iii) subject to Section 6.01, all insurance policies and all rights and claims thereunder and any proceeds thereof;

(iv) all rights, claims and credits to the extent relating to any Excluded Asset or any Retained Liability, including any such items arising under any guarantees, warranties, indemnities and similar rights in favor of Weyerhaeuser or any other member of the Weyerhaeuser Group in respect of any Excluded Asset or any Retained Liability;

(v) all shares of capital stock of, or other equity interests in, any affiliate of Weyerhaeuser or any other Person (in each case, other than the Newco Subsidiaries, Wapawekka Lumber and Wapawekka Lumber Partnership);

(vi) all assets (other than the Benefit Plan Assets) relating to any employee benefit plan in which any employees of Weyerhaeuser or any of its affiliates participate;

(vii) subject to Section 7.01 of this Agreement or, as applicable, Section 5.09 of the Tax Sharing Agreement, all financial and tax Records relating to the Newco Business that form part of Weyerhaeuser's or any other member of the Weyerhaeuser Group's general ledger;

[[2672857]]

(viii) all (A) Records that are not Transferred Records, and (B) Records prepared in connection with the sale or transfer of the Newco Business, including bids received from third parties and analyses relating to the Newco Business;

(ix) all rights of Weyerhaeuser or any other member of the Weyerhaeuser Group under this Agreement or any other Transaction Document;

(x) the Retained Names;

(xi) all owned real property, leaseholds and other interests in real property set forth on Schedule 2.02(b)(xi) and all owned real property, leaseholds and other interests that are not Transferred Real Property, in each case together with Weyerhaeuser's and any other member of the Weyerhaeuser Group's right, title and interest in, to and under all buildings, improvements and fixtures thereon and all other appurtenances and real property rights pertaining thereto;

(xii) all Intellectual Property set forth on Schedule 2.02(b)(xii) and all other Intellectual Property that is not Transferred Intellectual Property;

(xiii) all Technology that is used or held for use in Weyerhaeuser's fluff pulp and specialty pulp operations and all other Technology that is not Transferred Technology;

(xiv) all Permits set forth on Schedule 2.02(b)(xiv) and all other Permits that are not Transferred Permits;

(xv) all Contracts set forth on Schedule 2.02(b)(xv) and all other Contracts that are not Transferred Contracts;

(xvi) all accounts receivable pursuant to which a payment is owed (i) by any member of the Weyerhaeuser Group to any other member of the Weyerhaeuser Group, or (ii) by the Weyerhaeuser Business to the Newco Business;

(xvii) any other property or assets not constituting Newco Assets;

(xviii) all corporate-level services of the type provided as of August 22, 2006 to the Newco Business by Weyerhaeuser or any of its affiliates;

(xix) all tangible personal property and interests therein (including all machinery, equipment, furniture, furnishings, tools and vehicles) set forth on Schedule 2.02(b)(xix) and all other tangible personal property that is not Transferred Equipment;

(xx) all Excluded IRB Rights;

(xxi) the Newco Canada Exchangeco Assets and Canadian Excluded Assets;

(xxii) all assets that are expressly contemplated by the Tax Sharing Agreement as assets to be retained by Weyerhaeuser or any other member of the Weyerhaeuser Group;

(xxiii) the Bowater Claim;

(xxiv) all finished pulp manufactured at the Transferred Real Property owned by Weyerhaeuser or any other member of the Weyerhaeuser Group and that, as of the close of business on the Contribution Date, is located at Weyerhaeuser's facilities other than the Transferred Real Property, other than the Shared Inventory; and

(xxv) all accounts receivable with respect to pulp sales pursuant to which a payment is owed by a third party to the Newco Business and the Weyerhaeuser Business, other than the Shared Accounts Receivable.

For purposes of this Section 2.02(b) only, the "Newco Business" has the meaning given to such term in Article I without regards to the proviso in such definition.

SECTION 2.03. Newco Liabilities. (a) For the purposes of this Agreement, "Newco Liabilities" shall mean all obligations, liabilities and commitments of any nature, whether known or unknown, express or implied, primary or secondary, direct or indirect, liquidated, absolute, accrued, contingent or otherwise and whether due or to become due ("Liabilities"), of Weyerhaeuser or any other member of Weyerhaeuser Group arising out of or primarily relating to the Newco Assets, the Newco Business or the operation or conduct of the Newco Business prior to, on or after the Contribution Date, excluding the Retained Liabilities, which Newco Liabilities shall include (in each case, other than the Retained Liabilities):

(i) all Liabilities under the Transferred Contracts and the Transferred Permits;

(ii) all accounts payable and accrued liabilities solely arising out of the operation or conduct of the Newco Business;

(iii) all Liabilities arising out of or primarily relating to any and all products manufactured or sold by the Newco Business at any time, including obligations, liabilities and commitments for refunds, adjustments, allowances, repairs, exchanges, returns and warranty, product liability, merchantability and other claims relating to such products;

(iv) all Liabilities arising as a result of at any time being the owner, lessee or occupant of, or the operator of the activities conducted at, the Transferred Real Property;

(v) all Environmental Liabilities at any time arising out of or primarily relating to the operation or conduct of the Newco Business or the ownership of, or activities conducted at, the Transferred Real Property;

[[2672857]]

(vi) all Liabilities in respect of any suit, action or proceeding (a "Proceeding"), pending or threatened, and claims, whether or not presently asserted, at any time arising out of or primarily relating to the operation or conduct of the Newco Business;

(vii) all employment and employee benefit-related Liabilities with respect to Transferred Employees and their dependents and beneficiaries (regardless of when or whether such Liabilities arose, arise, were or are incurred), including under or with respect to any Newco Benefit Plan or Newco Benefit Agreement set forth on Schedule 2.03(a)(vii), other than the Retained Benefit Liabilities (the "Benefit Plan Liabilities");

(viii) all Liabilities to be expressly assumed by any member of the Spinco Group pursuant to this Agreement or the other Transaction Documents (including all Taxes to the extent responsibility therefor is assigned to Spinco under the Tax Sharing Agreement);

(ix) all Liabilities to the extent arising out of the Hawesville IRB Indebtedness and the Marlboro IRB Indebtedness;

(x) all Liabilities reflected in the Interim Newco Balance Sheet other than Liabilities discharged after the date of such balance sheet; and

(xi) all accounts payable with respect to pulp liabilities pursuant to which a payment is owed collectively by the Newco Business and the Weyerhaeuser Business to any third party to the extent allocated to Newco in accordance with Schedule 2.04(d) (the "Shared Accounts Payable").

(b) For the purposes of this Agreement, "Retained Liabilities" shall mean the following Liabilities of Weyerhaeuser or any other member of the Weyerhaeuser Group:

(i) all Liabilities not constituting Newco Liabilities;

(ii) the Newco Canada Exchangeco Liabilities and Canadian Retained Liabilities;

(iii) all Liabilities (A) under the Weyerhaeuser Stock Plans (other than any Liabilities with respect to Spinco equity awards issued or required to be issued pursuant to Section 6.08 of the Transaction Agreement) and the Newco U.S. Pension Plans, (B) under or with respect to any Newco Benefit Plan or any Newco Benefit Agreement not set forth on Schedule 2.03(a)(vii), and (C) arising out of claims for medical benefits incurred on or prior to Closing (such plans, collectively, the "Excluded Benefit Plans" and such Liabilities, collectively, the "Retained Benefit Liabilities");

(iv) all Liabilities to be expressly retained or assumed by any member of the Weyerhaeuser Group pursuant to this Agreement or the other Transaction

21

Documents (including all Taxes to the extent responsibility therefor is assigned to Weyerhaeuser under the Tax Sharing Agreement);

(v) all Liabilities under Environmental Laws arising out of or primarily relating to real property, plants and other facilities formerly owned or leased by Weyerhaeuser or any member of the Weyerhaeuser Group and not included in the Transferred Real Property;

(vi) all Liabilities to the extent arising out of the Excluded IRB Indebtedness;

(vii) all accounts payable pursuant to which a payment is owed (i) by any member of the Weyerhaeuser Group to any other member of the Weyerhaeuser Group, or (ii) by the Newco Business to the Weyerhaeuser Business;

(viii) all Liabilities to the extent arising out of (x) any exposure to asbestos or asbestos-containing materials present in products formerly manufactured at facilities located on the Transferred Real Property or at any other facility now or formerly owned by Weyerhaeuser or any member of the Weyerhaeuser Group or (y) the pre-closing manufacture of these products at such facilities;

(ix) all accounts payable with respect to pulp liabilities pursuant to which a payment is owed collectively by the Newco Business and the Weyerhaeuser Business to any third party, other than the Shared Accounts Payable; and

(x) all Liabilities set forth on Schedule 2.03(b)(x).

SECTION 2.04. Post-Closing Working Capital Adjustment. (a) The Statement. Within 60 days after the Closing Date, Weyerhaeuser shall prepare and deliver to Spinco a statement (the "Statement"), setting forth (i) Working Capital of the Newco Business as of the close of business on the day prior to the Closing Date ("Closing Working Capital"), and (ii) the amounts of Shared Inventory, Shared Accounts Receivable and Shared Accounts Payable as of the close of business on the day prior to the Closing Date. Spinco shall provide reasonable assistance to Weyerhaeuser in the preparation of the Statement and shall provide Weyerhaeuser reasonable access at all reasonable times to the personnel, properties, books and records of the Newco Business for such purpose.

(b) Objections; Resolution of Disputes. The Statement shall become final and binding upon the parties on the 30th day following delivery thereof, unless Spinco gives written notice of its disagreement with the Statement (a "Notice of Disagreement") to Weyerhaeuser prior to such date. Any Notice of Disagreement shall (i) specify in reasonable detail the nature of any disagreement so asserted, and (ii) only include disagreements based on mathematical errors or based on Closing Working Capital not being calculated in accordance with this Section 2.04. If a Notice of Disagreement is received by Weyerhaeuser in a timely manner, then the Statement (as revised in accordance with this sentence) shall become final and binding upon Weyerhaeuser and Spinco on the earlier of (A) the date Weyerhaeuser and Spinco resolve in writing any

22

differences they have with respect to the matters specified in the Notice of Disagreement, and (B) the date any disputed matters are finally resolved in writing by the Accounting Firm. During the 30-day period following the delivery of a Notice of Disagreement, Weyerhaeuser and Spinco shall seek in good faith to resolve in writing any differences that they may have with respect to the matters specified in the Notice of Disagreement. At the end of such 30-day period, Weyerhaeuser and Spinco shall submit to an independent accounting firm (the "Accounting Firm") for arbitration any and all matters that remain in dispute and were properly included in the Notice of Disagreement. The Accounting Firm shall be Deloitte & Touche LLP or, if such firm is unable or unwilling to act, such other nationally recognized independent public accounting firm as shall be agreed upon by the parties hereto in writing. Weyerhaeuser and Spinco shall use reasonable efforts to cause the Accounting Firm to render a decision resolving the matters submitted to the Accounting Firm within 30 days of receipt of the submission. Judgment may be entered upon the determination of the Accounting Firm in any court having jurisdiction over the party against which such determination is to be enforced. The cost of any arbitration (including the fees and expenses of the Accounting Firm and reasonable attorney fees and expenses of the parties) pursuant to this Section 2.04 shall be equally shared by Spinco and Weyerhaeuser. Other than the fees and expenses referred to in the immediately preceding sentence, the fees and disbursements of Weyerhaeuser's independent auditors shall be borne by Weyerhaeuser and the fees and disbursements of Spinco's independent auditors shall be borne by Spinco.

(c) Adjustment Payment. If the Closing Working Capital is less than $500,000,000, Weyerhaeuser shall, within ten business days after the Statement becomes final and binding on the parties, pay to Spinco the amount by which Closing Working Capital is less than $500,000,000. If the Closing Working Capital exceeds $600,000,000, Spinco shall, within 10 Business Days after the Statement becomes final and binding on the parties, pay to Weyerhaeuser the amount by which Closing Working Capital exceeds $600,000,000. Any payment made pursuant to this Section 2.04(c) shall be made by wire transfer in immediately available funds to one or more accounts designated in writing at least two business days prior to such payment by the party entitled to receive such payment together with interest thereon at a rate of interest per annum equal to the rate of interest from time to time announced publicly by JPMorgan Chase Bank as its prime rate, calculated on the basis of the actual number of days elapsed divided by 365, from the Closing Date to the date of payment.

(d) Working Capital. The term "Working Capital" means Current Assets minus Current Liabilities. The terms "Current Assets" and "Current Liabilities" mean the current assets and current liabilities, respectively, of the portion of the Newco Business, calculated in the same way, using the same methods, policies, principles and methodologies, as the line items on the Interim Newco Balance Sheet, subject to adjustment in accordance with the Working Capital Principles. Closing Working Capital shall include the Shared Payment Amount. Without limiting the generality of the foregoing, Closing Working Capital is to be calculated (i) using the methods, policies, principles and methodologies set forth on Schedule 2.04(d), whether or not doing so is in accordance with (A) the methods used for calculating Working Capital on the Interim Newco Balance Sheet or (B) GAAP, (ii) if Schedule 2.04(d) does not set forth relevant

23

methods, policies, principles and methodologies, the Closing Working Capital is to be calculated in the same way, using the same methods, policies, principles and methodologies, as were used by Weyerhaeuser in preparation of the Interim Newco Balance Sheet, whether or not doing so is in accordance with GAAP, and (iii) if no relevant methods, policies, principles and methodologies are available pursuant to the foregoing clauses (i) and (ii), the Closing Working Capital is to be calculated in accordance with GAAP applied in a manner consistent with Weyerhaeuser's historic methods, policies, principles and methodologies excluding any effects of the transactions contemplated by this Agreement. The foregoing principles are referred to in this Agreement as the "Working Capital Principles". Closing Working Capital is to be calculated as of close of business on the day prior to the Closing Date in accordance with the Working Capital Principles. The scope of the disputes to be resolved by the Accounting Firm as provided in Section 2.04(b) shall be solely limited to whether such calculation was done in accordance with the Working Capital Principles, and whether there were mathematical errors in the Statement. Under no circumstances shall the Accounting Firm be authorized or permitted to make any other determination or adjustment based on GAAP if Working Capital Principles can be determined pursuant to clauses (i) and (ii) of the definition thereof. For purposes of this Section 2.04(d), any items on or omissions from the Interim Newco Balance Sheet that are based upon errors of fact or mathematical errors or that are not in accordance with GAAP shall be retained for purposes of calculating Closing Working Capital. Without limiting the generality of the foregoing, the Accounting Firm is not authorized or permitted to make any determination as to the accuracy of any representation or warranty in this Agreement or as to compliance by Weyerhaeuser with any of its covenants in this Agreement (other than in this Section 2.04).

(e) <u>Post-Closing Books and Records.</u> Following the Closing Date, neither Spinco nor Weyerhaeuser shall take any actions with respect to the accounting books and records of the Business on which the Statement is to be based that would affect the Statement. During the period of time from and after the Closing Date through the resolution of any payment contemplated by Section 2.04(c) or 2.04(f), each of Spinco and Weyerhaeuser shall afford to each other and their respective accountants and counsel in connection with any actions contemplated by this Section 2.04 reasonable access during normal business hours to all the properties, books, contracts, personnel and records of such party relevant to the Statement, the Notice of Disagreement and any payments contemplated by this Section 2.04.

(f) <u>Shared Payment Amount.</u> On the day that Weyerhaeuser delivers to Spinco the Statement in accordance with Section 2.04(a), Weyerhaeuser shall pay to Spinco an amount equal to (1)(A) the sum of the amount of Shared Accounts Receivable and the amount of Shared Inventory, in each case as reflected on the Statement, minus (B) the amount of the Shared Accounts Payable as reflected on the Statement (the amount so calculated, the "Shared Payment Amount"), plus (2) an amount (the "Pulp Inventory Adjustment Amount") equal to 100% of the sum of (A) the LIFO reserve applicable to the Shared Inventory reflected on the Statement (the "LIFO Reserve Amount") and (B) an amount equal to 5% multiplied by the sum of the Shared Inventory, as reflected in the Statement, and the LIFO Reserve Amount. On the day that the Statement becomes final

24

in accordance with Section 2.04(b), (i) if the Statement (as revised in accordance with Section 2.04(b)) reflects an increase in the Shared Payment Amount or the Pulp Inventory Adjustment Amount, Weyerhaeuser shall pay to Spinco the amount of such increase, and (ii) if the Statement (as revised in accordance with Section 2.04(b)) reflects a decrease in the Shared Payment Amount or the Pulp Inventory Adjustment Amount, Spinco shall pay to Weyerhaeuser the amount of such decrease. Any payment made pursuant to this Section 2.04(f) shall be made by wire transfer in immediately available funds to one or more accounts designated in writing at least two Business Days prior to such payment by the party entitled to receive such payment together. The payment pursuant to this Section 2.04(f) shall be independent of whether a payment is due pursuant to Section 2.04(c). Immediately following the Effective Time, (i) Newco shall transfer and assign to Weyerhaeuser the Shared Inventory and the Shared Accounts Receivable, and (ii) Weyerhaeuser shall assume from Newco the Shared Accounts Receivable. At such time, Newco and Spinco shall have no further rights with respect to the Shared Accounts Receivable and the Shared Inventory (which will become Excluded Assets) and shall have no further obligations with respect to the Shared Accounts Payable (which will become Retained Liabilities) other than the right to receive the payments provided for in this Section 2.04(f). Notwithstanding anything to the contrary in the Transaction Documents, Weyerhaeuser shall at any time control the collection of the Shared Accounts Receivables and the sale of the Shared Inventory and Newco and Spinco shall have no rights to dispute at any time any actions or omissions by Weyerhaeuser in connection therewith.

(g) <u>Allocations and Payments to the Weyerhaeuser Subsidiary.</u> All payments provided for in this Section 2.04, shall be allocated among Weyerhaeuser, Weyerhaeuser Canada and Weyerhaeuser Saskatchewan according to the respective amounts of Working Capital, Shared Accounts Receivable, Shared Accounts Payable and Shared Inventory attributable to each of them as determined by Weyerhaeuser. At Weyerhaeuser's direction, such payments may be made to or by Weyerhaeuser, Weyerhaeuser Canada or Weyerhaeuser Saskatchewan. Any payments allocable to Weyerhaeuser Canada or Weyerhaeuser Saskatchewan which are received or made by Weyerhaeuser shall be received or made as agent for Weyerhaeuser Canada or, as applicable, Weyerhaeuser Saskatchewan and shall promptly be remitted by Weyerhaeuser to Weyerhaeuser Canada or, as applicable, Weyerhaeuser Saskatchewan (or paid by Weyerhaeuser Canada or, as applicable, Weyerhaeuser Saskatchewan to Weyerhaeuser).

(h) <u>Tax Treatment.</u> Any payments to Spinco pursuant to this Section 2.04 shall be treated for all Tax purposes as a capital contribution to Spinco. Any payments made by Spinco pursuant to this Section 2.04 shall be treated for all Tax purposes as an adjustment to the value of the consideration paid for the Contribution. This Section 2.04(h) shall not apply to any payment under Section 2.04(f).

SECTION 2.05. <u>Documents Relating to Transfers of Newco Assets and Assumption of Newco Liabilities.</u> In furtherance of the assignment, transfer and conveyance of Newco Assets and the assumption of Newco Liabilities pursuant to Section 2.01, on or prior to the Contribution Date and, with respect to Delayed Transfer Assets and Delayed Transfer Liabilities, at such time after the Distribution Date as such

25

[[2672857]]

Delayed Transfer Asset or Delayed Transfer Liability can be transferred (a) Weyerhaeuser shall execute and deliver, and shall cause its subsidiaries to execute and deliver, such bills of sale, deeds, lease assignments and assumptions, leases, subleases, stock powers, certificates of title, assignments of contracts and other instruments of transfer, conveyance and assignment (including supplemental transfer tax forms, if applicable) as and to the extent necessary to evidence the transfer, conveyance and assignment of Weyerhaeuser's or the applicable subsidiary's right, title and interest in and to the Newco Assets to Newco (collectively, the "Asset Conveyance Documents"), and (b) Newco shall execute and deliver to Weyerhaeuser such assignments of contracts and other instruments of assumption as and to the extent necessary to evidence the valid and effective assumption by Newco of the Newco Liabilities (collectively, the "Liabilities Assumption Documents"); provided, that any instruments executed and delivered pursuant to this Section 2.05 shall be in a form acceptable to Domtar, which consent shall not be unreasonably withheld or delayed.

      SECTION 2.06. Other Ancillary Agreements. Effective as of the Contribution Date, each of Weyerhaeuser, Spinco and Newco shall execute and deliver, and cause its subsidiaries to execute and deliver, all Ancillary Agreements to which it is a party.

      SECTION 2.07. The Canadian Asset Sale. (a) Subject to Section 7.08, on or prior to the Contribution Date, Newco shall cause Exchangeco Subsidiary to purchase from Weyerhaeuser Canada and Weyerhaeuser Saskatchewan the Newco Canada Exchangeco Assets for fair market value, which shall be an aggregate purchase price of (i) $500,000,000 in cash, and (ii) the assumption by Exchangeco Subsidiary of the Newco Canada Exchangeco Liabilities (the "Canadian Asset Sale").

      (b) Subject to Section 7.08, in connection with the Canadian Asset Sale, Newco and Exchangeco Subsidiary shall enter into an agreement or agreements with Weyerhaeuser Canada and Weyerhaeuser Saskatchewan (the "Canadian Purchase Agreement") and such other documents and instruments, in each case in such form as shall be approved by Weyerhaeuser and Domtar, (i) to provide for and evidence the sale of the Newco Canada Exchangeco Assets to Exchangeco Subsidiary and the assumption of the Newco Canada Exchangeco Liabilities by Exchangeco Subsidiary, (ii) to provide for indemnification of Weyerhaeuser Canada, Weyerhaeuser Saskatchewan and Exchangeco Subsidiary as provided in Sections 4.04 and 4.05, (iii) to provide for the tax elections set forth under such heading in Exhibit A, and (iv) to provide for the assumption of the Assumed Canadian Plans by Exchangeco Subsidiary pursuant to Section 6.09(g) of the Transaction Agreement.

      (c) Subject to Section 7.08, prior to the Canadian Asset Sale, Weyerhaeuser shall (i) transfer to Newco $500,000,000 in cash, (ii) cause Newco to make a capital contribution to DDII in the amount of $50,000,000 and a capital contribution to Newco Holding in the amount of $450,000,000, (iii) cause DDII to purchase from Newco Holding 111 shares of Class B non-voting common stock of Newco Holding for $50,000,000, (iv) cause Newco Holding to purchase from Newco Canada additional common shares of Newco Canada for $500,000,000, (v) cause Newco Canada to lend the

26

Canadian dollar equivalent of $500,000,000 minus CDN$1,100,000 to Newco Canada Exchangeco in exchange for a promissory note in a form provided by Domtar at least three Business Days prior to the Canadian Asset Sale, and (vi) cause Newco Canada Exchangeco to lend the Canadian dollar equivalent of $500,000,000 to Exchangeco Subsidiary in exchange for a promissory note, in a form provided by Domtar at least three Business Days prior to the Canadian Asset Sale. For purposes of this Section 2.07(c), the Canadian dollar equivalent of a payment denominated in U.S. dollars will be calculated at the Bank of Canada noon rate on the last Business Day preceding such payment.

(d)  Subject to Section 7.08, prior to the Canadian Asset Sale, Weyerhaeuser shall cause Newco Canada (i) to purchase from Newco Canada Exchangeco 110,000 Class C non-voting preference shares of Newco Canada Exchangeco for CDN$1,100,000, such Class C non-voting preference shares to have such rights, privileges, restrictions and conditions as determined by Domtar at least three Business Days prior to the Canadian Asset Sale, and (ii) to enter into an agreement with a third party providing for the sale by Newco Canada to such third party of the Class C non-voting preference shares of Newco Canada Exchangeco, which agreement shall be in a form provided by Domtar at least three Business Days prior to the Canadian Asset Sale; provided, in each of clauses (i) and (ii) of this Section 2.07(d), that, (A) Domtar shall have selected at least three Business Days prior to the Canadian Asset Sale a third party willing to purchase such Class C non-voting preference shares under the terms and conditions set forth in this clause (d), and (B) the effectiveness of the sale of such Class C non-voting preference shares by Newco Canada to such third party shall be conditioned in all respects on the closing of the Arrangement.

(e)  Prior to the Contribution and with the consent of Domtar, Weyerhaeuser and Newco shall agree to the Schedules for attachment to Exhibit A.

SECTION 2.08.  Disclaimer of Representations and Warranties.  EXCEPT AS MAY EXPRESSLY BE SET FORTH IN THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT, (A) NONE OF WEYERHAEUSER OR ANY MEMBER OF THE WEYERHAEUSER GROUP MAKES ANY REPRESENTATION OR WARRANTY OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THE NEWCO EQUITY INTERESTS, THE NEWCO ASSETS, THE NEWCO LIABILITIES OR THE NEWCO BUSINESS, ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (INCLUDING ANY CONSENTS OR APPROVALS REQUIRED IN CONNECTION THEREWITH) OR THE BUSINESS, ASSETS, CONDITION OR PROSPECTS (FINANCIAL OR OTHERWISE) OF, OR ANY OTHER MATTER INVOLVING THE NEWCO EQUITY INTERESTS, THE NEWCO ASSETS, THE NEWCO LIABILITIES OR THE NEWCO BUSINESS; (B) ALL OF THE NEWCO EQUITY INTERESTS, THE NEWCO ASSETS TO BE TRANSFERRED OR THE NEWCO LIABILITIES TO BE ASSUMED OR TRANSFERRED IN ACCORDANCE WITH THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT SHALL BE TRANSFERRED OR ASSUMED ON AN "AS IS, WHERE IS" BASIS, AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE ARE HEREBY EXPRESSLY DISCLAIMED; AND (C) NONE OF THE

27

PARTIES HERETO OR ANY OTHER PERSON MAKES ANY REPRESENTATION OR WARRANTY WITH RESPECT TO ANY INFORMATION, DOCUMENTS OR MATERIAL MADE AVAILABLE IN CONNECTION WITH THE CONTRIBUTION, THE DISTRIBUTION OR THE ENTERING INTO OF THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS OR THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

SECTION 2.09. <u>Governmental Approvals and Consents.</u> (a) Subject to Section 6.07(c) of the Transaction Agreement, upon the terms and subject to the conditions set forth in this Agreement, each of the parties hereto shall use its reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective, on the Contribution Date or the Distribution Date, as applicable, the transactions contemplated by this Agreement and the other Transaction Documents, including (i) the obtaining of all necessary actions or nonactions, waivers, consents and approvals from Governmental Entities and the making of all necessary registrations and filings (including filings with Governmental Entities, if any) and the taking of all reasonable steps as may be necessary to obtain an approval or waiver from, or to avoid an action or proceeding by, any Governmental Entity, (ii) the obtaining of all necessary consents, approvals or waivers from third parties, (iii) the defending of any lawsuits or other legal proceedings, whether judicial or administrative, challenging this Agreement or any other Transaction Document including seeking to have any stay or temporary restraining order entered by any court or other Governmental Entity vacated or reversed and (iv) the execution and delivery of any additional instruments necessary to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

(b) If the transfer, assignment or assumption of any Delayed Transfer Asset or any Delayed Transfer Liability intended to be transferred, assigned or assumed hereunder is not consummated prior to or at the Contribution Date then the member of the Weyerhaeuser Group retaining such Delayed Transfer Asset or such Delayed Transfer Liability shall thereafter hold such Delayed Transfer Asset or such Delayed Transfer Liability for the use and benefit, insofar as reasonably practicable, of Newco (at the expense of Newco). In addition, the member of the Weyerhaeuser Group retaining such Delayed Transfer Asset or such Delayed Transfer Liability shall take such other actions in order to place Newco, insofar as reasonably practicable, in the same position as if such Delayed Transfer Asset or such Delayed Transfer Liability had been transferred or assumed as contemplated hereby and so that all the benefits and burdens relating to such Delayed Transfer Asset or such Delayed Transfer Liability, including possession, use, risk of loss, potential for gain, and dominion, control and command over such asset, are to inure from and after the Contribution Date to Newco. To the extent permitted by law and to the extent otherwise permissible in light of any Legal Impediment or required Consent and/or Governmental Approval, Newco shall be entitled to, and shall be responsible for, the management and the benefits and burdens of any Delayed Transfer Asset or any Delayed Transfer Liability not yet transferred to or assumed by it as a result of this Section 2.09(b) and the parties hereto agree to use reasonable best efforts to cooperate and coordinate with respect thereto.

28

(c) If and when the Legal Impediments and the Consents and/or Governmental Approvals, the failure to remove or the absence of which caused the deferral of the transfer or assumption of any Newco Asset or Newco Liability pursuant to Section 2.01(c), are removed or obtained, as the case may be, the transfer and assumption of the applicable Newco Asset or Newco Liability shall be promptly effected in accordance with the terms of this Agreement and/or the other applicable Transaction Documents, without the payment of additional consideration. After the Distribution Date, subject to Section 2.09(d), Weyerhaeuser and Newco agree to, and shall cause their respective subsidiaries to, use reasonable best efforts to remove such Legal Impediments and obtain such Consents and/or Governmental Approvals as promptly as practicable.

(d) The member of the Weyerhaeuser Group retaining a Delayed Transfer Asset or Delayed Transfer Liability due to the deferral of the transfer or assumption of such Newco Asset or Newco Liability pursuant to Section 2.01(c) shall not be obligated, in connection with this Section 2.09, to expend any money unless the necessary funds are advanced by Newco, other than reasonable out-of-pocket expenses, attorneys' fees and recording or similar fees, all of which shall be promptly reimbursed by Newco. Any member of the Spinco Group holding an Excluded Asset or a Retained Liability improperly transferred to or assumed by the Spinco Group shall not be obligated, in connection with the foregoing, to expend any money unless the necessary funds are advanced by Weyerhaeuser, other than reasonable out-of-pocket expenses, attorneys' fees and recording or similar fees, all of which shall be promptly reimbursed by Weyerhaeuser.

(e) If consent to assign the Bowater Agreement is needed but has not been obtained, the Bowater Agreement shall be a Delayed Transfer Asset in accordance with this Section 2.09. In such event, Weyerhaeuser shall pursue, and cause its subsidiaries to pursue, upon written request of Newco and subject to Sections 2.09(b) and 2.09(d), any claims for indemnification or reimbursement with respect to any liabilities and obligations for which the Bowater Agreement provides that Weyerhaeuser and/or Weyerhaeuser Canada has an indemnification or reimbursement claim. To the extent Newco makes any payment with respect to any liability of Weyerhaeuser or Weyerhaeuser Canada for which Weyerhaeuser or Weyerhaeuser Canada would be entitled to indemnification or reimbursement under the Bowater Agreement, Newco shall be subrogated to the maximum extent permitted by applicable Law to all rights of Weyerhaeuser and Weyerhaeuser Canada to indemnification and reimbursement under the Bowater Agreement with respect to such liability, and Weyerhaeuser or Weyerhaeuser Canada shall promptly pay to Newco the proceeds received by Weyerhaeuser or Weyerhaeuser Canada from any claims for indemnification or reimbursement under the Bowater Agreement. The foregoing shall not apply to any liabilities and obligations with respect to the Bowater Claim, which is expressly excluded from this Section 2.09.

SECTION 2.10. Separation of Contractual Arrangements. (a) Weyerhaeuser and Newco shall in good faith negotiate and use commercially reasonable efforts to enter into a joint purchase agreement with respect to the Contracts that are set forth on Schedule 2.10(a).

29

(b) Upon request of Newco after the Effective Time, Weyerhaeuser shall provide reasonable assistance to Newco, at Newco's expense, so that Newco may, with respect to each Contract set forth on Schedule 2.10(b), either, at Newco's election, (i) obtain a new Contract between any member of the Spinco Group and the third party to such Contract under terms and conditions acceptable to Newco, or (ii) benefit from such Contract as a partial assignee or sublessee thereunder.

SECTION 2.11. Employee Matters. (a) Employees. On or prior to the Distribution Date, Weyerhaeuser shall use reasonable best efforts to transfer to the appropriate member of the Spinco Group, including by causing the appropriate member of the Spinco Group to offer employment to, (a) each Newco Employee set forth on Schedule 2.11(a)(i), (b) each Mill Employee other than those set forth on Schedule 2.11(a)(ii), (c) each Newco Employee set forth on Schedule 2.11(a)(iii), (d) each Newco Employee employed in connection with the Forest Licenses in Ontario and Saskatchewan to be transferred to Newco (the "Forest Management Employees") set forth on Schedule 2.11(a)(iv), and (e) Newco Employees or new hires to perform the functions set forth on Schedule 2.11(a)(v) in accordance with Section 6.09(a)(iii) of the Transaction Agreement, provided, that, with the exception of the new hires included in clause (e), such Newco Employees are employed by Weyerhaeuser or any other member of the Weyerhaeuser Group immediately prior to the Distribution Date. Notwithstanding the foregoing, no Disabled Newco Employee shall be transferred to any member of the Spinco Group other than in accordance with Section 6.09(a)(ii) of the Transaction Agreement. The parties agree that no employee (other than the new hires referenced in clause (e) above) who is not engaged in the Newco Business will be a Transferred Employee. For purposes of this Section 2.11, "Mill Employee" means any Newco Employee employed by Weyerhaeuser or a Weyerhaeuser Subsidiary at the Transferred Real Property immediately prior to the Distribution Date (including any individuals who are not actively at work on the Distribution Date due to vacation, holiday, illness, jury duty, bereavement leave or other authorized leave of absence, Disabled Newco Employees, except to the extent contemplated in Sections 6.09(a)(ii) of the Transaction Agreement and U.S. WC Newco Employees, except to the extent contemplated in Section 6.09(a)(iii) of the Transaction Agreement).

(b) Transfer of Assets and Assumption of Liabilities. On or prior to the Distribution Date, (i) Weyerhaeuser shall transfer the Benefit Plan Assets to Newco (or the appropriate member of the Spinco Group or New Benefit Plan (including any related trust)), and (ii) Newco (or the appropriate member of the Spinco Group or New Benefit Plan (including any related trust)) shall assume the Benefit Plan Liabilities, in each case in accordance with the provisions of Section 6.09 of the Transaction Agreement.

(c) Collective Bargaining Agreements. During the period starting on the date of this Agreement and ending on the Distribution Date, as contemplated in Section 6.09 of the Transaction Agreement, Weyerhaeuser shall cause Newco (or the appropriate member of the Spinco Group) to comply in all material respects with CBAs (including all obligations to contribute to any pension plans) that cover one or more Transferred Employees.

[[2672857]]

(d) <u>Retiree Benefits.</u> Notwithstanding any provision of this Agreement to the contrary, following the Distribution, if Spinco or any affiliate of Spinco negotiates any changes in benefit levels or cost sharing that increase the retiree benefits for Canadian Newco Employees under a collective bargaining agreement, Spinco shall ensure that such changes will not apply to any persons who retired prior to the Distribution Date. In the event that, notwithstanding the preceding limitation or anything to the contrary in this Agreement, Spinco or any affiliate of Spinco negotiates any changes in benefit levels or cost sharing that increase the retiree benefits under a collective bargaining agreement for Canadian Newco Employees who do not become Transferred Employees and who retired prior to the Distribution Date, Spinco shall promptly reimburse Weyerhaeuser for all costs, expenses or liabilities resulting from such increase and shall indemnify and hold harmless Weyerhaeuser and all its affiliates for any Liabilities arising in connection therewith.

SECTION 2.12. <u>Transfer of Newco Equity Interests and Issuance of Spinco Common Stock.</u> (a) On the Contribution Date, (i) Weyerhaeuser shall sell, assign, transfer and convey to Spinco all the Newco Equity Interests held by Weyerhaeuser and constituting all the issued and outstanding Newco Equity Interests, (ii) Spinco shall issue and deliver to Weyerhaeuser the number of shares of Spinco Common Stock determined in accordance with Section 2.12(b), and (iii) Spinco shall pay to Weyerhaeuser an amount in cash equal to the New Debt Amount.

(b) On the Contribution Date, Spinco shall issue to Weyerhaeuser the number of shares of Spinco Common Stock equal to (x) the product, rounded to the nearest whole number, of (i) 11/9, and (ii) the sum of (A) the number of Domtar Common Shares issued and outstanding on the Measurement Date, (B) the number of Domtar Restricted Shares outstanding on the close of business on the Measurement Date to the extent not included in clause (A) above, (C) the aggregate number of Domtar Common Shares issuable pursuant to Domtar DSUs, Domtar PSUs and Domtar Rights, in each case outstanding on the close of business on the Measurement Date, (D) the aggregate number of Domtar Common Shares issuable pursuant to Domtar Options outstanding on the close of business on the Measurement Date that have an exercise price equal to or less than the volume weighted average (rounded to the nearest 1/10,000) of the trading prices of the Domtar Common Shares on the NYSE as reported by Bloomberg Financial Markets (or such other source as the parties shall agree in writing) for the last trading day immediately prior to the Measurement Date, and (E) the aggregate number of Domtar Common Shares that would have been issuable pursuant to Exchanged Options (as defined below) outstanding on the close of business on the Measurement Date had the Domtar Options (other than Domtar Options that have an exercise price equal to or less than the volume weighted average (rounded to the nearest 1/10,000) of the trading prices of the Domtar Common Shares on the NYSE as reported by Bloomberg Financial Markets (or such other source as the parties shall agree in writing) for the last trading day immediately prior to the Measurement Date) been exchanged for Exchanged Options as of the Measurement Date in accordance with the principles set out in the calculation model in Section 1.04(j) of the Domtar Disclosure Letter, minus (y) the sum of (A) the aggregate number of shares of Spinco Common Stock issuable pursuant to Substituted Spinco RSUs, Substituted Spinco SARs and Substituted Spinco Options, and (B) the

31

number of shares of Spinco Common Stock outstanding prior to the Contribution. For purposes of this Section 2.12(b):

(1) "Domtar Options", "Amended Replacement Options", "Domtar Restricted Shares", "Domtar Rights", "Domtar DSUs", "Domtar PSUs", "Substituted Spinco Options", "Substituted Spinco SARs" and "Substituted Spinco RSUs" have the meanings set forth in the Transaction Agreement.

(2) "Exchanged Options" means options to purchase Domtar Common Shares having an exercise price equal to the volume weighted average (rounded to the nearest 1/10,000) of the trading prices of the Domtar Common Shares on the NYSE as reported by Bloomberg Financial Markets (or such other source as the parties shall agree in writing) on the last trading day immediately prior to the Measurement Date.

(3) "Measurement Date" means (i) if the Distribution is effected in its entirety as a pro rata dividend, the last Business Day immediately prior to the Contribution Date, and (ii) to the extent that the Distribution is effected, in whole or in part, pursuant to an exchange offer, the Business Day determined by Weyerhaeuser that is at least 10 Business Days after the commencement of such exchange offer but not more than 20 Business Days prior to the Distribution Date.

(4) The number of shares of Spinco Common Stock issuable pursuant to Substituted Spinco Options, Substituted Spinco SARs and Substituted Spinco RSUs shall be calculated as provided in Section 6.08 of the Transaction Agreement, except that, for purposes of this Section 2.12(b) only, the "Option Exchange Ratio" shall be a fraction (A) the numerator of which shall be the Average Weyerhaeuser Pre-Distribution Price as defined in Section 6.08 of the Transaction Agreement unless on the Measurement Date the Weyerhaeuser Common Stock is trading ex-dividend with respect to the Distribution, in which case the numerator of which shall be the volume weighted average (rounded to the nearest 1/10,000) of the trading prices of Weyerhaeuser Common Stock on the NYSE as reported by Bloomberg Financial Markets (or such other source as the parties shall agree in writing) on the last trading day immediately prior to the Measurement Date on which the Weyerhaeuser Common Stock does not trade ex-dividend with respect to the Distribution, and (B) the denominator of which shall be the Average Spinco Distribution Price as defined in Section 6.08 of the Transaction Agreement unless on the Measurement Date the Average Spinco Distribution Price cannot be determined, in which case the denominator of which shall be the volume weighted average (rounded to the nearest 1/10,000) of the trading prices of the Domtar Common Shares on the NYSE as reported by Bloomberg Financial Markets (or such other source as the parties shall agree in writing) on the last trading day immediately prior to the Measurement Date.

32

[[2672857]]

ARTICLE III

The Distribution

SECTION 3.01.  Form of Distribution.  (a)  Weyerhaeuser may elect to effect the Distribution in the form of either a dividend of shares of Spinco Common Stock distributed to the Eligible Holders on a pro rata basis, an offer to exchange shares of Spinco Common Stock for Eligible Shares or a combination thereof.

(b)  If Weyerhaeuser elects to effect all or a portion of the Distribution in the form of a pro rata dividend, prior to the Distribution Date, the Board of Directors of Weyerhaeuser, in accordance with applicable law, shall establish the Record Date and the Distribution Date and any appropriate procedures in connection with the Distribution and all shares of Spinco Common Stock held by Weyerhaeuser on the Distribution Date shall be distributed to the Eligible Holders as provided in Section 3.03.  To the extent the Distribution is effected as an exchange offer followed by a pro rata dividend of the remaining shares of Spinco Common Stock held by Weyerhaeuser, Weyerhaeuser shall use its reasonable best efforts to set the Record Date as the date on which the validly tendered Eligible Shares are accepted for payment or as soon thereafter as practicable.

(c)  If Weyerhaeuser elects to effect all or a portion of the Distribution as an exchange offer of shares of Spinco Common Stock for Eligible Shares, Weyerhaeuser shall determine the terms of such exchange offer, including the number of shares of Spinco Common Stock that shall be offered for each validly tendered Eligible Share, the period during which such exchange offer shall remain open, the procedures for the tender and exchange of shares and all other provisions of such exchange offer, which shall comply with securities law requirements applicable to such exchange offer.  In the event the exchange offer is not fully subscribed, any shares of Spinco Common Stock issued to Weyerhaeuser on the Contribution Date that are not exchanged pursuant to the exchange offer will be distributed as a dividend to the Eligible Holders on a pro rata basis with a Record Date established in the same manner as provided in Section 3.01(b).

SECTION 3.02.  The Distribution.  (a)  Subject to the satisfaction or waiver of the conditions set forth in Section 5.01, to the extent the Distribution is effected as a pro rata dividend, each Eligible Holder shall be entitled to receive for each Eligible Share held by such Eligible Holder a number of shares of Spinco Common Stock equal to the total number of shares of Spinco Common Stock held by Weyerhaeuser on the Distribution Date, in each case after giving effect to any prior Distribution effected as an exchange offer, divided by the sum of (A) the total number of shares of Weyerhaeuser Common Stock outstanding on the Record Date, (B) the total number of shares of Weyerhaeuser Common Stock to be issued upon the exchange of all Weyerhaeuser Canada Exchangeable Shares outstanding on the Record Date (other than Weyerhaeuser Canada Exchangeable Shares owned by Weyerhaeuser), and (C) if and to the extent determined by Weyerhaeuser, the total number of Weyerhaeuser Benefit Plan Shares issued by Weyerhaeuser after the Record Date and prior to the Distribution Date (rounded down to the nearest 1/10,000 of a share).

33

(b) Subject to the satisfaction or waiver of the conditions set forth in Section 5.01, to the extent the Distribution is effected as an exchange offer, the number of shares of Spinco Common Stock to be exchanged for each Eligible Share in such exchange offer shall be determined by Weyerhaeuser in its sole discretion.

(c) Fractional shares of Spinco Common Stock that would otherwise be received by any Eligible Holders shall be aggregated, and Weyerhaeuser shall cause the shares obtained thereby to be sold by the transfer agent on behalf of the Eligible Holders, in the open market or otherwise, and the net proceeds thereof, after deducting any required withholding taxes and brokerage charges, commissions and transfer taxes, to be distributed to such Eligible Holders.

(d) None of the parties hereto or the Exchange Agent shall be liable to any person in respect of any shares of Spinco Common Stock (or dividends or distributions with respect thereto) or proceeds from a sale pursuant to Section 3.02(c) that are delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law.

(e) Weyerhaeuser, Spinco and Newco Canada Exchangeco, as the case may be, shall be entitled, and may instruct the transfer agent or the Exchange Agent, to deduct and withhold from the consideration otherwise payable pursuant to this Agreement such amounts required to be deducted and withheld with respect to the making of such payments under the Code, the ITA or any provision of local or foreign tax law. Any withheld amounts shall be treated for all purposes of this Agreement as having been paid to the persons otherwise entitled thereto.

SECTION 3.03. Delivery of Shares of Spinco Common Stock. (a) To the extent the Distribution is effected as a pro rata dividend, Weyerhaeuser shall give irrevocable instructions to the transfer agent to deliver the appropriate number of shares of Spinco Common Stock (in accordance with Section 3.02(a)) to each Eligible Holder, which delivery may be in the form of a certificate or, in whole or in part, in book-entry form through the direct registration system.

(b) To the extent the Distribution is effected as an exchange offer, Weyerhaeuser shall (i) determine the procedures for the tender and exchange of shares, (ii) appoint a bank or trust company (or similar institution) (the "Exchange Agent"), and (iii) enter into an agreement with the Exchange Agent providing for, among other things, the actions to be taken to effect the exchange offer.

SECTION 3.04. Timing of the Distribution. Subject to Sections 6.04(d) and 6.17 of the Transaction Agreement, Weyerhaeuser shall consummate the Contribution and the Distribution as promptly as practicable after satisfaction (or waiver to the extent permissible) of all of the conditions to the Contribution and the Distribution specified in Section 5.01 (other than conditions that by their nature are to be satisfied at the time of the Contribution, the Distribution or the Arrangement and shall in fact be satisfied at such time(s)). Subject to the preceding sentence and in accordance with

34

[[2672857]]

applicable law, the Board of Directors of Weyerhaeuser will determine the Contribution Date and the Distribution Date.

## ARTICLE IV

### Mutual Releases; Indemnification

SECTION 4.01. <u>Release of Pre-Distribution Claims.</u> (a) Except as provided in Section 4.01(c), effective as of the Distribution Date, Spinco does hereby, for itself and each other member of the Spinco Group, their respective affiliates (other than any member of the Weyerhaeuser Group), successors and assigns, remise, release and forever discharge Weyerhaeuser and the members of the Weyerhaeuser Group, their respective affiliates (other than any member of the Spinco Group), successors and assigns from any and all liabilities whatsoever, whether at law or in equity (including any right of contribution), whether arising under any contract or agreement, by operation of law or otherwise, existing or arising from any acts or events occurring or failing to occur or alleged to have occurred or to have failed to occur or any conditions existing or alleged to have existed on or before the Distribution Date, including in connection with the transactions and all other activities to implement any of the Contribution and the Distribution.

(b) Except as provided in Section 4.01(c), effective as of the Distribution Date, Weyerhaeuser does hereby, for itself and each other member of the Weyerhaeuser Group, their respective affiliates (other than any member of the Spinco Group), successors and assigns, remise, release and forever discharge Spinco, the respective members of the Spinco Group, their respective affiliates (other than any member of the Weyerhaeuser Group), successors and assigns from any and all liabilities whatsoever, whether at law or in equity (including any right of contribution), whether arising under any contract or agreement, by operation of law or otherwise, existing or arising from any acts or events occurring or failing to occur or alleged to have occurred or to have failed to occur or any conditions existing or alleged to have existed on or before the Distribution Date, including in connection with the transactions and all other activities to implement any of the Contribution and the Distribution.

(c) Nothing contained in Section 4.01(a) or 4.01(b) shall impair any right of any Person to enforce this Agreement or any other Transaction Document. Nothing contained in Section 4.01(a) or 4.01(b) shall release any Person from:

(i) any liability, contingent or otherwise, assumed, transferred, assigned or allocated to the Group of which such Person is a member in accordance with, or any other liability of any member of any Group under this Agreement or any other Transaction Document;

(ii) any liability that the parties may have with respect to indemnification pursuant to this Agreement for claims brought against the parties by third Persons, which liability shall be governed by the provisions of this Article IV and, if applicable, the appropriate provisions of the other Transaction Documents; or

35

(iii) any liability the release of which would result in the release of any Person other than a Person released pursuant to this Section 4.01.

(d) Spinco shall not make, and shall not permit any member of the Spinco Group and, after the Effective Time, Domtar and Domtar's Subsidiaries, to make, any claim or demand, or commence any Action asserting any claim or demand, including any claim of contribution or any indemnification, against Weyerhaeuser or any member of the Weyerhaeuser Group, or any other Person released pursuant to Section 4.01(a), with respect to any liabilities released pursuant to Section 4.01(a). Weyerhaeuser shall not, and shall not permit any member of the Weyerhaeuser Group, to make any claim or demand, or commence any Action asserting any claim or demand, including any claim of contribution or any indemnification against Spinco or any member of the Spinco Group, or any other Person released pursuant to Section 4.01(b), with respect to any liabilities released pursuant to Section 4.0l(b).

(e) At any time, at the request of any other party, each party shall cause each member of its respective Group to execute and deliver releases reflecting the provisions of this Section 4.01.

SECTION 4.02. Indemnification by Weyerhaeuser. From and after the Distribution Date, Weyerhaeuser shall indemnify, defend and hold harmless Spinco, each member of the Spinco Group and each of their affiliates and their respective officers, directors, employees, shareholders, agents and representatives (the "Spinco Indemnitees") from and against any and all claims, losses, damages, liabilities, obligations or expenses, including reasonable legal fees and expenses (collectively, "Losses"), to the extent arising or resulting from any of the following:

(i) any Retained Liability (other than any Newco Canada Exchangeco Liability);

(ii) all liabilities (including third party claims) imposed on, sustained, incurred or suffered by any of the Spinco Indemnitees arising out of or relating primarily to the Weyerhaeuser Business, the assets of the Weyerhaeuser Business or the failure of any member of the Weyerhaeuser Group to pay, perform or otherwise promptly discharge any Retained Liabilities (other than any Newco Canada Exchangeco Liabilities) in accordance with their terms, whether occurring, existing or asserted before, on or after the Distribution Date (other than the Newco Liabilities and the Newco Canada Exchangeco Liabilities);

(iii) any fees, expenses or other payments incurred or owed by Weyerhaeuser to any agent, broker, investment banker or other firm or Person retained or employed by it in connection with the transactions contemplated by this Agreement and the other Transaction Documents, except to the extent set forth in Section 6.11 of the Transaction Agreement; and

(iv) any claim that the transactions contemplated by this Agreement and the other Transaction Documents effected prior to or at Closing give rise to any

36

[[2672857]]

severance or other similar benefits with respect to, or constitute an actual or constructive termination or severance of employment of, any Transferred Employee or any employee of Weyerhaeuser or any member of the Weyerhaeuser Group who is not a Transferred Employee.

SECTION 4.03. Indemnification by Spinco. From and after the Distribution Date, Spinco and Newco, jointly and severally, shall indemnify, defend and hold harmless Weyerhaeuser, each member of the Weyerhaeuser Group and each of their affiliates and their respective officers, directors, employees, shareholders, agents and representatives (the "Weyerhaeuser Indemnitees") from and against any and all Losses, to the extent arising or resulting from any of the following:

(i) any Newco Liability;

(ii) any liabilities (including third party claims) imposed on, sustained, incurred or suffered by any of the Weyerhaeuser Indemnitees arising out of or relating primarily to the Newco Business, the Newco Assets or the failure of Spinco or any other member of the Spinco Group to pay, perform or otherwise promptly discharge any Newco Liabilities in accordance with their terms, whether occurring, arising, existing or asserted before, on or after the Distribution Date (other than the Retained Liabilities);

(iii) any claim that any action taken or omission by Spinco or any member of the Spinco Group after the Closing with respect to any Transferred Employee gives rise to any severance or other similar benefits with respect to, or constitutes an actual or constructive termination or severance of employment of, any Transferred Employee;

(iv) any discontinuance, suspension or modification by Spinco, Newco or any of their respective affiliates on or after the Distribution Date of any employee benefit plan, program, arrangement or policy, including those described in Section 4.11(a) of the Transaction Agreement; and

(v) any liabilities in respect of the financing of the Transaction Debt and all agreements relating to such financing.

SECTION 4.04. Indemnification by Weyerhaeuser Canada and Weyerhaeuser Saskatchewan. (a) From and after the Distribution Date, Weyerhaeuser shall cause Weyerhaeuser Canada and Weyerhaeuser Saskatchewan, jointly and severally, to indemnify, defend and hold harmless Exchangeco Subsidiary and its affiliates and each of their respective officers, directors, employees, shareholders, agents and representatives (the "Newco Canada Exchangeco Indemnitees") from and against any and all Losses, to the extent arising or resulting from any of the following:

(i) any Canadian Retained Liability;

(ii) any liabilities (including third party claims) imposed on, sustained, incurred or suffered by any of the Newco Canada Exchangeco Indemnitees

37

arising out of or relating primarily to the operation of any portion of the Weyerhaeuser Business by Weyerhaeuser Canada or Weyerhaeuser Saskatchewan, the assets of the Weyerhaeuser Business owned by Weyerhaeuser Canada or Weyerhaeuser Saskatchewan or the failure of Weyerhaeuser Canada or Weyerhaeuser Saskatchewan to pay, perform or otherwise promptly discharge any Canadian Retained Liabilities in accordance with their terms, whether occurring, existing or asserted before, on or after the Distribution Date (other than the Newco Canada Exchangeco Liabilities);

(iii) any fees, expenses or other payments incurred or owed by Weyerhaeuser Canada or Weyerhaeuser Saskatchewan to any agent, broker, investment banker or other firm or Person retained or employed by it in connection with the transactions contemplated by this Agreement and the other Transaction Documents, except to the extent set forth in Section 6.11 of the Transaction Agreement; and

(iv) any claim that the transactions contemplated by this Agreement and the other Transaction Documents effected prior to or at Closing give rise to an severance or other similar benefits with respect to, or constitute an actual or constructive termination or severance of employment of, any Transferred Employee or any employee of Weyerhaeuser Canada or Weyerhaeuser Saskatchewan who is not a Transferred Employee.

(b) From and after the Distribution Date, Weyerhaeuser shall guarantee the due and complete performance by Weyerhaeuser Canada and Weyerhaeuser Saskatchewan of their respective obligations under Section 4.04(a).

SECTION 4.05. Indemnification by Exchangeco Subsidiary. (a) From and after the Distribution Date, Spinco and Newco, jointly and severally, shall cause Exchangeco Subsidiary to indemnify, defend and hold harmless Weyerhaeuser Canada, Weyerhaeuser Saskatchewan and each of their respective affiliates, officers, directors, employees, shareholders, agents and representatives (the "Weyerhaeuser Canada Indemnitees") from and against any and all Losses, to the extent arising or resulting from any of the following:

(i) any Newco Canada Exchangeco Liability;

(ii) any liabilities (including third party claims) imposed on, sustained, incurred or suffered by any of the Weyerhaeuser Canada Indemnitees arising out of or relating primarily to the operation of any portion of the Newco Business by Newco Canada Exchangeco, the Newco Canada Exchangeco Assets or the failure of Newco Canada Exchangeco to pay, perform or otherwise promptly discharge any Newco Canada Exchangeco Liabilities in accordance with their terms, whether occurring, arising, existing or asserted before, on or after the Distribution Date (other than the Canadian Retained Liabilities and the other Retained Liabilities (other than the Newco Canada Exchangeco Liabilities));

[[2672857]]

(iii) any claim that any action taken or omission by Newco Canada Exchangeco after the Closing gives rise to any severance or other similar benefits with respect to, or constitutes an actual or constructive termination or severance of employment of, any Transferred Employee; and

(iv) any discontinuance, suspension or modification by Newco Canada, Newco Canada Exchangeco or any of their respective Canadian affiliates of any New Benefit Plan or Assumed Canadian Plan after the Distribution Date.

(b) From and after the Distribution Date, Spinco, Newco and Newco Canada Exchangeco, jointly and severally, shall guarantee the due and complete performance by Exchangeco Subsidiary of its obligations under Section 4.05(a).

SECTION 4.06. <u>Indemnification Procedures.</u> (a) <u>Procedures Relating to Indemnification of Third Party Claims.</u> If any party (the "<u>Indemnified Party</u>") receives written notice of the commencement of any action or proceeding or the assertion of any claim by a third party or the imposition of any penalty or assessment for which indemnity may be sought under Section 4.02, 4.03, 4.04 or 4.05 (a "<u>Third Party Claim</u>"), and such Indemnified Party intends to seek indemnity pursuant to this Article IV, the Indemnified Party shall promptly provide the other party (the "<u>Indemnifying Party</u>") with written notice of such Third Party Claim, stating the nature, basis and the amount thereof, to the extent known, along with copies of the relevant documents evidencing such Third Party Claim and the basis for indemnification sought. Failure of the Indemnified Party to give such notice will not relieve the Indemnifying Party from liability on account of this indemnification, except if and to the extent that the Indemnifying Party is materially prejudiced thereby. The Indemnifying Party will have 30 days from receipt of any such notice of a Third Party Claim to give notice to assume the defense thereof. If notice to the effect set forth in the immediately preceding sentence is given by the Indemnifying Party, the Indemnifying Party will have the right to assume the defense of the Indemnified Party against the Third Party Claim with counsel of its choice; <u>provided, however,</u> that such counsel is reasonably satisfactory to the Indemnified Party; <u>provided, further, however,</u> that in the event the Indemnifying Party assumes the defense of any Third Party Claim it shall actively pursue such defense in good faith. If the Indemnifying Party does not assume the defense of such Third Party Claim within 30 days of receipt of such notice, the Indemnified Party against which such Third Party Claim has been asserted will have the right to assume the defense thereof, at its sole cost and expense, upon delivery of notice to such effect to the Indemnifying Party; <u>provided, however,</u> that if the Indemnifying Party at any time thereafter agrees to assume the defense of such Third Party Claim, the Indemnifying Party shall bear the reasonable fees, costs and expenses of the Indemnified Party's counsel incurred prior to the time of the Indemnifying Party's assumption of such defense. So long as the Indemnifying Party has assumed the defense of the Third Party Claim in accordance herewith, (i) the Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third Party Claim, (ii) the Indemnified Party will not file any papers or consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party and (iii) the Indemnifying Party will not (A) admit to any wrongdoing or (B) consent to the entry of

39

[[2672857]]

any judgment or enter into any settlement with respect to the Third Party Claim to the extent such judgment or settlement provides for (x) relief other than money damages or (y) money damages if the Indemnifying Party has not acknowledged in writing that it shall be responsible for such money damages, in each case, without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld or delayed).  The parties will use their reasonable best efforts to minimize Losses from Third Party Claims and will act in good faith in responding to, defending against, settling or otherwise dealing with such claims.  The parties will also cooperate in any such defense and give each other reasonable access to all information relevant thereto. Whether or not the Indemnifying Party has assumed the defense, such Indemnifying Party will not be obligated to indemnify the Indemnified Party hereunder for any settlement entered into or any judgment that was consented to without the Indemnifying Party's prior written consent.

(b)  Procedures for Non-Third Party Claims.  The Indemnified Party will notify the Indemnifying Party in writing promptly of its discovery of any matter that does not involve a Third Party Claim giving rise to the claim of indemnity pursuant hereto. The failure so to notify the Indemnifying Party shall not relieve the Indemnifying Party from liability on account of this indemnification, except only to the extent that the Indemnifying Party is materially prejudiced thereby.  The Indemnifying Party will have 30 days from receipt of any such notice to give notice of dispute of the claim to the Indemnified Party.  The Indemnified Party will reasonably cooperate and assist the Indemnifying Party in determining the validity of any claim for indemnity by the Indemnified Party and in otherwise resolving such matters.  Such assistance and cooperation will include providing reasonable access to and copies of information, records and documents relating to such matters, furnishing employees to assist in the investigation, defense and resolution of such matters and providing legal and business assistance with respect to such matters.

SECTION 4.07.  Indemnification as Sole and Exclusive Remedy.  Subject to Section 4.09(a), Weyerhaeuser, Spinco and Newco acknowledge and agree that, should the Distribution occur, Weyerhaeuser's, Weyerhaeuser Canada's, Weyerhaeuser Saskatchewan's, Spinco's, Newco's, Newco Canada Exchangeco's and Exchangeco Subsidiary's sole and exclusive remedy with respect to any and all claims relating to this Agreement, the Newco Business, the Newco Assets, the Excluded Assets, the Newco Liabilities, the Retained Liabilities, the Newco Canada Exchangeco Assets, the Canadian Excluded Assets, the Newco Canada Exchangeco Liabilities, the Canadian Retained Liabilities or the transactions contemplated by this Agreement and the Ancillary Agreements shall be pursuant to the indemnification provisions set forth in this Article IV.  In furtherance of the foregoing and subject to the indemnification provision set forth in this Article IV, Weyerhaeuser, Spinco and Newco hereby waive, from and after the Distribution Date, any and all rights, claims and causes of action Weyerhaeuser or any other Weyerhaeuser Indemnitee, on the one hand, and Spinco or any other Spinco Indemnitee, on the other hand, may have against Spinco or any of its affiliates or, respectively, Weyerhaeuser or any of its affiliates, or their respective directors, officers and employees arising under or based upon any Federal, state, provincial, local or foreign statute, law, ordinance, rule or regulation or otherwise (including with respect to

40

[[2672857]]

environmental matters generally and any matters under the Comprehensive Environmental Response, Compensation, and Liability Act). This Section 4.07 will not apply to any breach following the Effective Time of the Transaction Agreement, the Tax Sharing Agreement, the Intellectual Property License Agreement, the Site Services Agreements, the Fiber Supply Agreements and the Transition Services Agreement.

SECTION 4.08. Calculation of Indemnity Payments. The amount of any Loss for which indemnification is provided under this Article IV shall be net of any amounts recovered by the Indemnified Party under insurance policies or underground storage tank reimbursement programs, with respect to such Loss and shall be (a) increased to take account of any net Tax cost actually incurred by the Indemnified Party arising from the receipt of indemnity payments hereunder (grossed up for such increase) and (b) reduced to take account of any net Tax benefit actually realized by the Indemnified Party arising from the incurrence or payment of any such indemnified amount. In computing the amount of any such Tax cost or Tax benefit, the Indemnified Party shall be deemed to recognize all other items of income, gain, loss, deduction or credit before recognizing any item arising from the receipt of any indemnity payment hereunder or the incurrence or payment of any indemnified amount. For purposes of indemnification under Sections 4.02 and 4.04, the amount of any Loss shall be reduced to the extent of any related "current liability" in the Statement (as fully resolved).

SECTION 4.09. Additional Matters. (a) Notwithstanding anything to the contrary in this Agreement, indemnification for Tax matters shall be governed by the terms, provisions and procedures of the Tax Sharing Agreement and not by this Article IV.

(b) In no event shall an Indemnifying Party be liable for special, punitive, exemplary, incidental, consequential or indirect damages, or lost profits, whether based on contract, tort, strict liability, other law or otherwise other than in the case of Third Party Claims.

ARTICLE V

Conditions to the Contribution and Distribution

SECTION 5.01. Transaction Agreement. The obligations of Weyerhaeuser pursuant to this Agreement to effect the Contribution and the Distribution shall be subject to the fulfillment (or waiver by Weyerhaeuser), at or prior to the Contribution Date, of the condition that each of the parties to the Transaction Agreement shall have irrevocably confirmed to each other that each condition in Article VII of the Transaction Agreement to such parties' respective obligations to effect the transactions contemplated thereby have been fulfilled or shall be fulfilled at the Effective Time or are or have been waived by such party, as the case may be.

SECTION 5.02. Spinco Financing. (a) Spinco shall have entered into a credit facility or facilities (or replacement facilities therefor) on the terms and conditions set forth in the New Debt Commitment Letter, or on terms and conditions which are not

41

materially more burdensome to Spinco than those set forth in the New Debt Commitment Letter in an amount at least equal to $2.65 billion.

(b) Spinco shall have received the proceeds of the financing referenced in Section 5.02(a) in an amount at least equal to the New Debt Amount.

## ARTICLE VI

### Certain Other Matters

SECTION 6.01. <u>Rights Under Weyerhaeuser Insurance Policies.</u> (a) Weyerhaeuser shall, and shall cause its subsidiaries to, keep all insurance policies currently maintained with respect to the Newco Assets, the Newco Canada Exchangeco Assets and the Newco Business (the "<u>Weyerhaeuser Insurance Policies</u>"), or suitable replacements therefor, in full force and effect through the close of business on the Distribution Date. Spinco and Newco acknowledge that any and all Weyerhaeuser Insurance Policies are owned and maintained by Weyerhaeuser or any member of the Weyerhaeuser Group (and not the Newco Business) and are Excluded Assets. Subject to Section 6.01(b), Spinco and Newco will not have any rights under the Weyerhaeuser Insurance Policies from and after the Distribution Date.

(b) If any Newco Asset, any Newco Canada Exchangeco Asset or the Newco Business suffers or has suffered any damage, destruction or other casualty loss or any Assumed Liability or Newco Canada Exchangeco Liability that is insured under the Weyerhaeuser Insurance Policies and arises or has arisen prior to the Distribution Date (but, in the case a loss arising from damage, destruction or other casualty loss to any Newco Asset or any Newco Canada Exchangeco Asset, after March 25, 2006), Weyerhaeuser shall, or shall cause the appropriate member of the Weyerhaeuser Group to, (i) assert a claim under the appropriate Weyerhaeuser Insurance Policies, and (ii) (x) surrender to Newco after the Distribution Date any insurance proceeds received by Weyerhaeuser or any member of the Weyerhaeuser Group under any Weyerhaeuser Insurance Policy with respect to such damage, destruction, liability or loss, less any amount of cash or proceeds applied by Weyerhaeuser or any other member of the Weyerhaeuser Group to the physical restoration of such asset or payment of such liability, and (y) assign to Newco after the Distribution Date all rights of Weyerhaeuser or any member of the Weyerhaeuser Group with respect to any causes of action (other than the rights with respect to causes of actions under the Weyerhaeuser Insurance Policies, which are hereby expressly retained by Weyerhaeuser), whether or not litigation has commenced as of the Distribution Date, in connection with such damage, destruction, liability or loss; <u>provided</u>, <u>however</u>, that the amount of the insurance proceeds to be surrendered to Newco shall be reduced by the amount of any applicable deductibles and co-payment provisions or any payment, reinsurance or reimbursement obligations of Weyerhaeuser or any member of the Weyerhaeuser Group in respect thereof. During three years after the Distribution Date (or, if later, until the final resolution of any relevant claim relating to the Newco Business), Weyerhaeuser shall not and shall cause the other members of the Weyerhaeuser Group not to amend, terminate, buy-out, extinguish or otherwise modify its or their respective liability under any Weyerhaeuser

42

[[2672857]]

Insurance Policies in a manner that would adversely affect Newco's rights pursuant to this Section 6.01(b); provided, however, that this sentence shall not require Weyerhaeuser to renew or keep from lapsing any Weyerhaeuser Insurance Policy.

SECTION 6.02. Registration Prior to the Distribution Date. (a) If required by applicable law, the parties shall use their reasonable best efforts to prepare and file with the Commission a registration statement under the Securities Act and each party shall use its reasonable best efforts to have such registration statement declared effective by the Commission as promptly as practicable after such filing and to keep such registration statement effective as long as necessary to consummate the Distribution. The parties shall use their reasonable best efforts to prepare and file with the Commission any necessary amendment or supplement to such registration statement.

(b) The parties hereto shall take all such actions as may reasonably be required or appropriate under federal or state securities or Blue Sky laws (and any comparable laws under any foreign jurisdiction) in connection with the transactions contemplated by this Agreement or any Ancillary Agreement.

(c) The parties shall cooperate in preparing, filing with the Commission and causing to become effective any registration statements or amendments thereto, if any, which are necessary or appropriate to reflect the establishment of, or amendments to, any employee benefit plans contemplated by Sections 6.08 and 6.09 of the Transaction Agreement requiring registration under the Securities Act.

SECTION 6.03. Financing Arrangements. Prior to the Distribution, Spinco shall enter into an agreement or agreements providing for the New Debt Amount. Weyerhaeuser, Spinco and Newco shall participate in the preparation of all materials and presentations as may be reasonably necessary to secure funding pursuant to such agreement or agreements, including rating agency presentations necessary to obtain the requisite ratings needed to secure the Transaction Debt. Notwithstanding anything to the contrary in this Agreement or any other Transaction Document, Spinco and Newco, jointly and severally, shall pay all third party costs and expenses incurred by any member of the Weyerhaeuser Group associated with the Transaction Debt.

SECTION 6.04. Enforcement of Confidentiality Agreements. Weyerhaeuser shall not, and shall not permit any other member of the Weyerhaeuser Group to, waive or amend any confidentiality agreement between Weyerhaeuser or any other member of the Weyerhaeuser Group and any Person (other than any member of the Weyerhaeuser Group) to the extent such waiver or amendment adversely affects the confidentiality of information related to the Newco Business. At Spinco's written request, Weyerhaeuser shall, and shall cause each other member of the Weyerhaeuser Group to, enforce in accordance with its terms any confidentiality agreement between Weyerhaeuser or any other member of the Weyerhaeuser Group and any Person (other than any member of the Weyerhaeuser Group) to the extent such agreement protects the confidentiality of information related to the Newco Business; provided, however, that no member of the Weyerhaeuser Group shall be obligated to expend any money in connection with this Section 6.04 unless the necessary funds are advanced by Spinco,

43

[[2672857]]

other than reasonable out-of-pocket expenses, which shall be promptly reimbursed by Spinco.

SECTION 6.05. <u>Site Separation Requirements.</u> The parties acknowledge and agree that the Newco Business includes only portions of the operations conducted at the Weyerhaeuser facilities located in Plymouth, North Carolina; Kamloops, British Columbia and Columbus, Mississippi. Weyerhaeuser will use reasonable best efforts to (i) secure any Governmental Approvals required for separation of these operations from the other operations conducted at these facilities as set forth on Schedule 6.05, subject to such modifications as may be required or requested by Governmental Entities, and (ii) accomplish the subdivision, in accordance with the Governmental Approvals, so as to be able to convey the fee interests in such subdivided portions to Newco. In addition, with respect to each such portion, the subdivision of which shall have been accomplished by the Contribution Date, to the extent that Schedule 6.05 provides for easements and/or operating agreements to be entered into in connection with the separation of the operations described in this Section 6.05, Weyerhaeuser or the applicable member(s) of the Weyerhaeuser Group and Newco will execute and deliver such agreements on the Contribution Date. Notwithstanding the foregoing, to the extent that Weyerhaeuser has not accomplished the subdivision required for the conveyance of fee interests in the applicable portions of one or more of these facilities to Newco on the Contribution Date, (a) Weyerhaeuser or the applicable member(s) of the Weyerhaeuser Group and Newco, on the Contribution Date, will enter into interim net leases, under the terms set forth in Schedule 6.05, leasing to Newco the applicable portions of each of such facilities for which the subdivision has not been accomplished by the Contribution Date, pending the obtaining of such Governmental Approvals, it being the parties' intent that the conveyance of the fee interest of the premises demised under each of such leases to Newco (with such modifications as may be required by the Governmental Entities in granting such Governmental Approvals) shall occur promptly after the accomplishment of the applicable subdivision, and (b) to the extent that Schedule 6.05 provides for easements and/or operating agreements to be entered into in connection with the separation of the operations at such facilities, Weyerhaeuser or the applicable member(s) of the Weyerhaeuser Group and Newco shall, in lieu of causing such agreements to be executed and delivered on the Contribution Date, arrange for the easements and/or services to be provided to Newco on an interim basis under the Transition Services Agreement or otherwise pending conveyance of fee interests in the premises demised under such leases to Newco, until the conveyance of such fee interests. Newco will cooperate with Weyerhaeuser in connection with the separation of the operations at the facilities and Weyerhaeuser's efforts to secure the Governmental Approvals described in this Section 6.05.

ARTICLE VII

Additional Covenants

SECTION 7.01. <u>Agreement for Exchange of Information; Archives.</u> (a) Following the Distribution Date, for so long as such information is retained by a party or any of its subsidiaries (which shall be for a period of at least seven years for all

44

records necessary in connection with Taxes and in resolving all disputes and audits with respect to all taxable periods relating to Taxes and shall be a period of at least four years for information relating to all other matters ), upon reasonable written notice, each party shall afford or cause to be afforded to the other party and its agents, representatives and auditors reasonable access to the personnel, properties, books, systems, Contracts, and Records (including financial records) relating to the Newco Business for any reasonable business purpose, including in respect of litigation, insurance matters and financial reporting of such party and its affiliates, including by, as and when reasonably requested by the other party, providing copies of any the foregoing books, systems, Contracts and Records (including financial records) related to the Newco Business to the other party; provided, that the party requesting such access agrees to reimburse the other party promptly for all reasonable and necessary out-of-pocket costs and expenses incurred in connection with any such request. Notwithstanding the foregoing, a party will not be required to disclose any information (i) which such party is prohibited from disclosing by a confidentiality agreement with a third party if such party has used reasonable best efforts to obtain the consent of the third party to such disclosure (it being understood that no party shall be obligated to pay any consideration to any third party from whom such consent is requested), or (ii) which would constitute privileged attorney-client communications or attorney work product, the transfer of which or the provision of access to which would, as reasonably determined by such party's counsel, constitute a waiver of any such privilege. If any material is withheld by a party pursuant to the immediately preceding sentence, such party shall inform the other party as to the general nature of what is being withheld. Weyerhaeuser may redact such portions of any books and records (including any Records and Transferred Records) that do not relate to the Newco Assets, the Newco Canada Exchangeco Assets, the Newco Liabilities, the Newco Canada Exchangeco Liabilities or the Newco Business.

(b) After the Distribution Date, except in the case of an Action by one party against another party, each party hereto shall use its reasonable best efforts to make available to each other party, upon written request, the former, current and future directors, officers, employees, other personnel and agents of members of the Newco Business as witnesses, to the extent that any such Person (giving consideration to business demands of such directors, officers, employees, other personnel and agents) may reasonably be required in connection with any Action in which the requesting party may from time to time be involved, regardless of whether such Action is a matter with respect to which indemnification may be sought hereunder. The requesting party shall bear all costs and expenses in connection therewith.

SECTION 7.02. <u>Further Assurances.</u> From time to time, as and when requested by any party, each party shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions, as such other party may reasonably deem necessary or desirable to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

SECTION 7.03. <u>No Use of Certain Retained Names.</u> Newco shall, and shall cause its subsidiaries to, promptly, and in any event (a) within 60 days after the

45

Distribution Date, make all necessary filings and take all other necessary actions to discontinue any references to the Retained Names, (b) within 180 days after the Distribution Date, to revise print advertising, product labeling and all other information or other materials, including any Internet or other electronic communications vehicles, to delete all references to the Retained Names and (c) within 180 days after the Distribution Date, to change signage and stationery and otherwise discontinue use of the Retained Names. In no event shall Newco or any of its subsidiaries use any Retained Names after the Distribution in any manner or for any purpose different from the use of such Retained Names by Weyerhaeuser or any of its subsidiaries during the 90-day period preceding the Distribution Date. With respect to the Transferred Inventory, Newco may continue to sell such inventory, notwithstanding that it or its labeling or packaging bears one or more of the Retained Names, for 12 months after the Distribution. None of the foregoing provisions of this Section 7.03 shall be construed to obligate Newco to require any wholesaler, retailer or other merchant or customers of the Newco Business to conduct themselves in accordance therewith. After the Distribution Date, Newco shall file applications to amend or terminate any certificate of assumed name or d/b/a filings, within 60 days after Newco shall have become aware of such assumed name or d/b/a filing so as to eliminate the right of Newco to use the Retained Names.

SECTION 7.04.  Permits.  Weyerhaeuser, Spinco and Newco shall use their reasonable best efforts to obtain, or to cause to be obtained, a Permit for Newco or Exchangeco Subsidiary with respect to each Permit currently used by Weyerhaeuser, Weyerhaeuser Canada or Weyerhaeuser Saskatchewan in connection with the operation of, the Newco Business that is not transferred pursuant to Section 2.02(a)(vii) or pursuant to the Canadian Purchase Agreement; provided, however, that Weyerhaeuser shall not be obligated to pay any consideration to any third party or Governmental Entity from whom such Permits are requested under this Section 7.04.

SECTION 7.05.  Removal of Certain Property.  If the containerboard machine (and related old corrugated container assets) set forth on Schedule 2.02(b)(i) have not been removed from the facility located in Plymouth, North Carolina, prior to the Distribution Date, Newco shall allow Weyerhaeuser to have reasonable access to such facility after the Distribution Date for the purpose of removing such machine and related assets. Weyerhaeuser shall bear all costs of such removal and shall reimburse Newco for the reasonable costs of repairing any damage to the facility caused by such removal and shall reimburse Newco for any other reasonable expenses Newco may incur in connection with such removal (including the reasonable cost of any work stoppage at such facility caused by such removal). Weyerhaeuser shall complete the asset removals provided under this Section 7.05 within one year of the Distribution Date.

SECTION 7.06.  Covenant Not to Compete.  (a)  In consideration of the mutual covenants provided for in this Agreement and the other Transaction Documents and other good and valuable consideration to be delivered to Weyerhaeuser and its shareholders in connection with the transactions contemplated hereby or thereby (the sufficiency of which is hereby acknowledged), during the period beginning on the Distribution Date and ending on the third year anniversary of the Distribution Date, Weyerhaeuser shall not, and shall cause each of its subsidiaries not to, directly or

46

[[2672857]]

indirectly, engage in activities or businesses, or establish any new businesses, within North America that are substantially in competition with the uncoated free sheet operations (including uncoated free sheet converting operations) and the forms operations included in the Newco Business as conducted on the Distribution Date ("Competitive Activities"); provided, however, that:

(i) this Section 7.06(a) shall be deemed not breached as a result of the ownership by Weyerhaeuser or any of its subsidiaries of: (A) any other securities (other than 20% or more of stock having general voting power in the election of directors (or securities exchangeable for such stock)) of a Person (other than a subsidiary of Weyerhaeuser) engaged, directly or indirectly, in Competitive Activities; or (B) any securities of a Person (other than a subsidiary of Weyerhaeuser) that engages, directly or indirectly, in Competitive Activities if, at the time such securities are acquired, such Competitive Activities account for less than 10% of such Person's consolidated annual revenues;

(ii) nothing contained in this Section 7.06(a) shall prohibit or restrict (A) activities or businesses of Weyerhaeuser or any of its subsidiaries related to the Excluded Assets, (B) the sale of goods and services produced by or related to the Excluded Assets, or (C) subject to Section 7.06(a)(i), any restructuring or sale of any of the Excluded Assets; and

(iii) nothing contained in this Section 7.06(a) shall prohibit or restrict Weyerhaeuser or any of its subsidiaries from being acquired after the Distribution Date by a non-affiliated third Person which prior to such acquisition conducted Competitive Activities in North America.

(b) The parties agree that the covenants included in this Section 7.06 are, taken as a whole, reasonable in their geographic and temporal coverage, and no party shall raise any issue of geographic or temporal reasonableness in any proceeding to enforce such covenant; provided, however, that if the provisions of this Section 7.06 should ever be deemed to exceed the time or geographic limitations or any other limitations permitted by applicable Law in any jurisdiction, then such provisions shall be deemed reformed in such jurisdiction to the minimum extent required by applicable Law to cure such problem.

(c) The parties acknowledge and agree that in the event of a breach of the provisions of this Section 7.06, monetary damages shall not constitute a sufficient remedy. Consequently, in the event of any such breach, the non-breaching party may, in addition to any other rights and remedies existing in its favor, apply to any court referred to in Section 9.09 for specific performance and/or preliminary and final injunctive relief or other relief to enforce or prevent any violation of the provisions hereof.

SECTION 7.07. Cooperation with respect to Quarterly Reports. Following the Distribution Date, Weyerhaeuser shall cooperate, and shall request its independent accountants to cooperate, with Spinco in providing information for the preparation of any reports that are required to be filed by Spinco with the SEC pursuant

47

to Section 13 or 15(d) of the Exchange Act with respect to any fiscal quarter up to and including the fourth complete fiscal quarter following the Distribution Date. Notwithstanding anything to the contrary in the Transaction Documents, Spinco shall pay all fees and expenses of Weyerhaeuser's independent accountants and Weyerhaeuser's reasonable expenses in connection with the preparation of such reports. Spinco and Newco, jointly and severally, shall indemnify, defend and hold harmless Weyerhaeuser from and against any and all Losses, under the Exchange Act or otherwise, in connection with such quarterly reports except to the extent arising or resulting from information provided by Weyerhaeuser for inclusion in such reports that is inaccurate or incomplete in any material respect.

SECTION 7.08.  Canadian Asset Sale Structure.  The parties shall use reasonable best efforts to cause the Canadian Asset Sale to be structured in the most mutually Tax-efficient manner; provided, however, that no party will be required to agree to a structure that would reasonably be expected to increase costs, expenses or liabilities expected to be incurred by such party in connection with the transactions contemplated by the Transaction Documents.

## ARTICLE VIII

### Termination

SECTION 8.01.  Termination by Mutual Consent.  This Agreement may be terminated at any time prior to the Distribution Date with the consent of Weyerhaeuser, Spinco, Newco and Domtar.

SECTION 8.02.  Other Termination.  Notwithstanding any provision hereof, this Agreement may be terminated by Weyerhaeuser prior to the Distribution Date at any time following termination of the Transaction Agreement in accordance with its terms.

SECTION 8.03.  Effect of Termination.  In the event of any termination of this Agreement prior to the Distribution Date pursuant to Section 8.01, no party to this Agreement (or any of its directors or officers) shall have any liability or further obligation to any other party with respect to this Agreement.

## ARTICLE IX

### Miscellaneous

SECTION 9.01.  Notices.  All notices, requests, claims, demands, waivers and other communications under this Agreement shall be in writing and shall be deemed given (a) five Business Days following sending by registered or certified mail, postage prepaid, (b) when sent, if sent by facsimile, provided that the facsimile transmission is promptly confirmed by telephone, (c) when delivered, if delivered personally to the intended recipient and (d) one Business Day following sending by overnight delivery via

48

[[2672857]]

a national courier service and, in each case, addressed to a party at the following address for such party:

If to Weyerhaeuser, to:

Weyerhaeuser Company
33663 Weyerhaeuser Way South
Federal Way, WA 98003
Attn:  Sandy McDade
Facsimile:  1-253-924-2685

with a copy to:

Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Attn:  Richard Hall
Facsimile:  1-212-474-3700

If to Spinco, to:

Weyerhaeuser Company
33663 Weyerhaeuser Way South
Federal Way, WA 98003
Attn:  Sandy McDade
Facsimile:  1-253-924-2685

with a copy to:

Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Attn:  Richard Hall
Facsimile:  1-212-474-3700

If to Newco, to:

Weyerhaeuser Company
33663 Weyerhaeuser Way South
Federal Way, WA 98003
Attn:  Sandy McDade
Facsimile:  1-253-924-2685

49

with a copy to:

> Cravath, Swaine & Moore LLP
> Worldwide Plaza
> 825 Eighth Avenue
> New York, NY 10019
> Attn: Richard Hall
> Facsimile: 1-212-474-3700

If to Domtar, to:

> Domtar Inc.
> 395 de Maisonnueve Blvd. West
> Montreal, QC
> Canada H3A 1L6
> Attn: Gilles Pharand
> Facsimile: 1-514-848-6850

with a copy to:

> Debevoise & Plimpton LLP
> 919 Third Avenue
> New York, NY 10022
> Attn: Alan H. Paley and Paul S. Bird
> Facsimile: 1-212-909-6836

Any party may, by notice to the other party, change the address to which such notices are to be given. Domtar shall be copied on any notice given pursuant to this Section 9.01 at the address provided above.

SECTION 9.02. Interpretation. When a reference is made in this Agreement to an Article or a Section, such reference shall be to an Article or a Section of this Agreement unless otherwise indicated. The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation".

SECTION 9.03. Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule or Law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible to the end that the transactions contemplated hereby are fulfilled to the extent possible.

50

[[2672857]]

SECTION 9.04. <u>Counterparts.</u> This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered to the other parties.

SECTION 9.05. <u>Entire Agreement.</u> This Agreement, taken together with the other Transaction Documents, constitute the entire agreement, and supersede all prior agreements and understandings, both written and oral, among the parties hereto with respect to the Contribution and the Distribution.

SECTION 9.06. <u>Third Party Beneficiaries.</u> Except for the provisions hereof relating to indemnification, which are also for the benefit of the Indemnitees, and except for those provisions of the Agreement that provide for the consent of Domtar, which are for the benefit of Domtar, nothing in this Agreement, express or implied, is intended to or shall confer upon any Person (other than Weyerhaeuser, Spinco, Newco and their respective successors or permitted assigns) any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement and no Person (other than as so specified) shall be deemed a third party beneficiary under or by reason of this Agreement.

SECTION 9.07. <u>Governing Law.</u> This Agreement and, unless expressly provided therein, each Ancillary Agreement, shall be governed by, and construed in accordance with, the laws of the State of Delaware, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

SECTION 9.08. <u>Assignment.</u> Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned, in whole or in part, by operation of law or otherwise by any of the parties hereto without the prior written consent of the other parties. Any purported assignment without such consent shall be void. Subject to the preceding sentences, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their respective successors and assigns.

SECTION 9.09. <u>Enforcement.</u> The parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Agreement or any Ancillary Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties hereto shall be entitled to an injunction or injunctions to prevent breaches of any this Agreement or any Ancillary Agreement and to enforce specifically the terms and provisions of this Agreement and any Ancillary Agreement in any Federal court located in the State of Delaware or, if such Federal courts do not have subject matter jurisdiction, any Delaware state court, this being in addition to any other remedy to which they are entitled at law or in equity. In addition, each of the parties hereto (a) consents to submit itself to the personal jurisdiction of any Federal court located in the State of Delaware or, if such Federal courts do not have subject matter jurisdiction, any Delaware state court in the event any dispute arises out of the Contribution, the Distribution, this Agreement or any Ancillary Agreement, (b) agrees that it will not attempt to deny or defeat such personal jurisdiction

51

by motion or other request for leave from any such court, (c) agrees that it will not bring any action relating to the Contribution, the Distribution, this Agreement or any Ancillary Agreement in any court other than any Federal court sitting in the State of Delaware or, if such Federal courts do not have subject matter jurisdiction, any Delaware state court and (d) waives any right to trial by jury with respect to any action related to or arising out of the Contribution, the Distribution, this Agreement or any Ancillary Agreement.

SECTION 9.10. <u>Amendments.</u> No provisions of this Agreement or any Ancillary Agreement shall be deemed waived, amended, supplemented or modified by any party, unless such waiver, amendment, supplement or modification is in writing and signed by the authorized representatives of (i) the Person against whom it is sought to enforce such waiver, amendment, supplement or modification, and (ii) if such waiver, amendment, supplement or modification occurs prior to the Effective Time, Domtar.

SECTION 9.11. <u>Expenses.</u> Except as expressly set forth in this Agreement or in any Transaction Document, all costs and expenses and third party fees, paid or incurred in connection with the Contribution, the Distribution, this Agreement or any Transaction Document shall be paid in accordance with Section 6.11 of the Transaction Agreement.

[[2672857]]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives.

WEYERHAEUSER COMPANY,

By: _____
    Name:  Richard J. Taggart
    Title:  Executive Vice President

DOMTAR PAPER COMPANY, LLC,
By Weyerhaeuser Company, as its sole member,

By: _____
    Name:  Jeffrey W. Nitta
    Title:  Vice President

DOMTAR CORPORATION,

By: _____
    Name:  Jeffrey W. Nitta
    Title:  Vice President

Domtar hereby agrees to the above amendment and restatement of the Contribution and Distribution Agreement, dated as of August 22, 2006, among Weyerhaeuser, Newco and Spinco in accordance with Section 9.10 of such agreement.

DOMTAR INC,

By: _____
    Name:
    Title:

[[2672857]]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives.

WEYERHAEUSER COMPANY,

By: _____
       Name:
       Title:

DOMTAR PAPER COMPANY, LLC,
By Weyerhaeuser Company, as its sole member,

By: _____
       Name:
       Title:

DOMTAR CORPORATION,

By: _____
       Name:
       Title:

Domtar hereby agrees to the above amendment and restatement of the Contribution and Distribution Agreement, dated as of August 22, 2006, among Weyerhaeuser, Newco and Spinco in accordance with Section 9.10 of such agreement.

DOMTAR INC.,

By: _____
       Name:
       Title:

[[2672857]]

**Exhibit B**

AMENDED AND RESTATED TRANSACTION AGREEMENT

Dated as of the 25th day of January, 2007,

Among

WEYERHAEUSER COMPANY,

DOMTAR CORPORATION,

DOMTAR PAPER COMPANY, LLC,

DOMTAR DELAWARE HOLDINGS INC.,

DOMTAR PACIFIC PAPERS INC.,

DOMTAR PACIFIC PAPERS ULC,

DOMTAR (CANADA) PAPER INC.

and

DOMTAR INC.

||2672858||

# TABLE OF CONTENTS

Page

## ARTICLE I

The Arrangement

SECTION 1.01. Implementation Steps by Domtar regarding the Arrangement. ..............................3
SECTION 1.02. Arrangement Implementation Steps by the Spinco Parties.........................4
SECTION 1.03. Interim Order.................................................................................................5
SECTION 1.04. Articles of Arrangement.................................................................................5
SECTION 1.05. The Effect of the Arrangement .......................................................................9
SECTION 1.06. Closing...........................................................................................................9
SECTION 1.07. Effective Time................................................................................................9
SECTION 1.08. Effects ...........................................................................................................9
SECTION 1.09. Certificate of Incorporation and By-laws......................................................9
SECTION 1.10. Directors and Officers of Spinco ................................................................10
SECTION 1.11. Tax Consequences.......................................................................................10
SECTION 1.12. Headquarters Etc .........................................................................................10

## ARTICLE II

Effect on the Capital Stock of Domtar; Delivery of Certificates

SECTION 2.01. Effect of the Arrangement on Domtar Common Shares.....................................10
SECTION 2.02. Delivery of Spinco Common Stock and Exchangeable Shares ..........................10

## ARTICLE III

Representations and Warranties of Domtar

SECTION 3.01. Organization, Standing and Power................................................................11
SECTION 3.02. Domtar Subsidiaries; Equity Interests..........................................................11
SECTION 3.03. Capital Structure of Domtar.........................................................................11
SECTION 3.04. Authority; Execution and Delivery; Enforceability......................................12
SECTION 3.05. No Conflicts; Governmental Approvals ........................................................13
SECTION 3.06. CSA and SEC Documents; Undisclosed Liabilities .......................................14
SECTION 3.07. Information Supplied ....................................................................................15
SECTION 3.08. Absence of Certain Changes or Events.........................................................15
SECTION 3.09. Taxes............................................................................................................16
SECTION 3.10. Benefit Plans ...............................................................................................17
SECTION 3.11. Employment Agreements; ERISA Compliance; Excess Parachute
Payments..............................................................................................18
SECTION 3.12. Labor Matters..............................................................................................21
SECTION 3.13. Litigation.....................................................................................................21
SECTION 3.14. Compliance with Applicable Laws ...............................................................21

i

## TABLE OF CONTENTS
### (Continued)

SECTION 3.15. Brokers ................................................................................................21
SECTION 3.16. Environmental Matters ........................................................................22
SECTION 3.17. Title To Properties ..............................................................................23
SECTION 3.18. Intellectual Property ............................................................................23
SECTION 3.19. Insurance .............................................................................................24
SECTION 3.20. Material Agreements ...........................................................................24
SECTION 3.21. Opinion of Financial Advisors ...........................................................25
SECTION 3.22. Real Estate...........................................................................................25

## ARTICLE IV

Representations and Warranties of Weyerhaeuser and the Spinco Parties

SECTION 4.01. Organization, Standing and Power........................................................25
SECTION 4.02. Spinco Parties; Equity Interests ..........................................................26
SECTION 4.03. Capital Structure ..................................................................................28
SECTION 4.04. Authority; Execution and Delivery; Enforceability ............................29
SECTION 4.05. No Conflicts; Governmental Approvals ..............................................30
SECTION 4.06. SEC Documents; Undisclosed Liabilities ...........................................31
SECTION 4.07. Information Supplied ...........................................................................33
SECTION 4.08. Absence of Certain Changes or Events ...............................................33
SECTION 4.09. Taxes....................................................................................................33
SECTION 4.10. Benefit Plans .......................................................................................35
SECTION 4.11. Employment Agreements; ERISA Compliance....................................35
SECTION 4.12. Labor Matters.......................................................................................37
SECTION 4.13. Litigation..............................................................................................38
SECTION 4.14. Compliance with Applicable Laws ......................................................38
SECTION 4.15. Brokers.................................................................................................38
SECTION 4.16. Environmental Matters.........................................................................38
SECTION 4.17. Title To Properties ...............................................................................40
SECTION 4.18. Intellectual Property.............................................................................40
SECTION 4.19. Insurance..............................................................................................41
SECTION 4.20. Material Agreements............................................................................41
SECTION 4.21. Affiliate Transactions..........................................................................42
SECTION 4.22. Opinion of Weyerhaeuser Financial Advisor.......................................42
SECTION 4.23. Real Estate............................................................................................42
SECTION 4.24. Sufficiency of Assets ...........................................................................43

## ARTICLE V

Covenants Relating to Conduct of Business

SECTION 5.01. Conduct of Business...............................................................................43

ii

**TABLE OF CONTENTS**
(Continued)

ARTICLE VI

Additional Agreements

SECTION 6.01. Preparation of the Domtar Circular...................................................................50
SECTION 6.02. Preparation of the Form S-4, the Exchange Offer Schedule and the
Form 10................................................................................................................50
SECTION 6.03. Securities Laws Compliance.............................................................................51
SECTION 6.04. Preparation of Other Filings.............................................................................52
SECTION 6.05. Compliance with Securities Laws.....................................................................53
SECTION 6.06. Access to Information; Confidentiality.............................................................53
SECTION 6.07. Reasonable Best Efforts; Notification..............................................................54
SECTION 6.08. Weyerhaeuser Stock Options, Stock Appreciation Rights and Restricted
Stock Units..........................................................................................................56
SECTION 6.09. New Benefit Plans.............................................................................................58
SECTION 6.10. Directors' and Officers' Liability Insurance......................................................66
SECTION 6.11. Fees and Expenses............................................................................................66
SECTION 6.12. Public Announcements .....................................................................................67
SECTION 6.13. Transition Services, Site Services and Other Agreements................................67
SECTION 6.14. Non-Solicitation of Employees.........................................................................67
SECTION 6.15. Stock Exchange Listing ....................................................................................67
SECTION 6.16. Tax Treatment...................................................................................................68
SECTION 6.17. Distribution .......................................................................................................68
SECTION 6.18. Contribution and Distribution Agreement ........................................................68
SECTION 6.19. Covenants Regarding Non-Solicitation ............................................................69
SECTION 6.20. Notice by Domtar of Superior Proposal Determination....................................70
SECTION 6.21. Break Fee. .........................................................................................................71
SECTION 6.22. Effect of Break Fee Payment ............................................................................72
SECTION 6.23. Securities Act Exemptions ...............................................................................72
SECTION 6.24. Audited Financial Statements ...........................................................................73
SECTION 6.25. Domtar Share Purchase Plans and Domtar Stock Plans ...................................73
SECTION 6.26. Furnishing of Tax Opinion................................................................................74
SECTION 6.27. IRS Ruling.........................................................................................................74
SECTION 6.28. Equity Calculation.............................................................................................75
SECTION 6.29. Redemption of Excluded IRB Indebtedness .....................................................75
SECTION 6.30. Confidentiality ..................................................................................................75
SECTION 6.31. Internal Controls ...............................................................................................76
SECTION 6.32. Spinco Common Stock Matters ........................................................................76

ARTICLE VII

Conditions Precedent

SECTION 7.01. Conditions to Each Party's Obligation to Effect the Transactions ....................76
SECTION 7.02. Conditions to Obligations of Weyerhaeuser, Spinco and Newco......................78

iii

# TABLE OF CONTENTS
## (Continued)

SECTION 7.03. Conditions to Obligations of Domtar .............................................................. 79

## ARTICLE VIII

### Termination, Amendment and Waiver

SECTION 8.01. Termination ...................................................................................... 80
SECTION 8.02. Effect of Termination ......................................................................... 81
SECTION 8.03. Amendment ...................................................................................... 81
SECTION 8.04. Extension; Waiver ............................................................................. 81
SECTION 8.05. Procedure for Termination, Amendment, Extension or Waiver ........................ 81

## ARTICLE IX

### General Provisions

SECTION 9.01. Nonsurvival of Representations and Warranties; Indemnity ......................... 82
SECTION 9.02. Notices ........................................................................................... 83
SECTION 9.03. Definitions ....................................................................................... 86
SECTION 9.04. Interpretation; Disclosure Letters .......................................................... 95
SECTION 9.05. Severability ..................................................................................... 95
SECTION 9.06. Counterparts ................................................................................... 95
SECTION 9.07. Entire Agreement; No Third-Party Beneficiaries ...................................... 95
SECTION 9.08. Governing Law ................................................................................ 96
SECTION 9.09. Assignment ..................................................................................... 96
SECTION 9.10. Enforcement .................................................................................... 96
SECTION 9.11. Certain Matters ................................................................................ 96

Annex 1          Glossary of Defined Terms

Exhibit A        Form of Certificate of Incorporation of Spinco

Exhibit B        Form of By-laws of Spinco

Exhibit C        Form of Arrangement Resolution

Exhibit D        Form of Plan of Arrangement

Exhibit E        Form of Transition Services Agreement

Exhibit F        Form of Support Agreement

Exhibit G        Form of Voting and Exchange Trust Agreement

Exhibit H        Form of Tax Sharing Agreement

Exhibit I        Knowledge of Weyerhaeuser

Exhibit J        Knowledge of Domtar

iv

## AMENDED AND RESTATED TRANSACTION AGREEMENT

**THIS AMENDED AND RESTATED AGREEMENT** (the "Agreement") dated this 25ᵗʰ day of January, 2007,

A M O N G:
("Weyerhaeuser")

**WEYERHAEUSER COMPANY**, a Washington corporation

– and –

**DOMTAR CORPORATION (FORMERLY KNOWN AS WEYERHAEUSER TIA, INC.)**, a Delaware corporation ("Spinco")

- and -

**DOMTAR PAPER COMPANY, LLC (FORMERLY KNOWN AS WEYERHAEUSER ELI, LLC)**, a Delaware limited liability company ("Newco")

– and -

**DOMTAR DELAWARE HOLDINGS INC. (FORMERLY KNOWN AS WEYERHAEUSER ELI, INC.)**, a Delaware corporation ("Newco Holding")

– and –

**DOMTAR PACIFIC PAPERS INC. (FORMERLY KNOWN AS WEYERHAEUSER CROSBY, INC.)**, a corporation governed by the *Business Corporations Act (British Columbia)* ("Old Newco Canada")

– and –

**DOMTAR PACIFIC PAPERS ULC**, an unlimited liability company governed by the *Companies Act (Novia Scotia)* ("Newco Canada")

– and –

**DOMTAR (CANADA) PAPER INC. (FORMERLY KNOWN AS WEYERHAEUSER YUKON, INC.)**, a corporation governed by the *Business Corporations Act (British Columbia)* ("Newco Canada Exchangeco")

– and –

**DOMTAR INC.**, a corporation governed by the *Canada Business Corporations Act* ("Domtar")

WHEREAS Weyerhaeuser, Spinco, Newco, Newco Holding, Old Newco Canada, Newco Canada Exchangeco and Domtar entered into a Transaction Agreement dated as of August 22, 2006 (the "Original Agreement"), and Weyerhaeuser, Spinco, Newco, Newco Holding, Newco Canada, Old Newco Canada, Newco Canada Exchangeco and Domtar now desire to amend and restate the Original Agreement;

WHEREAS, prior to the date hereof, Weyerhaeuser has incorporated Spinco under the laws of the State of Delaware as a wholly-owned subsidiary of Weyerhaeuser;

WHEREAS, prior to the date hereof, Weyerhaeuser has formed Newco under the laws of the State of Delaware as a wholly-owned subsidiary of Weyerhaeuser;

WHEREAS, prior to the date hereof, Newco has incorporated (i) DDII (as defined in Section 9.03) under the laws of the State of Delaware as a wholly-owned subsidiary of Newco, (ii) Newco Holding under the laws of the State of Delaware as a wholly-owned subsidiary of Newco, (iii) Newco Canada under the Companies Act (Nova Scotia) as a wholly-owned subsidiary of Newco Holding, (iv) Old Newco Canada under the Business Corporations Act (British Columbia) as a wholly-owned subsidiary of Newco Holding, (v) Newco Canada Exchangeco under the Business Corporations Act (British Columbia) as a wholly-owned subsidiary of Newco Canada, (vi) Exchangeco Subsidiary (as defined in Section 9.03) under the Canada Business Corporations Act (the "CBCA") as a wholly-owned subsidiary of Newco Canada Exchangeco, and (vii) Offerco (as defined in Section 9.03) under the CBCA as a wholly-owned subsidiary of Newco Canada Exchangeco (Newco, Newco Holding, Old Newco Canada and Newco Canada Exchangeco being referred to as the "Newco Parties", and Spinco and the Newco Parties being referred to as the "Spinco Parties");

WHEREAS, prior to the Effective Time (as defined in Section 1.07), Weyerhaeuser will cause Weyerhaeuser Canada and Weyerhaeuser Saskatchewan to sell to Exchangeco Subsidiary the Newco Canada Exchangeco Assets and cause Exchangeco Subsidiary to assume the Newco Canada Exchangeco Liabilities (each as defined in Section 9.03);

WHEREAS, prior to the Effective Time, Weyerhaeuser will (i) transfer or cause to be transferred (A) to Newco, the Newco Assets and the Newco Liabilities (each as defined in Section 9.03), and (B) to Spinco, the issued and outstanding limited liability company interests of Newco, ("Newco Equity Interests"), and (ii) distribute to Eligible Holders (as defined in Section 9.03) the shares of common stock of Spinco, par value $0.01 per share (the "Spinco Common Stock"), on a pro rata basis or, at Weyerhaeuser's election, as an exchange offer or a combination thereof, in the case of each of clauses (i) and (ii) above upon the terms and subject to the conditions set forth in the Amended and Restated Contribution and Distribution Agreement dated as of the date hereof among Weyerhaeuser, Spinco and Newco (the "Contribution and Distribution Agreement");

WHEREAS an executed commitment letter and related term sheet have been delivered to the parties hereto pursuant to which the financial institutions named therein have agreed to provide debt financing to Spinco in an amount at least equal to $2.65 billion (the "New Debt Commitment Letter");

WHEREAS, at the Effective Time, the parties hereto will effect the Arrangement (as defined in Section 9.03), with Spinco becoming a public company and owning, directly or indirectly, all of the outstanding common shares of Domtar and all of the outstanding Newco Equity Interests, all upon the terms and subject to the conditions set forth herein, whereby each issued and outstanding common share in the capital of Domtar (a "Domtar Common Share") shall be exchanged for one Class B Common Share of Offerco, which, in turn, shall be transferred to Newco Canada Exchangeco for one share of Spinco Common Stock or one Exchangeable Share (as defined in Section 9.03), as the case may be, in accordance with the provisions of Section 1.04;

WHEREAS the respective Boards of Directors of Weyerhaeuser, Spinco, DDII, Newco Holding, Newco Canada, Newco Canada Exchangeco, Exchangeco Subsidiary, Offerco and Domtar, and Weyerhaeuser as the sole member of Newco, have approved the Transactions (as defined in Section 1.05) that they are a party to or are contemplated to be a party to;

WHEREAS for United States Federal income tax purposes it is intended that the Contribution and the Distribution shall qualify under Sections 355 and 368(a)(1)(D) of the Code;

WHEREAS for Canadian income tax purposes it is intended that the exchange of Class B Common Shares by eligible holders resident in Canada for Exchangeable Shares shall be tax deferred to such holders under the ITA (as defined in Section 9.03), provided that appropriate elections are filed in the prescribed manner in accordance with Section 85 of the ITA; and

WHEREAS Weyerhaeuser, Spinco, Newco, Newco Holding, Newco Canada and Newco Canada Exchangeco, on the one hand, and Domtar, on the other hand, desire to make certain representations, warranties, covenants and agreements in connection with the Transactions and also to prescribe various conditions to the Transactions.

NOW, THEREFORE, the parties hereto agree as follows:

ARTICLE I

THE ARRANGEMENT

SECTION 1.01.  Implementation Steps by Domtar regarding the Arrangement.

Capitalized terms used but not defined elsewhere in this Agreement shall have the meanings set forth in Section 9.03.

Domtar covenants in favor of Weyerhaeuser and the New Spinco Parties (collectively, the "Weyerhaeuser Parties") that Domtar shall:

(a) subject to Section 6.01, as soon as reasonably practicable, apply in a manner acceptable to the Weyerhaeuser Parties, acting reasonably, under Section 192 of the CBCA for the Interim Order and for an order approving the Arrangement and thereafter seek with reasonable diligence to obtain the Interim Order;

||2672858||

(b) subject to Section 6.01, convene and hold the Domtar Meeting for the purpose of considering the Arrangement Resolution (and for any other proper purpose as may be set out in the notice for such meeting);

(c) subject to obtaining the approvals as are required by the Interim Order, apply to the Court for and pursue with reasonable diligence the application to the Court for the Final Order; and

(d) subject to obtaining the Final Order and the satisfaction or waiver of the other conditions herein contained in favor of each party, send to the Director, for endorsement and filing by the Director, the Articles of Arrangement and such other documents as may be required in connection therewith under the CBCA to give effect to the Arrangement.

SECTION 1.02. Arrangement Implementation Steps by the Spinco Parties. Weyerhaeuser and the Spinco Parties covenant in favor of Domtar that, on or prior to the Closing Date (as defined in Section 1.06) and subject to the satisfaction or waiver of the other conditions herein contained in favor of each such party:

(a) Spinco, Newco, Newco Canada, Newco Holding and Newco Canada Exchangeco shall execute and deliver the Support Agreement;

(b) Spinco, Newco Canada, Newco Canada Exchangeco and the Trustee shall execute and deliver the Voting and Exchange Trust Agreement;

(c) Spinco shall issue to the Trustee one share of Special Voting Stock;

(d) Weyerhaeuser shall transfer the Newco Assets and Newco Liabilities to Newco and the units of Newco Equity Interests to Spinco upon the terms and subject to the conditions set forth in the Contribution and Distribution Agreement;

(e) Exchangeco Subsidiary shall enter into, and Weyerhaeuser shall cause Exchangeco Subsidiary, Weyerhaeuser Canada and Weyerhaeuser Saskatchewan to enter into, an agreement providing, upon the terms and subject to the conditions set forth in the Canadian Purchase Agreement and the Contribution and Distribution Agreement, for the purchase by Exchangeco Subsidiary of the Newco Canada Exchangeco Assets and the assumption by Exchangeco Subsidiary of the Newco Canada Exchangeco Liabilities as contemplated by the Contribution and Distribution Agreement;

(f) Weyerhaeuser shall effect the Distribution as provided in Article III of the Contribution and Distribution Agreement and in accordance with Section 6.17; and

(g) Spinco shall issue, after the Distribution but prior to the Arrangement, a number of shares of Spinco Common Stock equal to the number of Spinco Elected Shares and shall transfer such shares to Newco as a contribution to the capital of Newco, which, in turn, will transfer 90% of such shares to Newco Holding as a contribution to the capital of Newco Holding and 10% of such shares to DDII as a contribution to the capital of DDII, and Newco will cause DDII in turn to transfer the shares of Spinco Common Stock received by it from Newco to Newco Holding as a contribution to the capital of Newco

Case 14-10592-SLR Document 3112-5 Filed 07/03/17 Page 70 of 119
Case 14-10592-SLR Doc 1145-2 Filed 02/04/15 Page 70 of 119

5

Holding, which, in turn, will transfer all of the shares of Spinco Common Stock received by it from Newco and DDII to Newco Canada in exchange for additional shares of Newco Canada, which, in turn, will transfer such shares of Spinco Common Stock to Newco Canada Exchangeco in exchange for additional shares of Newco Canada Exchangeco, which, in turn, will transfer such shares of Spinco Common Stock to holders of Spinco Elected Shares, and the Spinco Elected Shares shall be transferred to Newco Canada Exchangeco in accordance with Section 1.04(b) or Section 1.04(d).

SECTION 1.03. Interim Order. The notice of motion for the application referred to in Section 1.01(a) shall request that the Interim Order provide:

(a) for the class of persons to whom notice is to be provided in respect of the Arrangement and the Domtar Meeting and for the manner in which such notice is to be provided;

(b) that the requisite approval for the Arrangement Resolution shall be (i) 66-2/3% of the votes cast on the Arrangement Resolution by Domtar Shareholders and holders of Domtar Options present in person or by proxy at the Domtar Meeting and (ii) 66-2/3% of the votes cast on the Arrangement Resolution by Domtar Shareholders present in person or by proxy excluding (A) holders of Domtar Options, (B) holders of Domtar Common Shares, which are pledged to secure loans provided pursuant to a Domtar Stock Plan (as defined in Section 3.03), and (C) holders of Domtar Common Shares who also hold Domtar Options (clauses (i) and (ii) collectively, the "Domtar Shareholder Approval");

(c) that, in all other respects, the terms, restrictions and conditions of the articles of incorporation and by-laws of Domtar, including quorum requirements and all other matters, shall apply in respect of the Domtar Meeting; and

(d) for the grant of the Dissent Rights.

SECTION 1.04. Articles of Arrangement. The Articles of Arrangement shall, with such other matters as are necessary to effect the Arrangement, and all as subject to the provisions of the Plan of Arrangement, provide substantially as follows:

(a) each outstanding Domtar Common Share that is not held by a holder who has exercised its Dissent Rights will be transferred by the holder thereof to Offerco in exchange for one fully paid and non-assessable Class B Common Share of Offerco (which Class B Common Shares shall, upon issuance, be listed and posted for trading on the Toronto Stock Exchange (the "TSX")) and the name of the holder of such Domtar Common Shares will be removed from the register of holders of Domtar Common Shares and added to the register of holders of Class B Common Shares of Offerco and Offerco will be recorded as the registered holder of the Domtar Common Shares so exchanged and will be deemed to be the legal and beneficial owner thereof;

(b) following the exchange contemplated by Section 1.04(a), each outstanding Class B Common Share of Offerco will be transferred to Newco Canada Exchangeco by the holder thereof in exchange for, at the holder's election, (i) one fully paid and

non-assessable share of Spinco Common Stock (each such Class B Common Share, a "Spinco Elected Share"), or (ii) one fully paid and non-assessable Exchangeable Share and the rights under the Voting and Exchange Trust Agreement (the "Ancillary Rights") (each such Class B Common Share, an "Exchangeable Elected Share"); provided, however, that, notwithstanding the foregoing, a holder of Class B Common Shares will not be entitled to elect to receive Exchangeable Shares, and any such election otherwise made by any such holder in respect of any such Class B Common Shares shall be and be deemed to be an election to receive shares of Spinco Common Stock, if such holder is (i) a non-resident of Canada, (ii) a resident of Canada exempt from tax under the ITA, or (iii) a partnership of which all of the partners are non-residents of Canada and/or residents of Canada exempt from tax under the ITA;

(c) upon the transfer of Class B Common Shares of Offerco by the holder thereof as set forth in Section 1.04(b), the name of such holder will be removed from the register of holders of Class B Common Shares of Offerco and added to the register of holders of Spinco Common Stock or Exchangeable Shares, as the case may be, and Newco Canada Exchangeco will be recorded as the registered holder of such Class B Common Shares so exchanged and will be deemed to be the legal and beneficial owner thereof;

(d) each outstanding Class B Common Share of Offerco in respect of which no election has been made by the holder thereof, or in respect of which an effective election has not been made (i) in the case of a holder of Class B Common Shares whose address as shown in the register of Class B Common Shares is in Canada will be deemed to be an Exchangeable Elected Share and will be transferred by the holder thereof, without any act or formality on its part, to Newco Canada Exchangeco in exchange for one fully paid and non-assessable Exchangeable Share and the Ancillary Rights, and the name of each such holder of Class B Common Shares will be removed from the register of holders of Class B Common Shares of Offerco and added to the register of holders of Exchangeable Shares and (ii) in the case of a holder of Class B Common Shares whose address as shown in the register of Class B Common Shares of Offerco is not in Canada will be deemed to be a Spinco Elected Share and will be transferred by the holder thereof, without any act or formality on its part, to Newco Canada Exchangeco in exchange for one fully paid and non-assessable share of Spinco Common Stock, and the name of each such holder of Class B Common Shares of Offerco will be removed from the register of holders of Class B Common Shares and added to the register of holders of shares of Spinco Common Stock and Newco Canada Exchangeco will be recorded as the registered holder of such Class B Common Shares of Offerco so exchanged and will be deemed to be the legal and beneficial owner thereof;

(e) each Class B Common Share of Offerco held by Newco Canada Exchangeco following the exchanges contemplated by Sections 1.04(b) and 1.04(d) shall be converted into one Class A Common Share of Offerco;

(f) Intentionally Deleted;

(g) a holder of Class B Common Shares who is either a resident of Canada or a partnership at least one partner of which is a resident of Canada for the purposes of the

[[2672858]]

ITA (other than any such holder or partner who is exempt from tax under the ITA), and who has elected to receive or receives Exchangeable Shares shall be entitled to make an income tax election pursuant to subsection 85(1) of the ITA or, if the holder is a partnership, subsection 85(2) of the ITA (and in each case, where applicable, the analogous provisions of provincial income tax law) with respect to the transfer of their Class B Common Shares to Newco Canada Exchangeco. Newco Canada Exchangeco will not be responsible for any taxes, interest or penalties resulting from the failure by a holder of Class B Common Shares of Offerco to properly complete or file the election forms in the form and manner and within the time prescribed by the ITA (or any applicable provincial legislation);

(h) each outstanding award of restricted Domtar Common Shares ("Domtar Restricted Shares") granted pursuant to the Domtar Restricted Stock Plan shall be exchanged for Class B Common Shares, in accordance with Section 1.04(a), which in turn will be exchanged for restricted shares of Spinco Common Stock or restricted Exchangeable Shares in accordance with Sections 1.04(b), 1.04(c) and 1.04(d), as applicable ("Replacement Restricted Shares"), and the Replacement Restricted Shares shall be subject to the same terms and conditions as were applicable to the Domtar Restricted Shares;

(i) Spinco shall issue to and deposit with the Trustee one share of Special Voting Stock, in consideration of the payment to Spinco of $1.00, to be thereafter held by the Trustee for and on behalf of, and for the use and benefit of, the holders of Exchangeable Shares in accordance with the Voting and Exchange Trust Agreement;

(j) (i) following the exchange of the Class B Common Shares of Offerco provided by Sections 1.04(b) and 1.04(d), (A) each Domtar Option that has an exercise price equal to or less than the Average Spinco Distribution Price (as defined in Section 6.08) (whether vested or unvested) shall be exchanged, on the same terms and conditions as were applicable under such Domtar Option, for an option (a "Replacement Option") to purchase that number of shares of Spinco Common Stock equal to the number of Domtar Common Shares subject to such Domtar Option and the exercise price per share shall be equal to the exercise price per share of such option immediately prior to the Effective Time, (B) each Domtar Option (other than any Domtar Option that has an exercise price equal to or less than the Average Spinco Distribution Price) (whether vested or unvested) shall be exchanged, on the same terms and conditions, except as set forth in this Section 1.04(j)(i), as were applicable under such Domtar Option, for an option (an "Amended Replacement Option") to purchase that number of shares of Spinco Common Stock (rounded down to the nearest whole number) determined in accordance with the principles set out in the calculation model in Section 1.04(j) of the Domtar Disclosure Letter (as defined in Article III), and having an exercise price per share equal to the Average Spinco Distribution Price (rounded up to the nearest whole cent) (such exchange, the "Domtar Option Exchange"), (C) notwithstanding clauses (A) and (B), each outstanding "right" to be granted bonus Domtar Common Shares under the Domtar Executive Stock Option and Share Purchase Plan (other than those cancelled pursuant to clauses (D) and (E)) (each, an "Domtar Right") shall be exchanged for a "right" with respect to the number of shares of Spinco Common Stock equal to the number of Domtar

||2672858||

Common Shares subject to such Domtar Right (each, as so granted, a "<u>Replacement Right</u>"), (D) each Domtar Common Share pledged to secure a loan provided to a participant under a Domtar Stock Plan will be returned to Domtar for cancelation against set off and deemed repayment of that portion of the principal amount of the participant's corresponding loan equal to the Average Spinco Distribution Price with the balance of the principal amount (and any accrued but unpaid interest) of each such loan, if any, being forgiven by Domtar and any Domtar Rights associated therewith cancelled and any rights thereunder extinguished, and (E) each forward purchase contract entered into between a participant and Domtar under the Domtar Executive Stock Option and Share Purchase Plan in connection with the exercise of a stock right under such Domtar Executive Stock Option and Share Purchase Plan shall be cancelled with any obligations of a participant thereunder together with any Domtar Rights associated therewith being released by Domtar;

(ii) following the exchange of the Class B Common Shares provided by Sections 1.04(b) and 1.04(d), each outstanding grant of deferred share units with respect to Domtar Common Shares (each, an "<u>Domtar DSU</u>") shall be exchanged, on the same terms and conditions as were applicable under the Domtar DSU, for a deferred share unit with respect to the number of shares of Spinco Common Stock equal to the number of Domtar Common Shares subject to such Domtar DSU (each, as so granted, a "<u>Replacement DSU</u>");

(iii) following the exchange of the Class B Common Shares provided by Sections 1.04(b) and 1.04(d), each outstanding grant of performance share units with respect to Domtar Common Shares (each, an "<u>Domtar PSU</u>") shall be exchanged, on the same terms and conditions as were applicable under the Domtar PSU, for a performance share unit with respect to the number of shares of Spinco Common Stock equal to the number of Domtar Common Shares subject to such Domtar PSU (each, as so granted, a "<u>Replacement PSU</u>");

(iv) as soon as reasonably practicable after the Effective Time, Spinco shall deliver to the holders of Replacement Options, Amended Replacement Options, Replacement Rights, Replacement DSUs, Replacement PSUs and Replacement Restricted Shares appropriate notices setting forth such holders' rights pursuant to the respective Domtar Stock Plans and the agreements evidencing the grants of such Replacement Options, Amended Replacement Options, Replacement Rights, Replacement DSUs, Replacement PSUs and Replacement Restricted Shares, and that such Replacement Options, Amended Replacement Options, Replacement Rights, Replacement DSUs, Replacement PSUs and Replacement Restricted Shares and agreements shall be granted by Spinco and shall continue in effect on the same terms and conditions (subject to the adjustments required by this Section 1.04(j) after giving effect to the Transactions);

(v) a holder of a Replacement Option or Amended Replacement Option may exercise such Replacement Option or Amended Replacement Option in whole or in part in accordance with its terms by delivering a properly executed

notice of exercise to Spinco, together with the consideration therefore and any applicable Canadian or U.S. withholding tax information required in accordance with the related Domtar Stock Plan; and

(k) all Domtar Preferred Shares that are not held by a holder who has exercised its Dissent Rights shall remain outstanding after the Effective Time.

SECTION 1.05. The Effect of the Arrangement. The Arrangement shall be effected and the other transactions contemplated hereby and by the Transaction Documents shall be completed on the terms and subject to the conditions set forth in this Agreement and in accordance with the CBCA and the Final Order. The Arrangement, the issuance by Spinco of the shares of Spinco Common Stock in connection with the Arrangement (the "Spinco Share Issuance"), the issuance by Offerco of the Class B Common Shares and the issuance by Newco Canada Exchangeco of the Exchangeable Shares and the delivery of the Ancillary Rights in connection with the Arrangement (the "Exchangeable Share Issuance"), and the other transactions (including the Contribution, the Distribution and the Canadian Asset Sale) contemplated by the Transaction Documents are referred to in this Agreement collectively as the "Transactions".

SECTION 1.06. Closing. The closings (the "Closing") of the Arrangement and the Distribution shall take place at the offices of Cravath, Swaine & Moore LLP, 825 Eighth Avenue, New York, New York 10019 at 10:00 a.m. on the second Business Day following the satisfaction (or, to the extent permitted by Law (as defined in Section 3.05(a)), waiver by all parties) of the conditions set forth in Section 7.01 or, if on such day any condition set forth in Section 7.02 or 7.03 has not been satisfied (or, to the extent permitted by Law, waived by the party or parties entitled to the benefits thereof), as soon as practicable after all the conditions set forth in Article VII have been satisfied (or, to the extent permitted by Law, waived by the party or parties entitled to the benefits thereof), or at such other place, time and date as shall be agreed in writing between Weyerhaeuser and Domtar. The date on which the Closing occurs is referred to in this Agreement as the "Closing Date".

SECTION 1.07. Effective Time. Subject to Section 6.04(d), prior to or on the Closing Date, Domtar shall file with the Director under the CBCA, the Articles of Arrangement or other appropriate documents executed in accordance with the relevant provisions of the CBCA and shall make all other filings or recordings required under the CBCA. The Arrangement shall become effective on the date that the certificate of arrangement (the "Certificate of Arrangement") is issued by the Director under Section 192 of the CBCA giving effect to the Arrangement, which shall be on the Distribution Date. The time at which the Arrangement becomes effective shall be the "Effective Time", which shall be deemed to be immediately following the Distribution.

SECTION 1.08. Effects. The Arrangement shall have the effects set forth in the CBCA, the Plan of Arrangement, the Final Order, the Articles of Arrangement and the Certificate of Arrangement.

SECTION 1.09. Certificate of Incorporation and By-laws. Prior to the Effective Time, Spinco shall take all action necessary to amend its certificate of incorporation and by-laws

Case 4:16-00524-SDR Document 06-11456290 Filed 07/03/2017 Page 75 of 124
Case 4:16-00524-SDR Document 06-11456290 Filed 02/20/18 Page 75 of 124

10

to read, as of the Effective Time, in the forms of Exhibits A and B hereto, respectively, and, as so amended, such certificate of incorporation and by-laws shall be the certificate of incorporation and by-laws of Spinco until thereafter changed or amended as provided therein or by applicable Law.

SECTION 1.10. <u>Directors and Officers of Spinco.</u> Prior to the Effective Time, Spinco shall take all action necessary to elect the persons set forth in Section 1.10 of the Weyerhaeuser Disclosure Letter (as defined in Article IV) as its directors and officers, which election shall become effective at the Effective Time.

SECTION 1.11. <u>Tax Consequences.</u> For United States Federal income tax purposes, it is intended that the Contribution and the Distribution shall qualify under Sections 355 and 368(a)(1)(D) of the Code. For Canadian income tax purposes, it is intended that the exchange of the Class B Common Shares by certain eligible holders resident in Canada for Exchangeable Shares shall be tax deferred to such holders under the ITA, provided appropriate elections are filed in the prescribed manner in accordance with Section 85 of the ITA.

SECTION 1.12. <u>Headquarters Etc.</u> From and after the Effective Time, the head office of Spinco will be located in Montréal, Canada, and the operational headquarters of Spinco and its non-Canadian subsidiaries will be located in Fort Mill, South Carolina.

ARTICLE II

EFFECT ON THE CAPITAL STOCK OF DOMTAR; DELIVERY OF CERTIFICATES

SECTION 2.01. <u>Effect of the Arrangement on Domtar Common Shares.</u> At the Effective Time, by virtue of the Arrangement and without any further action on the part of the holder of any Domtar Common Shares (other than as set forth in Section 1.04), each outstanding Domtar Common Share that is not held by a holder who has exercised its Dissent Rights shall be exchanged for one Class B Common Share and each such Class B Common Share shall immediately be exchanged for one share of Spinco Common Stock or one Exchangeable Share, as determined in accordance with Section 1.04. The shares of Spinco Common Stock, the Exchangeable Shares to be issued upon the exchange of Class B Common Shares and the Class B Common Shares to be issued upon the exchange of Domtar Common Shares, in each case pursuant to this Section 2.01 and Section 1.04, and the Ancillary Rights are referred to as the "<u>Arrangement Consideration</u>". The Arrangement Consideration issued in accordance with the terms of this Article II upon the exchange of any Domtar Common Shares shall be deemed to have been issued in full satisfaction of all rights pertaining to such Domtar Common Shares.

SECTION 2.02. <u>Delivery of Spinco Common Stock and Exchangeable Shares.</u> At the Effective Time, Newco Canada Exchangeco shall give irrevocable instructions for the delivery of the appropriate number of shares of Spinco Common Stock and Exchangeable Shares to each holder of Class B Common Shares of Offerco in accordance with Article 4 of the Plan of Arrangement. Such delivery may be in the form of a certificate or, in whole or in part, in book-entry form through the direct registration system.

||26728581||

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF DOMTAR

Domtar represents and warrants to Weyerhaeuser and Spinco that, except as disclosed in the manner contemplated in Section 9.04 in the letter, dated as of August 22, 2006, from Domtar to Weyerhaeuser, Newco and Spinco (the "Domtar Disclosure Letter") and except as expressly contemplated in the Transaction Documents:

SECTION 3.01. Organization, Standing and Power. Domtar and each subsidiary of Domtar (an "Domtar Subsidiary") is duly organized, validly existing and in good standing (or its equivalent status) under the laws of the jurisdiction in which it is organized and has full power and authority and possesses all governmental franchises, licenses, permits, authorizations and approvals necessary to enable it to own, lease or otherwise hold its properties and assets and to conduct its businesses as presently conducted, other than such franchises, licenses, permits, authorizations and approvals, the lack of which, individually or in the aggregate, has not had and would not reasonably be expected to have a Domtar Material Adverse Effect. Domtar and each Domtar Subsidiary is duly qualified to do business in each jurisdiction where the nature of its business or the ownership or leasing of its properties make such qualification necessary or the failure to so qualify has had or would reasonably be expected to have a Domtar Material Adverse Effect. Domtar has delivered to Weyerhaeuser and Spinco true and complete copies of its certificate and articles of incorporation and by-laws, as amended through August 22, 2006, and the certificates and articles of incorporation and by-laws or comparable organizational documents of each Domtar Subsidiary, in each case as amended through August 22, 2006.

SECTION 3.02. Domtar Subsidiaries; Equity Interests. (a) Section 3.02 of the Domtar Disclosure Letter lists each Domtar Subsidiary and its jurisdiction of organization. All the outstanding shares of capital stock of each Domtar Subsidiary have been duly authorized, validly issued and are fully paid and non-assessable and are owned by Domtar or by a Domtar Subsidiary, free and clear of all pledges, liens, charges, mortgages, encumbrances and security interests of any kind or nature whatsoever (collectively, "Liens").

(b) Except for its interests in the Domtar Subsidiaries, Domtar does not own, directly or indirectly, any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any person.

SECTION 3.03. Capital Structure of Domtar. As of August 22, 2006, the authorized capital stock of Domtar consisted solely of an unlimited number of common shares, Series A Preferred Shares and Series B Preferred Shares. As of the close of business on August 21, 2006, 231,436,850 Domtar Common Shares, 67,476 Series A Preferred Shares and 1,290,000 Series B Preferred Shares were outstanding. There are no bonds, debentures, notes or other indebtedness of Domtar having the right to vote (or convertible into, or exchangeable for, securities having the right to vote) on any matters on which holders of Domtar Common Shares may vote ("Voting Domtar Debt"). All outstanding Common Shares, Series A Preferred Shares and Series B Preferred Shares are, and all such shares which may be issued will be, when issued, duly authorized, validly issued, fully paid and non-assessable. Section 3.03 of the Domtar Disclosure Letter sets forth, as of August 22, 2006, the number and kind of outstanding options,

Case 1:16-cv-00524-SLR Document 1-14 Filed 02/24/16 Page 77 of 126
Case 14-10592-SLR Document 1452 Filed 02/04/14 Page 77 of 126

12

stock appreciation rights, restricted stock units, restricted shares and all other awards granted under the Domtar Stock Plans including the exercise prices of such options and stock appreciation rights and the number of Domtar Common Shares issuable pursuant thereto. There are no Domtar or Domtar Subsidiary stock or equity appreciation rights and, other than as granted pursuant to the Domtar Executive Stock Option and Share Purchase Plan, the Domtar Share Purchase Plan for Canadian Employees, the Domtar Share Purchase Plan for Employees in the United States, the Domtar Restricted Stock Plan, the Domtar Executive Performance Share Unit Plan, the Domtar Deferred Share Unit Plan and the Domtar Deferred Share Unit Plan for Outside Directors (collectively, the "Domtar Stock Plans"), there are no options, warrants, rights, convertible or exchangeable securities, "phantom" stock or other equity rights, stock-based performance units, commitments, Contracts, arrangements or undertakings of any kind to which Domtar or any Domtar Subsidiary is a party or by which any of them is bound (i) obligating Domtar or any Domtar Subsidiary to issue, deliver, sell, repurchase, redeem or otherwise acquire or cause to be issued, delivered, sold, repurchased, redeemed or otherwise acquired additional shares of capital stock or other equity interests in, or any security convertible or exercisable for or exchangeable into any capital stock of or other equity interest in, Domtar or any Domtar Subsidiary or any Voting Domtar Debt, (ii) obligating Domtar or any Domtar Subsidiary to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, Contract, arrangement or undertaking, or (iii) that give any person the right to receive any economic benefit or right similar to or derived from the economic benefits and rights accruing to holders of Domtar Common Shares or to holders of shares of any Domtar Subsidiary.

SECTION 3.04. Authority; Execution and Delivery; Enforceability. (a) The Board of Directors of Domtar has duly approved this Agreement and the other Transaction Documents and the transactions contemplated thereby, including the Arrangement. Domtar has all requisite power and authority to execute and deliver each Transaction Document to which it is or is contemplated to be a party, to perform its obligations thereunder and to consummate the Transactions. The execution and delivery by Domtar of each Transaction Document to which it is or is contemplated to be a party and the consummation by Domtar of the Transactions have been duly authorized by all requisite action on the part of Domtar. Domtar has duly executed and delivered this Agreement, and, assuming due authorization, execution and delivery by the other parties hereto, this Agreement constitutes its legal, valid and binding obligation, enforceable against Domtar in accordance with its terms (except insofar as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally, or by principles governing the availability of equitable remedies). Prior to the Effective Time, Domtar will have duly executed and delivered each other Transaction Document to which it is or is contemplated to be a party, and, assuming due authorization, execution and delivery by the other parties thereto, each other Transaction Document to which it is or is contemplated to be a party will constitute its legal, valid and binding obligation, enforceable against it in accordance with its terms (except insofar as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally, or by principles governing the availability of equitable remedies).

(b) The Board of Directors of Domtar, at a meeting, duly called and held, duly and unanimously adopted (with all directors in attendance voting in favor) resolutions (i) approving this Agreement, the other Transaction Documents to which Domtar is or is

contemplated to be a party, the Arrangement and the other Transactions, (ii) determining that the terms of the Arrangement, this Agreement and the other Transactions are fair to and in the best interests of Domtar's shareholders, and (iii) recommending that Domtar Shareholders and holders of Domtar Options vote in favor of this Agreement, which resolutions have not been subsequently rescinded, modified or withdrawn in any way. Domtar is not subject to a shareholders' rights plan, or "poison pill" or similar plan.

(c) The only vote or consent of holders of any class or series of Domtar Capital Shares necessary to approve this Agreement, the Arrangement and the other Transactions is the Domtar Shareholder Approval. The affirmative vote or consent of the holders of Domtar Capital Shares, or any of them, is not necessary to consummate any of the transactions contemplated hereby, other than the Arrangement.

(d) As of August 22, 2006, the Board of Directors of Domtar (or if appropriate, any committee administering the Domtar Stock Plans) has adopted such resolutions or taken such other actions as may be required to ensure that no Domtar equity awards will become vested or exercisable in connection with the Transactions.

SECTION 3.05. No Conflicts; Governmental Approvals. (a) The execution and delivery by Domtar of each Transaction Document to which it is a party do not, the execution and delivery by Domtar of each Transaction Document to which it is contemplated to be a party will not, and the consummation of the Transactions and compliance with the terms hereof and thereof will not, conflict with, or result in any violation of or default (or an event that, with or without notice or lapse of time or both, would become a default) under, or give rise to a right of termination, cancelation or acceleration of any obligation or to loss of a material benefit under, or to increased, additional, accelerated or guaranteed rights or entitlements of any person under, or result in the creation of any Lien upon any issued and outstanding share of capital stock of Domtar or any of the properties or assets of Domtar under, any provision of (i) the certificate or articles of incorporation and the by-laws or comparable charter or organizational documents of Domtar or any Domtar Subsidiary, (ii) any Contract to which Domtar or any Domtar Subsidiary is a party or by which any of their respective properties or assets is bound (including the Domtar Indentures and the Domtar Credit Facility), or (iii) subject to the filings, consents and other matters referred to in Section 3.05(b), any judgment, order or decree ("Judgment") or statute, law (including common law), ordinance, rule or regulation ("Law") applicable to Domtar or any Domtar Subsidiary or their respective properties or assets, other than, in the case of clauses (ii) and (iii) above, any such items that, individually or in the aggregate, have not had and would not reasonably be expected to have a Domtar Material Adverse Effect.

(b) No consent, approval, license, permit, order or authorization ("Governmental Approval") of, or registration, declaration or filing with, or permit from, any federal, provincial, state, local or foreign government or any court of competent jurisdiction, administrative agency or commission or other governmental authority or instrumentality, domestic or foreign (a "Governmental Entity") (including a certificate under Section 116 of the ITA) is required to be obtained or made by or with respect to Domtar or any Domtar Subsidiary in connection with the execution, delivery and performance of any Transaction Document to which it is a party or the consummation of the Transactions, other than (i) compliance with and filings under the Competition Act (Canada) (the "Competition Act"), the Investment Canada Act and the Hart-

||26728581||

Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), (ii) the filings by Domtar with Canadian Securities Administrators (the "CSAs") under applicable Canadian Securities Legislation, (iii) the filing of the Articles of Arrangement with the Director under the CBCA and any filings required by the Final Order, and (iv) such other Governmental Approvals, registrations, declarations, filings or permits that, individually or in the aggregate, have not had and would not reasonably be expected to have a Domtar Material Adverse Effect.

SECTION 3.06. CSA and SEC Documents; Undisclosed Liabilities. (a) Domtar has filed all reports, schedules, forms, statements and other documents required to be filed by Domtar with the Securities and Exchange Commission (the "SEC") since January 1, 2005 pursuant to Sections 13(a) and 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and as of its respective date, each such report, schedule, form, statement or other document complied in all material respects with the requirements of the Exchange Act or the Securities Act of 1933, as amended (the "Securities Act"), as the case may be. None of the documents filed by Domtar with the CSAs or pursuant to Section 13(a) or 15(d) of the Exchange Act with the SEC since January 1, 2005, as of their respective dates (or, if amended or superseded by a filing prior to August 22, 2006, then on the date of such filing) contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

(b) Domtar has previously made available to Weyerhaeuser and Spinco:

(i) the audited consolidated balance sheets of Domtar, the Domtar Subsidiaries and Domtar's joint ventures at December 31, 2005 and 2004, and the related audited consolidated statements of earnings, retained earnings and cash flows for each of the years in the three-year period ended December 31, 2005, including the notes thereto and the report of the auditors of Domtar thereon (collectively, the "Audited Domtar Financial Statements"); and

(ii) the unaudited interim consolidated balance sheet of Domtar, the Domtar Subsidiaries and Domtar's joint ventures at March 31, 2006 (together with the notes thereto, the "Interim Domtar Balance Sheet"), and the related unaudited interim consolidated statements of earnings, retained earnings and cash flows of Domtar, the Domtar Subsidiaries and Domtar's joint ventures for the three months ended March 31, 2006 (together with the notes thereto and the Interim Domtar Balance Sheet, the "Interim Domtar Financial Statements" and, together with the Audited Domtar Financial Statements, the "Domtar Financial Statements").

(c) The Domtar Financial Statements (i) were prepared in accordance with the books of account and other financial records of Domtar, the Domtar Subsidiaries and Domtar's joint ventures, (ii) present fairly in all material respects, the financial position of Domtar, the Domtar Subsidiaries and Domtar's joint ventures and the results of their operations and changes in cash flows as of the dates thereof and for the periods covered thereby, (iii) have been prepared in accordance with Canadian GAAP, in a manner and using accounting principles consistent with Domtar's historical financial statements (except as may be indicated in the notes thereto and subject, in the case of unaudited interim financial statements, to normal year-end adjustments), and (iv) in the case of the Audited Domtar Financial Statements, meet the requirements of Regulation S-X promulgated under the Securities Act.

(d) Except as set forth in the Interim Domtar Balance Sheet, Domtar and the Domtar Subsidiaries do not have any liability or obligation of any nature (whether accrued, absolute, contingent or otherwise) other than (i) liabilities or obligations incurred in the ordinary course of business since March 31, 2006, (ii) liabilities or obligations not required to be disclosed in a balance sheet for Domtar and the Domtar Subsidiaries prepared in accordance with Canadian GAAP or in the notes thereto, or (iii) liabilities or obligations that would not, individually or in the aggregate, reasonably be expected to have a Domtar Material Adverse Effect.

(e) At or prior to the Effective Time, Domtar, to the extent required by applicable Law, will have (A) designed and be maintaining a system of internal controls over financial reporting (as provided by National Instrument 52-109, "*Certification of Disclosure in Issuer's Annual and Interim Filings*" ("NI 52-109") of the CSAs) sufficient to provide reasonable assurances regarding the reliability of financial reporting with respect to the Domtar Business and the preparation of financial statements with respect to the Domtar Business for external purposes in accordance with Canadian GAAP, and (B) designed and be maintaining disclosure controls and procedures (as contemplated by NI 52-109) to ensure that material information that Domtar is required to disclose with respect to the Domtar Business in the reports Domtar is required to file or submit under applicable Canadian Securities Legislation is recorded, processed, summarized and reported within the time periods specified in the CSAs' instruments, policies and forms and is accumulated and communicated to Domtar's management as appropriate to allow timely decisions regarding required disclosure and to make the certifications of the chief executive officer and chief financial officer of Domtar required pursuant to NI 52-109.

SECTION 3.07. Information Supplied. None of the information supplied or to be supplied by Domtar for inclusion or incorporation by reference in the Domtar Circular, the Weyerhaeuser Canada Circular, the Form 10 or, if applicable, the Form S-4 or the Exchange Offer Schedule (each as defined in Section 4.05(b)) will, at the time each such document is filed with the CSAs or the SEC, as applicable, at any time it is amended or supplemented or at the time it becomes effective under applicable Canadian Securities Legislation (in the case of the Domtar Circular and the Weyerhaeuser Canada Circular), the Securities Act (in the case of the Form S-4) or the Exchange Act (in the case of the Form 10), contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading.

SECTION 3.08. Absence of Certain Changes or Events. From March 31, 2006 to August 22, 2006, the Domtar Business has been conducted only in the ordinary course, and during such period there has not been:

(i) any event, change, effect or development that, individually or in the aggregate, has had or would reasonably be expected to have a Domtar Material Adverse Effect; or

(ii) any action by Domtar or any Domtar Subsidiary that, if taken during the period from August 22, 2006 through the Effective Time, would constitute a breach of Section 5.01(a).

SECTION 3.09. <u>Taxes.</u> (a) Except as, individually or in the aggregate, have not had and would not reasonably be expected to have a Domtar Material Adverse Effect:

(i) all Tax Returns relating to Domtar, each Domtar Subsidiary and the Domtar Business required to be filed on or prior to the date hereof have been timely filed and all such Tax Returns required to be filed after the date hereof and prior to the Closing shall have been timely filed;

(ii) all such Tax Returns are true, correct and complete in all respects; and

(iii) all Taxes relating to Domtar, each Domtar Subsidiary and the Domtar Business required to be paid, charged or collected on or prior to the Closing Date have been timely paid, charged or collected.

(b) The Domtar Financial Statements reflect an adequate reserve in accordance with Canadian GAAP for all Taxes payable by Domtar and the Domtar Subsidiaries (in addition to any reserve for deferred taxes to reflect timing differences between book and tax items) for all Taxable periods and portions thereof through the date of such financial statements.

(c) No deficiency with respect to any Taxes has been proposed, asserted or assessed in writing against Domtar or any Domtar Subsidiary, except to the extent any such deficiency, individually or in the aggregate, has not had and would not reasonably be expected to have a Domtar Material Adverse Effect.

(d) No written agreement or other written document waiving or extending, or having the effect of waiving or extending, the statute of limitations or the period of assessment or collection of any Taxes relating to Domtar, the Domtar Business or any Domtar Subsidiary and no power of attorney with respect to any such Taxes has been filed or entered into with any taxing authority.

(e) There are no material Liens for Taxes (other than for current Taxes not yet due and payable) on the assets of Domtar or any Domtar Subsidiary.

(f) No Domtar Subsidiary (i) has been a member of an affiliated group (or similar state, local or foreign filing group) filing a consolidated U.S. Federal income Tax Return (other than with Domtar or another Domtar Subsidiary) or (ii) has any material liability for the Taxes of any person (other than Domtar or a Domtar Subsidiary) under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign Law).

(g) Neither Domtar nor any Domtar Subsidiary has any material liability for the Taxes of any person as a transferee or successor.

(h) Neither Domtar nor any Domtar Subsidiary has participated directly, indirectly or through a partnership in a transaction or series of transactions which could give rise to an adjustment under subsection 247(2) of the ITA or any comparable law of any province or territory of Canada.

(i) Domtar and each Domtar Subsidiary has deducted, withheld, remitted or self-assessed all material amounts required or permitted to be deducted, withheld, remitted or self-assessed in respect of Taxes on all amounts paid to non-residents of Canada (or, in the case of a Domtar Subsidiary that is resident in the United States, non-residents of the United States) or employees.

(j) Neither Domtar nor any Domtar Subsidiary is bound by any material agreement or arrangement with respect to Taxes (other than such an agreement or arrangement exclusively between or among Domtar and Domtar Subsidiaries).

(k) Within the past two years, neither Domtar nor any Domtar Subsidiary has been a "distributing corporation" or a "controlled corporation" in a distribution intended to qualify for tax-free treatment under Section 355 of the Code.

(l) Neither Domtar nor any Domtar Subsidiary has been a party to a transaction that constitutes a "listed transaction", for purposes of Section 6011 of the Code and applicable Treasury Regulations thereunder (or a similar provision of state Law), that is or may be subject to examination by the U.S. Internal Revenue Service (the "IRS").

(m) Neither Domtar nor any Domtar Subsidiary will be required to include in a taxable period ending after the Effective Time any material amount of net taxable income attributable to income that accrued in a prior taxable period but was not included in taxable income for that or another prior taxable period. Without limiting the generality of the foregoing, there are no circumstances that could result in the application of Sections 78, 80, 80.01 to 80.04 or 160 of the ITA or any analogous provision of any provincial or territorial law of Canada.

(n) Neither Domtar nor any Domtar Subsidiary has taken or agreed to take any action or knows of any fact, agreement, plan or other circumstance that would reasonably be expected to prevent the Arrangement from being tax-deferred under the ITA for certain eligible holders of Domtar Common Shares resident in Canada that exchange such shares for Exchangeable Shares provided appropriate elections are filed in the prescribed manner in accordance with Section 85 of the ITA. Neither Domtar nor any Domtar Subsidiary has taken or agreed to take any action or knows of any fact, agreement, plan or other circumstances that would result in the Contribution, Distribution or Arrangement giving rise to Tax liability under Section 355(e) of the Code.

SECTION 3.10. Benefit Plans. From March 31, 2006 to August 22, 2006, neither Domtar nor any Domtar Subsidiary has terminated, adopted, amended or agreed to terminate, adopt or amend in any material respect any collective bargaining agreement or any bonus, pension, profit sharing, deferred compensation, incentive compensation, stock or other equity ownership, stock or other equity purchase, stock or other equity appreciation, restricted stock or other equity, stock or other equity repurchase rights, stock or other equity option, phantom stock or other equity, performance, retirement, vacation, severance, disability, death benefit, hospitalization, medical or other plan, arrangement or understanding (whether or not legally binding or subject to the Laws of Canada or the United States) (i) maintained, contributed to or required to be maintained or contributed to by Domtar or any Domtar Subsidiary or any other person that, together with Domtar is treated as a single employer under Section 414(b), (c),

||2672858||

(m) or (o) of the Code or any other applicable Law, providing benefits to any current or former officer, manager, director or employee of Domtar or any Domtar Subsidiary (including, for the avoidance of doubt, any individual who (A) is not actively at work by reason of illness, vacation, short-term disability, long-term disability, workers' compensation or other leave of absence or (B) is, or is expected to become, an officer, manager, director or employee of Domtar or any Domtar Subsidiary as of the Effective Time) (an "Domtar Employee") or (ii) in respect of which Domtar or any Domtar Subsidiary would reasonably be expected to have any liability (collectively, "Domtar Benefit Plans"), or made any material change in the manner in which contributions to any Domtar U.S. Pension Plans or Domtar Canadian Pension Plans (in each case, as defined in Section 3.11(a)) are made or the basis on which such contributions are determined.

SECTION 3.11. Employment Agreements; ERISA Compliance; Excess Parachute Payments. (a) Section 3.11(a) of the Domtar Disclosure Letter contains a list of each Domtar Benefit Plan that is an "employee pension benefit plan" (as defined in Section 3(2) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) ("Domtar U.S. Pension Plans"), "registered pension plan" (as defined in Section 248(1) of the ITA) ("Domtar Canadian Pension Plans"), "employee welfare benefit plan" (as defined in Section 3(1) of ERISA) ("Domtar U.S. Welfare Plans"), employee health and welfare plan maintained for the benefit of Domtar Employees employed in Canada ("Domtar Canadian Welfare Plans") and all other material Domtar Benefit Plans. For the avoidance of doubt, the term "Domtar U.S. Pension Plans" shall not include any Domtar Canadian Pension Plans, and the term "Domtar U.S. Welfare Plans" shall not include any Domtar Canadian Welfare Plans. Section 3.11(a) of the Domtar Disclosure Letter contains a list of each material employment, consulting, indemnification, severance, termination, change in control, bonus, retention or similar agreement or arrangement between Domtar or any Domtar Subsidiary, on the one hand, and any individual Domtar Employee, on the other hand (collectively, "Domtar Benefit Agreements"). The Domtar Benefit Plans (other than any "multi-employer pension plan", as defined under applicable Canadian federal or provincial pension standards legislation (an "Domtar Canadian MEPP") and the Domtar Benefit Agreements have been administered in compliance with their terms and applicable Law, other than instances of non-compliance that, individually and in the aggregate, have not had and would not reasonably be expected to have a Domtar Material Adverse Effect. Domtar has delivered or made available to Weyerhaeuser and Spinco true, complete and correct copies of (i) each Domtar Benefit Plan (other than any Domtar Canadian MEPP) and Domtar Benefit Agreement required to be listed on Section 3.11(a) of the Domtar Disclosure Letter (or, in the case of any unwritten Domtar Benefit Plan or Domtar Benefit Agreement required to be listed on Section 3.11(a) of the Domtar Disclosure Letter, a description thereof), (ii) the most recent annual report on Form 5500 filed with respect to each such Domtar Benefit Plan (if any such report was required), (iii) the most recent summary plan description for each such Domtar Benefit Plan (other than any Domtar Canadian MEPP) for which such summary plan description is required, (iv) each trust agreement, group annuity contract or other funding agreement or contract relating to each such Domtar Benefit Plan, and (v) the most recent actuarial valuation report, if any, for each such Domtar Benefit Plan.

(b) All Domtar U.S. Pension Plans intended to be tax qualified have been the subject of determination letters from the IRS, with respect to all tax Law changes with respect to which the IRS is currently willing to provide a determination letter to the effect that such Domtar

U.S. Pension Plans are qualified and exempt from Federal income taxes under Sections 401(a) and 501(a), respectively, of the Code, and no such determination letter has been revoked nor, to the knowledge of Domtar, has revocation been threatened, nor has any such Domtar U.S. Pension Plan been amended since the date of its most recent determination letter or application therefor in any respect that would reasonably be expected to adversely affect its qualification or materially increase its costs (other than any amendment to permit Newco Employees (as defined in Section 4.10) to participate in such plan) or require "security" within the meaning of Section 307 of ERISA. Each Domtar Canadian Pension Plan (other than any Domtar Canadian MEPP) has been established and registered in accordance with the applicable requirements of the ITA and applicable pension standards legislation and such registration has not been revoked nor, to the knowledge of Domtar, has revocation been threatened by the Canadian tax authorities or the applicable pension regulatory authorities.

(c) No Domtar U.S. Pension Plan, other than any Domtar U.S. Pension Plan that is a "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA (an "Domtar Multiemployer Pension Plan"), had, as of the respective last annual valuation date for each such Domtar U.S. Pension Plan, an "unfunded benefit liability" (as such term is defined in Section 4001(a)(18) of ERISA), based on actuarial assumptions that have been furnished to Weyerhaeuser and Spinco, except for instances which, either individually or in the aggregate, have not had and would not reasonably be expected to have a Domtar Material Adverse Effect. None of the Domtar U.S. Pension Plans has an "accumulated funding deficiency" (as such term is defined in Section 302 of ERISA or Section 412 of the Code), whether or not waived, except for instances which, either individually or in the aggregate, have not had and would not reasonably be expected to have a Domtar Material Adverse Effect. Each Domtar Canadian Pension Plan is fully funded on a going concern and solvency basis pursuant to the actuarial assumptions and methodologies set out in Section 3.11(c) of the Domtar Disclosure Letter. None of Domtar or any Domtar Subsidiary, and, to the knowledge of Domtar, no Domtar Employee and no trustee, fiduciary or administrator of any Domtar Benefit Plan or trust thereunder, has engaged in a "prohibited transaction" (as such term is defined in Section 406 of ERISA or Section 4975 of the Code) or any other breach of fiduciary responsibility that would reasonably be expected to subject Domtar, any Domtar Subsidiary or any Domtar Employee to the tax or penalty on prohibited transactions imposed by such Section 4975 or to any liability under Section 502(i) or 502(1) of ERISA, except to the extent that any such taxes or penalties, individually or in the aggregate, have not had and would not reasonably be expected to have a Domtar Material Adverse Effect. None of such Domtar Benefit Plans and trusts has been terminated, nor has there been any "reportable event" (as that term is defined in Section 4043 of ERISA) with respect to any Domtar Benefit Plan during the last five years, except to the extent that any such reportable events, individually or in the aggregate, have not had and would not reasonably be expected to have a Domtar Material Adverse Effect. Neither Domtar nor any Domtar Subsidiary has incurred a "complete withdrawal" or a "partial withdrawal" (as such terms are defined in Sections 4203 and 4205, respectively, of ERISA) since the effective date of such Sections 4203 and 4205 with respect to any Domtar Multiemployer Pension Plan. Neither Domtar nor any Domtar Subsidiary contributes to or has any liability under any multi-employer pension plan as defined under applicable Canadian federal or provincial pension standards legislation.

(d) No Domtar U.S. Welfare Benefit Plan is unfunded or funded through a "welfare benefits fund" (as such term is defined in Section 419(e) of the Code). Each Domtar U.S. Welfare Plan that is a "group health plan" (as such term is defined in Section 5000(b)(1) of the Code), complies with the applicable requirements of Section 4980B(f) of the Code. Each Domtar U.S. Welfare Plan and each Domtar Canadian Welfare Plan (in each case including any such plan covering retirees or other former employees) may be amended or terminated without material liability to Domtar and any Domtar Subsidiary on or at any time after the Effective Time. No Domtar U.S. Welfare Plan or Domtar Canadian Welfare Plan provides post-retirement health or life insurance benefits, except where the cost thereof is borne entirely by the former employee (or his or her eligible dependents).

(e) Neither Domtar nor any person or entity that would be treated as a single employer with Domtar for purposes of Section 414(b), (c), (m) or (o) of the Code would reasonably be expected to incur any Controlled Group Liability (as defined in this Section 3.11(e)) in an amount that would reasonably be expected to have a Domtar Material Adverse Effect. For purposes of this Agreement, "Controlled Group Liability" means any and all liabilities (i) under Title IV of ERISA, other than for payment of premiums to the Pension Benefit Guaranty Corporation ("PBGC"), (ii) under Section 302 or 4068(a) of ERISA, (iii) under Section 412(n) or 4971 of the Code, and (iv) for violation of the continuation coverage requirements of Section 601 et seq. of ERISA and Section 4980B of the Code or the group health requirements of Sections 9801 et seq. of the Code and Sections 701 et seq. of ERISA.

(f) Other than payments that may be made to the persons listed in Section 3.11(f) of the Domtar Disclosure Letter (the "Primary Domtar Executives"), no amount or other entitlement that could be received (whether in cash or property or the vesting of property) as a result of the Transaction by any officer, director, manager or employee of Domtar or any Domtar Subsidiary who is a "disqualified individual" (as such term is defined in Treasury Regulation Section 1.280G-1) under any Domtar Benefit Plan, Domtar Benefit Agreement or other compensation arrangement would be characterized as an "excess parachute payment" (as defined in Section 280G(b)(1) of the Code) and no such disqualified individual is entitled to receive any additional payment (including, without limitation, any tax gross up or other payment) from Domtar, any Domtar Subsidiary or any other person in the event that the excise tax required by Section 4999(a) of the Code is imposed on such disqualified individual. Section 3.11(f) of the Domtar Disclosure Letter sets forth (i) the Company's reasonable, good faith estimates of the maximum amount that could be paid to each Primary Domtar Executive as a result of the Transactions under any Domtar Benefit Plan, Domtar Benefit Agreement or other compensation arrangements and (ii) the "base amount" (as defined in Section 280G(b)(3) of the Code) for each Primary Domtar Executive calculated as of August 22, 2006.

(g) The execution and delivery of each Transaction Document do not, and the consummation of the Transactions and compliance with the terms hereof and thereof will not (i) entitle any Domtar Employee to severance, termination, change in control or similar pay and benefits, (ii) accelerate the time of payment or vesting or trigger any payment or funding (through a grantor trust or otherwise) of compensation or benefits under, increase the amount payable or trigger any other material obligation pursuant to, any Domtar Benefit Plan or Domtar Benefit Agreement, or (iii) result in any breach or violation of, or a default under, any Domtar Benefit Plan or Domtar Benefit Agreement.

||26728581||

SECTION 3.12. Labor Matters. Except as set forth in Section 3.12 of the Domtar Disclosure Letter:

(a) There are no, and during the past three years there has not been any, strikes, lockouts, work stoppages, slowdowns or any other concerted interference with normal operations, stoppage or lockout pending or, to the knowledge of Domtar, threatened against or affecting any Domtar Employee, Domtar or any Domtar Subsidiary, except where such strikes, lockouts, work stoppages, slowdowns, or any other concerted interference with normal operations, stoppage or lockout, individually or in the aggregate, have not had and would not reasonably be expected to have a Domtar Material Adverse Effect.

(b) There are no formal or informal complaints, charges, claims or grievances against Domtar or any Domtar Subsidiary pending or, to the knowledge of Domtar, threatened to be brought or filed with any Governmental Entity, arbitrator or court based on or arising out of the employment by Domtar or any Domtar Subsidiary of any Domtar Employee.

(c) Each of Domtar and the Domtar Subsidiaries is in compliance with all laws, regulations, rules and orders of all Governmental Entities relating to the employment of the Domtar Employees, including without limitation laws, regulations rules and orders relating to wages, hours, collective bargaining, discrimination, civil rights, safety and health, worker notification requirements, immigration, workers' compensation, layoffs and the collection and payment of withholding Taxes and similar Taxes, except where the failure to be in compliance, individually or in the aggregate, has not had and would not reasonably be expected to have a Domtar Material Adverse Effect.

SECTION 3.13. Litigation. There is no Action pending or, to the knowledge of Domtar, claims that have been asserted against or affecting Domtar or any Domtar Subsidiary (and Domtar is not aware of any basis for any such Action or claim) that, individually or in the aggregate, has had or would reasonably be expected to have a Domtar Material Adverse Effect, nor is there any Judgment outstanding against Domtar or any Domtar Subsidiary that has had or would reasonably be expected to have a Domtar Material Adverse Effect. This Section 3.13 does not relate to Environmental Claims, which are the subject of Section 3.16.

SECTION 3.14. Compliance with Applicable Laws. Domtar and each Domtar Subsidiary is, and has since January 1, 2003 been, in compliance with all applicable Laws, including those relating to occupational health and safety, except for instances of non-compliance that, individually and in the aggregate, have not had and would not reasonably be expected to have a Domtar Material Adverse Effect. Neither Domtar nor any Domtar Subsidiary has received any written communication during the past two years from a Governmental Entity that alleges that Domtar or any Domtar Subsidiary is not in compliance in any material respect with any applicable Law. This Section 3.14 does not relate to matters with respect to Taxes, which are the subject of Section 3.09, or Environmental Laws, which are the subject of Section 3.16.

SECTION 3.15. Brokers. No broker, investment banker, financial advisor or other person, other than JP Morgan and RBC Dominion Securities Inc. is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the

Transactions based upon arrangements made by or on behalf of Domtar or any of its subsidiaries. The fees and expenses of JP Morgan and RBC Dominion Securities Inc. will be paid by Domtar.

SECTION 3.16. Environmental Matters. (a) Except for those matters that, individually or in the aggregate, have not had and would not reasonably be expected to have a Domtar Material Adverse Effect:

(i) Domtar and the Domtar Subsidiaries are, and have since January 1, 2003 been, in compliance with all Environmental Laws, and neither Domtar nor any Domtar Subsidiary has received any (A) communication that alleges that Domtar or any Domtar Subsidiary is in violation of, or has liability under, any Environmental Law, or (B) written request for information pursuant to any Environmental Law, including new source review requirements under the Federal Clean Air Act or any state analogue thereto;

(ii) to the knowledge of Domtar, compliance with applicable Environmental Laws will not require Domtar or any Domtar Subsidiary to incur costs, including the costs of pollution control equipment that are known or anticipated to be required in the future, beyond those (A) currently budgeted for the fiscal year ended December 31, 2006, (B) approved by senior management of Domtar in a budget for the fiscal year ended December 31, 2007 materially consistent with the budget for the fiscal year ended December 31, 2006, or (C) set forth in Section 3.16(a)(ii) of the Domtar Disclosure Letter;

(iii) (A) Domtar and each Domtar Subsidiary have obtained and are in compliance with all permits, licenses and governmental authorizations pursuant to Environmental Laws (collectively "Environmental Permits") necessary for their operations as currently conducted, (B) all such Environmental Permits are valid and in good standing, and (C) neither Domtar nor any Domtar Subsidiary has been advised by any Governmental Entity of any actual or potential change in the status or terms and conditions of any such Environmental Permit;

(iv) there are no Environmental Claims pending or, to the knowledge of Domtar, threatened that have been asserted against or affecting Domtar or any Domtar Subsidiary;

(v) there have been no Releases of any Hazardous Material that have formed the basis of any Environmental Claim or unsatisfied judgment pending against Domtar or any Domtar Subsidiary or against any person whose liabilities for such Environmental Claims Domtar or any Domtar Subsidiary has, or may have, retained or assumed, either contractually or by operation of law; and

(vi) (A) neither Domtar nor any Domtar Subsidiary has retained or assumed, either contractually or by operation of law, any liabilities or obligations that have had or would reasonably be expected to form the basis of any Environmental Claim against Domtar or any Domtar Subsidiary, and (B) to the knowledge of Domtar, no Environmental Claims are pending against any person whose liabilities for such Environmental Claims Domtar or any Domtar Subsidiary has, or may have, retained or assumed, either contractually or by operation of law.

(b) Domtar has provided Weyerhaeuser with all material Phase I and Phase II environmental site assessments and non-privileged internal environmental audit reports, in each

case conducted since July 1, 2003 and in the possession, custody or control of Domtar or any Domtar Subsidiary.

SECTION 3.17. Title To Properties. Domtar and each Domtar Subsidiary has, in all material respects, good and valid fee simple title (and for real estate located in Quebec, good and valid title) to the Domtar Owned Real Property (as defined in Section 3.22(a)), valid leasehold interests in the Domtar Leased Real Property (as defined in Section 3.22(b)) and valid title in other tangible assets necessary for the conduct of the Domtar Business as currently conducted, in each case free of any Liens, except for (i) Liens securing indebtedness reflected in the Domtar Financial Statements, (ii) Liens consisting of zoning or planning restrictions, permits, easements, covenants and other restrictions or limitations on the use of real property or irregularities in title thereto, which do not materially impair the use of such property as it is presently used in connection with the Domtar Business, (iii) Liens for current Taxes, assessments or governmental charges or levies on property not yet due or which are being contested in good faith and for which appropriate reserves in accordance with Canadian GAAP have been created, (iv) mechanic's, materialmen's and similar Liens arising in the ordinary course of business or by operation of Law, (v) Liens which have been placed by any developer, landlord or other third party on any Domtar Leased Real Property and subordination or similar agreements relating thereto and (vi) Liens which would not, individually or in the aggregate, reasonably be expected to materially and adversely affect the use of such assets in the Domtar Business ("Domtar Permitted Liens").

SECTION 3.18. Intellectual Property. (a) Section 3.18(a) of the Domtar Disclosure Letter sets forth all patents, trademarks, trade names, service marks, copyrights and domain names (collectively, the "Registered Intellectual Property") that are owned by Domtar and used in the conduct of the Domtar Business as currently conducted. Except for the Intellectual Property Rights, trade secrets, know-how and all other intellectual property rights (collectively, the "Intellectual Property Rights") that are the subject of claims set forth in Section 3.18(b) of the Domtar Disclosure Letter (to the extent of such claims), (1) Domtar or a Domtar Subsidiary is the sole and exclusive owner of the Intellectual Property Rights owned by Domtar or a Domtar Subsidiary and used in the conduct of the Domtar Business as currently conducted (collectively, "Domtar Intellectual Property Rights") free and clear of all perfected and unperfected security interests other than Domtar Permitted Liens, (2) neither Domtar nor any Domtar Subsidiary has granted an exclusive license to any Domtar Intellectual Property Rights, and (3) no material license fees of any kind are currently required for the use by Domtar or any Domtar Subsidiary of any Domtar Intellectual Property Rights. Notwithstanding any other representations in this Section 3.18(a), Domtar makes no representation with respect to whether patent applications set forth in Section 3.18(a) of the Domtar Disclosure Letter will be issued by the applicable governmental authority or if issued, whether practicing any of the claims in any such patents infringes or will infringe any claims of any third party's patents.

(b) Except as set forth in Section 3.18(b) of the Domtar Disclosure Letter, no claims are pending or, to the knowledge of Domtar, have been asserted, as of August 22, 2006 against Domtar or any Domtar Subsidiary by any person (i) claiming that Domtar or any Domtar Subsidiary is infringing or has infringed any Intellectual Property Right in the operation or conduct of the Domtar Business as currently conducted or (ii) challenging the validity, ownership, patentability, enforceability, registrability or use by Domtar or any Domtar

Subsidiary of any Domtar Intellectual Property Rights. As of August 22, 2006, to the knowledge of Domtar, no person is infringing or misappropriating the rights of Domtar or any Domtar Subsidiary with respect to any Domtar Intellectual Property Rights.

(c) There are no unpaid maintenance or renewal fees currently overdue for any Registered Intellectual Property set forth or required to be set forth in Section 3.18(a) of the Domtar Disclosure Letter, nor have any material applications or registrations therefor lapsed or been abandoned, canceled, or expired other than in the ordinary course of business.

SECTION 3.19. <u>Insurance.</u> All of the material insurance policies held by Domtar or any of the Domtar Subsidiaries, or under which any of them is an insured party, that insure any assets or business of Domtar or any Domtar Subsidiary or the Domtar Business (or any portion thereof) (i) are maintained with reputable insurers in such amounts and covering such risks as are in accordance with normal industry practice for companies engaged in a business similar to the Domtar Business and (ii) are in full force and effect and all premiums due thereon have been paid. Domtar and the Domtar Subsidiaries have complied with the terms and provisions of such insurance policies, except for any non-compliance that, individually or in the aggregate, has not had and would not reasonably be expected to have a Domtar Material Adverse Effect.

SECTION 3.20. <u>Material Agreements.</u> Section 3.20 of the Domtar Disclosure Letter sets forth a list of all the Domtar Material Agreements as of August 22, 2006. For the purpose of this Agreement, the term "<u>Domtar Material Agreements</u>" means any of the following agreements, arrangements, commitments or understandings, whether or not in writing, to which Domtar or any Domtar Subsidiary is a party:

(a) any "material contract" (as defined in Item 601(b)(10) of Regulation S-K promulgated under the Securities Act);

(b) any non-competition agreement or any other agreement, arrangement, commitment or understanding that materially limits, or would reasonably be expected to materially limit, Domtar or any Domtar Subsidiary from conducting and engaging in the Domtar Business after the Effective Time;

(c) any agreement, arrangement, commitment or understanding with respect to any partnership, joint venture or strategic alliance material to the Domtar Business;

(d) any agreement, arrangement, commitment or understanding that will govern the terms of indebtedness, or guarantees of indebtedness, of Domtar or any Domtar Subsidiary after the Effective Time; and

(e) any agreement, arrangement, commitment or understanding (other than any short-term purchase agreement, arrangement, commitment or understanding entered into in the ordinary course of business) that provides for annual payments in excess of $1,000,000 and that is not terminable by notice of not more than 90 days for a cost of less than $75,000.

Each of the Domtar Material Agreements required to be set forth in Section 3.20 of the Domtar Disclosure Letter or entered into after August 22, 2006 is or will be in full force and effect (except to the extent any of them expires in accordance with its terms) and neither Domtar nor any Domtar Subsidiary has violated any provisions of, or committed or failed to perform any act that, with or without notice, lapse of time or both, would constitute a default under the provisions of any Domtar Material Agreement, except for violations or defaults that, individually or in the aggregate, have not had and would not reasonably be expected to have a Domtar Material Adverse Effect. True, correct and complete copies of each written Domtar Material Agreement, and a summary of each oral Domtar Material Agreement, listed in Section 3.20 of the Domtar Disclosure Letter (including all written modifications and amendments thereto and waivers thereunder) have been made available to Weyerhaeuser.

SECTION 3.21. Opinion of Financial Advisors. JP Morgan and RBC Dominion Securities Inc. have delivered to Domtar written opinions to the effect that, as of August 22, 2006, the Arrangement Consideration is fair from a financial point of view to the Domtar Shareholders who become holders of Spinco Common Stock or Exchangeable Shares in connection with the Transactions. Domtar has delivered a copy of such opinions to Weyerhaeuser for informational purposes only.

SECTION 3.22. Real Estate. (a) Section 3.22(a) of the Domtar Disclosure Letter lists all real property (in each case, together with the address, if any) that is owned by Domtar and the Domtar Subsidiaries and that is material in the operation or conduct of the Domtar Business (the "Domtar Owned Real Property").

(b) Section 3.22(b) of the Domtar Disclosure Letter lists all real property (in each case, together with the address, if any) in which Domtar or any of the Domtar Subsidiaries holds a leasehold interest and that is material in the operation or conduct of the Domtar Business (the "Domtar Leased Real Property"). Domtar has made available to Weyerhaeuser a true and complete copy of each material lease agreement under which the Domtar Leased Real Property is held. There is no material default under any such lease by Domtar or any Domtar Subsidiary or, to the knowledge of Domtar, by any other party thereto that has had or would reasonably be expected to have a Domtar Material Adverse Effect.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF WEYERHAEUSER
AND THE SPINCO PARTIES

Weyerhaeuser and the Spinco Parties, jointly and severally, represent and warrant to Domtar that, except as disclosed in the manner contemplated in Section 9.04 in the letter, dated as of August 22, 2006, from Weyerhaeuser to Domtar (the "Weyerhaeuser Disclosure Letter") and except as contemplated in the Transaction Documents:

SECTION 4.01. Organization, Standing and Power. Each of Weyerhaeuser, Weyerhaeuser Canada, Weyerhaeuser Saskatchewan and the Spinco Parties is duly organized, validly existing and in good standing (or its equivalent status) under the laws of the jurisdiction

in which it is organized and has full power and authority, and Weyerhaeuser, Weyerhaeuser Canada, and Weyerhaeuser Saskatchewan possess, and Newco and Exchangeco Subsidiary will possess immediately after the Distribution Date, all governmental franchises, licenses, permits, authorizations and approvals necessary to enable it to own, lease or otherwise hold its properties and assets and to conduct the Newco Business as presently conducted, other than such franchises, licenses, permits, authorizations and approvals the lack of which, individually or in the aggregate, has not had and would not reasonably be expected to have a Newco Material Adverse Effect. Each of Weyerhaeuser, Weyerhaeuser Canada, Weyerhaeuser Saskatchewan and the Spinco Parties is duly qualified to do business in each jurisdiction where the nature of the Newco Business or the ownership or leasing of the Newco Assets or the Newco Canada Exchangeco Assets make such qualification necessary or the failure to so qualify has had or would reasonably be expected to have a Newco Material Adverse Effect. Weyerhaeuser, Weyerhaeuser Canada, Weyerhaeuser Saskatchewan and the Spinco Parties have delivered to Domtar true and complete copies of their articles of incorporation and by-laws, certificate of incorporation and by-laws or certificate of formation and limited liability company agreement, in each case, as amended through August 22, 2006.

SECTION 4.02. <u>Spinco Parties; Equity Interests.</u>    (a) Section 4.02 of the Weyerhaeuser Disclosure Letter lists each Spinco Party and each subsidiary of Weyerhaeuser (a "<u>Weyerhaeuser Subsidiary</u>") involved in the conduct of the Newco Business and its jurisdiction of organization. All the outstanding shares of capital stock or other equity interests of each Spinco Party have been duly authorized, validly issued and (to the extent representing capital stock) are fully paid and non-assessable and are owned by Weyerhaeuser or by a New Spinco Party, free and clear of all Liens. Each of the New Spinco Parties was formed specifically for the Transactions and has conducted no operations and incurred no obligations other than in connection with the Transactions.

(b) As of August 22, 2006, Spinco did not own, directly or indirectly, any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any person. Immediately prior to the Closing Date, Spinco will not own, directly or indirectly, any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any person, except for its interests in Newco, DDII, Newco Holding, Newco Canada, Old Newco Canada, Newco Canada Exchangeco, Exchangeco Subsidiary, Offerco, Wapawekka Lumber Partnership and Wapawekka Lumber.

(c) As of August 22, 2006, Newco did not own, directly or indirectly, any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any person other than its interests in Newco Holding, Old Newco Canada and Newco Canada Exchangeco. Immediately prior to the Closing Date, Newco will not own, directly or indirectly, any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any person other than its interests in Newco Holding, DDII, Newco Canada, Old Newco Canada, Newco Canada Exchangeco, Exchangeco Subsidiary, Offerco, Wapawekka Lumber Partnership and Wapawekka Lumber.

(d) As of the date of this Agreement, DDII does not own, directly or indirectly, any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any person. Immediately prior to the Closing Date, DDII will not own, directly or

||2672858||

indirectly, any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any person other than its interests in Newco Holding, Newco Canada, Old Newco Canada, Newco Canada Exchangeco, Exchangeco Subsidiary, Offerco, Wapawekka Lumber Partnership and Wapawekka Lumber.

(e) As of August 22, 2006, Newco Holding did not own, directly or indirectly, any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any person other than its interests in Old Newco Canada and Newco Canada Exchangeco. Immediately prior to the Closing Date, Newco Holding will not own, directly or indirectly, any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any person other than its interests in Newco Canada, Old Newco Canada, Newco Canada Exchangeco, Exchangeco Subsidiary, Offerco, Wapawekka Lumber Partnership and Wapawekka Lumber.

(f) As of August 22, 2006, Old Newco Canada did not own, directly or indirectly, any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any person other than its interests in Newco Canada Exchangeco. As of the date of this Agreement and immediately prior to the Closing Date, Old Newco Canada does not own and will not own, directly or indirectly, any capital stock, membership interest, partnership interest, joint venture interest or equity interest in any person.

(g) As of the date of this Agreement, Newco Canada does not own, directly or indirectly, any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any person other than its interests in Newco Canada Exchangeco, Exchangeco Subsidiary and Offerco. Immediately prior to the Closing Date, Newco Canada will not own, directly or indirectly, any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any person other than its interests in Newco Canada Exchangeco, Exchangeco Subsidiary, Offerco, Wapawekka Lumber Partnership and Wapawekka Lumber.

(h) As of August 22, 2006, Newco Canada Exchangeco did not own, directly or indirectly, any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any person. Immediately prior to the Closing Date, Newco Canada Exchangeco will not own, directly or indirectly, any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any person other than its interests in Exchangeco Subsidiary, Offerco, Wapawekka Lumber Partnership and Wapawekka Lumber.

(i) As of the date of this Agreement, Exchangeco Subsidiary does not own, directly or indirectly, any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any person. Immediately prior to the Closing Date, Exchangeco Subsidiary will not own, directly or indirectly, any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any person other than its interests in Wapawekka Lumber Partnership and Wapawekka Lumber.

(j) As of the date of this Agreement and immediately prior to the Closing Date, Offerco does not own and will not own, directly or indirectly, any capital stock, membership interest, partnership interest, joint venture interest or equity interest in any person.

SECTION 4.03. Capital Structure. (a) As of August 22, 2006, the authorized capital stock of Spinco consisted solely of 1,000 shares of Spinco Common Stock, of which 1,000 shares of Spinco Common Stock were outstanding. Prior to the Distribution, all the outstanding shares of Spinco Common Stock will be owned directly by Weyerhaeuser free and clear of any Lien. Immediately following the Distribution, (i) there will be outstanding a number of shares of Spinco Common Stock determined as provided in Section 2.12 of the Contribution and Distribution Agreement, (ii) no shares of Spinco Common Stock will be held in its treasury, and (iii) no bonds, debentures, notes or other indebtedness of Spinco having the right to vote (or convertible into, or exchangeable for, securities having the right to vote) on any matters on which holders of Spinco Common Stock may vote ("Voting Spinco Debt") will be outstanding. All shares of Spinco Common Stock to be issued in the Transactions will be, when issued, duly authorized, validly issued, fully paid and non-assessable. Except as provided in this Agreement and the Contribution and Distribution Agreement, there are no options, warrants, rights, convertible or exchangeable securities, "phantom" stock or other equity rights, stock or other equity appreciation rights, stock-based performance units, commitments, Contracts, arrangements or undertakings of any kind to which Spinco or any Spinco Party is a party or by which any of them is bound (i) obligating Spinco or any Spinco Party to issue, deliver, sell, repurchase, redeem or otherwise acquire or cause to be issued, delivered, sold, repurchased, redeemed or otherwise acquired additional shares of capital stock or other equity interests in, or any security convertible or exercisable for or exchangeable into any capital stock of or other equity interest in, Spinco or of any Spinco Party or any Voting Spinco Debt, (ii) obligating Spinco or any Spinco Party to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, Contract, arrangement or undertaking, or (iii) that give any person the right to receive any economic benefit or right similar to or derived from the economic benefits and rights accruing to holders of Spinco Common Stock or to holders of shares of any of the other Spinco Parties.

(b) As of August 22, 2006, 1,000 units of Newco Equity Interests were issued and outstanding. Immediately prior to the Contribution, all such units of Newco Equity Interests will be owned directly by Weyerhaeuser, free and clear of any Lien. At the Effective Time, all such units of Newco Equity Interests will be owned directly by Spinco free and clear of any Lien, except for any Lien securing Transaction Debt (as defined in Section 7.01(j)). There are not any bonds, debentures, notes or other indebtedness of Newco having the right to vote (or convertible into, or exchangeable for, securities having the right to vote) on any matters on which holders of Newco Equity Interests may vote ("Voting Newco Debt"). All units of Newco Equity Interests to be issued in the Transactions will be, when issued, duly authorized, validly issued, fully paid and non-assessable. Except as provided in this Agreement and the Contribution and Distribution Agreement, there are no options, warrants, rights, convertible or exchangeable securities, "phantom" or other equity stock rights, stock or other equity appreciation rights, stock-based performance units, commitments, Contracts, arrangements or undertakings of any kind to which Newco or any of its subsidiaries (each, a "Newco Subsidiary") is a party or by which any of them is bound (i) obligating Newco or any Newco Subsidiary to issue, deliver, sell, repurchase, redeem or otherwise acquire or cause to be issued, delivered,

sold, repurchased, redeemed or otherwise acquired additional limited liability company interests or other equity interests in, or any security convertible or exercisable for or exchangeable into any limited liability company interests of or other equity interest in, Newco or of any Newco Subsidiary or any Voting Newco Debt, (ii) obligating Newco or any Newco Subsidiary to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, Contract, arrangement or undertaking or (iii) that give any person the right to receive any economic benefit or right similar to or derived from the economic benefits and rights accruing to holders of Newco Equity Interests.

(c) As of August 22, 2006, the authorized capital stock of Weyerhaeuser consisted solely of 400,000,000 shares of Weyerhaeuser Common Stock, 7,000,000 shares of preferred stock, par value $1.00 per share, 40,000,000 preference shares, par value $1.00 per share and one share of Special Voting Stock. As of the close of business on August 21, 2006, (i) 246,253,931 shares of Weyerhaeuser Common Stock and one share of Special Voting Stock were issued and outstanding, (ii) 11,061,777 shares of Weyerhaeuser Common Stock were reserved for issuance pursuant to the Weyerhaeuser Stock Plans (as defined in Section 6.08(e)), and (iii) 2,018,630 shares of Weyerhaeuser Common Stock were reserved for issuance upon the exchange of Weyerhaeuser Canada Exchangeable Shares issued by Weyerhaeuser Canada. All outstanding shares of Weyerhaeuser Common Stock are, and all shares of Weyerhaeuser Common Stock which may be issued will be, when issued, duly authorized, validly issued, fully paid and non-assessable. Section 4.03(c) of the Weyerhaeuser Disclosure Letter sets forth, as of August 22, 2006, the number and kind of outstanding options, stock appreciation rights, restricted stock units, restricted shares and other awards granted under the Weyerhaeuser Stock Plans held by Newco Employees on such date, including the exercise prices of such options and stock appreciation rights and the number of shares of Weyerhaeuser Common Stock issuable pursuant thereto. Other than the Weyerhaeuser Equity Awards (as defined in Section 6.08), there are not any options, warrants, rights, convertible or exchangeable securities, "phantom" stock rights, stock appreciation rights, stock-based performance units, commitments, Contracts, arrangements or undertakings of any kind to which Weyerhaeuser is a party obligating Weyerhaeuser to deliver or distribute any shares of Spinco Common Stock, or obligating Weyerhaeuser to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, Contract, arrangement or undertaking.

SECTION 4.04. Authority; Execution and Delivery; Enforceability. (a) Each of Weyerhaeuser and the Spinco Parties has all requisite power and authority to execute and deliver each Transaction Document to which it is or is contemplated to be a party, to perform its obligations thereunder and to consummate the Transactions. The execution and delivery by Weyerhaeuser and the Spinco Parties of each Transaction Document to which they are or are contemplated to be a party and the consummation by Weyerhaeuser and the Spinco Parties of the Transactions have been duly authorized by all requisite action on the part of Weyerhaeuser and the Spinco Parties. Each of Weyerhaeuser and the Spinco Parties has duly executed and delivered this Agreement, and, assuming due authorization, execution and delivery by the other parties hereto, this Agreement constitutes its legal, valid and binding obligation, enforceable against each of Weyerhaeuser and such Spinco Parties in accordance with its terms (except insofar as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally or by principles governing the availability of equitable remedies). Prior to the Effective Time, each of

Weyerhaeuser and the Spinco Parties will have duly executed and delivered each other Transaction Document to which it is or is contemplated to be a party, and, assuming due authorization, execution and delivery by the other parties thereto, each other Transaction Document to which it is or is contemplated to be a party will constitute its legal, valid and binding obligation, enforceable against it in accordance with its terms (except insofar as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally or by principles governing the availability of equitable remedies).

(b) The Boards of Directors of Weyerhaeuser and each of the Spinco Parties have duly and unanimously approved this Agreement and the other Transaction Documents to which they are or are contemplated to be a party. Weyerhaeuser, as the sole member and manager of Newco, has duly approved this Agreement and the other Transaction Documents to which Newco is or is contemplated to be a party.

(c) As of August 22, 2006, the sole stockholder of Spinco was Weyerhaeuser. Immediately after execution of the Original Agreement, Weyerhaeuser approved and adopted (the "Spinco Stockholder Approval") by written consent all aspects of this Agreement, the other Transaction Documents to which Spinco is or is contemplated to be a party and the Transactions, in each case which require the consent of Spinco's stockholders under the DGCL, Spinco's certificate of incorporation or Spinco's by-laws. The approval of Weyerhaeuser's shareholders is not required to effect the Transactions. Upon obtaining the Spinco Stockholder Approval, the approval of Spinco's stockholders after the Distribution Date will not be required to effect the Transactions, unless this Agreement is amended after the Distribution Date and such approval is required, solely as a result of such amendment, under the DGCL, Spinco's certificate of incorporation or Spinco's by-laws.

SECTION 4.05. No Conflicts; Governmental Approvals. (a) The execution and delivery by each of Weyerhaeuser and the Spinco Parties of each Transaction Document to which it is a party do not, the execution and delivery by each of Weyerhaeuser and the Spinco Parties of each Transaction Document to which it is contemplated that Weyerhaeuser or such Spinco Party will be a party will not, and the consummation of the Spinco Share Issuance and the other Transactions and compliance with the terms hereof and thereof will not, conflict with, or result in any violation of or default (or an event that, with or without notice or lapse of time or both, would become a default) under, or give rise to a right of termination, cancelation or acceleration of any obligation or to a loss of a material benefit under, or to increased, additional, accelerated or guaranteed rights or entitlements of any person under, or result in the creation of any Lien upon any issued and outstanding share of capital stock or equity interest of any Spinco Party or any of the Newco Assets, Newco Canada Exchangeco Assets, Newco Liabilities, Newco Canada Exchangeco Liabilities or the Newco Business under, any provision of (i) the certificate or articles of incorporation, the by-laws, the certificate of formation, the limited liability company agreement or the comparable charter or organizational documents of Weyerhaeuser or any Spinco Party, (ii) any Contract to which Weyerhaeuser, any Spinco Party or any Weyerhaeuser Subsidiary is a party or by which any of their respective properties or assets is bound, or (iii) subject to the filings, consents and other matters referred to in Section 4.05(b), any Judgment or Law applicable to Weyerhaeuser, any Spinco Party or any Weyerhaeuser Subsidiary or their respective properties or assets, other than, in the case of clauses (ii) and (iii) above, any

such items that, individually or in the aggregate, have not had and would not reasonably be expected to have a Newco Material Adverse Effect or a Material Adverse Effect on Weyerhaeuser.

(b) No Governmental Approval of, or registration, declaration or filing with, or permit from, any Governmental Entity is required to be obtained or made by or with respect to Weyerhaeuser, any Spinco Party or any Weyerhaeuser Subsidiary in connection with the execution, delivery and performance of any Transaction Document to which Weyerhaeuser or any Spinco Party is a party or the consummation of the Transactions, other than (i) compliance with and filings under the Competition Act, the Investment Canada Act and the HSR Act, (ii) the filings by Spinco with the SEC (A) on Form S-4 (or other appropriate form required by the SEC) registering under the Securities Act the distribution of shares of Spinco Common Stock to holders of Weyerhaeuser Common Stock if such registration is required by applicable Law or the SEC (the "Form S-4"), (B) on Form 10 (the "Form 10") registering under the Exchange Act the shares of Spinco Common Stock, (C) the Spinco Registration Statement (as defined in Section 6.03(b)) registering under the Securities Act the issuance of shares of Spinco Common Stock from time to time after the Effective Time upon exchange of the Exchangeable Shares, and (D) the Form S-8 registering under the Securities Act the shares of Spinco Common Stock issued from time to time after the Effective Time upon exercise of the Replacement Options, Amended Replacement Options, Replacement Rights, Replacement DSUs, Replacement PSUs, Replacement Restricted Shares, Substituted Spinco Options, Substituted Spinco SARs and Substituted Spinco RSUs (collectively, the "Equity Awards"), (iii) if Weyerhaeuser elects to effect the Distribution as an exchange offer, the filings by Weyerhaeuser with the SEC pursuant to Rule 13e-4 under the Exchange Act (the "Exchange Offer Schedule"), (iv) the filing of the amended certificate of incorporation of Spinco pursuant to Section 1.09 with the Secretary of State of the State of Delaware, (v) any Governmental Approval or filing in connection with the listing of the shares of Spinco Common Stock on the New York Stock Exchange, Inc. (the "NYSE") and the TSX and compliance by Weyerhaeuser with the rules of the NYSE and the by-laws and requirements of the TSX, (vi) any Governmental Approval or filing in connection with the listing of the Exchangeable Shares and the Class B Common Shares on the TSX and compliance by Newco Canada Exchangeco and Offerco with the by-laws and requirements of the TSX, (vii) any filings with the CSAs and the TSX in connection with the issuance and first resale of (A) the shares of Spinco Common Stock, Class B Common Shares and Exchangeable Shares issued pursuant to the Arrangement or the Distribution, (B) the shares of Spinco Common Stock issued from time to time after the Effective Time upon exchange of the Exchangeable Shares, and (C) the shares of Spinco Common Stock issued from time to time after the Effective Time upon exercise of the Equity Awards, (viii) any filings with the CSAs, (ix) such Governmental Approvals and filings as are required to be obtained or made under the securities or "Blue Sky" laws of various states in connection with the issuance of the shares of Spinco Common Stock pursuant to the Transaction Documents, (x) such Governmental Approvals and filings as are required to be obtained or made from the IRS in connection with the IRS Ruling (as defined in Section 6.27(a)), and (xi) such other Governmental Approvals, registrations, declarations, filings or permits that, individually or in the aggregate, have not had and would not reasonably be expected to have a Newco Material Adverse Effect.

SECTION 4.06. SEC Documents; Undisclosed Liabilities. (a) As of August 22, 2006 no Newco Party is subject to the reporting requirements of Section 13(a) or 15(d) of the

Exchange Act. Weyerhaeuser has filed all reports, schedules, forms, statements and other documents required to be filed by Weyerhaeuser with the SEC since January 1, 2005 pursuant to Sections 13(a) and 15(d) of the Exchange Act, and as of its respective date, each such report, schedule, form, statement or other document complied in all material respects with the requirements of the Exchange Act except for such failures to make such filings that, individually or in the aggregate, would not have a materially adverse effect on, or materially delay, the ability of Weyerhaeuser to perform its obligations under this Agreement and the other Transaction Documents or to consummate the Transaction. With respect to the Newco Business only, Weyerhaeuser has not filed any documents with the SEC since January 1, 2005 under Section 13(a) or 15(d) of the Exchange Act which, as of their respective dates (or, if amended or superseded by a filing prior to August 22, 2006, then on the date of such filing) contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

(b) Section 4.06(b) of the Weyerhaeuser Disclosure Letter includes (i) an unaudited balance sheet with respect to the Newco Business (other than the Canadian Logging, Forest Management and Saw Mill Operations) at March 26, 2006 (together with the notes thereto, the "Interim Newco Balance Sheet") and the related unaudited statements of income and cash flows for the 13-week period ended March 26, 2006 (together with the notes thereto and the Interim Newco Balance Sheet, the "Interim Newco Financial Statements") and (ii) an unaudited balance sheet with respect to the Newco Business (other than the Canadian Logging, Forest Management and Saw Mill Operations) at December 25, 2005 (together with the notes thereto, the "2005 Newco Balance Sheet") and the related unaudited statements of income and cash flows for the twelve month period ended December 25, 2005 (together with the notes thereto and the 2005 Newco Balance Sheet, the "2005 Unaudited Newco Financial Statements" and, together with the Interim Newco Financial Statements, the "Unaudited Newco Financial Statements"). The Unaudited Newco Financial Statements and, when delivered in accordance with Section 6.24(a), the Audited Newco Financial Statements (as defined in Section 6.24(a)) (collectively, the "Newco Financial Statements"), (i) were (and, in the case of the Audited Newco Financial Statements, shall have been) prepared in accordance with the books of account and other financial records of Weyerhaeuser and its subsidiaries, (ii) present fairly (and, in the case of the Audited Newco Financial Statements, shall present fairly), in all material respects, the financial position of the Newco Business (in the case of the Unaudited Newco Financial Statements other than the Canadian Logging, Forest Management and Saw Mill Operations) and the results of its operations and changes in cash flows as of the dates thereof and for the periods covered thereby, (iii) have been (and, in the case of the Audited Newco Financial Statements, shall have been) prepared in accordance with U.S. GAAP, in a manner and using accounting principles consistent with Weyerhaeuser's historical financial statements (except as may be indicated in the notes thereto and subject, in the case of unaudited financial statements, to normal year-end adjustments), and (iv) in the case of the Audited Newco Financial Statements, shall meet the requirements of Regulation S-X, promulgated pursuant to the Securities Act.

(c) Except as set forth on the Interim Newco Balance Sheet, the Newco Business (other than the Canadian Logging, Forest Management and Saw Mill Operations) has no liability or obligation of any nature (whether accrued, absolute, contingent or otherwise) other than (i) liabilities or obligations incurred in the ordinary course of business since March 26, 2006, (ii)

liabilities or obligations not required to be disclosed on a balance sheet for the Newco Business prepared in accordance with U.S. GAAP or in the notes thereto, or (iii) liabilities or obligations that would not, individually or in the aggregate, reasonably be expected to have a Newco Material Adverse Effect.

SECTION 4.07. Information Supplied. None of the information supplied or to be supplied by Weyerhaeuser or any of the Spinco Parties for inclusion or incorporation by reference in the Domtar Circular, the Weyerhaeuser Canada Circular, the Form 10 or, if applicable, the Form S-4 or the Exchange Offer Schedule will, at the time each such document is filed with the CSAs or the SEC, as applicable, at any time it is amended or supplemented or at the time it becomes effective under applicable Canadian Securities Legislation (in the case of the Domtar Circular and the Weyerhaeuser Canada Circular), the Securities Act (in the case of the Form S-4) or the Exchange Act (in the case of the Form 10), contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading.

SECTION 4.08. Absence of Certain Changes or Events. From March 26, 2006 to August 22, 2006, the Newco Business has been conducted only in the ordinary course, and during such period there has not been:

(i) any event, change, effect or development that, individually or in the aggregate, has had or would reasonably be expected to have a Newco Material Adverse Effect; or

(ii) any action by Weyerhaeuser, any Weyerhaeuser Subsidiary or any Spinco Party that, if taken during the period from August 22, 2006 through the Effective Time, would constitute a breach of Section 5.01(b).

SECTION 4.09. Taxes. (a) Except as, individually or in the aggregate, have not had and would not reasonably be expected to have a Newco Material Adverse Effect:

(i) all Tax Returns (including Tax Returns of Weyerhaeuser and any Weyerhaeuser Subsidiary) relating to the Newco Business, the Newco Assets, the Newco Canada Exchangeco Assets and the Spinco Parties required to be filed on or prior to the date of this Agreement have been timely filed and all such Tax Returns required to be filed after the date of this Agreement and prior to the Closing shall have been timely filed;

(ii) all such Tax Returns are true, correct and complete in all respects; and

(iii) all Taxes relating to the Newco Business, the Newco Assets, the Newco Canada Exchangeco Assets and the Spinco Parties required to be paid, charged or collected on or prior to the Closing Date have been timely paid, charged or collected.

(b) The Unaudited Newco Financial Statements reflect an adequate reserve in accordance with U.S. GAAP for all Taxes payable by the Spinco Parties (in addition to any reserve for deferred taxes to reflect timing differences between book and tax items) for all Taxable periods and portions thereof through the date of such financial statements.

[[2672858]]

(c) No deficiency with respect to any Taxes has been proposed, asserted or assessed in writing against Weyerhaeuser, any Weyerhaeuser Subsidiary or any Spinco Party with respect to the Newco Business, except to the extent any such deficiency, individually or in the aggregate, has not had and would not reasonably be expected to have a Newco Material Adverse Effect.

(d) No written agreement or other written document waiving or extending, or having the effect of waiving or extending, the statute of limitations or the period of assessment or collection of any Taxes relating to any Spinco Party or the Newco Business and no power of attorney with respect to any such Taxes have been filed or entered into with any taxing authority.

(e) There are no material Liens for Taxes (other than for current Taxes not yet due and payable) on the assets of any Spinco Party.

(f) No Spinco Party (i) has been a member of an affiliated group (or similar state, local or foreign filing group) filing a consolidated U.S. Federal income Tax Return (other than the group the common parent of which is Weyerhaeuser) or (ii) has any material liability for the Taxes of any person (other than Weyerhaeuser or a Weyerhaeuser Subsidiary) under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign Law).

(g) No Spinco Party has any material liability for the Taxes of any person as a transferee or successor.

(h) No Spinco Party is bound by any material agreement or arrangement with respect to Taxes (other than the Tax Sharing Agreement).

(i) Within the past two years, no Spinco Party has been a "distributing corporation" or a "controlled corporation" in a distribution intended to qualify for tax-free treatment under Section 355 of the Code (other than in connection with the Distribution).

(j) No Spinco Party has been a party to a transaction that constitutes a "listed transaction", for purposes of Section 6011 of the Code and applicable Treasury Regulations thereunder (or a similar provision of state Law), that is or may be subject to examination by the IRS.

(k) No Spinco Party will be required to include in a taxable period ending after the Effective Time any material amount of net taxable income attributable to income that accrued in a prior taxable period but was not included in taxable income for that or another prior taxable period.

(l) Neither Weyerhaeuser nor any Spinco Party has taken or agreed to take any action or knows of any fact, agreement, plan or other circumstance that has had or would reasonably be expected to prevent: (i) the Contribution and Distribution from qualifying as a spin-off pursuant to Section 355 of the Code and as a reorganization pursuant to Section 368 of the Code, or (ii) the Arrangement from being tax deferred under the ITA for certain eligible holders of Domtar Common Shares resident in Canada that exchange such shares for Exchangeable Shares provided appropriate elections are filed in the prescribed manner in accordance with Section 85 of the ITA. Neither Weyerhaeuser nor any Spinco Party has taken or

||2672858||

agreed to take any action or knows of any fact, agreement, plan or other circumstances that would result in the Contribution, Distribution or Arrangement giving rise to Tax liability under Section 355(d) or 355(e) of the Code.

(m) The classification for United States Federal income tax purposes of each affiliate owned by Spinco is as set forth in Section 4.09(m) of the Weyerhaeuser Disclosure Letter.

(n) Weyerhaeuser and each Weyerhaeuser Subsidiary has deducted, withheld, remitted or self-assessed all material amounts required or permitted to be deducted, withheld, remitted or self-assessed in respect of Taxes on all amounts paid to non-residents of the United States (or, in the case of a Weyerhaeuser Subsidiary which is resident in Canada, non-residents of Canada) or employees, in each case only to the extent such amounts relate to the Newco Business.

SECTION 4.10. Benefit Plans. From March 26, 2006 to August 22, 2006, none of Weyerhaeuser or any of its subsidiaries has terminated, adopted, amended or agreed to terminate, adopt or amend in any material respect any collective bargaining agreement or any bonus, pension, profit sharing, deferred compensation, incentive compensation, stock or other equity ownership, stock or other equity purchase, stock or other equity appreciation, restricted stock or other equity, stock or other equity repurchase rights, stock or other equity option, phantom stock or other equity, performance, retirement, vacation, severance, disability, death benefit, hospitalization, medical or other plan, arrangement or understanding (whether or not legally binding or subject to the Laws of the United States or Canada) (i) maintained, contributed to or required to be maintained or contributed to by Weyerhaeuser or any of its subsidiaries or any other person that, together with Weyerhaeuser or any New Spinco Party, is treated as a single employer under Section 414(b), (c), (m) or (o) of the Code or any other applicable Law, providing benefits to any current or former officer, manager, director or employee of Newco or any Newco Party (including, for the avoidance of doubt, any individual who (A) is not actively at work by reason of illness, vacation, short-term disability, long-term disability, workers' compensation or other leave of absence, (B) is primarily engaged in the Newco Business or (C) is, or is expected to become, an officer, director or employee of any New Spinco Party as of the Effective Time) (a "Newco Employee") or (ii) in respect of which Newco or any Newco Subsidiary would reasonably be expected to have any liability (collectively, "Newco Benefit Plans"), or made any material change in the manner in which contributions to any Newco U.S. Pension Plan or Newco Canadian Pension Plan (in each case as defined in Section 4.11(a)) are made or the basis on which such contributions are determined.

SECTION 4.11. Employment Agreements; ERISA Compliance. (a) Section 4.11(a) of the Weyerhaeuser Disclosure Letter contains a list of each Newco Benefit Plan that is an "employee pension benefit plan" (as defined in Section 3(2) of ERISA) ("Newco U.S. Pension Plans"), "registered pension plan" (as defined in Section 248(1) of the ITA) ("Newco Canadian Pension Plans"), "employee welfare benefit plans" (as defined in Section 3(1) of ERISA) ("Newco U.S. Welfare Plans"), employee health or welfare plan maintained for the benefit of Newco Employees employed in Canada ("Newco Canadian Welfare Plans") and all other material Newco Benefit Plans. For the avoidance of doubt, the term "Newco U.S. Pension Plans" shall not include any Newco Canadian Pension Plans, and the

term "Newco U.S. Welfare Plans" shall not include any Newco Canadian Welfare Plans. Section 4.11(a) of the Weyerhaeuser Disclosure Letter contains a list of each material employment, consulting, indemnification, severance, termination, change in control, retention, bonus or similar agreement or arrangement between Weyerhaeuser or any of its subsidiaries, on the one hand, and any individual Newco Employee, on the other hand (collectively, "Newco Benefit Agreements"). Weyerhaeuser has delivered or made available to Domtar true, complete and correct copies of (i) each Newco Benefit Plan (other than any "multi-employer pension plan", as defined under applicable Canadian federal or provincial pension standards legislation ("Newco Canadian MEPP") and each Newco Benefit Agreement required to be listed on Section 4.11(a) of the Weyerhaeuser Disclosure Letter (or, in the case of any unwritten Newco Benefit Plan or Newco Benefit Agreement required to be listed on Section 4.11(a) of the Weyerhaeuser Disclosure Letter, a description thereof), (ii) the most recent annual information return with respect to each Assumed Canadian Plan (as defined in Section 6.09(g)(i)) (if any such return was required), (iii) the most recent summary plan description for each such Newco Benefit Plan (other than any Newco Canadian MEPP) for which such summary plan description is required, (iv) each trust agreement, group annuity contract or any other funding agreement or contract relating to each Assumed Canadian Plan, and (v) the most recent actuarial valuation report for each Assumed Canadian Plan.

(b) Each Newco 401(k) Plan (as defined in Section 6.09(f)(i)) has been the subject of determination letters from the IRS with respect to all Tax Law changes with respect to which the IRS is currently willing to provide a determination letter to the effect that such Newco 401(k) Plan is qualified and exempt from Federal income taxes under Sections 401(a) and 501(a), respectively, of the Code, and no such determination letter has been revoked nor, to the knowledge of Weyerhaeuser, has revocation been threatened, nor has any such Newco 401(k) Plan been amended since the date of its most recent determination letter or application therefor in any respect that would reasonably be expected to adversely affect its qualification. With respect to any Newco Employee, the Newco 401(k) Plans, the Newco Benefit Plans (other than the Excluded Benefit Plans and any Newco Canadian MEPP) and the Newco Benefit Agreements have been administered in compliance with their terms, other than instances of non-compliance that, either individually or in the aggregate, have not had and would not reasonably be expected to have a Newco Material Adverse Effect. Each Assumed Canadian Plan has been established and registered in accordance with the applicable requirements of the ITA and applicable pension standards legislation and such registration has not been revoked nor, to the knowledge of Weyerhaeuser, has revocation been threatened by the Canadian tax authorities or the applicable pension regulatory authorities. Each Assumed Canadian Plan has been administered in accordance with its terms and applicable Law, other than instances of non-compliance that, either individually or in the aggregate, have not had and would not reasonably be expected to have a Newco Material Adverse Effect. Neither Weyerhaeuser nor any Weyerhaeuser Subsidiary contributes to or has any liability under any multi-employer pension plan (as defined under applicable Canadian federal or provincial pension standards legislation).

(c) Each Assumed Canadian Plan is fully-funded on a going-concern and solvency basis pursuant to the actuarial assumptions and methodologies set out in Section 4.11(c) of the Weyerhaeuser Disclosure Letter.

(d) No Newco U.S. Welfare Plan is funded or is insured through a third party.

(e) None of Weyerhaeuser or any person or entity that would be treated as a single employer with Weyerhaeuser for purposes of Section 414(b), (c), (m) or (o) of the Code would reasonably be expected to incur any Controlled Group Liability in an amount that would reasonably be expected to have a Newco Material Adverse Effect.

(f) No Newco U.S. Welfare Plan or Newco Canadian Welfare Plan provides post-retirement health or life insurance benefits, except where the cost thereof is borne entirely by the former employee (or his or her eligible dependents).

(g) The execution and delivery of each Transaction Document does not, and the consummation of the Transactions and compliance with the terms hereof and thereof will not, (i) entitle any Newco Employee to severance, termination, change in control or similar pay and benefits, (ii) accelerate the time of payment or vesting or trigger any payment or funding (through a grantor trust or otherwise) of compensation or benefits under, increase the amount payable or trigger any other material obligation pursuant to, any Newco Benefit Plan or Newco Benefit Agreement, or (iii) result in any breach or violation of, or a default under, any Newco Benefit Plan or Newco Benefit Agreement.

(h) No amount or other entitlement that could be received (whether in cash or property or the vesting of property) as a result of the Transaction by any Transferred Employee (as defined in Section 6.09) who is a "disqualified individual" (as such term is defined in Treasury Regulation Section 1.280G-1) under any Newco Benefit Plan, Newco Benefit Agreement or other compensation arrangement would be characterized as an "excess parachute payment" (as defined in Section 280G(b)(1) of the Code) and no such disqualified individual is entitled to receive any additional payment (including, without limitation, any tax gross up or other payment) from Newco, any Spinco Party or any other person in the event that the excise tax required by Section 4999(a) of the Code is imposed on such disqualified individual.

SECTION 4.12. Labor Matters. Except as set forth in Section 4.12 of the Weyerhaeuser Disclosure Letter:

(a) There are no, and during the past three years there have not been any, strikes, lockouts, work stoppages, slowdowns, or any other concerted interference with normal operations, stoppage or lockout pending, or, to the knowledge of Weyerhaeuser, threatened against or affecting any Newco Employee, Newco Assets, Newco Canada Exchangeco Assets, Newco or any Newco Subsidiary, except where such strikes, lockouts, work stoppages, slowdowns, or any other concerted interference with normal operations, stoppage or lockout, individually or in the aggregate, have not had and would not reasonably be expected to have a Newco Material Adverse Effect.

(b) There are no formal or informal complaints, charges, claims or grievances against Weyerhaeuser or any Weyerhaeuser Subsidiary pending, or, to the knowledge of Weyerhaeuser, threatened to be brought or filed with any Governmental Entity, arbitrator or court based on or arising out of the employment by Weyerhaeuser or any Weyerhaeuser Subsidiary of any Newco Employee.

(c) Weyerhaeuser and each Weyerhaeuser Subsidiary is in compliance with all laws, regulations, rules and orders of all Governmental Entities relating to the employment of the Newco Employees, including without limitation laws, regulations rules and orders relating to wages, hours, collective bargaining, discrimination, civil rights, safety and health, worker notification requirements, immigration, workers' compensation, layoffs and the collection and payment of withholding Taxes and similar Taxes, except where the failure to be in compliance, individually or in the aggregate, has not had and would not reasonably be expected to have an Newco Material Adverse Effect.

SECTION 4.13. <u>Litigation.</u> There is no Action pending or, to the knowledge of Weyerhaeuser, claims that have been asserted against or affecting Weyerhaeuser or any Weyerhaeuser Subsidiary (including the Spinco Parties) relating to the Newco Business (and Weyerhaeuser is not aware of any basis for any such Action or claim) that, individually or in the aggregate, has had or would reasonably be expected to have a Newco Material Adverse Effect, nor is there any Judgment outstanding against Weyerhaeuser or any Weyerhaeuser Subsidiary (including the Spinco Parties) relating to the Newco Business that has had or would reasonably be expected to have a Newco Material Adverse Effect. This Section 4.13 does not relate to Environmental Claims, which are the subject of Section 4.16.

SECTION 4.14. <u>Compliance with Applicable Laws.</u> With respect to the Newco Business only, Weyerhaeuser and the Weyerhaeuser Subsidiaries (including the Newco Parties) are, and have since January 1, 2003 been, in compliance with all applicable Laws, including those relating to occupational health and safety, except for instances of non-compliance that, individually and in the aggregate, have not had and would not reasonably be expected to have a Newco Material Adverse Effect. With respect to the Newco Business only, neither Weyerhaeuser nor any Weyerhaeuser Subsidiary (including the Newco Parties) has received any written communication during the past two years from a Governmental Entity that alleges that Weyerhaeuser or any Weyerhaeuser Subsidiary is not in compliance in any material respect with any applicable Law. This Section 4.14 does not relate to matters with respect to Taxes, which are the subject of Section 4.09, or Environmental Laws, which are the subject of Section 4.16.

SECTION 4.15. <u>Brokers.</u> No broker, investment banker, financial advisor or other person, other than Morgan Stanley & Co., Inc., is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the Transactions based upon arrangements made by or on behalf of Weyerhaeuser, Spinco or Newco. The fees and expenses of Morgan Stanley & Co., Inc. will be paid by Weyerhaeuser; <u>provided</u>, <u>however</u>, that, subject to Section 6.11, in the event the Transactions are consummated, Spinco shall reimburse Weyerhaeuser for such fees and reasonably documented out-of-pocket expenses of Morgan Stanley & Co., Inc. incurred in connection with the Transactions.

SECTION 4.16. <u>Environmental Matters.</u> (a) Except for those matters that, individually or in the aggregate, have not had and would not reasonably be expected to have a Newco Material Adverse Effect:

(i) with respect to the Newco Business only, Weyerhaeuser and the Weyerhaeuser Subsidiaries (including the Newco Parties) are, and have since January 1, 2003 been, in compliance with all Environmental Laws and have not received any (A) communication

||2672858||

that alleges that the Newco Business is in violation of, or has liability under, any Environmental Law, or (B) written request for information with respect to the Newco Business pursuant to any Environmental Law, including new source review requirements under the Federal Clean Air Act or any state analogue thereto;

(ii) to the knowledge of Weyerhaeuser, compliance of the operations of the Newco Business with applicable Environmental Laws will not require the Newco Parties, Newco Canada or Exchangeco Subsidiary to incur costs, including the costs of pollution control equipment that are known or anticipated to be required in the future, beyond those (A) currently budgeted for the fiscal year ended December 31, 2006, (B) approved by senior management of Weyerhaeuser in a budget for the fiscal year ended December 30, 2007 materially consistent with the budget for the fiscal year ended December 31, 2006, or (C) set forth in Section 4.16(a)(ii) of the Weyerhaeuser Disclosure Letter;

(iii) (A) Weyerhaeuser and the Weyerhaeuser Subsidiaries have obtained and are in compliance with all Environmental Permits necessary for the operations of the Newco Business as currently conducted, (B) all such Environmental Permits are valid and in good standing, and (C) neither Weyerhaeuser nor any Weyerhaeuser Subsidiaries have been advised by any Governmental Entity of any actual or potential change in the status or terms and conditions of any such Environmental Permit;

(iv) there are no Environmental Claims pending or, to the knowledge of Weyerhaeuser, threatened that have been asserted against or affecting Weyerhaeuser or any Weyerhaeuser Subsidiary relating to the Newco Business;

(v) there have been no Releases of any Hazardous Material that have formed the basis of any Environmental Claim or unsatisfied judgment relating to the Newco Business pending against Weyerhaeuser or any Weyerhaeuser Subsidiary or against any person whose liabilities for such Environmental Claims relating to the Newco Business, Weyerhaeuser or any Weyerhaeuser Subsidiary has, or may have, retained or assumed, either contractually or by operation of law;

(vi) (A) neither Weyerhaeuser nor any Weyerhaeuser Subsidiary has retained or assumed, either contractually or by operation of law, any liabilities or obligations that have had or would reasonably be expected to form the basis of any Environmental Claim relating to the Newco Business against Weyerhaeuser or any Weyerhaeuser Subsidiary, and (B) to the knowledge of Weyerhaeuser, no Environmental Claims are pending against any person whose liabilities for such Environmental Claims relating to the Newco Business, Weyerhaeuser or any Weyerhaeuser Subsidiary has, or may have, retained or assumed, either contractually or by operation of law; and

(b) Weyerhaeuser has provided Domtar with all material Phase I and Phase II environmental site assessments and non-privileged internal environmental audit reports, in each case relating to the Newco Assets or Newco Canada Exchangeco Assets, conducted since July 1, 2003 and in the possession, custody or control of Weyerhaeuser or any Weyerhaeuser Subsidiary.

SECTION 4.17. <u>Title To Properties.</u> Except as provided in Section 6.05 of the Contribution and Distribution Agreement, after giving effect to the Contribution and the other Transactions described in or contemplated by this Agreement and the Contribution and Distribution Agreement, the Newco Parties, Newco Canada or Exchangeco Subsidiary will have, in all material respects, good and valid fee simple title to the Newco Owned Real Property (as defined in Section 4.23(a)), valid leasehold interests in the Newco Leased Real Property (as defined in Section 4.23(b)) and valid title to the other tangible assets necessary for the conduct of the Newco Business as currently conducted, in each case free of any Liens, except for (i) Liens securing indebtedness reflected in the Newco Financial Statements, (ii) Liens consisting of zoning or planning restrictions, permits, easements, covenants and other restrictions or limitations on the use of real property or irregularities in title thereto which do not materially impair the use of such property as it is presently used in connection with the Newco Business, (iii) Liens for current Taxes, assessments or governmental charges or levies on property not yet due or which are being contested in good faith and for which appropriate reserves in accordance with U.S. GAAP have been created, (iv) mechanic's, materialmen's and similar Liens arising in the ordinary course of business or by operation of Law, (v) Liens which have been placed by any developer, landlord or other third party on any Newco Leased Real Property and subordination or similar agreements relating thereto and (vi) Liens which would not, individually or in the aggregate, reasonably be expected to materially and adversely affect the use of such assets in the Newco Business ("<u>Newco Permitted Liens</u>" and, together with Domtar Permitted Liens, the "<u>Permitted Liens</u>").

SECTION 4.18. <u>Intellectual Property.</u> (a) Section 4.18(a) of the Weyerhaeuser Disclosure Letter sets forth all Registered Intellectual Property that is owned by Weyerhaeuser and used primarily in the conduct of the Newco Business as currently conducted except for Excluded Assets. Except for the Intellectual Property Rights that are the subject of claims set forth in Section 4.18(b) of the Weyerhaeuser Disclosure Letter (to the extent of such claims), all Intellectual Property Rights that are material to the Newco Business as currently conducted will be, to the extent owned by or licensed to Weyerhaeuser or any Weyerhaeuser Subsidiary, owned by, licensed to or sublicensed to Newco or the Newco Subsidiaries after giving effect to the Intellectual Property License Agreement, the Weyerhaeuser Contribution and the other Transactions described in or contemplated by the Contribution and Distribution Agreement. Except for the Intellectual Property Rights that are the subject of claims set forth in Section 4.18(b) of the Weyerhaeuser Disclosure Letter (to the extent of such claims), (1) Weyerhaeuser or a Weyerhaeuser Subsidiary is the sole and exclusive owner of the Intellectual Property Rights owned by Weyerhaeuser or a Weyerhaeuser Subsidiary and used primarily in the conduct of the Newco Business as currently conducted except for Excluded Assets (collectively, "<u>Weyerhaeuser Intellectual Property Rights</u>") free and clear of all perfected and unperfected security interests other than Newco Permitted Liens, (2) neither Weyerhaeuser nor any Weyerhaeuser Subsidiary has granted an exclusive license, other than the Intellectual Property License Agreement, to any Weyerhaeuser Intellectual Property Rights, and (3) no material license fees of any kind are currently required for the use by Weyerhaeuser or any Weyerhaeuser Subsidiary of any Weyerhaeuser Intellectual Property Rights. Notwithstanding any other representations in this Section 4.18(a), Weyerhaeuser makes no representation with respect to whether patent applications set forth in Section 4.18(a) of the Weyerhaeuser Disclosure Letter will be issued by the applicable governmental authority or if issued, whether practicing any of the claims in any such patents infringes or will infringe any claims of any third party's patents.

(b) Except as set forth in Section 4.18(b) of the Weyerhaeuser Disclosure Letter, no claims are pending or, to the knowledge of Newco, have been asserted, as of August 22, 2006, against Weyerhaeuser or any Weyerhaeuser Subsidiary by any person (i) claiming that Weyerhaeuser or any Weyerhaeuser Subsidiary is infringing or has infringed any Intellectual Property Right in the operation or conduct of the Newco Business as currently conducted or (ii) challenging the validity, ownership, patentability, enforceability, registrability or use by Weyerhaeuser or any Weyerhaeuser Subsidiary of any Weyerhaeuser Intellectual Property Rights. As of August 22, 2006, to the knowledge of Weyerhaeuser, no person is infringing or misappropriating the rights of Weyerhaeuser or any Weyerhaeuser Subsidiary with respect to any Weyerhaeuser Intellectual Property Rights.

(c) There are no unpaid maintenance or renewal fees currently overdue for any Registered Intellectual Property set forth or required to be set forth in Section 4.18(a) of the Weyerhaeuser Disclosure Letter, nor have any material applications or registrations therefor lapsed or been abandoned, canceled, or expired other than in the ordinary course of business.

(d) Notwithstanding anything to the contrary in this Agreement or the other Transaction Documents, Weyerhaeuser and any other member of the Weyerhaeuser Group do not make any representation or warranty of any kind whatsoever, express or implied, with respect to the "Willamette" name, which shall be transferred on an "as is, where is" basis, and all implied warranties of ownership, validity, non-infringement or otherwise are hereby expressly disclaimed.

SECTION 4.19. Insurance. All of the material insurance policies held by Weyerhaeuser or any of the Weyerhaeuser Subsidiaries, or under which any of them is an insured party, that insure any Newco Assets, any Newco Canada Exchangeco Assets or the Newco Business (or any portion thereof) are (i) maintained with reputable insurers in such amounts and covering such risks as are in accordance with normal industry practice for companies engaged in a business similar to the Newco Business, and (ii) are in full force and effect and all premiums due thereon have been paid. Weyerhaeuser and such Weyerhaeuser Subsidiaries have complied with the terms and provisions of such insurance policies, except for any non-compliance that, individually or in the aggregate, has not had or would not reasonably be expected to have a Newco Material Adverse Effect.

SECTION 4.20. Material Agreements. Section 4.20 of the Weyerhaeuser Disclosure Letter sets forth a list of all the Newco Material Agreements as of August 22, 2006. For the purpose of this Agreement, the term "Newco Material Agreements" means any of the following agreements, arrangements, commitments or understandings, whether or not in writing, to which Weyerhaeuser or any Weyerhaeuser Subsidiary, with respect to the Newco Business only, is a party:

(a) any "material contract" (as defined in Item 601(b)(10) of Regulation S-K promulgated under the Securities Act) (the term "material contract" to be applied as if Newco were a separate company for purposes of this Section 4.20(a));

(b) any non-competition agreement or any other agreement, arrangement, commitment or understanding that materially limits Weyerhaeuser and the Weyerhaeuser

Subsidiaries from conducting and engaging in the Newco Business, or that would reasonably be expected to materially limit any Newco Party from conducting and engaging in the Newco Business after the Effective Time;

(c) any agreement, arrangement, commitment or understanding with respect to any partnership, joint venture or strategic alliance material to the Newco Business;

(d) any agreement, arrangement, commitment or understanding that will govern the terms of indebtedness, or guarantees of indebtedness, of Newco or any Newco Subsidiary after the Effective Time; and

(e) any agreement, arrangement, commitment or understanding (other than any short-term purchase agreement, arrangement, commitment or understanding entered into in the ordinary course of business) that provides for annual payments in excess of $1,000,000 and that is terminable by notice of not more than 90 days for a cost of less than $75,000.

Each of the Newco Material Agreements required to be set forth in Section 4.20 of the Weyerhaeuser Disclosure Letter or entered into after August 22, 2006 is or will be in full force and effect (except to the extent any of them expires in accordance with its terms), and neither Weyerhaeuser nor any Weyerhaeuser Subsidiary has violated any provisions of, or committed or failed to perform any act that, with or without notice, lapse of time, or both, would constitute a default under the provisions of any Newco Material Agreement, except for violations or defaults that, individually or in the aggregate, have not had and would not reasonably be expected to have a Newco Material Adverse Effect. True, correct and complete copies of each written Newco Material Agreement (and a summary of each oral Newco Material Agreement) listed in Section 4.20 of the Weyerhaeuser Disclosure Letter (including all written modifications and amendments thereto and waivers thereunder) have been made available to Domtar.

SECTION 4.21. Affiliate Transactions. Section 4.21 of the Weyerhaeuser Disclosure Letter sets forth a list of all contracts, agreements, arrangements, commitments or understandings, whether or not entered into in the ordinary course of business, to or by which Weyerhaeuser or any Weyerhaeuser Subsidiary (other than the New Spinco Parties), on the one hand, and any New Spinco Party, on the other hand, are a party or are bound, and that were in effect on August 22, 2006 and shall, or are reasonably expected to, be in effect on or after the Effective Time other than this Agreement and the other Transaction Documents.

SECTION 4.22. Opinion of Weyerhaeuser Financial Advisor. Weyerhaeuser, as the sole stockholder of Spinco, has received the written opinion of Morgan Stanley & Co. Incorporated, to the effect that, as of the date of such opinion, the consideration to be received by the holders of Weyerhaeuser Common Stock pursuant to the Transactions is fair from a financial point of view to such holders. Weyerhaeuser has delivered a copy of such opinion to Domtar for informational purposes only.

SECTION 4.23. Real Estate. (a) Section 4.23(a) of the Weyerhaeuser Disclosure Letter lists all real property (in each case, together with the address, if any) that is, or following the Contribution and the other Transactions contemplated by this Agreement, will be,

owned by Newco and the Newco Subsidiaries and that is material in the operation or conduct of the Newco Business (the "<u>Newco Owned Real Property</u>").

(b) Section 4.23(b) of the Weyerhaeuser Disclosure Letter lists all real property (in each case, together with the address, if any) in which Newco or any of the Newco Subsidiaries will hold a leasehold interest following the Contribution and the other Transactions contemplated by this Agreement and that is material in the operation or conduct of the Newco Business (the "<u>Newco Leased Real Property</u>"). Weyerhaeuser has made available to Domtar a true and complete copy of each material lease agreement under which the Newco Leased Real Property is held. There is no material default under any such lease agreement by Weyerhaeuser or any Weyerhaeuser Subsidiary or, to the knowledge of Weyerhaeuser, by any other party thereto that has had or would reasonably be expected to have a Newco Material Adverse Effect.

SECTION 4.24. <u>Sufficiency of Assets.</u> At the Effective Time, the Newco Assets, taken together with the Newco Canada Exchangeco Assets and the services available from Weyerhaeuser or any Weyerhaeuser Subsidiary under the Transition Services Agreement, the intellectual property rights licensed under the Intellectual Property License Agreement and the goods and services provided under the Fiber Supply Agreements, the Site Services Agreements, the other Transaction Documents and the arrangements contemplated by Sections 2.09 and 2.10 of the Contribution and Distribution Agreement, will constitute those assets, services and intellectual property rights reasonably required to operate the Newco Business in all material respects as currently conducted and as proposed to be conducted in accordance with Section 5.01(b). Nothing in this Section 4.24 shall be construed to constitute a representation or warranty as to title to the Newco Assets, the Newco Exchangeco Assets or the Retained Licensed Intellectual Property licensed under the Intellectual Property License Agreement, which is the subject of Sections 4.17 and 4.18.

## ARTICLE V

## COVENANTS RELATING TO CONDUCT OF BUSINESS

SECTION 5.01. <u>Conduct of Business.</u> (a) <u>Conduct of Business by Domtar.</u> Except for matters set forth in Section 5.01(a) of the Domtar Disclosure Letter or otherwise expressly permitted by the Transaction Documents, from August 22, 2006 to the Effective Time, Domtar shall, and shall cause each Domtar Subsidiary to, conduct its business in the usual, regular and ordinary course in substantially the same manner as previously conducted and, to the extent consistent therewith, use all reasonable efforts to preserve intact its current business organization, maintain its material rights, licenses and permits, keep available the services of its current officers and employees and keep its relationships with customers, suppliers, licensors, licensees, distributors and others having business dealings with them to the end that its goodwill and ongoing business shall be unimpaired in any material respect at the Effective Time. In addition, and without limiting the generality of the foregoing, except for matters set forth in the Section 5.01(a) of the Domtar Disclosure Letter or otherwise expressly permitted by this Agreement and the other Transaction Documents, from August 22, 2006 to the Effective Time, Domtar shall not, and shall not permit any Domtar Subsidiary to, do any of the following without the prior written consent of Weyerhaeuser, which shall not be unreasonably withheld or delayed:

||2672858||

(i) (A) declare, set aside or pay any dividends on, or make any other distributions in respect of, any shares of the capital stock or joint venture or other equity interests of Domtar or any Domtar Subsidiary other than dividends and distributions by a direct or indirect wholly-owned Domtar Subsidiary to its parent, (B) split, combine or reclassify any of the capital stock or joint venture or other equity interests of Domtar or any Domtar Subsidiary or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for its shares of capital stock or joint venture or other equity interests, except for any such transaction by a direct or indirect wholly-owned Domtar Subsidiary which remains a direct or indirect wholly-owned Domtar Subsidiary after consummation of such transaction, or (C) purchase, redeem or otherwise acquire or amend the terms of any shares of capital stock or joint venture or other equity interests of Domtar or any Domtar Subsidiary or any rights, warrants, options or other equity awards to acquire, directly or indirectly, any such shares of capital stock or joint venture or other equity interests;

(ii) issue, deliver, sell, grant, pledge or otherwise encumber (A) any of its shares of capital stock or joint venture or other equity interests, (B) any Voting Domtar Debt or other voting securities, (C) any securities convertible into or exchangeable for, or any options, warrants or rights to acquire, any such shares of capital stock, joint venture or other equity interests, Voting Domtar Debt, voting securities or convertible or exchangeable securities or (D) any "phantom" stock or other equity, "phantom" stock or other equity rights, stock or other equity appreciation rights or stock or other equity-based performance units, other than (1) the issuance of Domtar Common Shares upon the exercise of Domtar stock options or in connection with other equity-based awards granted pursuant to the Domtar Stock Plans and outstanding on August 22, 2006 and in accordance with their terms, and (2) the grant of Domtar stock options or other equity-based awards prior to the Measurement Date providing for the issuance of Domtar Common Shares pursuant to the Domtar Stock Plans in accordance with their present terms and consistent with past practice and the issuance of Domtar Common Shares upon the grant, exercise or vesting of such Domtar stock options or other equity-based awards;

(iii) amend its certificate or articles of incorporation, by-laws, certificate of formation, limited liability company agreement or other comparable charter or organizational documents;

(iv) acquire or agree to acquire, in a single transaction or a series of related transactions, whether by merging or consolidating with, or by purchasing a substantial equity interest in or a substantial portion of the assets of, or by any other manner, any business or any corporation, partnership, limited liability company, joint venture, association or other business organization or division thereof or any other person, or otherwise, if any of the foregoing are material, individually or in the aggregate, to Domtar and the Domtar Subsidiaries, taken as a whole, except purchases in the ordinary course of business consistent with past practice;

(v) except as required to ensure that any Domtar Benefit Plan or Domtar Benefit Agreement in effect on August 22, 2006 is not then out of compliance with applicable Law or as specifically required pursuant to this Agreement, (A) adopt, enter into, terminate or amend any collective bargaining agreement, Domtar Benefit Plan or Domtar Benefit Agreement, other than in the ordinary course of business consistent with past practice, (B) increase in any manner the compensation or benefits of, or pay any bonus to, any Domtar Employee, except for increases in

base salary or payments of bonuses in the ordinary course of business consistent with past practice or as required to comply with any Domtar Benefit Plan or Domtar Benefit Agreement in effect on August 22, 2006, (C) pay or provide to any Domtar Employee any benefit not provided for under a Domtar Benefit Plan or Domtar Benefit Agreement as in effect on August 22, 2006, other than the payment of base compensation in the ordinary course of business consistent with prior practice or as permitted by clause (B) above, (D) except to the extent expressly permitted under Section 5.01(a)(ii)(D), grant any awards under any Domtar Benefit Plan (including the grant of stock or other equity options, stock or other equity appreciation rights, performance units, restricted stock or other equity, stock or other equity purchase rights or other stock or other equity-based or stock-related awards) or remove or modify existing restrictions in any Domtar Benefit Plan or Domtar Benefit Agreement or awards made thereunder, (E) take any action to fund or in any other way secure the payment of compensation or benefits under any Domtar Benefit Plan or Domtar Benefit Agreement, (F) take any action to accelerate the vesting or payment of any compensation or benefits under any Domtar Benefit Plan or Domtar Benefit Agreement, or (G) make any material determination under any Domtar Benefit Plan or Domtar Benefit Agreement that is inconsistent with the ordinary course of business or past practice;

(vi) make any change in Domtar's tax accounting or financial accounting methods, principles or practices in effect on March 31, 2006, except insofar as may have been required by applicable Law or a change in Canadian GAAP;

(vii) (A) sell, lease (as lessor), license or otherwise dispose of or make subject to any Lien any properties or assets, except dispositions in the ordinary course of business consistent with past practice, or (B) consummate any "spin-off" of all or part of the Domtar Business prior to the Effective Time;

(viii) (A) incur any indebtedness for borrowed money or guarantee or otherwise become contingently liable for any such indebtedness of another person, issue or sell any debt securities or warrants or other rights to acquire any debt securities of Domtar or any Domtar Subsidiary, guarantee any debt securities of another person, enter into any "keep well" or other agreement to maintain any financial statement condition of another person or enter into any arrangement having the economic effect of any of the foregoing, except for short-term borrowings incurred in the ordinary course of business consistent with past practice, (B) make any loans, advances or capital contributions to, or investments in, any other person, other than (x) to or in Domtar or any direct or indirect wholly-owned Domtar Subsidiary, (y) in the ordinary course of business, or (z) in an amount not in excess of $500,000 individually or $2,000,000 in the aggregate, (C) enter into any lease with aggregate annual lease payments in excess of $1,000,000 (whether such lease is an operating or capital lease) other than operating leases in the ordinary course of business consistent with past practice, (D) authorize or make any capital expenditures other than (x) in the ordinary course of business consistent with past practice, or (y) as provided in the capital expenditures budget set forth in Section 5.01(a)(viii) of the Domtar Disclosure Letter, or (E) fail in any material respect to make capital expenditures contemplated by the capital expenditures budget set forth in Section 5.01(a)(viii) of the Domtar Disclosure Letter;

(ix) make any material Tax election inconsistent with past practice or settle or compromise any material Tax liability or refund;

(x) (A) pay, discharge or satisfy any claims, liabilities or obligations (absolute, accrued, asserted or unasserted, contingent or otherwise), other than the payment, discharge or satisfaction, in the ordinary course of business consistent with past practice or in accordance with their terms, of liabilities reflected or reserved against in, or contemplated by, the Interim Domtar Balance Sheet or incurred in the ordinary course of business consistent with past practice, (B) cancel any material indebtedness (individually or in the aggregate) or waive any claims or rights of substantial value or (C) waive the benefits of, or agree to modify in any manner, any confidentiality, standstill or similar agreement affecting the Domtar Business or to which Domtar or any Domtar Subsidiary is a party;

(xi) enter into any agreement or arrangement that limits or otherwise restricts Domtar or any Domtar Subsidiary, or that would, after the Effective Time, limit or restrict Domtar or any Domtar Subsidiary from engaging in any business in any geographic area;

(xii) adopt a plan or agreement of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other material reorganization or any other transaction that would preclude or be inconsistent in any material respect with, or hinder or delay in any material respect, the Transactions;

(xiii) enter into or amend any agreement or arrangement with any of their respective affiliates other than with wholly-owned subsidiaries of Domtar;

(xiv) except in the ordinary course of business consistent with past practice, modify, amend, enter into or terminate any Domtar Material Agreement or waive, release or assign any material rights or claims of Domtar or any Domtar Subsidiary;

(xv) settle any Action if such settlement would require any payment by Domtar or any Domtar Subsidiary in an amount in excess of $1,000,000 individually or $5,000,000 in the aggregate, or would obligate Domtar or any Domtar Subsidiary to take any material action or restrict Domtar or any Domtar Subsidiary in any material respect from taking any action, in each case at or after the Effective Time;

(xvi) engage in any business other than the Domtar Business substantially as currently conducted; or

(xvii) authorize any of, or commit or agree to take any of, the foregoing actions.

(b) Conduct of Business by Weyerhaeuser and Spinco. Except for matters set forth in Section 5.01(b) of the Weyerhaeuser Disclosure Letter or otherwise expressly permitted by the Transaction Documents (including the Contribution and Distribution Agreement), from August 22, 2006 to the Effective Time, Weyerhaeuser and Spinco shall, and Weyerhaeuser and Spinco shall cause their respective subsidiaries (in the case of Weyerhaeuser and its subsidiaries, with respect to the Newco Business only) to, conduct their business in the usual, regular and ordinary course in substantially the same manner as previously conducted and, to the extent consistent therewith, use all reasonable efforts to preserve intact its current business organization, maintain its material rights, licenses and permits, keep available the services of its current officers and employees (including the Newco Employees for the benefit of the Newco Business) and keep its relationships with customers, suppliers, licensors, licensees, distributors

and others having business dealings with them to the end that its goodwill and ongoing business shall be unimpaired in any material respect at the Effective Time. In addition, and without limiting the generality of the foregoing, except for matters set forth in Section 5.01(b) of the Weyerhaeuser Disclosure Letter or otherwise expressly permitted by this Agreement and the other Transaction Documents (including the Contribution and Distribution Agreement), from August 22, 2006 to the Effective Time, Weyerhaeuser and Spinco shall not, and Weyerhaeuser and Spinco shall not permit any of their respective subsidiaries (in the case of Weyerhaeuser and its subsidiaries, other than in the case of clauses (i), (ii), (iii), (xii), (xvi) and, to the extent applicable to the foregoing clauses, (xvii), with respect to the Newco Business only) to, do any of the following without the prior written consent of Domtar, which shall not be unreasonably withheld or delayed:

(i) (A) declare, set aside or pay any dividends on, or make any other distributions in respect of, any shares of the capital stock of any New Spinco Party, (B) split, combine or reclassify any of the capital stock of any New Spinco Party or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for shares of capital stock of any New Spinco Party, or (C) purchase, redeem or otherwise acquire any shares of capital stock or other equity interests of any New Spinco Party or any rights, warrants, options or other equity awards to acquire, directly or indirectly, any such shares of capital stock or other equity interests;

(ii) issue, deliver, sell, grant, pledge or otherwise encumber (A) any shares of capital stock of any New Spinco Party, (B) any Voting Spinco Debt or other voting securities of any New Spinco Party, (C) any securities convertible into or exchangeable for, or any options, warrants or rights to acquire, any such shares, Voting Spinco Debt, voting securities or convertible or exchangeable securities of any New Spinco Party or (D) any "phantom" stock or other equity, "phantom" stock or other equity rights, stock or other equity appreciation rights or stock or other equity-based performance units of any New Spinco Party;

(iii) amend the certificate of incorporation, by-laws, certificate of formation, limited liability company agreement or other organizational documents of any New Spinco Party, except to the extent required pursuant to Section 1.09 or to change the name of any New Spinco Party or as required to comply with the Transaction Documents;

(iv) acquire or agree to acquire, in a single transaction or a series of related transactions, whether by merging or consolidating with, or by purchasing a substantial equity interest in or a substantial portion of the assets of, or by any other manner, any business or any corporation, partnership, limited liability company, joint venture, association or other business organization or division thereof or any other person, or otherwise, if any of the foregoing are material, individually or in the aggregate, to the Newco Business, taken as a whole, except purchases in the ordinary course of business consistent with past practice;

(v) except as required to ensure that any Newco Benefit Plan or Newco Benefit Agreement in effect on August 22, 2006 is not then out of compliance with applicable Law or as specifically required pursuant to this Agreement, (A) with respect to the Newco Employees, adopt, enter into, terminate or amend any collective bargaining agreement, Newco Benefit Plan or Newco Benefit Agreement, other than in the ordinary course of business consistent with past practice, or extend or renew any collective bargaining agreement with respect to Newco

Employees, (B) increase in any manner the compensation or benefits of, or pay any bonus to, any Newco Employee, except for increases in base salary or payments of bonuses in the ordinary course of business consistent with past practice or as required to comply with any Newco Benefit Plan or Newco Benefit Agreement in effect on August 22, 2006, (C) pay or provide to any Newco Employee any benefit not provided for under any Newco Benefit Plan or Newco Benefit Agreement as in effect on August 22, 2006, other than the payment of base compensation in the ordinary course of business consistent with past practice or as permitted by clause (B) above, (D) grant to any Newco Employee any awards under any Newco Benefit Plan (including the grant of stock or other equity options, stock or other equity appreciation rights, performance units, restricted stock or other equity, stock or other equity purchase rights or other stock or other equity-based or stock-related awards) or remove or modify existing restrictions in any Newco Benefit Plan or Newco Benefit Agreement or awards made thereunder with respect to the Newco Employees other than (x) the issuance of shares of Weyerhaeuser Common Stock upon the exercise of Weyerhaeuser Options (as defined in Section 6.08(a)(ii)) or in connection with other equity-based awards granted to Newco Employees pursuant to the Weyerhaeuser Stock Plans and outstanding on August 22, 2006 and in accordance with their terms, and (y) the issuance of Weyerhaeuser Options or other equity-based awards to Newco Employees prior to the Measurement Date pursuant to the Weyerhaeuser Stock Plans in accordance with their present terms and consistent with past practice and the issuance of shares of Weyerhaeuser Common Stock upon the grant, exercise or vesting of such Weyerhaeuser Options or other equity-based awards, (E) with respect to the Newco Employees, take any action to fund or in any other way secure the payment of compensation or benefits under any Newco Benefit Plan or Newco Benefit Agreement, (F) with respect to the Newco Employees, take any action to accelerate the vesting or payment of any compensation or benefits under any Newco Benefit Plan or Newco Benefit Agreement, or (G) with respect to the Newco Employees, make any material determination under any Newco Benefit Plan or Newco Benefit Agreement that is inconsistent with the ordinary course of business or past practice;

(vi) make any change in any New Spinco Party's or the Newco Business' tax accounting methods or financial accounting, principles or practices in effect at March 26, 2006, except insofar as may have been required by any applicable Law or a change in U.S. GAAP;

(vii) (A) sell, lease (as lessor), license or otherwise dispose of or make subject to any Lien any Newco Assets or Newco Canada Exchangeco Assets, except dispositions in the ordinary course of business consistent with past practice, or (B) consummate any "spin off" of all or part of the Newco Assets or the Newco Canada Exchangeco Assets (other than the Distribution) prior to the Effective Time;

(viii) (A) incur any indebtedness for borrowed money or guarantee or otherwise become contingently liable for any such indebtedness of another person, issue or sell any debt securities or warrants or other rights to acquire any debt securities of any New Spinco Party, guarantee any debt securities of another person, enter into any "keep well" or other agreement to maintain any financial statement condition of another person or enter into any arrangement having the economic effect of any of the foregoing, except for short-term borrowings incurred in the ordinary course of business consistent with past practice, (B) make any loans, advances or capital contributions to, or investments in, any other person, other than (x) in the ordinary course of business, or (y) in an amount not in excess of $500,000 individually or $2,000,000 in the

aggregate, (C) enter into any lease with aggregate annual lease payments in excess of $1,000,000 (whether such lease is an operating or capital lease) other than operating leases in the ordinary course of business consistent with past practice, (D) authorize or make any capital expenditures other than (x) in the ordinary course of business consistent with past practice, or (y) as provided in the capital expenditures budget set forth in Section 5.01(b)(viii) of the Weyerhaeuser Disclosure Letter, or (E) fail in any material respect to make capital expenditures contemplated by the capital expenditures budget for the fiscal year ended December 31, 2006 set forth in Section 5.01(b)(viii) of the Weyerhaeuser Disclosure Letter and thereafter in the ordinary course consistent with past practice;

(ix) make any material Tax election inconsistent with past practice or settle or compromise any material Tax liability or refund, in each case only with respect to any New Spinco Party, the Newco Assets, the Newco Canada Exchangeco Assets or the Newco Business;

(x) (A) pay, discharge or satisfy any claims, liabilities or obligations (absolute, accrued, asserted or unasserted, contingent or otherwise), other than the payment, discharge or satisfaction, in the ordinary course of business consistent with past practice or, in accordance with their terms, of liabilities reflected or reserved against in, or contemplated by, the Interim Newco Balance Sheet or incurred in the ordinary course of business consistent with past practice, (B) cancel any material indebtedness (individually or in the aggregate) or waive any claims or rights of substantial value, or (C) waive or amend any confidentiality agreement between Weyerhaeuser or any Weyerhaeuser Subsidiary and any person (other than any Weyerhaeuser Subsidiary) to the extent such waiver or amendment adversely affects the confidentiality of information related to the Newco Business;

(xi) enter into any agreement or arrangement that limits or otherwise restricts any New Spinco Party, or that would, after the Effective Time, limit or restrict any New Spinco Party from engaging in any business in any geographic area;

(xii) adopt a plan or agreement of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other material reorganization or any other transaction that would preclude or be inconsistent in any material respect with, or hinder or delay in any material respect, the Distribution and the Transactions;

(xiii) enter into or amend (A) any agreement or arrangement with any of their respective affiliates that binds any of the New Spinco Parties or affects the Newco Business after the Effective Time, and (B) any agreement or arrangement among the New Spinco Parties;

(xiv) except in the ordinary course of business consistent with past practice, modify, amend, enter into or terminate any Newco Material Agreement, or waive, release or assign any material rights or claims of Weyerhaeuser or any Weyerhaeuser Subsidiary primarily relating to the Newco Business;

(xv) settle any Action if such settlement would require any payment of an amount in excess of $1,000,000 individually or $5,000,000 in the aggregate by any New Spinco Party, or would obligate any New Spinco Party to take any material action, or restrict any New Spinco Party in any material respect from taking any action, in each case at or after the Effective Time;

(xvi) engage in any business involving the Newco Assets, the Newco Canada Exchangeco Assets or the Newco Employees other than the Newco Business substantially as currently conducted; or

(xvii) authorize any of, or commit or agree to take any of, the foregoing actions.

(c) Advice of Changes. Domtar and Weyerhaeuser shall promptly advise the other orally and in writing of any change or event that has had or would reasonably be expected to have a Domtar Material Adverse Effect or a Newco Material Adverse Effect.

# ARTICLE VI

## ADDITIONAL AGREEMENTS

SECTION 6.01. Preparation of the Domtar Circular. (a) As promptly as practicable after August 22, 2006, Domtar shall prepare the Domtar Circular together with any other documents required by the Canadian Securities Legislation or other applicable Laws in connection with the Arrangement, and as promptly as practicable after August 22, 2006, and in any event within thirty days following the date that Weyerhaeuser has provided to Domtar the Audited Newco Financial Statements, Domtar shall cause the Domtar Circular and any other documentation required in connection with the Domtar Meeting to be sent to each holder of Domtar Common Shares, Domtar Preferred Shares and Domtar Options and filed and otherwise provided as required by the Interim Order and applicable Laws.

(b) Domtar shall ensure that the Domtar Circular complies with Canadian Securities Legislation and all applicable Laws and, without limiting the generality of the foregoing, that the Domtar Circular does not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements contained therein not misleading in light of the circumstances in which they are made (other than with respect to any information relating to and provided by the Weyerhaeuser Parties or any third party that is not an affiliate of Domtar). Without limiting the generality of the foregoing, Domtar shall ensure that the Domtar Circular provides holders of Domtar Common Shares, Domtar Preferred Shares and Domtar Options with information in sufficient detail to permit them to form a reasoned judgment concerning the matters to be placed before them at the Domtar Meeting and Weyerhaeuser shall provide all information regarding it and the Weyerhaeuser Parties necessary to do so.

SECTION 6.02. Preparation of the Form S-4, the Exchange Offer Schedule and the Form 10. (a) As soon as practicable after August 22, 2006, Weyerhaeuser, Spinco, Newco and Domtar shall prepare and Spinco shall file with the SEC the Form 10 and, if such filings are required by applicable Law or the SEC, the Form S-4 and the Exchange Offer Schedule. Each of Weyerhaeuser, Spinco, Newco and Domtar shall use its reasonable best efforts to have (i) the Form S-4 declared effective under the Securities Act, and (ii) the Form 10 declared effective under the Exchange Act, in each case as applicable and as promptly as practicable after such filing. Spinco and Newco shall also take any action (other than qualifying to do business in any jurisdiction in which it is not now so qualified) required to be taken under any applicable state

securities laws in connection with the issuance of Spinco Common Stock in the Arrangement and, if applicable, the exchange of shares of Spinco Common Stock pursuant to an exchange offer. Spinco and Newco shall notify Weyerhaeuser and Domtar promptly of the receipt of any comments from the SEC or its staff and of any request by the SEC or its staff for amendments or supplements to the Form S-4, the Exchange Offer Schedule or the Form 10 or for additional information and shall supply Weyerhaeuser and Domtar with copies of all correspondence between Spinco, Newco or any of their respective representatives, on the one hand, and the SEC or its staff, on the other hand, with respect to the Form S-4, the Exchange Offer Schedule, the Form 10, the Arrangement or any of the other Transactions. The parties will cooperate in preparing and filing with the SEC the Form S-4, the Exchange Offer Schedule, the Form 10 and any necessary amendment or supplement thereto. Neither the Form S-4, the Exchange Offer Schedule, the Form 10 nor any amendment or supplement thereto shall be filed without the approval of all of the parties hereto, which approvals shall not be unreasonably withheld or delayed.

(b) If, prior to the Effective Time, any event occurs with respect to Domtar or any Domtar Subsidiary, or any change occurs with respect to other information supplied by such parties for inclusion in the Form S-4, the Exchange Offer Schedule or the Form 10, which is required to be described in an amendment of, or a supplement to, the Form S-4, the Exchange Offer Schedule or the Form 10, Domtar shall promptly notify Weyerhaeuser, Spinco and Newco of such event, and the parties hereto shall cooperate in the prompt filing with the SEC of any necessary amendment or supplement to the Form S-4, the Exchange Offer Schedule or the Form 10.

(c) If, prior to the Effective Time, any event occurs with respect to Weyerhaeuser, any Spinco Party or the Newco Business, or any change occurs with respect to other information supplied by such parties for inclusion in the Form S-4, the Exchange Offer Schedule or the Form 10, which is required to be described in an amendment of, or a supplement to the Form S-4, the Exchange Offer Schedule or the Form 10, Weyerhaeuser shall promptly notify Domtar of such event, and the parties to this agreement shall cooperate in the prompt filing with the SEC of any necessary amendment or supplement to the Form S-4, the Exchange Offer Schedule or the Form 10.

SECTION 6.03. Securities Laws Compliance. (a) Spinco shall, and Weyerhaeuser shall cause Spinco to, use all reasonable efforts to obtain all orders required from the applicable CSAs to permit the issuance and first resale of (i) the Exchangeable Shares and the shares of Spinco Common Stock issued pursuant to the Arrangement and the Transactions, (ii) the shares of Spinco Common Stock issued upon exchange of the Exchangeable Shares from time to time and (iii) the shares of Spinco Common Stock issued from time to time upon the exercise of the Equity Awards, in each case without qualification with or approval of or the filing of any prospectus or similar document, or the taking of any proceeding with, or the obtaining of any further order, ruling or consent from, the CSAs or any other Governmental Entity or regulatory authority under any Canadian Securities Legislation or other Laws or pursuant to the rules and regulations of the CSAs or any regulatory authority administering such Laws, or the fulfillment of any other legal requirement in any such jurisdiction (other than, with respect to such first resales, any restrictions on transfer by reason of, among other things, a holder being a "control person" of Spinco or Domtar for purposes of Canadian Securities Legislation).

(b) As promptly as practicable after August 22, 2006, Spinco shall file a registration statement on an appropriate form (the "Spinco Registration Statement") registering under the Securities Act the issuance of shares of Spinco Common Stock from time to time after the Effective Time upon exchange of the Exchangeable Shares and shall use its reasonable efforts to cause the Spinco Registration Statement to become effective and to maintain the effectiveness of such registration for the period that such Exchangeable Shares remain outstanding.

(c) As soon as reasonably practicable following the Effective Time, Spinco shall either (i) prepare and file with the SEC a registration statement on Form S-8 (or another appropriate form) registering a number of shares of Spinco Common Stock equal to the number of shares subject to the Equity Awards or (ii) grant the Equity Awards under an existing equity incentive plan with respect to which a registration statement on Form S-8 (or another appropriate form) is currently effective. The registration statement in clauses (i) and (ii) of the preceding sentence shall be referred to in this Agreement as the "Form S-8". Spinco shall use its reasonable efforts to maintain the effectiveness of the Form S-8 as long as any Equity Awards may remain outstanding.

(d) Domtar, Weyerhaeuser and Spinco shall take all such steps as may be required to cause the transactions contemplated by Article II and any other acquisition of Spinco equity securities (including derivative securities) in connection with this Agreement or the Transactions by any individual who is a director or officer of Domtar or Weyerhaeuser to be exempt under Rule 16b-3 promulgated under the Exchange Act.

SECTION 6.04. Preparation of Other Filings. (a) Weyerhaeuser, Spinco and Domtar shall cooperate in:

(i) the preparation of any application for the orders and the preparation of any required registration statements and any other documents reasonably deemed by Weyerhaeuser, Spinco or Domtar to be necessary to discharge their respective obligations under United States federal or state securities Laws of the Canadian Securities Legislation in connection with the Arrangement and the other Transactions;

(ii) the taking of all such action as may be required under the Canadian Securities Legislation and any applicable United States federal or state securities Laws (including "Blue Sky laws") in connection with the issuance of the Exchangeable Shares and the shares of Spinco Common Stock in connection with the Arrangement or the exercise of the Equity Awards; provided, however, that with respect to the Canadian Securities Legislation and United States "Blue Sky" qualifications none of Weyerhaeuser, Spinco nor Domtar shall be required to register or qualify as a foreign corporation or to take any action that would subject it to service of process in any jurisdiction where such entity is not now so subject, except as to matters and transactions arising solely from the offer and conversion of the Exchangeable Shares and the issuance of the shares of Spinco Common Stock; and

(iii) the taking of all such action as may be required under the CBCA in connection with the transactions contemplated by this Agreement and the Plan of Arrangement.

(b) Each of the Spinco Parties and Domtar shall furnish to the other all such information concerning it and its shareholders as may be required (and, in the case of its shareholders, available to it) for the effectuation of the actions described in Sections 6.01 through 6.03 and the foregoing provisions of this Section 6.04, and each covenants that no information furnished by it (to its knowledge in the case of information concerning its shareholders) in connection with such actions or otherwise in connection with the consummation of the Transactions contemplated by this Agreement will contain any untrue statement of a material fact or omit to state a material fact required to be stated in any such document or necessary in order to make any information so furnished for use in any such document not misleading in the light of the circumstances in which it is furnished.

(c) Weyerhaeuser, Spinco and Domtar shall each promptly notify the other if at any time before or after the Effective Time it becomes aware that the Domtar Circular, the Weyerhaeuser Canada Circular or an application for an order, filing or a registration statement described in Section 6.02 or 6.03 contains any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements contained therein not misleading in light of the circumstances in which they are made, or that otherwise requires an amendment or supplement to the Domtar Circular, the Weyerhaeuser Canada Circular or such application, filing or registration statement. In any such event, the Spinco Parties and Domtar shall cooperate in the preparation of a supplement or amendment to the Domtar Circular, the Weyerhaeuser Canada Circular or such other document, as required and as the case may be, and, if required, shall cause the same to be distributed to shareholders of Weyerhaeuser or Domtar and/or filed with the relevant securities regulatory authorities.

(d) Weyerhaeuser, Spinco and Domtar shall coordinate the filing of the Articles of Arrangement and other appropriate documents with the Director under the CBCA so that the Arrangement shall become effective on the Distribution Date.

SECTION 6.05. Compliance with Securities Laws. Spinco shall ensure that the Spinco Registration Statement and the Form S-8 comply with all applicable Laws and, without limiting the generality of the foregoing, that such documents do not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements contained therein not misleading in light of the circumstances in which they are made (other than with respect to any information relating to and provided by Domtar or any third party that is not an affiliate of Spinco) and Domtar shall provide all information regarding it necessary to do so.

SECTION 6.06. Access to Information; Confidentiality. Each of Weyerhaeuser, Newco and Domtar shall, and shall cause each of its respective subsidiaries to (in the case of Weyerhaeuser, with respect to the Newco Business only), afford to the other party and to the officers, employees, accountants, counsel, financial advisors and other representatives of such other party, reasonable access during normal business hours during the period prior to the Effective Time to all their respective properties, plants, books, contracts, commitments, personnel and records and, during such period, each of Weyerhaeuser (with respect to the Newco Business only) and Domtar shall, and shall cause each of its respective subsidiaries to, furnish promptly to the other party (a) a copy of each report, schedule, registration statement and other document filed by it during such period pursuant to the requirements of Canadian Securities

Legislation or of U.S. Federal or state securities laws and (b) to the extent permitted by Law, all other information concerning its business, properties and personnel as such other party may reasonably request; provided, however, that either party may withhold (i) any documents (or portions thereof) or information that is subject to the terms of a confidentiality agreement with a third party, (ii) any document (or portions thereof) or information which may constitute privileged attorney-client communications or attorney work product and the transfer of which, or the provision of access to which, as reasonably determined by such party's counsel, constitutes a waiver of any such privilege, or (iii) any documents (or portions thereof) or information relating to pricing or other matters that are highly sensitive if the exchange of such documents (or portions thereof) or information, as determined by such party's counsel, might reasonably result in antitrust difficulties for such party or any of its affiliates. If any material is withheld by such party pursuant to the proviso to the preceding sentence, such party shall inform the other party as to the general nature of what is being withheld. Upon its execution of a work paper access letter in customary form, each of Domtar and Weyerhaeuser shall be afforded reasonable access by the other party during normal business hours during the period prior to the Effective Time to all information used by such other party in the preparation of Audited Newco Financial Statements or, as applicable, the Audited Domtar Financial Statements (in the case of the Audited Newco Financial Statements, when such financial statements become available). All information exchanged pursuant to this Section 6.06 shall be held by the parties as Evaluation Material (as defined in the Confidentiality Agreement, dated as of August 8, 2005, between Weyerhaeuser and Domtar (the "Confidentiality Agreement")) and shall be subject to the Confidentiality Agreement.

SECTION 6.07. Reasonable Best Efforts; Notification. (a) Upon the terms and subject to the conditions set forth in this Agreement, each of the parties hereto shall use its reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the Transactions, including (i) the obtaining of all necessary or advisable actions or non-actions, waivers, consents and approvals from Governmental Entities and the making of all necessary or advisable registrations and filings (including filings with Governmental Entities, if any) and the taking of all reasonable steps as may be necessary to obtain an approval or waiver from, or to avoid an action or proceeding by, any Governmental Entity, (ii) the obtaining of all necessary or advisable consents, approvals or waivers from third parties, (iii) the defending of any lawsuits or other legal proceedings, whether judicial or administrative, challenging this Agreement or any other Transaction Document or the consummation of the Transactions, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Entity vacated or reversed and (iv) the execution and delivery of any additional instruments necessary to consummate the Transactions and to fully carry out the purposes of the Transaction Documents. In connection with and without limiting the foregoing, Domtar shall (i) take all action necessary to ensure that the take-over provisions of the Canadian Securities Legislation and the state takeover statutes or similar statutes or regulations are not and do not become applicable to any Transaction or this Agreement or any other Transaction Document and (ii) if the Canadian Securities Legislation or any state takeover statute or similar statute or regulation becomes applicable to any Transaction or this Agreement or any other Transaction Document, take all action necessary to ensure that the Arrangement and the other Transactions may be consummated as promptly as practicable on the terms contemplated by the Transaction

Documents. Each of the parties hereto shall keep the other parties reasonably informed of its progress in obtaining any necessary or advisable Consents and Governmental Approvals.

(b) Domtar shall give prompt notice to Weyerhaeuser and Newco, and Weyerhaeuser and Newco shall give prompt notice to Domtar of (i) any representation or warranty made by it contained in any Transaction Document that is qualified as to materiality becoming untrue or inaccurate in any respect or any such representation or warranty that is not so qualified becoming untrue or inaccurate in any material respect or (ii) the failure by it to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by it under any Transaction Document; provided, however, that no such notification shall affect the representations, warranties, covenants or agreements of the parties or the conditions to the obligations of the parties under the Transaction Documents.

(c) Nothing in Section 6.07(a) shall require any of the parties or any of their respective subsidiaries to (i) pay any consideration to any third party from whom any consents, approvals, or waivers are requested, other than filing fees paid to Governmental Entities, or (ii) dispose of any of its assets or to limit its freedom of action with respect to any of its businesses, or to consent to any disposition of any assets or limits on its freedom of action with respect to any of its businesses, or to commit or agree to any of the foregoing in order to obtain any consents, approvals, permits or authorizations or to remove any impediments to the Transactions relating to the Competition Act, the HSR Act, the Investment Canada Act or other antitrust, competition or pre-merger notification, trade regulation law, regulation or order ("Review Laws") or to avoid the entry of, or to effect the dissolution of, any injunction, temporary restraining order or other order in any suit or proceeding relating to Review Laws, other than dispositions, limitations, consents or commitments that individually or in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect on the Newco Business and Domtar Business, taken as a whole.

(d) Each of Domtar, Weyerhaeuser and the Spinco Parties shall (i) file or cause to be filed as promptly as practicable with the United States Federal Trade Commission (the "FTC") and the United States Department of Justice (the "DOJ") all notification and report forms that may be required for the Transactions and any supplemental information requested in connection therewith pursuant to the HSR Act, and (ii) make such other filings as promptly as practicable as are necessary under the Review Laws and shall promptly provide any supplemental information requested by applicable Governmental Entities relating thereto. No party shall include in any such filing, notification or report form referred to in clauses (i) and (ii) of the immediately preceding sentence a request for early termination or acceleration of any applicable waiting periods without the prior written consent of the other parties. Any such filing, notification and report form and supplemental information shall be in substantial compliance with the requirements of the HSR Act and other Review Laws. Each of Domtar, Weyerhaeuser and the Spinco Parties shall furnish to the other such necessary information and reasonable assistance as the other may reasonably request in connection with their preparation of any filing or submission that is necessary under the HSR Act and other Review Laws. Each of Domtar, Weyerhaeuser and the Spinco Parties shall keep each other apprised of the status of any communications with, and any inquiries or requests for additional information from, the FTC, the DOJ and any other applicable Governmental Entity and shall comply with any such inquiry or request as promptly as practicable. Domtar, Weyerhaeuser and the Spinco Parties shall not have

any substantive contact with any Governmental Entity in respect of any filing or proceeding contemplated by this Section unless it consults with the other parties in advance and, to the extent permitted by such Governmental Entity, gives the other party or parties the opportunity to participate.

(e)  Without limiting the generality of the first sentence of Section 6.07(a), each of Weyerhaeuser and Domtar shall use its reasonable best efforts to cooperate with Spinco and Newco in connection with the financing contemplated by the New Debt Commitment Letter, including using (and causing its subsidiaries to use) reasonable best efforts to satisfy all conditions precedent to be satisfied by the New Spinco Parties in the New Debt Commitment Letter, providing information to and permitting the financing sources and their representatives access to the Newco Business and the Domtar Business, respectively, participating in meetings with prospective investors and participating (and permitting members of its senior management to participate) in bank meetings in connection with the financing, participating in meetings with rating agencies, participating in drafting sessions related to the offering materials for the debt financing contemplated by the New Debt Commitment Letter, causing the present and former independent accountants for Weyerhaeuser and Domtar, respectively, to participate in drafting sessions related to the offering materials for the debt financing contemplated by the New Debt Commitment Letter and making work papers available to the respective parties, the financing sources and their respective representatives.

SECTION 6.08.  Weyerhaeuser Stock Options, Stock Appreciation Rights and Restricted Stock Units.  (a)  As soon as practicable after August 22, 2006, the Board of Directors of Weyerhaeuser (or, if appropriate, any committee administering the Weyerhaeuser Stock Plans) and the Board of Directors of Spinco shall adopt such resolutions or take such other actions as may be required to effect the following:

(i)  prior to the Contribution, each Newco Employee that holds a Weyerhaeuser equity award that is described in clauses (ii), (iii), (iv) or (v) below (each, a "Weyerhaeuser Equity Award") shall be given the opportunity to elect, by a date prior to the Measurement Date as determined by Weyerhaeuser, to (A) continue to hold all of such Newco Employee's Weyerhaeuser Equity Awards in accordance with their terms, or (B) surrender all of such Newco Employee's Weyerhaeuser Equity Awards in exchange for substituted Spinco equity awards as set forth in clauses (ii), (iii), (iv) and (v) below (any Newco Employee who elects to surrender all of such Newco Employee's Weyerhaeuser Equity Awards as set forth in this clause (B), a "Rollover Employee");

(ii)  immediately prior to the Distribution, each outstanding option to acquire shares of Weyerhaeuser Common Stock granted under the Weyerhaeuser Stock Plans held by a Rollover Employee (whether vested or unvested) (each, a "Weyerhaeuser Option") shall be surrendered to Weyerhaeuser in exchange for an option granted by Spinco to acquire, on the same terms and conditions as were applicable under the Weyerhaeuser Option, a number of shares of Spinco Common Stock (rounded down to the nearest whole share), determined by multiplying the number of shares of Weyerhaeuser Common Stock subject to such Weyerhaeuser Option by the Option Exchange Ratio (as defined in this Section 6.08(a)), at an exercise price per share of Spinco Common Stock (rounded up to the nearest whole cent) equal to (A) the per share exercise price for the shares of Weyerhaeuser Common Stock otherwise purchasable pursuant to

such Weyerhaeuser Option divided by (B) the Option Exchange Ratio (each, as so granted, a "Substituted Spinco Option");

(iii) any Weyerhaeuser Option that is intended to be an "incentive stock option" (as defined in Section 422 of the Code), that may not be exchanged in the manner described in clauses (i) and (ii) of this Section 6.08(a) and that remains an incentive stock option, shall be adjusted in accordance with the requirements of Section 424 of the Code in a manner that most closely produces the economic results obtained with respect to other Substituted Spinco Options (it being understood that it is the intention of the parties hereto that Substituted Spinco Options so granted by Spinco qualify, to the fullest extent permissible, as "incentive stock options" (as defined in Section 422 of the Code), to the extent that such Weyerhaeuser Options qualified as "incentive stock options" immediately prior to the Contribution);

(iv) immediately prior to the Distribution, each outstanding stock appreciation right with respect to Weyerhaeuser Common Stock granted under the Weyerhaeuser Stock Plans held by a Rollover Employee (whether vested or unvested) (each, a "Weyerhaeuser SAR") shall be surrendered to Weyerhaeuser in exchange for a stock appreciation right granted by Spinco, on the same terms and conditions as were applicable under the Weyerhaeuser SAR, with respect to the number of shares of Spinco Common Stock (rounded down to the nearest whole share), determined by multiplying the number of shares of Weyerhaeuser Common Stock subject to such Weyerhaeuser SAR by the Option Exchange Ratio, at an appreciation base price per share of Spinco Common Stock (rounded up to the nearest whole cent) equal to (A) the per share appreciation base price for the shares of Weyerhaeuser Common Stock subject to such Weyerhaeuser SAR divided by (B) the Option Exchange Ratio (each, as so granted, a "Substituted Spinco SAR"); and

(v) immediately prior to the Distribution, each outstanding grant of restricted stock units with respect to Weyerhaeuser Common Stock granted under the Weyerhaeuser Stock Plans held by a Rollover Employee (each, a "Weyerhaeuser RSU") shall be surrendered to Weyerhaeuser in exchange for a grant of restricted stock units by Spinco, on the same terms and conditions as were applicable under the Weyerhaeuser RSU, with respect to the number of shares of Spinco Common Stock (rounded down to the nearest whole share), determined by multiplying the number of shares of Weyerhaeuser Common Stock subject to such Weyerhaeuser RSU by the Option Exchange Ratio (each, as so granted, a "Substituted Spinco RSU").

For purposes of this Section 6.08(a), the following definitions shall apply:

"Option Exchange Ratio" shall mean a fraction, the numerator of which is the Average Weyerhaeuser Pre-Distribution Price, and the denominator of which is the Average Spinco Distribution Price.

"Average Weyerhaeuser Pre-Distribution Price" shall mean the volume weighted average (rounded to the nearest 1/10,000) of the trading prices of the Weyerhaeuser Common Stock on the NYSE as reported by Bloomberg Financial Markets (or such other source as the parties shall agree in writing) for the last trading day immediately prior to (i) the date on which the Weyerhaeuser Common Stock begins to trade ex-dividend with respect to the Distribution (if

the Distribution is effected in whole as a pro rata dividend) or (ii) the Distribution Date (if the Distribution is effected in whole or in part as an exchange offer).

"Average Spinco Distribution Price" shall mean the volume weighted average (rounded to the nearest 1/10,000) of the trading prices of the Domtar Common Shares on the NYSE as reported by Bloomberg Financial Markets (or such other source as the parties shall agree in writing) for the last trading day immediately prior to the Distribution Date.

(b) Subject to the adjustments required by Section 6.08(a) after giving effect to the Transactions, immediately following the Distribution, Spinco shall assume the Substituted Spinco Options, Substituted Spinco SARs and Substituted Spinco RSUs, with the result that all obligations of Spinco under the stock plans of Spinco (the "Spinco Stock Plans") with respect to Substituted Spinco Options, Substituted Spinco SARs and Substituted Spinco RSUs outstanding immediately prior to the Distribution, shall be obligations of Spinco following the Distribution. Notwithstanding the foregoing, Spinco may grant the Substituted Spinco Options, Substituted Spinco SARs and Substituted Spinco RSUs under an existing or newly established equity incentive plan of Spinco.

(c) As soon as reasonably practicable after the Distribution, Spinco shall deliver to the holders of Substituted Spinco Options, Substituted Spinco SARs and Substituted Spinco RSUs appropriate notices setting forth such holders' rights pursuant to the respective Weyerhaeuser Stock Plans and the agreements evidencing the grants of such Substituted Spinco Options, Substituted Spinco SARs and Substituted Spinco RSUs and that such Substituted Spinco Options, Substituted Spinco SARs and Substituted Spinco RSUs and agreements shall be granted by Spinco and shall continue in effect on the same terms and conditions (subject to the adjustments required by this Section 6.08 after giving effect to the Transactions.

(d) A holder of an Substituted Spinco Option or Substituted Spinco SAR may exercise such Substituted Spinco Option or Substituted Spinco SAR in whole or in part in accordance with its terms by delivering a properly executed notice of exercise to Spinco, together with the consideration therefor and any applicable Canadian or U.S. Federal withholding tax information required in accordance with the related Weyerhaeuser Stock Plan.

(e) For purposes of this Agreement, "Weyerhaeuser Stock Plans" means the Weyerhaeuser Company 2004 Long-Term Incentive Plan, the Weyerhaeuser Company 1998 Long-Term Incentive Compensation Plan and the Weyerhaeuser Company 1992 Long-Term Incentive Compensation Plan.

SECTION 6.09. New Benefit Plans. (a) General. (i) For purposes of this Agreement, the term "Transferred Employee" shall refer to each Newco Employee who, at the Effective Time, is employed with Newco or its subsidiaries (including any individuals who are not actively at work on the Distribution Date due to vacation, holiday, illness, jury duty, bereavement leave or other authorized leave of absence, including, subject to Section 6.09(a)(ii) short-term disability leave, long-term disability leave or, subject to Section 6.09(a)(iii), workers' compensation). The parties hereto intend that Transferred Employees shall have continuous and uninterrupted employment immediately before and immediately after the Effective Time, and that for purposes of any severance or termination benefit plan, program, policy, agreement or

arrangement of Weyerhaeuser, Spinco, Newco, Domtar or any of their respective subsidiaries or affiliates, the Transactions contemplated by the Transaction Documents shall not constitute a severance of employment of any Transferred Employee prior to or upon the consummation of the Transactions.

(ii) Newco Employees who are on short-term or long-term disability leave ("Disabled Newco Employees") other than union employees at Dryden, Ontario; Ear Falls, Ontario; Big River, Saskatchewan; Prince Albert, Saskatchewan and Kamloops, British Columbia will not become Transferred Employees until such time, if any, as they are determined by the relevant insurer to be no longer eligible for benefits under the applicable Weyerhaeuser short-term or long-term disability plan and present themselves for re-employment, at which time any such employee shall be offered continuing employment, to the extent such employee is able to return to employment (including with any reasonable accommodation), with Newco on the terms and conditions generally applicable to Transferred Employees under this Section 6.09. Prior to such time, Weyerhaeuser shall retain all liability with respect to providing short-term and long-term disability benefits to Disabled Newco Employees to the extent the Disabled Newco Employees are eligible to receive such benefits. Disabled Newco Employees who are union employees at Dryden, Ontario; Ear Falls, Ontario; Big River, Saskatchewan; Prince Albert, Saskatchewan and Kamloops, British Columbia will become Transferred Employees pursuant to the Canadian Purchase Agreement but continue to receive short-term and long-term disability benefits under Weyerhaeuser benefit plans for so long as they are eligible to receive such benefits under such plans, provided that, Newco fully and promptly reimburses Weyerhaeuser for all costs incurred in allowing for such continued participation in such Weyerhaeuser benefit plans and that Newco makes all reasonable efforts, including accommodation, to allow such employees to return to active employment.

(iii) With respect to each of the functions set forth on Schedule 2.11(a)(v) to the Contribution and Distribution Agreement, Weyerhaeuser shall confer with Domtar in good faith to identify and determine the approach to filling full time equivalent positions (including new hires) with respect to Weyerhaeuser employees who are not exclusively engaged in the Newco Business but are currently performing the functions set forth on such Schedule 2.11(a)(v) so that sufficient employees (both as to number and expertise) shall be (i) transferred from Weyerhaeuser to Newco or hired by Newco to enable Newco to operate the Newco Business from and after the Effective Time in substantially the same manner that it was operated prior to the Effective Time after giving effect to the services provided under the Transition Services Agreement and the Site Services Agreements, and (ii) retained by Weyerhaeuser to enable Weyerhaeuser to operate the Weyerhaeuser Business from and after the Effective Time in the same manner that such business was operated prior to the Effective Time. During the period commencing on the 90th day prior to the day on which the parties anticipate the Effective Time will occur and ending on the Closing Date, Domtar shall be permitted to make presentations to and meet with (A) the Newco Employees set forth in Schedule 2.11(a)(i) to the Contribution and Distribution Agreement, (B) the Mill Employees other than those set forth on Schedule 2.11(a)(ii) to the Contribution and Distribution Agreement, (C) each Newco Employee set forth on Schedule 2.11(a)(iii) to the Contribution and Distribution Agreement, (D) the Forest Management Employees set forth in Schedule 2.11(a)(iv) to the Contribution and Distribution Agreement, and (E) the Newco Employees identified pursuant to the previous sentence with respect to the functions set forth on Schedule 2.11(a)(v) to the Contribution and Distribution

Agreement, in each case either individually or in groups and upon reasonable advance notice to Weyerhaeuser. Weyerhaeuser shall permit such Newco Employees to attend such meetings and Domtar shall cooperate with Weyerhaeuser to minimize any disruption or interference to any business operations of Weyerhaeuser or its affiliates in the scheduling, location or other conduct of any such meetings. On or about the 30th day prior to the day on which the parties anticipate the Effective Time will occur, Weyerhaeuser shall update Schedules 2.11(a) and 2.11(d) to the Contribution and Distribution Agreement with information regarding which Newco Employees listed thereon (i) have accepted offers of employment by a New Spinco Party, (ii) have refused an offer of employment by any New Spinco Party, (iii) whose employment by Weyerhaeuser, Spinco or any affiliate of Weyerhaeuser or Spinco has terminated for any reason, or (iv) are on short-term or long-term disability leave or other leave of absence. The parties agree that (i) no Newco Employee shall be required to relocate from his or her primary office location in connection with the transfer of his or her employment to any New Spinco Party, (ii) no employee (other than the new hires referenced in the first sentence of this Section 6.09(a)(iii)) who is not engaged in the Newco Business will be a Transferred Employee, and (iii) for the period commencing on August 22, 2006 and ending on the Closing Date, no Newco Employee who is expected to become a Transferred Employee (other than any Newco Employee who refuses an offer of employment from a New Spinco Party notwithstanding Weyerhaeuser's good faith compliance with this Section 6.09(a) and Section 2.11(a) of the Contribution and Distribution Agreement) will be offered employment with Weyerhaeuser or any of its affiliates other than a New Spinco Party. Newco Employees employed in the United States who are absent from work and receiving workers compensation benefits related to such absence ("U.S. WC Newco Employees") will not become Transferred Employees until such time, if any, as they are determined by the relevant insurer to be able to return to employment and present themselves for re-employment, at which time any such employee shall be offered continuing employment, to the extent such employee is able to return to employment, with Newco on the terms and conditions generally applicable to Transferred Employees under this Section 6.09. Prior to such time, Weyerhaeuser shall retain all liability with respect to providing workers compensation benefits to U.S. WC Newco Employees to the extent the U.S. WC Newco Employees are eligible to receive such benefits.

(b) <u>Prior Service Credit.</u> From and after the Effective Time, Newco shall give or cause the appropriate Newco Subsidiary to give each Transferred Employee full credit for all purposes (including for purposes of eligibility to participate, early retirement eligibility and early retirement subsidies, vesting and, except with respect to defined benefit pension plans, benefit accrual) under any employee benefit plans and arrangements provided, maintained or contributed to by Newco or any Newco Subsidiary (other than the Assumed Canadian Plans), for such Transferred Employee's service with Weyerhaeuser and its subsidiaries, and with any predecessor employer, to the same extent recognized by Weyerhaeuser and its subsidiaries and affiliates immediately prior to the Effective Time.

(c) <u>Establishment of New Benefit Plans.</u> Effective as of the Effective Time, each Transferred Employee shall cease to participate in any employee benefit plan, arrangement or understanding (other than the Assumed Canadian Plans) that is maintained or sponsored by Weyerhaeuser or any of its affiliates (other than Spinco, Newco or any Newco Subsidiary) (other than as a former employee of Weyerhaeuser or any of its affiliates to the extent, if any, permitted by the terms of such employee benefit plan, arrangement or understanding). Effective

immediately following the Effective Time, Spinco shall establish, or cause Newco to establish, compensation and benefit plans, programs and arrangements for the benefit of the Transferred Employees (collectively, "New Benefit Plans") that provide benefits that are substantially as favorable in the aggregate as such plans, programs and arrangements that were in effect for the benefit of the Transferred Employees immediately prior to the Effective Time, provided that the arrangements set forth in Section 6.09(c) of the Weyerhaeuser Disclosure Letter shall be implemented by Newco promptly following to the Effective Time. From and after the Effective Time, Spinco shall, or shall cause its subsidiaries (including Newco and Domtar) to, honor the liabilities, obligations and commitments under the Domtar Benefit Plans and the Domtar Benefit Agreements with respect to the Domtar Employees.

(d) <u>Annual Bonus for Year of Transactions.</u> Spinco shall, or shall cause its subsidiaries (including Newco and Domtar) to, (i) assume all liabilities, obligations and commitments with respect to the Transferred Employees under the applicable annual incentive plan or arrangement of Weyerhaeuser and its subsidiaries other than such liabilities, obligations and commitments arising out of services performed by the Transferred Employees during fiscal year 2006 and honor the liabilities, obligations and commitments with respect to the Domtar Employees under the applicable annual incentive plan or arrangement of Domtar and its subsidiaries that relate to any periods commencing prior to and ending after the Effective Time, (ii) maintain such applicable plan or arrangement pursuant to its terms as in effect as of the Effective Time for such Transferred Employees and Domtar Employees, subject to any modifications that are required in order to take into account the impact, if any, of the Transactions contemplated by the Transaction Documents on the performance measures set forth in such applicable plan or arrangement, with respect to all performance periods thereunder commencing prior to and ending after the Effective Time, and (iii) at the times prescribed by such applicable plan or arrangement as in effect as of the Effective Time, make payments to the Transferred Employees and the Domtar Employees in accordance with the terms of such applicable plan or arrangement as in effect as of the Effective Time.

(e) <u>Certain Welfare Benefits Matters.</u> (i) With respect to each New Benefit Plan that is an "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA or an employee health or welfare plan which provides benefits to Canadian employees (collectively, ("New Welfare Plans"), Spinco shall, or shall cause Newco to, (A) waive all limitations as to pre-existing conditions, exclusions and waiting periods and actively-at-work requirements with respect to participation and coverage requirements applicable to the Transferred Employees and their dependents and beneficiaries under the New Welfare Plans to the extent waived under the applicable corresponding Newco Benefit Plan immediately prior to the Effective Time and (B) provide each Transferred Employee and his or her eligible dependents and beneficiaries with credit under New Welfare Plans for any co-payments and deductibles paid under corresponding Newco Benefit Plans prior to the Effective Time in the calendar year in which the Effective Time occurs for purposes of satisfying any applicable deductible or out-of-pocket requirements (and any annual and lifetime maximums) under any New Welfare Plans in which the Transferred Employees participate. Spinco shall also (A) honor, and cause Domtar to continue to honor, the participation elections of each Domtar Employee with respect to each Domtar U.S. Welfare Plan and Domtar Canadian Welfare Plan as in effect as of the Effective Time and (B) if any Domtar Employee becomes a participant in a New Welfare Plan or other welfare plan sponsored or maintained by Newco or any of its affiliates (other than a Domtar U.S. Welfare Plan or Domtar

Canadian Welfare Plan) during the 12-month period following the Effective Time, (i) waive all limitations as to preexisting conditions, exclusions and waiting periods and actively-at-work requirements with respect to participation and coverage requirements applicable to participants and their dependents and beneficiaries under such plan to the extent waived under the applicable corresponding Domtar U.S. Welfare Plan or Domtar Canadian Welfare Plan and (ii) provide such Domtar Employee and his or her eligible dependents and beneficiaries with credit under such plan for any co-payments and deductibles paid under the corresponding Domtar Benefit Plan in the calendar year in which such Domtar Employee becomes a participant in such plan for purposes of satisfying any applicable deductible or out-of-pocket requirements (and any annual and lifetime maximums) under such plan.

(ii) Effective as of the Effective Time, Spinco shall, or shall cause Newco to, assume all obligations, liabilities and commitments of Weyerhaeuser and its subsidiaries to Transferred Employees and their eligible dependents in respect of health insurance under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Sections 601 et seq. and Sections 701 et seq. of ERISA, Section 4980B and Sections 9801 et seq. of the Code and applicable state or similar laws.

(f) Tax-Qualified Savings/401(k) Plan. (i) In accordance with Section 6.09(c), effective not later than the Effective Time, Spinco or its affiliates (including Newco) shall have in effect one or more defined contribution plans that include a qualified cash or deferred arrangement within the meaning of Section 401(k) of the Code (and a related trust exempt from tax under Section 501(a) of the Code) (as applicable, the "New 401(k) Plan"). Each Transferred Employee participating in a Newco Benefit Plan that is a defined contribution plan that includes a qualified cash or deferred arrangement within the meaning of Section 401(k) of the Code (the "Newco 401(k) Plan") immediately prior to the Effective Time shall become a participant in the corresponding New 401(k) Plan as of the Effective Time and each Transferred Employee shall be eligible to participate in a New 401(k) Plan as of the Effective Time.

(ii) Spinco shall, or shall cause Newco to, cause the New 401(k) Plan to accept a "direct rollover" to such New 401(k) Plan of the account balances of each Transferred Employee (including promissory notes evidencing all outstanding loans) under the Newco 401(k) Plan in which such Transferred Employee participates, if such direct rollover is elected in accordance with applicable Law by such Transferred Employee.

(g) Assumed Canadian Plans. (i) Weyerhaeuser shall cause to be assigned and transferred to Exchangeco Subsidiary pursuant to the Canadian Purchase Agreement all rights, obligations and liabilities of the applicable Weyerhaeuser Subsidiaries with respect to the following Newco Canadian Pension Plans: the Weyerhaeuser Saskatchewan Ltd. Pension Plan for Hourly Employees of the Prince Albert Pulp and Paper Division, Saskatchewan, the Big River Lumber Union Employees Pension Plan, the Weyerhaeuser Company Limited Pension Plan for Hourly Employees at Dryden, Ontario and the Weyerhaeuser Canada Ltd. Pension Plan for Hourly Employees of Ear Falls, Ontario (collectively, "Assumed Canadian Plans"). Spinco shall cause Exchangeco Subsidiary to accept pursuant to the Canadian Purchase Agreement such assignment and transfer and assume all liabilities, duties and responsibilities required of it as the successor sponsor of the Assumed Canadian Plans in accordance with the terms thereof and

applicable laws. Weyerhaeuser shall cause to be done all things required of the applicable Weyerhaeuser Subsidiaries, and Spinco shall cause to be done all things required of Exchangeco Subsidiary, under applicable laws to establish Exchangeco Subsidiary as successor sponsor to the applicable Weyerhaeuser Subsidiaries under the terms of the Assumed Canadian Plans as provided hereunder. Effective as of the Canadian Asset Sale, Exchangeco Subsidiary will be responsible for all costs and expenses related to the Assumed Canadian Plans, including all contributions required under the terms of such plans or applicable Law in respect of any funding deficiencies thereunder.

(ii) It is understood that assets held pursuant to funding agreements in respect of the Assumed Canadian Plans are invested in a master trust arrangement maintained by the applicable Weyerhaeuser Subsidiary and, as soon as practicable after the Effective Time, such Weyerhaeuser Subsidiary shall cause the interests held by the Assumed Canadian Plans in such master trust to be redeemed or transferred as the case may be in cash or in specie, as determined by the applicable Weyerhaeuser Subsidiary in consultation with Exchangeco Subsidiary. The applicable Weyerhaeuser Subsidiary shall have no obligation to assign or transfer to Exchangeco Subsidiary or to any funding media held by Exchangeco Subsidiary any interest in the said master trust. Subject to the foregoing, Newco shall cause Exchangeco Subsidiary to establish a trust or trusts for the purpose of assuming assets held under the Assumed Canadian Plans or to assume the trusts held under the Assumed Canadian Plans subject to the consent of the trustee thereunder (which the applicable Weyerhaeuser Subsidiary shall use reasonable best efforts to obtain) and provided any trust to be assumed holds no interest in the aforesaid master trust at the time it is assumed. Spinco agrees that the Weyerhaeuser Subsidiary shall be entitled, but shall not be obligated, to transfer the assets of the Assumed Canadian Plans from the master trust to a short-term money market fund. Subject to the direction and authorization of Exchangeco Subsidiary and at the expense of Exchangeco Subsidiary, the applicable Weyerhaeuser Subsidiary shall continue to administer each Assumed Canadian Plan until effective control and direction of the Assumed Canadian Plans is transferred to Exchangeco Subsidiary, which the applicable Weyerhaeuser Subsidiary shall use reasonable best efforts to accomplish as quickly as practicable. For the avoidance of doubt, no Weyerhaeuser Subsidiary shall be construed as the agent of Exchangeco Subsidiary for this purpose. The applicable Weyerhaeuser Subsidiaries' only responsibility in connection with the Assumed Canadian Plans from the Effective Time to the date effective control is acquired by Exchangeco Subsidiary and all necessary approvals are obtained from the applicable Governmental Entity shall be to execute the directions of Exchangeco Subsidiary. Exchangeco Subsidiary shall indemnify and save harmless each applicable Weyerhaeuser Subsidiary from and against all damage, liability, loss, expense or cost that each applicable Weyerhaeuser Subsidiary incurs as a result of Exchangeco Subsidiary's failure to provide directions or authorizations to the applicable Weyerhaeuser Subsidiary or as a result of the applicable Weyerhaeuser Subsidiary's compliance with directions or authorizations provided by Exchangeco Subsidiary, in each case in connection with the Assumed Canadian Plans on or after the Effective Time. After effective control is acquired by Exchangeco Subsidiary and all necessary approvals are obtained from the applicable Governmental Entity, the applicable Weyerhaeuser Subsidiaries shall have no further obligations or liabilities under any Assumed Canadian Plan or funding arrangement held thereunder and Exchangeco Subsidiary shall be responsible for all obligations, liabilities and commitments relating to such plans both before and after the Effective Time and in respect of Transferred Employees and any other person entitled to rights, benefits or payments under the Assumed Canadian Plans.

(h) <u>Accrued Vacation.</u> For purposes of determining the number of vacation days to which each Transferred Employee shall be entitled, Spinco shall, or shall cause Newco to, assume and honor all vacation days (regular, supplemental or banked) accrued or earned but not yet taken by such Transferred Employee as of the Effective Time. To the extent that a Transferred Employee is entitled under any applicable Law or any policy of Weyerhaeuser or any of its subsidiaries to be paid for any vacation days (regular, supplemental or banked) accrued or earned but not yet taken by such Transferred Employee as of the Effective Time, Spinco shall, or shall cause Newco to, assume the liability for such vacation days.

(i) <u>Administration.</u> Following August 22, 2006, the parties hereto shall reasonably cooperate in all matters reasonably necessary to effect the transactions contemplated by this Section 6.09, including exchanging information and data relating to workers' compensation, employee benefits and employee benefit plan coverages (except to the extent prohibited by applicable Law), and in obtaining any governmental approvals required hereunder.

(j) <u>Collectively Bargained Employees.</u> From and after the Effective Time, Spinco shall, or shall cause its affiliates (including Newco) to, comply in all material respects with the terms of all collective bargaining agreements (including all obligations to provide employee benefits and/or to contribute to any pension plans) that cover one or more Transferred Employees (each, a "<u>CBA</u>") as in effect immediately prior to the Effective Time until such time as Spinco or its affiliates (including Newco) negotiate a new collective bargaining agreement or agreements. Notwithstanding anything to the contrary in this Section 6.09, Spinco further agrees that the provisions of this Section 6.09 shall be subject to any applicable provisions of a CBA in respect of Transferred Employees, to the extent such provisions are inconsistent with or otherwise in conflict with the provisions of any such CBA.

(k) <u>Flexible Spending Account Plans.</u> Effective as of the Effective Time (or, with respect to a Newco Employee who becomes a Transferred Employee after the Effective Time, such later time that such Newco Employee becomes a Transferred Employee), Newco shall assume liabilities and account balances of the Weyerhaeuser Flexible Spending Account Plan maintained in the U.S. with respect to Transferred Employees and their dependents ("<u>U.S. Flexible Spending Account Plans</u>"). Effective as of the Effective Time (or, with respect to a Newco Employee who becomes a Transferred Employee after the Effective Time, such later time that such Newco Employee becomes a Transferred Employee), Weyerhaeuser shall transfer or cause to be transferred to Newco an amount in cash equal to the excess, if any, of the aggregate contributions for the plan year in which the Effective Time occurs (or, with respect to a Newco Employee who becomes a Transferred Employee after the Effective Time, the plan year in which such Newco Employee becomes a Transferred Employee (such year, the "<u>Transition Year</u>")) of all Transferred Employees then participating in Weyerhaeuser's U.S. Flexible Spending Account Plan over the aggregate reimbursements for the plan year in which the Effective Time occurs (or, as applicable, the Transition Year) to all Transferred Employees under such plan. Newco shall cause such amounts to be credited to each such employee's accounts under Newco's (or one of its affiliate's) corresponding U.S. Flexible Spending Account Plan, which shall be established and in effect for such employees as of the Effective Time, and all claims for reimbursement which have not been paid as of the date of the transfer to Newco (or one of its affiliates) and credited under Newco's (or one of its affiliate's) U.S. Flexible Spending Account Plan shall be paid pursuant to and under the terms of Newco's (or one of its affiliate's) U. S. Flexible

Spending Account Plan. In connection with such transfer, Newco shall deem that such employees' deferral elections made under Weyerhaeuser's U.S. Flexible Spending Account Plan for the plan year in which the Closing occurs (or, as applicable, the Transition Year) shall continue in effect under Newco's (or one of its affiliate's) U.S. Flexible Spending Account Plan for the remainder of the plan year in which the Closing occurs (or, as applicable, the Transition Year).

(l) <u>Canadian Health Spending Account.</u> Effective as of the Effective Time (or with respect to a Newco Employee who becomes a Transferred Employee after the Effective Time, such later time that such Newco Employee becomes a Transferred Employee), Newco shall, under any health spending account plan or arrangement provided by Newco to Transferred Employees employed in Canada, recognize and give credit for all unused account balances of such Transferred Employees, which are maintained under the applicable Weyerhaeuser health spending account at that time.

(m) <u>U.S. Multiemployer Pension Plan.</u> (i) Weyerhaeuser and Domtar intend that the Transactions shall not result in a complete or partial withdrawal by Weyerhaeuser or any Weyerhaeuser Subsidiary from the Multiemployer Pension Plan set forth in Section 4.11(a) of the Weyerhaeuser Disclosure Letter (the "<u>U.S. MEPP</u>") and Weyerhaeuser and Domtar shall reasonably cooperate to prevent the imposition of a withdrawal liability by the U.S. MEPP in connection with the Transactions, and, effective as of the Closing, Newco shall assume Weyerhaeuser's obligations to make contributions to the U.S. MEPP.

(ii) In the event that the Transactions are deemed to constitute sale of assets to an unrelated party under Section 4204 of ERISA, then Weyerhaeuser, Newco and Domtar agree that, unless the PBGC waives the requirements of Section 4204(a)(1)(B) of ERISA, if Domtar withdraws from the U.S. MEPP with respect to the Newco Employees within the first five plan years beginning after the Closing and does not pay its liability to such U.S. MEPP on account of such withdrawal, Weyerhaeuser shall be secondarily liable to such plan for any withdrawal liability that Newco would have had to the plan with respect to the Newco Employees in the absence of Section 4204(a) of ERISA, to the extent required by ERISA. Notwithstanding the provisions of the preceding sentence and Section 4204 of ERISA, it is expressly agreed that if Weyerhaeuser or any Weyerhaeuser Subsidiary incurs any secondary withdrawal liability under the preceding sentence, Newco shall indemnify and hold them harmless from any and all losses incurred by Weyerhaeuser or any Weyerhaeuser Subsidiary by reason of such secondary liability.

(iii) Newco may seek, pursuant to PBGC Regulations §§ 4204.11 and 4204.13, a variance from the bond/escrow requirement of Section 4204(a)(1)(B) of ERISA. Weyerhaeuser shall cooperate with Newco in connection with Newco's request for such variance, which cooperation shall include: (x) if so requested by Newco, timely and jointly with Newco notifying the U.S. MEPP in writing, as contemplated by PBGC Regulation § 4204.11, of their intention that the Transactions be covered by Section 4204 of ERISA and (y) providing Newco or the U.S. MEPP with such information that is reasonably available to Weyerhaeuser and that Domtar or the U.S. MEPP requests in connection with such request for such variance. If the U.S. MEPP determines that Newco's request does not qualify for a variance of the bond/escrow requirement, Newco shall provide the bond or escrow required under Section 4204(a)(1)(B)

within the time period set forth in PBGC Regulation § 4204.11(d), provided that the foregoing shall not be deemed to restrict the ability of Newco to seek a variance or exemption pursuant to PBGC Regulations §§ 4204.21 and 4204.22. ·

SECTION 6.10. <u>Directors' and Officers' Liability Insurance.</u> (a) As of the Effective Time, Spinco shall have in effect, at no expense to the beneficiaries, policies of directors' and officers' liability insurance with respect to claims arising from or related to facts or events which occurred at, before or after the Effective Time. Such policies will be comparable in coverage and amount to Weyerhaeuser directors' and officers' liability insurance policy and to the Domtar directors' and officers' liability insurance policy in effect as of August 22, 2006.

(b) Spinco shall for a period of at least six years after the Effective Time, indemnify and hold harmless, and provide advancement of expenses to, all past and present directors or officers of Domtar, Newco and their respective subsidiaries, and each individual who prior to the Effective Time becomes a director or officer of Domtar, Newco and their respective subsidiaries, to the maximum extent allowed under applicable Law in respect of acts or omissions that occurred at or prior to the Effective Time and, in the case of directors and officers of Newco, related to the Newco Business or in connection with any of the Transaction Documents or the Transactions.

(c) Spinco shall maintain in effect for each of the applicable persons referred to in Section 6.10(b) for a period of at least six years after the Effective Time policies of directors' and officers' liability insurance of at least the same coverage and containing terms and conditions which are, in the aggregate, no less advantageous to the insured, as the current policies of directors' and officers' liability insurance maintained by Domtar or Weyerhaeuser, with respect to claims arising from acts or omissions that occurred at or prior to the Effective Time and, in the case of directors and officers of Newco, related to the Newco Business or in connection with any of the Transaction Documents or the Transactions.

SECTION 6.11. <u>Fees and Expenses.</u> (a) All fees and expenses incurred in connection with the Transactions shall be paid by the party incurring such fees or expenses; <u>provided, however,</u> that in the event the Transactions are consummated, Spinco shall reimburse Weyerhaeuser, Weyerhaeuser Canada and Weyerhaeuser Saskatchewan for (i) all fees and expenses (including fees and expenses of financial institutions, legal counsel, auditors and title companies) incurred in connection with the financing of the Transaction Debt, including the preparation of the New Debt Commitment Letter and any other financing documents or other documents relating thereto (including any title reports, UCC searches and UCC filings) and roadshows, (ii) up to 50% of all fees and expenses (including fees and expenses of legal counsel, title companies and fees and expenses incurred with respect to efforts to obtain any Consents and Governmental Approvals) incurred in connection with the site separations set forth in Section 6.05 of the Contribution and Distribution Agreement, and (iii) up to an amount of $28,000,000 of all fees and expenses (including fees and expenses of investment bankers, legal counsel, auditors and environmental consultants and fees and expenses incurred with respect to efforts to obtain any Consents or Governmental Approvals) incurred in connection with the Transactions. This Section 6.11 does not relate to Transfer Taxes, which are the subject of Section 2.03 of the Tax Sharing Agreement.

(b) Following the Closing, each of Weyerhaeuser and Spinco shall each be responsible for 50% of the capital expenditures and one-time start-up expenses incurred by either party in connection with the actions required to separate the facilities of Spinco and Weyerhaeuser as disclosed in Section 9.03 of the Weyerhaeuser Disclosure Letter under the heading "Site Services Agreements" (the "Site Separation Costs"). Prior to the Closing, Weyerhaeuser and Domtar shall agree on the procedures to be followed by Weyerhaeuser and Spinco to determine the amount of and methods of reimbursement for such Site Separation Costs.

SECTION 6.12. Public Announcements. Weyerhaeuser and Newco, on the one hand, and Domtar, on the other hand, shall consult with each other and shall mutually agree upon any press release or other public statements with respect to the Transactions and shall not issue any such press release or make any such public statement prior to such consultation and agreement, except as may be required by applicable Law, court process or by obligations pursuant to any listing agreement with the TSX or any U.S. national securities exchange, in which case the party proposing to issue such press release or make such public announcement shall use its reasonable best efforts to consult in good faith with the other parties before issuing any such press release or making any such public announcement.

SECTION 6.13. Transition Services, Site Services and Other Agreements. Subject to Section 7.01(h), on or prior to the Closing Date, the parties shall negotiate in good faith and enter into (i) the Transition Services Agreement providing for services in accordance with the terms and subject to the conditions in Exhibit E, and (ii) the Fiber Supply Agreements and the Site Services Agreements, in each case providing for the goods and services and in accordance with the terms and subject to the conditions set forth in Section 9.03 of the Weyerhaeuser Disclosure Letter.

SECTION 6.14. Non-Solicitation of Employees. For a period of two years from the Effective Time, without the prior written consent of Spinco, Weyerhaeuser will not, and will not permit any affiliate of Weyerhaeuser to, directly or indirectly, employ or attempt to employ any employee of Newco or any Newco Subsidiary or solicit or induce any employee of Newco or any Newco Subsidiary to terminate such person's employment with Newco or such Newco Subsidiary. For a period of two years from the Effective Time, without the prior written consent of Weyerhaeuser, Spinco will not, and will not permit any affiliate of Spinco to, directly or indirectly, employ or attempt to employ any employee of Weyerhaeuser or any Weyerhaeuser Subsidiary or solicit or induce any employee of Weyerhaeuser or any Weyerhaeuser Subsidiary to terminate such person's employment with Weyerhaeuser or such Weyerhaeuser Subsidiary. For the purposes of this Section 6.14, the placement of "help wanted" advertisements, postings on internet job sites and searches by employment search companies that are not specifically targeting employees of Weyerhaeuser, any Weyerhaeuser Subsidiary, Newco or any Newco Subsidiary shall not result in a violation of this Section 6.14.

SECTION 6.15. Stock Exchange Listing. Weyerhaeuser, Spinco and Domtar shall use their reasonable best efforts to cause the shares of Spinco Common Stock to be issued in the Transactions pursuant to (i) the Spinco Share Issuance, (ii) the exercise of Substituted Spinco Options, Substituted Spinco SARs, Replacement Options, Amended Replacement Options, Replacement Rights, Replacement DSUs and Replacement PSUs, (iii) the Spinco Stock

Plans and/or Spinco Stock Plans and (iv) the exercise of the exchange rights attaching to the Exchangeable Shares to be approved for listing on the NYSE and the TSX, subject to official notice of issuance with respect to the NYSE and subject to compliance with the by-laws and requirements of the TSX, and the Exchangeable Shares to be approved for listing on the TSX, subject to compliance with the by-laws and requirements of the TSX, prior to the Closing Date. Domtar shall use its reasonable best efforts to cause the Class B Common Shares of Offerco to be listed and posted for trading on the TSX, subject to compliance with the by-laws and requirements of the TSX.

SECTION 6.16. Tax Treatment. The parties hereto will cooperate with each other and use their respective reasonable efforts to cause (i) the Contribution and the Distribution to qualify as a "reorganization" within the meaning of Section 368(a)(1)(D) of the Code and as tax-free under Section 355, and (ii) the Arrangement to be tax deferred under the ITA for certain eligible holders of Class B Common Shares resident in Canada that exchange such shares for Exchangeable Shares, provided appropriate elections are filed in the prescribed manner in accordance with Section 85 of the ITA (the qualifications referred to in clauses (i) and (ii), the "Intended Tax Treatment"), including not taking any action that such party knows is reasonably likely to prevent the Intended Tax Treatment.

SECTION 6.17. Distribution. (a) Weyerhaeuser shall use reasonable efforts to ensure that any decision to effect the Distribution, in whole or in part, as an exchange offer will be made sufficiently in advance of receipt of any Governmental Approvals such that the implementation would not reasonably be expected to delay the Closing Date by more than 30 days.

(b) If Weyerhaeuser elects to effect the Distribution, in whole or in part, as an exchange offer, Weyerhaeuser shall use reasonable efforts to and, upon request by Weyerhaeuser, Domtar shall use reasonable efforts to consummate the Distribution within 30 days after satisfaction (or waiver to the extent permissible) of all the conditions precedent to the Closing (other than conditions that by their nature are to be satisfied at the time of the Transactions and shall in fact be satisfied at such time(s)).

(c) Weyerhaeuser shall not use an exchange offer to effect the Distribution, in whole or in part, if such exchange offer would result in occurrence of the Distribution Date 30 days beyond the date on which the Transactions would otherwise be consummated.

(d) Weyerhaeuser shall be entitled to delay the Distribution and Closing for up to 10 Business Days to comply with any NYSE and TSX rules relating to notices of record dates and dividends.

SECTION 6.18. Contribution and Distribution Agreement. (a) Weyerhaeuser, Spinco and Newco shall not terminate or assign the Contribution and Distribution Agreement, amend any provision of the Contribution and Distribution Agreement, or waive compliance with any of the agreements or conditions contained therein without the prior written consent of Domtar.

(b) In connection with the assignment, transfer and conveyance of the Newco Assets and the assumption of the Newco Liabilities by Newco, and the purchase of the Newco Canada Exchangeco Assets and the assumption of the Newco Canada Exchangeco Liabilities by Exchangeco Subsidiary, in each case as contemplated in the Contribution and Distribution Agreement, Weyerhaeuser (i) will keep Domtar reasonably informed of its progress in obtaining any necessary or advisable Consents and Governmental Approvals, and (ii) will not enter into any agreement or other instrument with respect to any such assignment, transfer, conveyance, assumption or purchase without the prior approval of Domtar, which consent shall not be unreasonably withheld or delayed.

SECTION 6.19. Covenants Regarding Non-Solicitation. (a) Subject to Section 6.20, Domtar shall not, directly or indirectly, through any officer, director, employee, representative or agent of Domtar or any of its subsidiaries, (i) solicit, initiate or knowingly encourage (including by way of furnishing information or entering into any form of agreement, arrangement or understanding) the initiation of any inquiries or proposals regarding an Acquisition Proposal, (ii) participate in any discussions or negotiations regarding any Acquisition Proposal, (iii) withdraw or modify in a manner adverse to Weyerhaeuser the approval of the Board of Directors of Domtar of the Transactions or the recommendation of the Board of Directors of Domtar to the holders of Domtar Capital Shares or Domtar Options, (iv) approve or recommend any Acquisition Proposal or (v) enter into any agreement, arrangement or understanding related to any Acquisition Proposal. Notwithstanding the preceding part of this Section 6.19(a) and any other provision of this Agreement, nothing shall prevent the Board of Directors of Domtar prior to the issuance of the Final Order from considering, participating in any discussions or negotiations, or entering into a confidentiality agreement and providing information pursuant to Section 6.19(c), regarding an unsolicited *bona fide* written Acquisition Proposal that did not otherwise result from a breach of this Section 6.19 and that the Board of Directors of Domtar determines in good faith, after consultation with financial advisors and outside counsel, constitutes or is reasonably likely to result in a Superior Proposal; provided, however, that prior to taking such action, the Board of Directors must have determined, after consultation with outside counsel, that it is appropriate for the Board of Directors of Domtar take such action in order to discharge properly its fiduciary duties. Domtar shall not consider, negotiate, accept, approve or recommend an Acquisition Proposal after the date of the issuance of the Final Order. Domtar shall, and shall cause the officers, directors, employees, representatives and agents of Domtar and its subsidiaries to, cease immediately all discussions and negotiations conducted prior to August 22, 2006 regarding any proposal that constitutes, or may reasonably be expected to lead to, an Acquisition Proposal. Nothing contained in this Section 6.19(a) shall prohibit Domtar from responding to any unsolicited proposal or inquiry solely by advising the person making such proposal or inquiry of the terms of this Section 6.19(a).

(b) Domtar shall promptly notify Weyerhaeuser, at first orally and then in writing, of any Acquisition Proposal and any inquiry that could lead to an Acquisition Proposal, or any amendments to the foregoing, or any request for non-public information relating to Domtar or any material Domtar Subsidiary in connection with an Acquisition Proposal or for access to the properties, books or records of Domtar or any material Domtar Subsidiary by any person that informs Domtar or such material Domtar Subsidiary that it is considering making, or has made, an Acquisition Proposal. Such notice shall include a description of the material terms

and conditions of any proposal, the identity of the person making such proposal, inquiry or contact and provide such other details of the proposal, inquiry or contact as Weyerhaeuser may reasonably request. Domtar shall (i) keep Weyerhaeuser fully informed of the status including any change to the material terms of any such Acquisition Proposal or inquiry and (ii) provide to Weyerhaeuser, as soon as practicable after receipt or delivery thereof, copies of all correspondence and other written material sent or provided to Domtar or any Domtar Subsidiary from any person in connection with any Acquisition Proposal or sent or provided by Domtar to any person in connection with any Acquisition Proposal.

(c) If Domtar receives a request for material non-public information from a person who has made an unsolicited *bona fide* written Acquisition Proposal and Domtar is permitted, as contemplated under the second sentence of Section 6.19(a), to negotiate the terms of such Acquisition Proposal, then, and only in such case, the Board of Directors of Domtar may, subject to the execution by such person of a confidentiality agreement containing a standstill provision substantially similar to that contained in the Confidentiality Agreement, provide such person with access to information regarding Domtar; provided, however, that the person making the Acquisition Proposal shall not be precluded under such confidentiality agreement from making the Acquisition Proposal (including any amendment thereto); provided further that Domtar sends a copy of any such confidentiality agreement to Weyerhaeuser promptly upon its execution and Weyerhaeuser is provided with a list of or copies of the information provided to such person and immediately provided with access to similar information to which such person was provided.

(d) Domtar shall ensure that its officers, directors and employees and its subsidiaries and their officers, directors and employees and any financial advisors or other advisors or representatives retained by it are aware of the provisions of this Section 6.19, and it shall be responsible for any breach of this Section 6.19 by its officers, directors, employees, financial advisors or other advisors or representatives.

(e) Notwithstanding Section 6.19(a)(iii), the Board of Directors of Domtar may withdraw or modify in a manner adverse to Weyerhaeuser the approval of the Board of Directors of Domtar of the transactions contemplated hereby if an event has occurred and is continuing that, either alone or together with other events, has had or would reasonably be expected to have a Newco Material Adverse Effect.

SECTION 6.20. Notice by Domtar of Superior Proposal Determination.

(a) Notwithstanding Sections 6.19(a), 6.19(b), 6.19(d) and 6.19(e), Domtar may accept, approve, recommend or enter into any agreement, understanding or arrangement in respect of a Superior Proposal if, and only if, (i) it has provided Weyerhaeuser with a copy of the Superior Proposal document, (ii) five Business Days shall have elapsed from the later of the date Weyerhaeuser received written notice advising Weyerhaeuser that Domtar's Board of Directors has resolved, subject only to compliance with this Section 6.20 and termination of this Agreement, to accept, approve, recommend or enter into an agreement in respect of such Superior Proposal, specifying the terms and conditions of such Superior Proposal and identifying the person making such Superior Proposal, and the date Weyerhaeuser received a copy of such Superior Proposal, and (iii) it has previously or concurrently will have (A) paid to Weyerhaeuser

the Break Fee (as defined in Section 6.21(a)(iii)), if any, payable under Section 6.21 and (B) terminated this Agreement pursuant to Section 8.01(d)(ii). Any information provided by Domtar to Weyerhaeuser pursuant to this Section 6.20 or pursuant to Section 6.19 shall be subject to Section 6.06.

(b) During such five Business Day period, Domtar agrees that Weyerhaeuser shall have the right, but not the obligation, to offer to amend the terms of this Agreement. The Board of Directors of Domtar will review any offer by Weyerhaeuser to amend the terms of this Agreement in good faith in order to determine, in its discretion in the exercise of its fiduciary duties, whether Weyerhaeuser's offer upon acceptance by Domtar would result in such Superior Proposal ceasing to be a Superior Proposal. If the Board of Directors of Domtar so determines, it will enter into an amended agreement with Weyerhaeuser reflecting Weyerhaeuser's amended proposal. If the Board of Directors of Domtar continues to believe, in good faith and after consultation with financial advisors and outside counsel, that such Superior Proposal remains a Superior Proposal and therefore rejects Weyerhaeuser's amended proposal, Domtar may terminate this Agreement pursuant to Section 8.01(d)(ii); provided, however, that Domtar must concurrently pay to Weyerhaeuser the Break Fee, if any, payable to Weyerhaeuser under Section 6.21 and must concurrently with such termination enter into a definitive agreement with respect to such Acquisition Proposal. Domtar acknowledges and agrees that payment of the Break Fee, if any, payable under Section 6.21 is a condition to valid termination of this Agreement under Section 8.01(d)(ii) and this Section 6.20.

(c) Domtar also acknowledges and agrees that each successive modification of any Acquisition Proposal shall constitute a new Acquisition Proposal for purposes of the requirement under clause (ii) of Section 6.20(a) to initiate an additional five Business Day notice period.

SECTION 6.21. Break Fee.

(a) If:

(i) Domtar shall terminate this Agreement pursuant to Section 8.01(d)(ii), unless at the time of such termination, an event has occurred and is continuing that has a Newco Material Adverse Effect;

(ii) Weyerhaeuser shall terminate this Agreement pursuant to Section 8.01(c)(ii), unless at the time of such failure to recommend, withdrawal or adverse modification or change, or recommendation of an Acquisition Proposal, an event has occurred and is continuing that has a Newco Material Adverse Effect; or

(iii) either Domtar or Weyerhaeuser shall terminate this Agreement pursuant to Section 8.01(b)(i) or 8.01(b)(ii) in circumstances where Domtar Shareholder Approval has not been obtained at the Domtar Meeting, and (x)(A) in the case of a termination of this Agreement pursuant to Section 8.01(b)(i), a *bona fide* Acquisition Proposal has been made by any person other than a Weyerhaeuser Party prior to the Domtar Meeting and not withdrawn more than five days prior to the vote of the Domtar Shareholders and holders of Domtar Options, or (B) in the case of a termination of this Agreement pursuant to Section 8.01(b)(ii), a *bona fide* Acquisition

Proposal has been made by any Person other than a Weyerhaeuser Party that is either publicly disclosed or otherwise becomes publicly known prior to or at the time of the Domtar Meeting and that is not withdrawn more than five days prior to the vote of the Domtar Shareholders and holders of Domtar Options, and (y) Domtar enters into an agreement with respect to any Acquisition Proposal, or any Acquisition Proposal is consummated, after the date hereof and prior to the expiration of 12 months following termination of this Agreement, unless at the time of the Domtar Meeting an event has occurred and is continuing that has a Newco Material Adverse Effect;

then in any such case Domtar shall pay to Weyerhaeuser $62,000,000 (the "Break Fee") in immediately available funds to an account designated by Weyerhaeuser. Such payment shall be due (A) in the case of a termination specified in clause (i), prior to the termination of this Agreement, (B) in the case of a termination specified in clause (ii), within five Business Days after written notice of termination by Weyerhaeuser, or (C) in the case of a termination specified in clause (iii), at or prior to the earlier of the entering into of the agreement and the consummation of the transaction referred to therein; provided, however, that in the event that Domtar has reimbursed Weyerhaeuser for its out-of-pocket expenses pursuant to Section 6.21(b) prior to the date on which the Break Fee is payable, then the amount of the Break Fee payable shall be reduced by the amount of expenses actually reimbursed by Domtar pursuant to Section 6.21(b). Domtar shall not be obligated to make more than one payment pursuant to this Section 6.21(a).

(b) Domtar shall reimburse Weyerhaeuser for all its out-of-pocket expenses actually incurred in connection with this Agreement, the Original Agreement and the Transactions, subject to a maximum of $10,000,000, if this Agreement is terminated in. the circumstances specified in clause (iii) of Section 6.21(a) and the Break Fee is not payable upon the date of such termination. Such reimbursement shall be paid on demand following such termination.

SECTION 6.22. Effect of Break Fee Payment. For greater certainty, the parties hereto agree that if Domtar pays to Weyerhaeuser amounts required by Section 6.21 as a result of the occurrence of any of the events referenced in Section 6.21, the Weyerhaeuser Parties shall have no other remedy for monetary damages for any breach of this Agreement by Domtar.

SECTION 6.23. Securities Act Exemptions. In the event that, due to an amendment to the Securities Act, a change in the SEC's interpretation of the Securities Act or a decision of a court which provides that orders of Canadian courts such as the Final Order do not qualify under Section 3(a)(10) of the Securities Act, the exemption from registration under Section 3(a)(10) of the Securities Act is not available for any reason to exempt the issuance of the Spinco Shares and Exchangeable Shares in accordance with the Arrangement from the registration requirements of the Securities Act, then Spinco shall take all necessary action to file a registration statement on Form S-4 (or on such other form that may be available to Spinco) in order to register the shares of Spinco Common Stock and Exchangeable Shares, and shall use its reasonable best efforts to cause such registration statement to become effective at or prior to the Effective Time. In the event that, prior to the Distribution Date, due to an amendment to the Securities Act, a change in the SEC's interpretation of the Securities Act or a decision of a court, the Distribution by means of a dividend is required to be registered under the Securities Act, then

Weyerhaeuser shall cause Spinco to take all necessary action to file a registration statement on Form S-1 (or such other form that may be available to Spinco) in order to register the shares of Spinco Common Stock to be distributed as a dividend and shall cause Spinco to use its reasonable best efforts to cause such registration statement to become effective at or prior to the Distribution Date.

SECTION 6.24. Audited Financial Statements. (a) As soon as practicable after August 22, 2006, but no later than November 15, 2006, Weyerhaeuser shall deliver to Domtar (i) audited balance sheets with respect to the Newco Business as of December 25, 2005 and December 26, 2004 (together with the notes thereto, the "Audited Newco Balance Sheets"), and the related audited statements of results of operations and cash flows for each of the three years in the three-year period ended December 25, 2005 (together with the notes thereto and the Audited Newco Balance Sheets, the "Audited Newco Financial Statements"), which shall be substantially the same as the 2005 Unaudited Newco Financial Statements with respect to the period covered by such unaudited financial statements (except that the 2005 Unaudited Newco Financial Statements do not reflect the Canadian Logging, Forest Management and Saw Mill Operations, which shall be reflected in the Audited Newco Financial Statements), with audit adjustments that are only immaterial in amount and nature (except with respect to the Canadian Logging, Forest Management and Saw Mill Operations), (ii) an unqualified audit report on the Audited Newco Financial Statements, and (iii) a schedule showing all adjustments to the 2005 Unaudited Newco Financial Statements to reflect the Canadian Logging, Forest Management and Saw Mills Operations.

(b) The parties hereto will cooperate with each other and use their respective reasonable best efforts to prepare on a timely basis pro forma financial statements of Spinco, as adjusted to reflect the consummation of the Transactions, prepared in accordance with Regulation S-X promulgated by the SEC and applicable Canadian requirements, for the periods required to be included in the Domtar Circular, the Form 10, the Spinco Registration Statement or, if such filings are required by applicable Law or the SEC, the Form S-4 or the Exchange Offer Schedule.

SECTION 6.25. Domtar Share Purchase Plans and Domtar Stock Plans. (a) As soon as practicable after August 22, 2006, the Board of Directors of Domtar shall adopt such resolutions or take such other actions as may be required to provide that with respect to the Domtar Share Purchase Plan for Canadian Employees and the Domtar Share Purchase Plan for Employees in the United States (collectively, the "Domtar ESPPs") (A) each participant's outstanding right to purchase Domtar Common Shares under the Domtar ESPPs shall terminate on the last trading day immediately prior to the Measurement Date, (B) any amounts allocated to a participant's account under the Domtar ESPPs may be used to purchase Domtar Common Shares from Domtar prior to, but not after, the close of business on the day prior to the Measurement Date, and any unused amounts shall be refunded to such participant, (C) the Domtar ESPPs shall terminate at the close of business on the day immediately prior to the Measurement Date, (D) with respect to the Domtar ESPP for Canadian employees, the annual employer contribution for the calendar year ended December 31, 2006 shall be made to participants' accounts on the day immediately prior to the Measurement Date (if not previously made), and (E) no further rights shall be outstanding under the Domtar ESPPs (other than Domtar Rights relating to Domtar Common Shares previously purchased under the Domtar

ESPPs). After the Effective Time, the Board of Directors of Spinco may decide, at its discretion, whether it shall institute replacement share purchase plans for Spinco employees.

SECTION 6.26. Furnishing of Tax Opinion. At least 10 days prior to the Distribution Date, Weyerhaeuser shall furnish to Domtar a copy of the proposed form of the tax opinion described in Section 7.02(c) together with all letters or certificates that form the basis therefor (collectively, the "Opinion Materials"). Domtar shall be entitled to provide Weyerhaeuser with written comments on such Opinion Materials. Weyerhaeuser shall consider such comments and shall make changes to the Opinion Materials in accordance with such comments, but only to the extent that Weyerhaeuser, acting in good faith, determines that such changes are reasonable. Weyerhaeuser shall furnish Spinco with a copy of the final Opinion Materials. The Opinion Materials shall not include any letter, certificate or other item to which any Spinco Party is a signatory other than Section 6.26 of the Weyerhaeuser Disclosure Letter.

SECTION 6.27. IRS Ruling. (a) Weyerhaeuser and Spinco shall use their reasonable best efforts to seek, as promptly as practicable, a private letter ruling from the IRS, in form and substance reasonably satisfactory to Weyerhaeuser (the "IRS Ruling") to the effect that the Contribution and the Distribution shall qualify as a tax-free transaction under Sections 355 and 368 of the Code. Weyerhaeuser shall use its reasonable best efforts to notify Domtar's tax counsel about any substantive telephone communications with the IRS regarding any material issues arising with respect to the IRS Ruling, so that such counsel may participate on such calls; provided, however, that if advance notification to such counsel of a call with the IRS is not practically feasible due to the initiation of an unscheduled call by the IRS, Weyerhaeuser shall first attempt to include Domtar's tax counsel on such call and, if unsuccessful, shall timely inform Domtar's tax counsel of any material issues discussed with the IRS subsequent to the call. Domtar's tax counsel shall be allowed to participate in any in-person conference with the IRS (and Weyerhaeuser agrees to take such actions as the IRS may reasonably request in order to permit such participation), unless the IRS objects to such participation or such participation will unreasonably delay the holding of the conference. If Domtar's tax counsel participates in any in-person conference with the IRS, such participation shall be for the limited purposes of providing additional facts and improving the clarity of the discussion relating to Domtar's role in the Transactions.

(b) The IRS Ruling may be based upon customary factual statements, representations and covenants by the parties, their subsidiaries and their shareholders, consistent with the existing published guidance of the IRS, in each case with appropriate modifications to reflect the particular facts of the Transactions (collectively, the "Representations"). Subject to, and consistent with, Section 6.06, Domtar agrees to provide such appropriate information and Representations as the IRS shall reasonably request in connection with the IRS Ruling. In the event that the IRS will not issue the ruling requested by Weyerhaeuser, then Weyerhaeuser and Domtar shall consider in good faith any reasonable modifications to the structure of the Transactions that will facilitate receipt of the IRS Ruling, so long as such modifications will not materially adversely affect the value of the Transactions to either party or its shareholders.

(c) Weyerhaeuser shall be responsible for the preparation and filing of the request for the IRS Ruling and supplements thereto to be submitted to the IRS in connection with the IRS Ruling (the "IRS Submission"). Prior to submitting any IRS Submission, Weyerhaeuser

shall provide Domtar's tax counsel with a reasonable opportunity to review and comment on a draft of such IRS Submission; provided, however, Weyerhaeuser may redact from such draft of such IRS Submission any information that (x) Weyerhaeuser, in its good faith judgment, considers to be confidential information not germane to the IRS Ruling and to which Domtar is not otherwise entitled to have access to pursuant to Section 6.06 and (y) is not (and is not reasonably expected to become) a part of any other publicly available information. Weyerhaeuser shall timely provide to Domtar's tax counsel a final copy of any IRS Submission.

(d) Weyerhaeuser shall timely provide Domtar and its tax counsel with a copy of the IRS Ruling after receipt thereof from the IRS.

SECTION 6.28. Equity Calculation. On the Measurement Date, Weyerhaeuser shall provide Domtar with all relevant information regarding elections by Rollover Employees to receive Substituted Spinco Options, Substituted Spinco SARs, Substituted Spinco RSUs and the number of shares of Spinco Common Stock issuable pursuant thereto, and Domtar shall provide Weyerhaeuser with a statement setting forth the total number of Domtar Common Shares then issued and outstanding and all relevant information with respect to (i) the Domtar Restricted Shares and the number of additional Domtar Common Shares issuable pursuant thereto, and (ii) the Domtar Options, Domtar Rights, Domtar DSUs, Domtar PSUs and the number of Domtar Common Shares to be granted pursuant thereto, in each case for the purpose of determining the number of shares of Spinco Common Stock to be issued to Weyerhaeuser on the Contribution Date in accordance with Section 2.12(b) of the Contribution and Distribution Agreement. On the basis of this information, Weyerhaeuser and Domtar shall calculate in good faith the number of shares of Spinco Common Stock to be issued to Weyerhaeuser pursuant to such Section 2.12. Weyerhaeuser shall determine the Measurement Date in accordance with Section 2.12(b) of the Contribution and Distribution Agreement and shall provide Domtar with three Business Days' prior notice of such date.

SECTION 6.29. Redemption of Excluded IRB Indebtedness. Prior to the Closing Date, Weyerhaeuser shall redeem all Excluded IRB Indebtedness so that (i) all Weyerhaeuser's obligations in respect of such indebtedness shall have been satisfied in full, and (ii) all Liens on Newco Assets securing such Excluded IRB Indebtedness shall have been irrevocably released and terminated.

SECTION 6.30. Confidentiality. (a) Domtar and its affiliates acknowledge that the information being provided to them in connection with the Transactions is subject to the terms of the Confidentiality Agreement, which are incorporated herein by reference. Effective upon, and only upon, the Closing, the Confidentiality Agreement shall terminate with respect to information relating solely to the Newco Business; provided, however, that Domtar acknowledges that any and all other information provided to it by Weyerhaeuser, any of its affiliates or their respective representatives concerning Weyerhaeuser or any of its affiliates shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing.

(b) Weyerhaeuser shall keep confidential, and cause its affiliates and instruct its and their officers, directors, employees and advisors to keep confidential, all information relating to the Newco Business except as required by law or administrative process and except for information which is available to the public on the Closing Date, or thereafter becomes available

to the public other than as a result of a breach of this Section 6.30(b). The covenants set forth in this Section 6.30 shall terminate two years after the Closing Date.

SECTION 6.31. Internal Controls. The parties hereto will cooperate with each other and use their respective reasonable best efforts to (A) design a system of internal controls over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act) sufficient to provide reasonable assurances regarding the reliability of financial reporting by Spinco after the Effective Time, and the preparation of financial statements of Spinco after the Effective Time for external purposes, and (B) design disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) to ensure that material information that Spinco will be required to disclose after the Effective Time in the reports it is required to file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and is accumulated and communicated to Spinco's management as appropriate to allow timely decisions regarding required disclosure and to make the certifications of the principal executive officer and principal financial officer of Spinco required pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, as amended (the "Sarbanes-Oxley Act").

SECTION 6.32. Spinco Common Stock Matters. Prior to the Distribution, whether effected pursuant to a dividend or an exchange offer or a combination thereof, Weyerhaeuser shall and shall cause Spinco to either, at Weyerhaeuser's election and pursuant to documents reasonably acceptable to Domtar, (i) adopt and enter into a "shareholder rights plan" for Spinco containing customary terms and conditions and a threshold of 10% for the definition of "acquiring person" and similar terms or (ii) amend the Restated Certificate of Incorporation of Spinco attached hereto as Exhibit A in order to provide for a limitation on the ability of any person to have or acquire beneficial ownership of Spinco Common Stock equal to or greater than 10% of the issued and outstanding shares of such stock. Any such plan or amendment (A) shall have a term of two years, (B) shall not apply to any person who is and remains eligible to file a Schedule 13G under the Exchange Act and (C) shall, with respect to any person who has greater than 10% of the issued and outstanding shares of such stock immediately following the Closing in the event that the Distribution is effected in whole as a pro rata dividend, only apply to the extent such person acquires additional shares of such stock.

# ARTICLE VII

## CONDITIONS PRECEDENT

SECTION 7.01. Conditions to Each Party's Obligation to Effect the Transactions. The respective obligations of each party to effect the Arrangement and the Distribution are subject to the satisfaction or waiver on or prior to the Closing Date of the following conditions:

(a) Approval by Domtar Shareholders and Holders of Domtar Options. The Domtar Shareholder Approval shall have been obtained;

(b) <u>Final Order.</u> The Final Order shall have been granted prior to the Closing Date in form and substance satisfactory to Weyerhaeuser and Domtar, and shall not have been set aside or modified in a manner unacceptable to either of Weyerhaeuser or Domtar, on appeal or otherwise;

(c) <u>Review Law Approvals.</u> Any waiting period (and any extension thereof) applicable to the Transactions under the HSR Act shall have been terminated or shall have expired. Any consents, approvals and filings under any other Review Law, the absence of which would prohibit the consummation of Transactions, shall have been obtained or made and, with respect to approval under the Competition Act, either:

(i) the applicable waiting period under Section 123 of the Competition Act shall have expired and the Commissioner shall have issued a written notification stating that the Commissioner does not at that time intend to make application to the Competition Tribunal under Section 92 of the Competition Act (i.e., a "no-action" letter) in respect of the Transactions; or

(ii) the Commissioner shall have issued an advance ruling certificate under Section 102 of the Competition Act in respect of the Transactions;

(d) <u>Listing of Spinco Common Stock.</u> The shares of Spinco Common Stock issuable to the Eligible Holders and certain holders of Class B Common Shares pursuant to the Transactions and this Agreement and issuable upon exchange of the Exchangeable Shares and upon exercise of the Equity Awards from time to time, shall have been approved for listing on the NYSE, subject to notice of issuance;

(e) <u>Listing of Exchangeable Shares and Class B Common Shares.</u> The Exchangeable Shares issuable to certain holders of Class B Common Shares pursuant to the Transactions shall have been conditionally approved for listing on the TSX, and, subject to Section 9.11, the TSX shall have accepted that the Class B Common Shares issuable to holders of Domtar Common Shares pursuant to the Transactions shall, upon issuance, be listed and posted for trading on the TSX;

(f) <u>No Injunctions or Restraints.</u> No temporary restraining order, cease trading order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the Transactions shall be in effect; <u>provided, however,</u> that, prior to asserting this condition, subject to Section 6.07, each of the parties hereto shall have used its reasonable best efforts to prevent the entry of any such injunction or other order and to appeal as promptly as possible any such injunction or other order that may be entered;

(g) <u>Form S-4 and Form 10.</u> The Form S-4 (if required by applicable Law or the SEC) shall have become effective under the Securities Act and the Form 10 shall have become effective under the Exchange Act. The Form S-4 (if required by applicable Law or the SEC) shall not be the subject of any stop order or proceedings seeking a stop order; and Newco shall have received all required exemption orders or other approvals of the CSAs and all state

securities or "Blue Sky" authorizations necessary to issue shares of Spinco Common Stock pursuant to the Transactions;

(h) Transaction Documents. The Transaction Documents shall have been executed and delivered by each of the parties thereto and such Transaction Documents shall be in full force and effect;

(i) Contribution. The Contribution shall have been consummated in accordance with the terms and conditions of the Contribution and Distribution Agreement; and

(j) Spinco Financing. Spinco shall have entered into a credit facility or facilities on the terms and conditions set forth in the New Debt Commitment Letter, or on terms and conditions which are not materially more burdensome to Spinco than those set forth in the New Debt Commitment Letter, in an aggregate amount not less than $2.65 billion (the "Transaction Debt").

The foregoing conditions are for the mutual benefit of each of Weyerhaeuser, Spinco and Newco and of Domtar and may, subject to Section 8.04, be waived, in whole or in part, by either Weyerhaeuser, Spinco and Newco, acting jointly, or by Domtar at any time, provided that neither Weyerhaeuser, Spinco and Newco, acting jointly, nor Domtar may waive any mutual condition on behalf of the other of them.

SECTION 7.02. Conditions to Obligations of Weyerhaeuser, Spinco and Newco. The obligations of Weyerhaeuser, Spinco and Newco to effect the Arrangement and the Distribution are further subject to the following conditions:

(a) Representations and Warranties. The representations and warranties of Domtar in this Agreement that are qualified as to materiality or as to a Domtar Material Adverse Effect shall be true and correct and those not so qualified shall be true and correct in all material respects, as of August 22, 2006 and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date). Weyerhaeuser shall have received a certificate to such effect signed on behalf of Domtar by the chief executive officer and the chief financial officer of Domtar;

(b) Performance of Obligations of Domtar. Domtar shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing Date, and Weyerhaeuser and Newco shall have received a certificate to such effect signed on behalf of Domtar by the chief executive officer and the chief financial officer of Domtar;

(c) Absence of a Domtar Material Adverse Effect. Since August 22, 2006 there shall not have been any Effect that, individually or in the aggregate, has had or would reasonably be expected to have a Domtar Material Adverse Effect;

(d) Intentionally Deleted.

(e) Tax Opinion. Weyerhaeuser shall have received a written opinion, dated as of the Closing Date, from Cravath, Swaine & Moore LLP, to the effect that the Contribution and the Distribution will qualify as a tax-free transaction under Sections 355 and 368(a)(1)(D) of the Code; it being understood that in rendering such opinion, such tax counsel shall be entitled to rely upon customary representations provided by the relevant parties; and

(f) IRS Ruling. Weyerhaeuser shall have received the IRS Ruling in form and substance reasonably satisfactory to Weyerhaeuser (taking into account any changes pursuant to Section 6.27).

The foregoing conditions are for the benefit of each of Weyerhaeuser, Spinco and Newco and may, subject to Section 8.04, be waived, in whole or in part, by Weyerhaeuser, Spinco and Newco, acting jointly, at any time.

SECTION 7.03. Conditions to Obligations of Domtar. The obligations of Domtar to effect the Arrangement are further subject to the following conditions:

(a) Representations and Warranties. The representations and warranties of Weyerhaeuser and the Spinco Parties in this Agreement that are qualified as to materiality or as to a Newco Material Adverse Effect shall be true and correct and those not so qualified shall be true and correct in all material respects, as of August 22, 2006 and on the Closing Date as though made on the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date). Domtar shall have received a certificate to such effect signed on behalf of Weyerhaeuser by the chief executive officer and the chief financial officer of Weyerhaeuser;

(b) Performance of Obligations of Weyerhaeuser and Newco. Weyerhaeuser and Newco shall have performed in all material respects all obligations required to be performed by them under this Agreement at or prior to the Closing Date (and Weyerhaeuser and Newco shall have performed in all respects the obligations required to be performed by them under Sections 6.24(a) and 6.29), and Domtar shall have received a certificate to such effect signed on behalf of Weyerhaeuser and Newco by the chief executive officers and the chief financial officers of each of Weyerhaeuser and Newco, respectively;

(c) Absence of Newco Material Adverse Effect. Since August 22, 2006 there shall not have been any event, change, effect or development that, individually or in the aggregate, has had or would reasonably be expected to have a Newco Material Adverse Effect; and

(d) Distribution. The Distribution shall have occurred or shall occur immediately prior to the Effective Time.

The foregoing conditions are for the benefit of Domtar and may, subject to Section 8.04, be waived, in whole or in part, by Domtar at any time.

## ARTICLE VIII

## TERMINATION, AMENDMENT AND WAIVER

SECTION 8.01. Termination. This Agreement may be terminated at any time prior to the Effective Time:

(a) by mutual written consent of each party hereto;

(b) by either Weyerhaeuser or Domtar:

(i) if the Effective Time shall not have occurred on or before August 21, 2007 (the "Outside Date"), unless the failure to consummate the Transactions is the result of a material breach of any Transaction Document by the party seeking to terminate this Agreement; provided, however, that the passage of such period shall be tolled for any part thereof during which any party shall be subject to a non-final order, decree, ruling or action restraining, enjoining or otherwise prohibiting the consummation of the Transactions;

(ii) if Domtar Shareholder Approval shall not have been obtained by reason of the failure to obtain the required vote at the Domtar Meeting;

(iii) if there shall be passed any Law that makes consummation of the Transactions illegal or otherwise prohibited or if any injunction, order or decree enjoining Weyerhaeuser or Domtar from consummating the Transactions is entered and such injunction, order or decree shall become final and non-appealable; or

(iv) if any condition to the obligation of such party to consummate the Transactions set forth in Section 7.02 (in the case of Weyerhaeuser) or 7.03 (in the case of Domtar) becomes incapable of satisfaction prior to the Outside Date, unless the failure of such condition is the result of a breach of any Transaction Document by the party seeking to terminate this Agreement;

(c) by Weyerhaeuser;

(i) if Domtar breaches or fails to perform in any respect any of its representations, warranties or covenants contained in any Transaction Document, which breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 7.02(a) or 7.02(b), and (ii) cannot be or has not been cured within 30 days after the giving of written notice to Domtar of such breach (provided that Weyerhaeuser or Newco is not then in material breach of any representation, warranty or covenant contained in any Transaction Document); or

(ii) if the Board of Directors of Domtar shall have failed to recommend, withdrawn, modified or changed in a manner adverse to Weyerhaeuser its approval or recommendation of this Agreement or the Arrangement or shall have recommended an Acquisition Proposal; or

(d) by Domtar:

    (i) if any of Weyerhaeuser or the Spinco Parties breaches or fails to perform in any respect of any of its representations, warranties or covenants contained in any Transaction Document, which breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 7.03(a) or 7.03(b), and (ii) cannot be or has not been cured within 30 days after the giving of written notice to Weyerhaeuser of such breach (provided that Domtar is not then in material breach of any representation, warranty or covenant in any Transaction Document); or

    (ii) in order to enter into a definitive written agreement with respect to a Superior Proposal, subject to compliance with Section 6.20 and the payment of any fee required to be paid pursuant to Section 6.21(a).

SECTION 8.02. <u>Effect of Termination.</u> In the event of termination of this Agreement by either Weyerhaeuser or Domtar as provided in Section 8.01, this Agreement shall forthwith become void and have no effect, without any liability or obligation on the part of Weyerhaeuser, the Spinco Parties and Domtar, other than Section 3.15, Section 4.15, the last sentence of Section 6.06, Section 6.11, Section 6.21, Section 6.22, this Section 8.02 and Article IX, which provisions shall survive such termination, provided, however, that, subject to Section 6.22, a termination of this Agreement shall not relieve any party hereto from any liability or damages resulting from the willful and material breach by such party of any of its representations, warranties, covenants or agreements set forth in this Agreement or any other Transaction Document.

SECTION 8.03. <u>Amendment.</u> This Agreement may be amended by the parties hereto at any time; <u>provided</u>, <u>however</u>, that after the Distribution, there shall be made no amendment that by law requires further approval by the stockholders of Spinco or Domtar without the further approval of such stockholders. This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto.

SECTION 8.04. <u>Extension; Waiver.</u> At any time prior to the Effective Time, the parties hereto may (a) extend the time for the performance of any of the obligations or other acts of the other parties, (b) waive any inaccuracies in the representations and warranties contained in this Agreement or in any document delivered pursuant to this Agreement, or (c) waive compliance with any of the agreements or conditions contained in this Agreement; <u>provided</u>, <u>however</u>, that no such extension or waiver by Domtar or Spinco shall require the approval of their respective stockholders. Any agreement on the part of a party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party. The failure of any party to this Agreement to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of such rights.

SECTION 8.05. <u>Procedure for Termination, Amendment, Extension or Waiver.</u> A termination of this Agreement pursuant to Section 8.01, an amendment of this Agreement pursuant to Section 8.03 or an extension or waiver pursuant to Section 8.04 shall, in order to be effective, require in the case of any of the parties hereto, action by its Board of

Directors or the duly authorized designee of its Board of Directors or, in the case of Newco, its "manager" within the meaning of the Delaware Limited Liability Company Act.

## ARTICLE IX

## GENERAL PROVISIONS

SECTION 9.01. <u>Nonsurvival of Representations and Warranties; Indemnity.</u> (a) Other than Sections 3.07 and 4.07, none of the representations and warranties in this Agreement or in any instrument delivered pursuant to this Agreement, or any claim with respect thereto, shall survive the Effective Time. This Section 9.01 shall not limit any covenant or agreement of the parties hereto which by its terms contemplates performance after the Effective Time.

(b) Following the Effective Time, Domtar and the Spinco Parties will jointly and severally indemnify, defend and hold harmless Weyerhaeuser and its affiliates and each of their respective officers, directors, employees, shareholders, agents and representatives from and against any and all claims, losses, damages (including, in the case of Third Party Claims, any exemplary or punitive damages whether based on contract, tort, strict liability, other law or otherwise), liabilities, obligations or expenses, including reasonable legal fees and expenses (collectively, "<u>Losses</u>"), to the extent arising or resulting from any of the following:

(i) any breach by Domtar of the representations or warranties made by Domtar in Section 3.07;

(ii) any violation of the Securities Act (or any regulations promulgated thereunder), the Exchange Act (or any regulations promulgated thereunder), any applicable Canadian Securities Legislation, any applicable corporate laws with respect to the Arrangement or the approval of the Transactions by the Domtar shareholders, except to the extent such violation results from a breach by Weyerhaeuser of any of its representations and warranties or covenants set forth in this Agreement or any of the other Transaction Documents;

(iii) any claim brought by third parties alleging that the consummation of the Transactions violated any agreement, arrangement, commitment or understanding (including any debt instrument) to which Domtar or any affiliate of Domtar is or was a party; and

(iv) any claim brought by shareholders or former shareholders of Domtar in their capacity as shareholder or former shareholder, except to the extent such claim results from a breach by Weyerhaeuser of any of its representations and warranties or covenants set forth in this Agreement or any of the other Transaction Documents.

(c) Following the Effective Time, Weyerhaeuser will indemnify, defend and hold harmless Domtar, the Domtar Subsidiaries and their affiliates and each of their respective

officers, directors, employees, shareholders, agents and representatives from and against any and all Losses, to the extent arising or resulting from any of the following:

(i) any breach by Weyerhaeuser of the representations or warranties made by Weyerhaeuser in Section 4.07;

(ii) any violation of the Securities Act (or any regulations promulgated thereunder), the Exchange Act (or any regulations promulgated thereunder) or any applicable corporate laws with respect to the Distribution, except to the extent such violation results from a breach by Domtar of any of its representations and warranties or covenants set forth in this Agreement or any of the other Transaction Documents;

(iii) any claim brought by third parties alleging that the consummation of the Transactions violated any agreement, arrangement, commitment or understanding (including any debt instrument) to which Weyerhaeuser or any affiliate of Weyerhaeuser is or was a party; and

(iv) any claim brought by shareholders or former shareholders of Weyerhaeuser in their capacity as shareholder or former shareholder, except to the extent such claim results from a breach by Domtar of any of its representations and warranties or covenants set forth in this Agreement or any of the other Transaction Documents.

(d) The indemnification procedures and other provisions set forth in Sections 4.06, 4.08 and 4.09 of the Contribution and Distribution Agreement shall apply *mutatis mutandis* to the indemnities set forth in Sections 9.01(b) and 9.01(c).

SECTION 9.02. Notices. All notices, requests, claims, demands, waivers and other communications under this Agreement shall be in writing and shall be deemed given (a) five Business Days following sending by registered or certified mail, postage prepaid, (b) when sent, if sent by facsimile, provided that the facsimile transmission is promptly confirmed by telephone, (c) when delivered, if delivered personally to the intended recipient, and (d) one Business Day following sending by overnight delivery via a courier service that is nationally recognized in the U.S. and Canada and, in each case, addressed to a party at the following address for such party:

(a) if to Weyerhaeuser, to

Weyerhaeuser Company
33663 Weyerhaeuser Way South
Federal Way, WA 98003
Attention: Sandy McDade
Facsimile: 1-253-924-2685

with a copy to:

Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Attention: Richard Hall
Facsimile: 1-212-474-3700

(b) if to Spinco, to

Weyerhaeuser Company
33663 Weyerhaeuser Way South
Federal Way, WA 98003
Attention: Sandy McDade
Facsimile: 1-253-924-2685

with a copy to:

Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Attention: Richard Hall
Facsimile: 1-212-474-3700

(c) if to Newco, to

Weyerhaeuser Company
33663 Weyerhaeuser Way South
Federal Way, WA 98003
Attention: Sandy McDade
Facsimile: 1-253-924-2685

with a copy to:

Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Attention: Richard Hall
Facsimile: 1-212-474-3700

(d) if to Newco Holding, to

Weyerhaeuser Company
33663 Weyerhaeuser Way South
Federal Way, WA 98003
Attention: Sandy McDade
Facsimile: 253-924-2685

with a copy to:

Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Attention: Richard Hall
Facsimile: 1-212-474-3700

(e)  if to Newco Canada, to

Weyerhaeuser Company
33663 Weyerhaeuser Way South
Federal Way, WA 98003
Attention: Sandy McDade
Facsimile: 1-253-924-2685

with a copy to:

Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Attention: Richard Hall
Facsimile: 1-212-474-3700

(f)  if to Old Newco Canada, to

Weyerhaeuser Company
33663 Weyerhaeuser Way South
Federal Way, WA 98003
Attention: Sandy McDade
Facsimile: 1-253-924-2685

with a copy to:

Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Attention: Richard Hall
Facsimile: 1-212-474-3700

(g)  if to Newco Canada Exchangeco, to

Weyerhaeuser Company
33663 Weyerhaeuser Way South
Federal Way, WA 98003

Attention: Sandy McDade
Facsimile: 1-253-924-2685

with a copy to:

Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Attention: Richard Hall
Facsimile: 1-212-474-3700

(h)  if to Domtar, to

Domtar Inc.
395 de Maisonneuve Blvd West
Montreal, QC
Canada H3A 1L6
Attention: Gilles Pharand
Facsimile: 1-514-848-6850

with a copy to:

Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
Attention: Alan H. Paley and Paul S. Bird
Facsimile: 1-212-909-6836

or to such other address(es) as shall be furnished in writing by any such party to the other party hereto in accordance with the provisions of this Section 9.02. Notices made to Domtar's tax counsel pursuant to Section 6.27 shall be made to Debevoise & Plimpton LLP, 919 Third Avenue, New York, New York 10022, facsimile: 1-212-909-6836, Attn: Gary Friedman, and all notice by telephone to such counsel shall be to Gary Friedman at 1-212-909-6261.

SECTION 9.03. _Definitions._ For purposes of this Agreement:

"_Acquisition Proposal_" means any _bona fide_ proposal by a third party with respect to any merger, amalgamation, arrangement, take-over bid, sale of assets (excluding inventory sold in the ordinary course of business) representing more than 25% of the book value (on a consolidated basis) of Domtar's total assets (or any lease, long-term supply agreement or other arrangement having the same economic effect as a sale), any sale of more than 25% of the Domtar Common Shares then outstanding or substantially similar transactions involving Domtar or any material Domtar Subsidiary, or a proposal to do so, excluding the Arrangement. For purposes of Section 6.21(a)(iii)(y) only, each reference in this definition to 25% shall be deemed to be 35%.

"Action" has the meaning given to such term in the Contribution and Distribution Agreement.

An "affiliate" of any person means another person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first person.

"Ancillary Agreements" has the meaning given to such term in the Contribution and Distribution Agreement.

"Arrangement" means the combination of Spinco and Domtar in accordance with the Plan of Arrangement.

"Arrangement Resolution" means the special resolution of the Domtar Shareholders and holders of Domtar Options, to be substantially in the form and content of Exhibit C annexed hereto.

"Articles of Arrangement" means the Articles of Arrangement of Domtar in respect of the Arrangement that are required by the CBCA to be sent to the Director after the Final Order is made.

"Business Day" means any day on which commercial banks are generally open for business in Seattle, Washington and Montreal, Quebec other than a Saturday, a Sunday or a day observed as a holiday in Seattle, Washington under the laws of the State of Washington or the federal laws of the United States of America or in Montreal, Quebec under the laws of the Province of Québec or the federal laws of Canada.

"Canadian Asset Sale" has the meaning given to such term in the Contribution and Distribution Agreement.

"Canadian GAAP" means generally accepted accounting principles in effect in Canada at the relevant time.

"Canadian Logging, Forest Management and Saw Mill Operations" means (i) the logging and forest management operations as conducted by Weyerhaeuser Canada and Weyerhaeuser Saskatchewan pursuant to the Forest Licenses, and (ii) the saw mill operations as conducted at Weyerhaeuser Canada's facilities in Ear Falls, Ontario and at Weyerhaeuser Saskatchewan's facilities in Big River, Saskatchewan and, as conducted by Wapawekka Lumber Ltd., Wapawekka, Saskatchewan.

"Canadian Purchase Agreement" has the meaning given to such term in the Contribution and Distribution Agreement.

"Canadian Securities Administrators" or "CSAs" means the securities commission or other body of each province or territory of Canada having the responsibility for the administration and enforcement of the Canadian Securities Legislation.

"Canadian Securities Legislation" means the *Securities Act* or similar legislation of each of the provinces and territories of Canada and the regulations thereunder, and the rules, policy statements, orders and similar instruments of any of the Canadian Securities Administrators in force at the relevant time.

"Class A Common Shares" means the Class A Common Shares in the share capital of Offerco having substantially the rights, privileges, restrictions and conditions set out in Appendix 1 to the Plan of Arrangement.

"Class B Common Shares" means the Class B Common Shares in the share capital of Offerco having substantially the rights, privileges, restrictions and conditions set out in Appendix 1 to the Plan of Arrangement.

"Code" means the U.S. Internal Revenue Code of 1986, as amended, and the Treasury regulations promulgated thereunder.

"Consents" has the meaning given to such term in the Contribution and Distribution Agreement.

"Contracts" has the meaning given to such term in the Contribution and Distribution Agreement.

"Contribution" has the meaning given to such term in the Contribution and Distribution Agreement.

"Contribution Date" has the meaning given to such term in the Contribution and Distribution Agreement.

"Court" means the Superior Court of Quebec.

"DDII" means Domtar Delaware Investments Inc., a Delaware corporation and wholly-owned subsidiary of Newco.

"DGCL" means the Delaware General Corporation Law.

"Director" means the Director appointed pursuant to Section 260 of the CBCA.

"Dissent Rights" means the rights of dissent in respect of the Arrangement described in Sections 3.1 and 3.2 of the Plan of Arrangement.

"Distribution" has the meaning given to such term in the Contribution and Distribution Agreement.

"Distribution Date" has the meaning given to such term in the Contribution and Distribution Agreement.

"dollars" or "$" means lawful money of the United States of America.

"Domtar Business" means the business, operations and affairs of Domtar and the Domtar Subsidiaries, taken as a whole.

"Domtar Capital Shares" means the Domtar Common Shares and the Domtar Preferred Shares.

"Domtar Circular" means the notice of the Domtar Meeting and accompanying management information circular, including all schedules and exhibits thereto, to be sent to holders of Domtar Common Shares, Domtar Preferred Shares and Domtar Options in connection with the Domtar Meeting.

"Domtar Credit Facility" means the Credit Agreement, dated as of March 3, 2005, as amended by the First Amendment, dated as of November 23, 2005, among Domtar Inc., as Borrower, the lenders from time to time parties thereto, the Bank of Nova Scotia and Toronto-Dominion Bank as Documentation Agents, National Bank of Canada and Royal Bank of Canada, as Syndication Agents and JPMorgan Chase Bank, N.A., Toronto Branch, as Administrative Agent.

"Domtar Indentures" means (i) the Indenture dated as of April 15, 1987 between Domtar and Montreal Trust Company, as Trustee, in respect of the issue of the 10% Debentures of Domtar due 2011, (ii) the Indenture dated as of August 5, 1987 between Domtar and Montreal Trust Company, as Trustee, in respect of the issue of the 10.85% Debentures of Domtar due 2017, (iii) the Indenture dated as of July 31, 1996 between Domtar and The Bank of New York, as Trustee, in respect of the issue of the 9.50% Debentures of Domtar due 2016, (iv) the Indenture dated as of October 16, 2001 between Domtar and The Chase Manhattan Bank as Trustee, in respect of the issue of the 7.875% Notes of Domtar due 2011, and (v) the Indenture dated November 18, 2003 between Domtar and JPMorgan Chase Bank, as Trustee, in respect of the issue of the 7.125% Notes due 2015 of Domtar and the 5.375% Notes of Domtar due 2013.

"Domtar Material Adverse Effect" means any state of facts, change, effect, condition, development, event or occurrence (any such item, an "Effect"), including any Effect regarding Norampac, that has been or would reasonably be likely to be material and adverse to (A) the business, assets, properties, condition (financial or otherwise), or results of operations of Domtar and the Domtar Subsidiaries, taken as a whole, or of the Domtar Business, other than an Effect relating to (i) the economy generally, (ii) the industries in which Domtar operates generally (including changes in prices for energy and raw materials), (iii) the financial, securities and currency markets generally and (iv) the entering into or the public announcement or disclosure of this Agreement or the Original Agreement or the consummation or proposed consummation of the Transactions or the pendency thereof (in each of clauses (i), (ii) and (iii) to the extent such Effect does not disproportionately affect Domtar or the Domtar Business), or to (B) the ability of Domtar to perform its obligations under the Transaction Documents or consummate the Transactions.

"Domtar Meeting" means the meeting of the holders of the Domtar Common Shares, the Domtar Preferred Shares and the Domtar Options convened to consider and, if thought fit, approve the Transactions.

"Domtar Option" means an option to purchase a Domtar Common Share granted pursuant to a Domtar Stock Plan.

"Domtar Preferred Shares" means the issued and outstanding Series A Preferred Shares and Series B Preferred Shares of Domtar.

"Domtar Shareholders" means the holders of the Domtar Common Shares and the Domtar Preferred Shares.

"Effect" has the meaning given to such term in the definition of "Domtar Material Adverse Effect" in this Section 9.03.

"Eligible Holders" has the meaning given to such term in the Contribution and Distribution Agreement.

"Environmental Claim" means any and all administrative, regulatory or judicial actions, suits, orders, demands, directives, claims, liens, investigations, proceedings or written notices of non-compliance or violation by or from any person alleging liability of whatever kind of nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from (y) the presence or Release of, or exposure to, any Hazardous Materials at any location or (z) the failure to comply with any Environmental Law.

"Environmental Laws" means all applicable federal, state, provincial, local and foreign Laws, Judgments, legally binding agreements and Environmental Permits issued, promulgated or entered into by or with any Governmental Entity, relating to pollution, natural resources, protection or restoration of the environment (including ambient air, surface water, groundwater, land surface or subsurface strata), endangered or threatened species or human health.

"Exchangeable Shares" means the non-voting exchangeable shares in the capital of Newco Canada Exchangeco, having substantially the rights, privileges, restrictions and conditions set out in Appendix 1 to the Plan of Arrangement.

"Exchangeco Subsidiary" means Domtar Pulp and Paper Products Inc., a corporation governed by the CBCA and a wholly-owned subsidiary of Newco Canada Exchangeco.

"Excluded Assets" has the meaning given to such term in the Contribution and Distribution Agreement.

"Excluded Benefit Plan" has the meaning given to such term in the Contribution and Distribution Agreement.

"Excluded IRB Indebtedness" has the meaning given to such term in the Contribution and Distribution Agreement.

"Fiber Supply Agreements" means the agreements between Newco or one of its subsidiaries, on the one hand, and Weyerhaeuser or one of its subsidiaries, on the other hand, relating to the supply of the goods and services set forth in Section 9.03 of the Weyerhaeuser Disclosure Letter under the heading "Fiber Supply Agreements" under the terms and subject to the conditions set forth therein.

"Final Order" means the order of the Court approving the Arrangement, as such order may be amended at any time prior to the Effective Date or, if appealed, then unless such appeal is withdrawn or denied, as affirmed.

"Forest Licenses" has the meaning given to such term in the Contribution and Distribution Agreement.

"Hazardous Materials" means (i) any petroleum or petroleum products, radioactive materials or wastes, asbestos in any form, urea formaldehyde foam insulation and polychlorinated biphenyls and (ii) any other chemical, material, substance or waste that in relevant form or concentration is prohibited, limited or regulated under any Environmental Law.

"Intellectual Property License Agreement" means the intellectual property license agreement substantially in the form attached as Exhibit B to the Contribution and Distribution Agreement.

"Interim Order" means the interim order of the Court, as the same may be amended, containing declaration and directions regarding the notice to be given in respect of and the conduct of the Domtar Meeting with respect to the Transactions.

"Investment Canada Act" means the *Investment Canada Act* (Canada), R.S.C. 1985, c. 28, 1st Supplement, and the regulations thereunder, as amended from time to time.

"ITA" means the *Income Tax Act* (Canada), R.S.C. 1985, 5th Supplement, and the regulations thereunder, as amended from time to time.

"knowledge of Domtar" means the actual knowledge of the persons set forth on Exhibit J.

"knowledge of Weyerhaeuser" means the actual knowledge of the persons set forth on Exhibit I.

"Material Adverse Effect" on a party means any Effect that has been or would reasonably be likely to be material and adverse to (A) the business, assets, properties, condition (financial or otherwise), or results of operations of such party and its subsidiaries, taken as a whole, other than an Effect relating to (i) the economy generally, (ii) the industries in which such party operates generally (including changes in prices for energy and raw materials), (iii) the financial, securities and currency markets generally and (iv) the entering into or the public announcement or disclosure of this Agreement or the Original Agreement or the consummation or proposed consummation of the Transactions or the pendency thereof (in each of clauses (i), (ii) and (iii) to the extent such Effect does not disproportionally affect the party or any of its

subsidiaries), or to (B) the ability of such party to perform its obligations under the Transaction Documents or consummate the Transactions.

"Measurement Date" has the meaning given to such term in the Contribution and Distribution Agreement.

"Mill Employees" has the meaning given to such term in the Contribution and Distribution Agreement.

"New Spinco Parties" means the Spinco Parties, Newco Canada, DDII, Offerco and Exchangeco Subsidiary.

"Newco Assets" has the meaning given to such term in the Contribution and Distribution Agreement.

"Newco Business" has the meaning given to such term in the Contribution and Distribution Agreement.

"Newco Canada Exchangeco Assets" has the meaning given to such term in the Contribution and Distribution Agreement.

"Newco Canada Exchangeco Liabilities" has the meaning given to such term in the Contribution and Distribution Agreement.

"Newco Liabilities" has the meaning given to such term in the Contribution and Distribution Agreement.

"Newco Material Adverse Effect" means any Effect that has been or would reasonably be likely to be material and adverse to (A) the business, assets, properties, condition (financial or otherwise), or results of operations of Newco and the Newco Subsidiaries, taken as a whole, or of the Newco Business, other than an Effect relating to (i) the economy generally, (ii) the industries in which Newco or the Newco Business operate generally (including changes in prices for energy and raw materials), (iii) the financial, securities and currency markets generally and (iv) the entering into or the public announcement or disclosure of this Agreement or the Original Agreement or the consummation or proposed consummation of the Transactions or the pendency thereof (in each of clauses (i), (ii) and (iii) to the extent such Effect does not disproportionally affect Newco or the Newco Business), or to (B) the ability of Weyerhaeuser and Newco to perform their obligations under the Transaction Documents or consummate the Transactions.

"Offerco" means 4388216 Canada Inc., a corporation governed by the CBCA and a wholly-owned subsidiary of Newco Canada Exchangeco.

"person" means any individual, a general or limited partnership, a corporation, a trust, a joint venture, an unincorporated organization, a limited liability entity, any other entity and any Governmental Entity.

||2672858||

"Plan of Arrangement" means the plan of arrangement substantially in the form and content of Exhibit D annexed hereto and any amendments or variations thereto made in accordance with Section 8.03 or the provisions of the Plan of Arrangement or made at the direction of the Court in the Final Order.

"Release" means any actual or threatened release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment (including ambient air, surface water, groundwater, land surface or subsurface strata) or within any building, structure, facility or fixture.

"Retained Licensed Intellectual Property" has the meaning given to such term in the Intellectual Property License Agreement.

"Site Services Agreements" means the agreements between Weyerhaeuser and Newco pursuant to which Weyerhaeuser and Newco shall agree to provide the goods and services set forth in Section 9.03 of the Weyerhaeuser Disclosure Letter under the heading "Site Services Agreements" under the terms and subject to the conditions set forth therein.

"Special Voting Stock" means the special voting stock, par value $0.01 per share, having substantially the rights, privileges, restrictions and conditions described in the form of Certificate of Incorporation of Spinco attached as Exhibit A.

"subsidiary" of any person means any corporation or other organization whether incorporated or unincorporated of which at least a majority of the securities or interests having by the terms thereof ordinary voting power to elect at least a majority of the board of directors or others performing similar functions with respect to such corporation or other organization is directly or indirectly owned or controlled (i) by such person, (ii) by any one or more of its subsidiaries, or (iii) by such person and one or more of its subsidiaries; provided, however, that no person that is not directly or indirectly wholly-owned by any other person shall be a subsidiary of such other person unless such other person controls, or has the right, power or ability to control, that person.

"Superior Proposal" means any *bona fide* proposal by a third party to acquire, directly or indirectly, assets representing more than 50% of the book value (on a consolidated basis) of Domtar's total assets or more than 50% of the outstanding Domtar Common Shares, whether by way of merger, amalgamation, arrangement, take-over bid, sale of assets or otherwise, and that in the good faith determination of the Board of Directors of Domtar after consultation with financial advisors and outside counsel (a) is reasonably capable of being completed, taking into account all legal, financial, regulatory and other aspects of such proposal and the party making such proposal, and (b) would, if consummated in accordance with its terms, result in a transaction more favorable to the Domtar Shareholders, from a financial point of view, than the transactions contemplated by this Agreement.

"Support Agreement" means an agreement to be made between Spinco, Newco, Newco Holding, Newco Canada and Newco Canada Exchangeco substantially in the form and content of Exhibit F annexed hereto, with such changes thereto as the parties hereto, acting reasonably, may agree.

"Taxes" or "Tax" has the meaning given to such term in the Tax Sharing Agreement.

"Tax Return" has the meaning given to such term in the Tax Sharing Agreement.

"Tax Sharing Agreement" means the tax sharing agreement by and among Weyerhaeuser, Spinco and Domtar substantially in the form attached as Exhibit H.

"Third Party Claim" has the meaning given to such term in the Contribution and Distribution Agreement.

"Transaction Documents" means this Agreement, the Contribution and Distribution Agreement (including the Ancillary Agreements), the New Debt Commitment Letter, the Plan of Arrangement, the Support Agreement, the Voting and Exchange Trust Agreement and the Confidentiality Agreement.

"Transfer Taxes" has the meaning given to such term in the Tax Sharing Agreement.

"Transition Services Agreement" means the agreement substantially in form attached as Exhibit E.

"Trustee" means the trustee to be chosen by Weyerhaeuser and Domtar, acting reasonably, to act as trustee under the Voting and Exchange Trust Agreement, being a corporation organized and existing under the laws of Canada and authorized to carry on the business of a trust company in all the provinces of Canada, and any successor trustee appointed under the Voting and Exchange Trust Agreement.

"U.S. GAAP" means generally accepted accounting principles in effect in the United States at the relevant time.

"Voting and Exchange Trust Agreement" means an agreement to be made between Spinco, Newco Canada, Newco Canada Exchangeco and the Trustee in connection with the Plan of Arrangement substantially in the form and content of Exhibit G annexed hereto, with such changes thereto as the parties hereto, acting reasonably, may agree.

"Wapawekka Lumber" has the meaning given to such term in the Contribution and Distribution Agreement.

"Wapawekka Lumber Partnership" has the meaning given to such term in the Contribution and Distribution Agreement.

"Weyerhaeuser Business" has the meaning given to such term in the Contribution and Distribution Agreement.

"Weyerhaeuser Canada" has the meaning given to such term in the Contribution and Distribution Agreement.

"Weyerhaeuser Canada Circular" means, if applicable, the notice of a meeting of holders of Weyerhaeuser Canada Exchangeable Shares and accompanying management information circular, including all schedules and exhibits thereto, to be sent to holders of Weyerhaeuser Canada Exchangeable Shares.

"Weyerhaeuser Canada Exchangeable Shares" has the meaning given to such term in the Contribution and Distribution Agreement.

"Weyerhaeuser Common Stock" has the meaning given to such term in the Contribution and Distribution Agreement.

"Weyerhaeuser Group" has the meaning given to such term in the Contribution and Distribution Agreement.

"Weyerhaeuser Saskatchewan" has the meaning given to such term in the Contribution and Distribution Agreement.

SECTION 9.04. Interpretation; Disclosure Letters. When a reference is made in this Agreement to a Section, such reference shall be to a Section of this Agreement unless otherwise indicated. The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation". Any matter disclosed in any section of the Domtar Disclosure Letter or the Weyerhaeuser Disclosure Letter shall qualify the correspondingly numbered representation and warranty or covenant and any other representation and warranty or covenant of Domtar or, as applicable, Weyerhaeuser and the Spinco Parties to the extent that the relevance of any such disclosure to such other representation and warranty or covenant is reasonably apparent from the text of such disclosure.

SECTION 9.05. Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule or Law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible to the end that the Transactions are fulfilled to the extent possible.

SECTION 9.06. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered to the other parties.

SECTION 9.07. Entire Agreement; No Third-Party Beneficiaries. The Transaction Documents, taken together with the Domtar Disclosure Letter and the Weyerhaeuser Disclosure Letter, constitute the entire agreement, and supersede all prior agreements and understandings, both written and oral, among the parties hereto with respect to the Transactions and are not intended to confer upon any person other than the parties hereto any rights or

remedies. Notwithstanding the immediately preceding sentence, following the Effective Time the provisions of Article II shall be enforceable by any person entitled to shares of Spinco Common Stock pursuant to Article II of this Agreement and the provisions of Section 6.10 shall be enforceable by the specified beneficiaries thereof.

SECTION 9.08. Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof, except to the extent the laws of Canada and of the Province of Québec are applicable to the Arrangement.

SECTION 9.09. Assignment. Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned, in whole or in part, by operation of law or otherwise by any of the parties hereto without the prior written consent of the other parties. Any purported assignment without such consent shall be void. Subject to the preceding sentences, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their respective successors and assigns.

SECTION 9.10. Enforcement. The parties hereto agree that irreparable damage would occur in the event that any of the provisions of any Transaction Document were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties hereto shall be entitled to an injunction or injunctions to prevent breaches of any Transaction Document and to enforce specifically the terms and provisions of each Transaction Document in any Federal court, located in the State of Delaware or, if such federal courts do not have subject matter jurisdiction in any Delaware state court, this being in addition to any other remedy to which they are entitled at law or in equity. In addition, each of the parties hereto (a) consents to submit itself to the personal jurisdiction of any Federal court located in the State of Delaware or if such federal courts do not have subject matter jurisdiction in any Delaware state court in the event any dispute arises out of any Transaction Document or any Transaction, (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, (c) agrees that it will not bring any action relating to any Transaction Document or any Transaction in any court other than any Federal court sitting in the State of Delaware or any Delaware state court and (d) waives any right to trial by jury with respect to any action related to or arising out of any Transaction Document or any Transaction.

SECTION 9.11. Certain Matters. In the event that for any reason Domtar does not obtain the listing and posting for trading of the Class B Common Shares on the TSX, Domtar and Weyerhaeuser shall agree to such amendments to this Agreement and the other Transaction Documents as shall be reasonably necessary to eliminate the Class B Common Shares from the structure for the Transactions set forth herein, including the deletion of the reference to the Class B Common Shares in Section 7.01(e).

IN WITNESS WHEREOF, each of Weyerhaeuser, Spinco, Newco, Newco Holding, Newco Canada, Old Newco Canada, Newco Canada Exchangeco and Domtar have duly executed this Agreement, all as of the date first written above.

WEYERHAEUSER COMPANY,

by _____

Name:   Richard J. Taggart
Title:    Executive Vice President

DOMTAR CORPORATION,

by _____

Name:   Jeffrey W. Nitta
Title:    Vice President

DOMTAR PAPER COMPANY, LLC,

by Weyerhaeuser Company,
    as its sole member
by _____

Name:   Jeffrey W. Nitta
Title:    Vice President

DOMTAR DELAWARE HOLDINGS INC.,

by _____

Name:   Jeffrey W. Nitta
Title:    Vice President

DOMTAR PACIFIC PAPERS INC.,

by _____

Name:   Jeffrey W. Nitta
Title:    Vice President

[[2672858]]

DOMTAR PACIFIC PAPERS ULC,

by _____

Name:  Jeffrey W. Nitta
Title:  Vice President


DOMTAR (CANADA) PAPER INC.,

by _____

Name:  Jeffrey W. Nitta
Title:  Vice President


DOMTAR INC.,

by _____

Name:
Title:

DOMTAR PACIFIC PAPERS ULC,

by

_____

Name:
Title:

DOMTAR (CANADA) PAPER INC.,

by

_____

Name:
Title:

DOMTAR INC.,

by _____

Name:
Title:

### Glossary of Defined Terms

| Term | Location |
|---|---|
| 2005 Newco Balance Sheet | Section 4.06(b) |
| 2005 Unaudited Newco Financial Statements | Section 4.06(b) |
| Acquisition Proposal | Section 9.03 |
| Action | Section 9.03 |
| affiliate | Section 9.03 |
| Agreement | Preamble |
| Amended Replacement Option | Section 1.04(j)(i) |
| Ancillary Agreements | Section 9.03 |
| Ancillary Rights | Section 1.04(b) |
| Arrangement | Section 9.03 |
| Arrangement Consideration | Section 2.01 |
| Arrangement Resolution | Section 9.03 |
| Articles of Arrangement | Section 9.03 |
| Assumed Canadian Plans | Section 6.09(g)(i) |
| Audited Domtar Financial Statements | Section 3.06(b)(i) |
| Audited Newco Balance Sheets | Section 6.24(a) |
| Audited Newco Financial Statements | Section 6.24(a) |
| Average Spinco Distribution Price | Section 6.08(a) |
| Average Weyerhaeuser Pre-Distribution Price | Section 6.08(a) |
| Break Fee | Section 6.21(a)(iii) |
| Business Day | Section 9.03 |
| Canadian GAAP | Section 9.03 |
| Canadian Logging, Forest Management and Saw Mill Operations | Section 9.03 |
| Canadian Asset Sale | Section 9.03 |
| Canadian Purchase Agreement | Section 9.03 |
| Canadian Securities Administrators | Section 9.03 |
| Canadian Securities Legislation | Section 9.03 |
| CBA | Section 6.09(j) |
| CBCA | Recitals |
| Certificate of Arrangement | Section 1.07 |
| Class A Common Shares | Section 9.03 |
| Class B Common Shares | Section 9.03 |
| Closing | Section 1.06 |
| Closing Date | Section 1.06 |
| COBRA | Section 6.09(e)(ii) |
| Code | Section 9.03 |
| Competition Act | Section 3.05(b) |
| Confidentiality Agreement | Section 6.06 |
| Consents | Section 9.03 |
| Contracts | Section 9.03 |

| Term | Location |
|------|----------|
| Contribution | Section 9.03 |
| Contribution and Distribution Agreement | Recitals |
| Contribution Date | Section 9.03 |
| Controlled Group Liability | Section 3.11(e) |
| Court | Section 9.03 |
| CSAs | Section 3.05(b) |
| DGCL | Section 9.03 |
| DDII | Section 9.03 |
| Director | Section 9.03 |
| Disabled Newco Employees | Section 6.09(a)(ii) |
| Dissent Rights | Section 9.03 |
| Distribution | Section 9.03 |
| Distribution Date | Section 9.03 |
| DOJ | Section 6.07(d) |
| Domtar | Preamble |
| Domtar Benefit Agreements | Section 3.11(a) |
| Domtar Benefit Plans | Section 3.10 |
| Domtar Business | Section 9.03 |
| Domtar Canadian MEPP | Section 3.11(a) |
| Domtar Canadian Pension Plans | Section 3.11(a) |
| Domtar Canadian Welfare Plans | Section 3.11(a) |
| Domtar Capital Shares | Section 9.03 |
| Domtar Circular | Section 9.03 |
| Domtar Common Share | Recitals |
| Domtar Credit Facility | Section 9.03 |
| Domtar Disclosure Letter | Article III |
| Domtar DSU | Section 1.04(j)(ii) |
| Domtar Employee | Section 3.10 |
| Domtar ESPPs | Section 6.25(a) |
| Domtar Financial Statements | Section 3.06(b)(ii) |
| Domtar Indentures | Section 9.03 |
| Domtar Intellectual Property Rights | Section 3.18(a) |
| Domtar Leased Real Property | Section 3.22(b) |
| Domtar Material Adverse Effect | Section 9.03 |
| Domtar Material Agreements | Section 3.20 |
| Domtar Meeting | Section 9.03 |
| Domtar Multiemployer Pension Plan | Section 3.11(c) |
| Domtar Option | Section 9.03 |
| Domtar Option Exchange | Section 1.04(j)(i) |
| Domtar Owned Real Property | Section 3.22(a) |
| Domtar Permitted Liens | Section 3.17 |
| Domtar Preferred Shares | Section 9.03 |
| Domtar PSU | Section 1.04(j)(iii) |

| Term | Location |
|------|----------|
| Domtar Restricted Shares | Section 1.04(h) |
| Domtar Right | Section 1.04(j)(i) |
| Domtar Shareholder Approval | Section 1.03(b) |
| Domtar Shareholders | Section 9.03 |
| Domtar Stock Plans | Section 3.03 |
| Domtar Subsidiary | Section 3.01 |
| Domtar U.S. Pension Plans | Section 3.11(a) |
| Domtar U.S. Welfare Plans | Section 3.11(a) |
| Effect | Section 9.03 |
| Effective Time | Section 1.07 |
| Eligible Holders | Section 9.03 |
| Environmental Claim | Section 9.03 |
| Environmental Laws | Section 9.03 |
| Environmental Permits | Section 3.16(a)(iii) |
| Equity Awards | Section 4.05(b) |
| ERISA | Section 3.11(a) |
| Exchange Act | Section 3.06(a) |
| Exchangeable Elected Share | Section 1.04(b) |
| Exchangeable Share Issuance | Section 1.05 |
| Exchangeable Shares | Section 9.03 |
| Exchangeco Subsidiary | Section 9.03 |
| Exchange Offer Schedule | Section 4.05(b) |
| Excluded Benefit Plan | Section 9.03 |
| Excluded IRB Indebtedness | Section 9.03 |
| Fiber Supply Agreements | Section 9.03 |
| Final Order | Section 9.03 |
| Forest Licenses | Section 9.03 |
| Form 10 | Section 4.05(b) |
| Form S-4 | Section 4.05(b) |
| Form S-8 | Section 6.03(c) |
| FTC | Section 6.07(d) |
| Governmental Approval | Section 3.05(b) |
| Governmental Entity | Section 3.05(b) |
| Hazardous Materials | Section 9.03 |
| HIPAA | Section 6.09(e)(ii) |
| HSR Act | Section 3.05(b) |
| Intellectual Property Rights | Section 3.18(a) |
| Intellectual Property License Agreement | Section 9.03 |
| Intended Tax Treatment | Section 6.16 |
| Interim Domtar Balance Sheet | Section 3.06(b)(ii) |
| Interim Domtar Financial Statements | Section 3.06(b)(ii) |
| Interim Newco Balance Sheet | Section 4.06(b) |
| Interim Newco Financial Statements | Section 4.06(b) |

[[2672858]]

4

| Term | Location |
|------|----------|
| Interim Order | Section 9.03 |
| Intellectual Property License Agreement | Section 9.03 |
| Investment Canada Act | Section 9.03 |
| IRS | Section 3.09(l) |
| IRS Ruling | Section 6.27(a) |
| IRS Submission | Section 6.27(c) |
| ITA | Section 9.03 |
| Judgment | Section 3.05(a) |
| knowledge of Domtar | Section 9.03 |
| knowledge of Weyerhaeuser | Section 9.03 |
| Law | Section 3.05(a) |
| Liens | Section 3.02(a) |
| Losses | Section 9.01(b) |
| Material Adverse Effect | Section 9.03 |
| Measurement Date | Section 9.03 |
| Mill Employees | Section 9.03 |
| New 401(k) Plan | Section 6.09(f)(i) |
| New Benefit Plans | Section 6.09(c) |
| Newco | Preamble |
| Newco 401(k) Plan | Section 6.09(f)(i) |
| Newco Assets | Section 9.03 |
| Newco Benefit Agreements | Section 4.11(a) |
| Newco Benefit Plans | Section 4.10 |
| New Spinco Parties | Section 9.03 |
| Newco Business | Section 9.03 |
| Newco Canada | Preamble |
| Newco Canada Exchangeco | Preamble |
| Newco Canada Exchangeco Assets | Section 9.03 |
| Newco Canada Exchangeco Liabilities | Section 9.03 |
| Newco Canadian MEPP | Section 4.11(a) |
| Newco Canadian Pension Plans | Section 4.11(a) |
| Newco Canadian Welfare Plans | Section 4.11(a) |
| Newco Employee | Section 4.10 |
| Newco Equity Interests | Recitals |
| Newco Financial Statements | Section 4.06(b) |
| Newco Holding | Preamble |
| Newco Leased Real Property | Section 4.23(b) |
| Newco Liabilities | Section 9.03 |
| Newco Material Adverse Effect | Section 9.03 |
| Newco Material Agreements | Section 4.20 |
| Newco Owned Real Property | Section 4.23(a) |
| Newco Parties | Recitals |
| Newco Permitted Liens | Section 4.17 |

5

| Term | Location |
|------|----------|
| Newco Subsidiary | Section 4.03(b) |
| Newco U.S. Pension Plans | Section 4.11(a) |
| Newco U.S. Welfare Plans | Section 4.11(a) |
| New Debt Commitment Letter | Recitals |
| New Welfare Plans | Section 6.09(e)(i) |
| NI 52-109 | Section 3.06(e) |
| Norampac | Section 3.02(b) |
| NYSE | Section 4.05(b) |
| Offerco | Section 9.03 |
| Old Newco Canada | Recitals |
| Opinion Materials | Section 6.26 |
| Option Exchange Ratio | Section 6.08(a) |
| Original Agreement | Recitals |
| Outside Date | Section 8.01(b)(i) |
| PBGC | Section 3.11(e) |
| Permitted Liens | Section 4.17 |
| person | Section 9.03 |
| Plan of Arrangement | Section 9.03 |
| Primary Domtar Executives | Section 3.11(f) |
| Registered Intellectual Property | Section 3.18(a) |
| Release | Section 9.03 |
| Replacement DSU | Section 1.04(j)(ii) |
| Replacement Option | Section 1.04(j)(i) |
| Replacement PSU | Section 1.04(j)(iii) |
| Replacement Restricted Shares | Section 1.04(h) |
| Replacement Right | Section 1.04(j)(i) |
| Representations | Section 6.27(b) |
| Retained Licensed Intellectual Property | Section 9.03 |
| Review Laws | Section 6.07(c) |
| Rollover Employee | Section 6.08(a)(i) |
| Sarbanes-Oxley Act | Section 6.31 |
| SEC | Section 3.06(a) |
| Securities Act | Section 3.06(a) |
| Site Separation Costs | Section 6.11(b) |
| Site Services Agreements | Section 9.03 |
| Special Voting Stock | Section 9.03 |
| Spinco | Preamble |
| Spinco Common Stock | Recitals |
| Spinco Elected Share | Section 1.04(b) |
| Spinco Parties | Recitals |
| Spinco Registration Statement | Section 6.03(b) |
| Spinco Share Issuance | Section 1.05 |
| Spinco Stockholder Approval | Section 4.04(c) |

| Term | Location |
|---|---|
| Spinco Stock Plans | Section 6.08(b) |
| subsidiary | Section 9.03 |
| Substituted Spinco Option | Section 6.08(a)(ii) |
| Substituted Spinco RSU | Section 6.08(a)(v) |
| Substituted Spinco SAR | Section 6.08(a)(iv) |
| Superior Proposal | Section 9.03 |
| Support Agreement | Section 9.03 |
| Taxes | Section 9.03 |
| Tax Return | Section 9.03 |
| Tax Sharing Agreement | Section 9.03 |
| Third Party Claim | Section 9.03 |
| Transaction Debt | Section 7.01(j) |
| Transaction Documents | Section 9.03 |
| Transactions | Section 1.05 |
| Transferred Employee | Section 6.09(a)(i) |
| Transfer Taxes | Section 9.03 |
| Transition Services Agreement | Section 9.03 |
| Transition Year | Section 6.09(k) |
| Trustee | Section 9.03 |
| TSX | Section 1.04(a) |
| Unaudited Newco Financial Statements | Section 4.06(b) |
| U.S. Flexible Spending Account Plans | Section 6.09(k) |
| U.S. GAAP | Section 9.03 |
| U.S. MEPP | Section 6.09(m) |
| U.S. WC Newco Employees | Section 6.09(a)(iii) |
| Voting and Exchange Trust Agreement | Section 9.03 |
| Voting Domtar Debt | Section 3.03 |
| Voting Newco Debt | Section 4.03(b) |
| Voting Spinco Debt | Section 4.03(a) |
| Wapawekka Lumber | Section 9.03 |
| Wapawekka Lumber Partnership | Section 9.03 |
| Weyerhaeuser | Preamble |
| Weyerhaeuser Business | Section 9.03 |
| Weyerhaeuser Canada | Section 9.03 |
| Weyerhaeuser Canada Circular | Section 9.03 |
| Weyerhaeuser Canada Exchangeable Shares | Section 9.03 |
| Weyerhaeuser Common Stock | Section 9.03 |
| Weyerhaeuser Disclosure Letter | Article IV |
| Weyerhaeuser Equity Award | Section 6.08(a)(i) |
| Weyerhaeuser Group | Section 9.03 |
| Weyerhaeuser Intellectual Property Rights | Section 4.18(a) |
| Weyerhaeuser Option | Section 6.08(a)(ii) |
| Weyerhaeuser Parties | Section 1.01 |

| Term | Location |
|------|----------|
| Weyerhaeuser RSU | Section 6.08(a)(v) |
| Weyerhaeuser SAR | Section 6.08(a)(iv) |
| Weyerhaeuser Saskatchewan | Section 9.03 |
| Weyerhaeuser Stock Plans | Section 6.08(e) |
| Weyerhaeuser Subsidiary | Section 4.02(a) |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WEYERHAEUSER COMPANY, a
Washington corporation,

        Plaintiff,

        v.

DOMTAR CORPORATION, a Delaware
corporation, and DOMTAR PAPER
COMPANY, LLC, a Delaware limited
liability company,

        Defendants.

C.A. No. 14-24-SLR

## DECLARATION OF ANNE GIARDINI IN SUPPORT OF
## PLAINTIFF WEYERHAEUSER COMPANY'S
## MOTION FOR SUMMARY JUDGMENT

I, Anne Giardini, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.    I was General Counsel and later President of Weyerhaeuser Company Limited. When I worked at Weyerhaeuser Company Limited, it was a wholly owned Canadian subsidiary of Weyerhaeuser Company. I retired from Weyerhaeuser in October 2014. I have personal knowledge of the matters set forth in this declaration and am competent to testify in this matter.

2.    By at least June 2008, I was leading the negotiations, on behalf of all Weyerhaeuser entities, with Domtar on many disputes, including workers compensation, arising from Domtar's purchase of Weyerhaeuser's Fine Paper business (the "Sale").

3.    Attached as Ex. A is a true and correct copy of an email I sent on November 7, 2008 to several recipients, including Ladan Nassiry, a Canadian attorney for Domtar. In that email, marked as deposition exhibit 168, I asked why a letter sent by Domtar was marked

"Without Prejudice."  I asked Domtar to remove the "Without Prejudice" designation because I wanted Weyerhaeuser to be able to rely on the statements in the letter from Domtar. Weyerhaeuser could not rely on statements in a letter marked "Without Prejudice."  I am licensed to practice law in Canada, have nearly 30 years of experience practicing law in Canada, and have been appointed Queen's Counsel.  In my experience, and according to my training, statements in documents marked "Without Prejudice" and exchanged in the course of settlement negotiations cannot be relied on by the recipient unless memorialized in a binding, with prejudice form.

4.      Documents are marked "Without Prejudice" by parties to claim the benefit of this "Without Prejudice" rule.  That is the express purpose for which I used the designation "Without Prejudice" in my dealings on Weyerhaeuser's behalf.  To my knowledge, any post-Sale agreements Weyerhaeuser reached with Domtar were memorialized in formal contracts negotiated and signed by all parties and expressly made to be binding on them.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 25th day of September, 2015, at Vancouver, British Columbia, Canada.

ANNE GIARDINI

# EXHIBIT A

**Smucker, Conrad**

EXHIBIT

168

JUNE 10/15

PENGAD 800-631-6989

| | |
|---|---|
| From: | Giardini, Anne |
| Sent: | Friday, November 07, 2008 7:45 AM |
| To: | Renaud, Louise (Domtar); Nassiry, Ladan (Domtar) |
| Cc: | Patterson, Bob; Stad, Deanna |
| Subject: | RE: WSIB - Daniel Tattrie |

Thank you for this letter. I am not sure however why it is marked Without Prejudice. We do need to rely on it and it does not contain any concessions on the part of Domtar. Can you please provide a version that we are able to rely on?

Best wishes,


*Anne Giardini*


This e-mail is confidential and may be subject to solicitor/client privilege. If the reader is not the intended recipient or his or her agent, no dissemination, distribution, or copying of any part of this e-mail is permitted. If you have received this e-mail in error, please notify me immediately and destroy any copies. Many thanks.

Anne Giardini
Weyerhaeuser Company Limited
925 West Georgia Street
Vancouver BC V6C 3L2
Telephone: 604 661 8086
Facsimile: 604 687 2314
Cell: 604 341-3484
e-mail anne.giardini@weyerhaeuser.com

---

**From:** Renaud, Louise [mailto:Louise.Renaud@domtar.com]
**Sent:** Friday, November 07, 2008 6:50 AM
**To:** Giardini, Anne
**Cc:** Patterson, Bob; Nassiry, Ladan (Domtar)
**Subject:** WSIB - Daniel Tattrie

Please see attached letter.

Regards,

Louise Renaud for:
Ladan Nassiry

*Louise Renaud*
Affaires juridiques / Legal Services
Domtar Inc.
Tél: 514-848-5555, poste 85327
Fax: 514-848-6850
Courriel: louise.renaud@domtar.com

1

WEY00030636

"Avis de confidentialité: Ce message est à l'usage exclusif du destinataire ci-dessus, est confidentiel et peut être protégé par le secret professionnel. Si vous n'êtes pas un destinataire désigné, toute diffusion du message est interdite. Si vous avez reçu ce message par erreur, veuillez aviser l'expéditeur immédiatement et détruire ce message et toute copie de celui-ci. Merci. "

Confidentiality Notice : This message is intended for the sole use of the addressee. It may contain information that is privileged and confidential or protected under solicitor-client privilege. If you are not the intended recipient, any dissemination of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately and delete this message and destroy all copies. Thank you."

WEY00030637